Law Clerk's Copy



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,                          :
                                         :
          Plaintiff                      :
                                         :
     v.                                  :        No. 1:00-CV-00577
                                         :        (Judge Kane)
W. CONWAY BUSHEY, et al.,                :
                                         :
          Defendants                     :

FILED
HARRISBURG, PA

JUL 2 7 2000

MARY E. D'ANDREA, CLERK
PER_____
          DEPUTY CLERK

**DEFENDANTS' BRIEF IN RESPONSE
TO PLAINTIFF'S MOTION TO CEASE
RETALIATION AGAINST PLAINTIFF**

## STATEMENT OF RELEVANT FACTS

This is a civil rights action brought pursuant to 42 U.S.C. §1983 alleging violations of various amendments to the United States Constitution. Plaintiff, Charles Iseley is a pro se prisoner currently incarcerated at the State Correctional Institution at Coal Township, Pennsylvania ("SCI-Coal"). Defendants are numerous employees or former employees of the Pennsylvania Department of Corrections, ("DOC"), or employees of the Pennsylvania Board of Probation and Parole, ("Board").

On June 28, 2000, plaintiff filed a Motion to Cease Retaliation Against Plaintiff and a supporting brief. Plaintiff appears to argue that defendants are retaliating against him because they are "unable to identify and refuse to investigate anything in retaliation for exercising his constitutional rights." Specifically, plaintiff states that defendants are withholding the identities of defendant Moe and Doe in order to "deliberately sabotage" his case. In addition, plaintiff alleges

he was denied parole in retaliation for filing prior lawsuits and prison grievances.   This brief is filed in response to plaintiff's motion.

## QUESTIONS PRESENTED

**DID THE DEFENDANTS RETALIATE AGAINST PLAINTIFF ?**

**A.      WHETHER DEFENDANTS FAILURE TO IDENTIFY DEFENDANTS "MOE" AND "DOE" ESTABLISHES A CLAIM OF RETALIATION ?**

**B.      WHETHER PLAINTIFF HAS ESTABLISHED THAT HE WAS DENIED PAROLE IN RETALIATION FOR FILING LITIGATION/GRIEVANCES ?**

## ARGUMENT

**THE DEFENDANTS ACTIONS WERE NOT RETALIATORY TO THE PLAINTIFF**

### I. The Standard for Retaliation

A party claiming unconstitutional retaliation must allege that the constitutionally protected conduct was a substantial or motivating factor influencing the alleged retaliation and said retaliation would not have occurred but for the protected conduct.   Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1997).   Following the Court's decision in Mt. Healthy, supra, the Third Circuit recognized that "in order to prevail on a retaliation claim, a plaintiff must prove; (1) that he engaged in a protected activity; (2) that he was subject to adverse actions by a state actor; and (3) the protected activity was a substantial motivating factor in the state's actors decision to take

adverse action." Nanayakkara v. Krug, et.al., 1998 WL 130104 (E.D. Pa. March 17, 1998)[1] *quoting* Anderson v. Davila, 125 F 3d 148, 160 (3d Cir. 1997). If the plaintiff proves these elements, the burden shifts to the state actor to prove that it would have taken the same action without the constitutional factors. In the prison context, the state actor may rebut the plaintiff's claim by showing that their actions were motivated by legitimate penological objectives. Nanayakkara, supra. at *6.

### A.    Plaintiff Has Failed to Establish That Defendants' Failure to Identify Defendants "Moe and "Doe" Was Retaliatory

Plaintiff, in his brief and declaration, states that defendants "are intentionally withholding the identities of defendants "Moe and "Doe" in order to deliberately sabotage plaintiff's case." (See Plaintiff's Brief, page 2)   He supports this allegation by claiming "it is impossible for the defendants to have been unable to ascertain the true identity of defendant Mike Moe since the documentation to be created by whoever reviews a prisoner for parole and the documents are signed by that person." (See Plaintiff's Brief, page 2).    Although he makes the conclusory allegations of retaliation, he offers no facts or evidence how this retaliation occurred or that adverse consequences resulted.

In paragraph 4 of the complaint, plaintiff identified "Jane Doe,  true name currently unknown, is a PBPP employee," and in paragraph 5, plaintiff identifies "Mike Moe, true name currently unknown, is a PBPP employee." Paragraph 6 of the complaint, references that '[t]he above defendants can be reached at the Pa. Board of Probation and Parole, P.O. Box 1611, 3101 North Front Street, Harrisburg, PA 17105. In addition,  paragraphs 129-134 of the complaint allege that interviews that took place among defendants Grow, Moe and Doe on February 17, 1999.

---

[1]Pursuant to LR 7.8,  a copy of this decision is attached as Exhibit "C".

Federal Rule of Civil Procedure, 8(b) provides, in part that:

"a party shall state in short and plain terms the party's defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies. If a party is without knowledge or information sufficient to form a belief as to the truth of an averment, the party shall so state and this has the effect of a denial."

F.R.C.P. 8(b). A party denying an averment based upon a lack knowledge or information has the duty to reasonably investigate whether the information exists and how difficult it would be to find. Based upon the information contained in the complaint, defendants conducted a reasonable investigation of the information available in plaintiff's DOC file and his file maintained by the Board. Defendants, relying on the good faith belief that the identity of "Doe" and "Moe" could not be determined with certainty, answered those paragraphs in the complaint that "after a reasonable investigation, they were without sufficient knowledge or information to form a belief who at the Pennsylvania Board of Probation and Parole plaintiff was referring to as Jane Doe or Mike Moe." (See Defendants' Answer to the Complaint, ¶¶ 4-6; 129-134.)

In addition, plaintiff has available to him, pursuant to F.R.C.P. 26, the mechanism to conduct discovery by way of interrogatories or document production request(s) in order to discover the identity of defendants "Moe" and "Doe." In light of the fact that plaintiff now believes that he knows the identity of defendant "Moe," he may amend his complaint to add or substitute the name. Plaintiff simply has failed to allege facts that give rise to a claim of retaliation where defendants failed to identify defendants "Moe" and "Doe."

**B.    Plaintiff Has Failed to Establish That He Was Denied
Parole For Retaliatory Reasons**

It is well established that a prisoner has no right to be released before the expiration of a valid

sentence arising under the Constitution itself or Pennsylvania law.  Greenholtz v. Inmates of

Nebraska Penal and Correctional Complex, 442 U.S. 1 (1979); Rogers v. Pennsylvania Board of

Probation and Parole, 555 Pa. 285, 724 A.2d 319 (1999).  The Third Circuit has held that "[c]ase law

has established that a state may not bar parole in retaliation for a prisoner's exercise of his

constitutional rights."  Burkett V. Love, 89 F. 3d 135 ( 3rd Cir. 1996).   No Third Circuit precedent

explicitly defines the elements of §1983 retaliation claim in the parole context.  However, in order

to prevail on a claim of retaliation, a prisoner must demonstrate by a preponderance of the evidence

that he was retaliated against for exercising his constitutional rights and that the retaliatory action

does not advance legitimate penological goals."  Jubilee v. Horn, 959 F. Supp. 267 (E.D. Pa 1997)

*quoting* Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curium); Nanayakkara v. Krug,

et al., 1998 WL 130104 (E.D. Pa. March 17, 1998).  Applying these courts' holdings, and the

rationale in Anderson and Mt. Healthy, plaintiff must show that a retaliatory motive was a

substantial or motivating in defendants decision to deny him parole, and that the action taken against

him would not have occurred "but for" the alleged reason.

In this case, plaintiff alleges that defendant "Moe" who plaintiff believes to be "Withers"

refuses to investigate anything and denied him parole in retaliation for filing litigation/grievances.

The decision to refuse Iseley parole was made by members of the Pennsylvania Board of Probation

and Parole.  As evidenced by the attached decisions of the Board, Iseley was refused parole because

the Board determined that "the mandates to protect the safety of the public and to assist in the fair

-5-

administration of justice cannot be achieved through your [Iseley] release on parole." (See Notice of Board Decision dated 7/7/2000, reaffirming the Board's action of 2/19/99, attached as Exhibit "A"; and Notice of Board Decision dated 2/19/99 attached as Exhibit "B")   Here, the substantial motivating factor in the Board's decision to refuse Iseley parole was  the goal of public protection and safety.  Because the Board's action was motivated by  legitimate penological goals, Iseley has failed to establish a claim of retaliation.

## **CONCLUSION**

For the foregoing reasons, plaintiff's motion to cease retaliation should be denied.

Respectfully submitted,

**D. MICHAEL FISHER**
**Attorney General**

By: _____

**MARYANNE M. LEWIS**
**Deputy Attorney General**

**SUSAN J. FORNEY**
**Chief Deputy Attorney General**
**Chief, Litigation Section**

Office of Attorney General
15th Flr., Strawberry Sq.
Harrisburg, PA  17120
FAX:  (717) 772-4526
Direct Dial:  (717) 787-9719
DATE:  July 27, 2000

# EXHIBIT "A"

NOTICE OF BOARD DECISION
PBLF-15(5/96)

COMMONWEALTH OF PENNSYLVANIA
PENNA. BOARD OF PROBATION AND PAROLE

DATE: 07/07/2000

CLIENT NAME: CHARLES W. ISLEY        PAROLE NO: 7951R
INSTITUTION: SCI - COAL TOWNSHIP     INSTITUTION NO: AM9320

AS RECORDED ON 07/07/2000 THE BOARD OF PROBATION AND PAROLE RENDERED THE
FOLLOWING DECISION IN YOUR CASE:

REAFFIRM BOARD ACTION OF 02/10/99 FOR FEBRUARY, 2001 REVIEW.

(APPLICATION)

*KBR 07-07-00*



FILE COPY

*Kathleen Zwierzyna*

KATHLEEN ZWIERZYNA
BOARD SECRETARY

EXHIBIT "A"

**EXHIBIT "B"**

NOTICE OF BOARD DECISION
PBPP-15(8/07)

# COMMONWEALTH OF PENNSYLVANIA
## PENNA. BOARD OF PROBATION AND PAROLE

DATE:    021999

| | | |
|---|---|---|
| CLIENT NAME: | CHARLES W. ISLEY | PAROLE NO    7951R |
| INSTITUTION. | SCI - MAHANOY | INSTITUTION NO:    AM9320 |

AS RECORDED ON    021099   THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

FOLLOWING AN INTERVIEW AND REVIEW OF YOUR FILE, THE PENNSYLVANIA BOARD OF PROBATION AND PAROLE HAS DETERMINED THAT THE MANDATES TO PROTECT THE SAFETY OF THE PUBLIC AND TO ASSIST IN THE FAIR ADMINISTRATION OF JUSTICE CANNOT BE ACHIEVED THROUGH YOUR RELEASE ON PAROLE. YOU ARE THEREFORE REFUSED PAROLE AND ORDERED TO:

BE REVIEWED IN OR AFTER FEBRUARY, 2001.

AT YOUR NEXT INTERVIEW, THE BOARD WILL REVIEW YOUR FILE AND CONSIDER:

WHETHER YOU HAVE RECEIVED A FAVORABLE RECOMMENDATION FOR PAROLE FROM THE DEPARTMENT OF CORRECTIONS.

WHETHER YOU HAVE MAINTAINED A CLEAR CONDUCT RECORD AND COMPLETED THE DEPARTMENT OF CORRECTIONS' PRESCRIPTIVE PROGRAM(S).

~LAH 2/19/99~

FILE COPY

W. CONWAY BUSHEY
BOARD SECRETARY

FEB 1 0 1999

EXHIBIT "B"

# EXHIBIT "C"

1998 WL 130104                                                    Page 1
(Cite as: 1998 WL 130104 (E.D.Pa.))
H

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

Amitha NANAYAKKARA, Plaintiff,
v.
Edward KRUG and Tonya Shuey, Defendants.

No. CIV. A. 95-CV-6418.

March 17, 1998.

J. M. KELLY, J.

*1 The court has considered the evidence that has been presented in this case and is prepared to make its Findings of Fact and Conclusions of Law and decision.

FINDINGS OF FACT

1. Plaintiff, Amitha Nanayakkara ("Nanayakkara"), is a 54 years old native of Sri Lanka, who immigrated to this country in 1980. He eventually brought over his wife and four sons.

2. Defendant, Edward Krug ("Krug"), is the Director of the Allentown Community Corrections Center ("Center") in Allentown, Pennsylvania.

3. Defendant, Tonya Shuey ("Shuey"), was the counselor assigned to Nanayakkara. Shuey began work as a counselor at the Center in 1993. She was assigned to counsel sex offenders in 1995.

4. In 1988, Nanayakkara was found guilty of the following offenses: rape, involuntary deviate sexual intercourse, indecent assault, unlawful restraint, false imprisonment, indecent exposure, simple assault, terroristic threats and conspiracy. He was sentenced to prison for a term of four to ten years.

5. Mrs. Nanayakkara was found guilty of conspiracy and served a lesser term.

6. Mr. & Mrs. Nanayakkara appealed their convictions, which convictions were affirmed.

7. In November of 1991, they appeared at their respective prison assignments to begin serving their sentences.

8. Nanayakkara was initially incarcerated at SCI-Graterford ("Graterford").

9. While at Graterford, Nanayakkara participated in a sex offender treatment program run by J.J. Peters Institute. While in the Peters program, Nanayakkara apparently described some of the details of his offense, but he did not admit to rape or the other sex offenses for which he was convicted.

10. Nanayakkara was transferred from Graterford to SCI-Waymart ("Waymart") in August, 1994.

11. While at Waymart, he was permitted a furlough on one occasion to see a son who is a quadriplegic and who was hospitalized in Abington Township. In February of 1995, he was granted a second furlough during which he returned to his home in Ambler, Pennsylvania, and spent time with his wife (who had been paroled) and his children.

12. Nanayakkara participated in sex offender treatment at Waymart. He claims that it was at Waymart that he first learned that rape encompassed any instance in which a woman did not consent to sex and was not restricted to instances where violence was threatened. While at Waymart, Nanayakkara began to admit guilt for his offenses.

13. In March, 1995, Nanayakkara was transferred to the Center at Allentown. The Center houses state prisoners on "pre-release" status. Center residents are permitted to hold jobs and take extended furloughs. One of its goals is to facilitate the prisoners' adjustment to society.

14. Defendant Edward Krug was the Director of the Center at the time Nanayakkara was admitted to that institution.

15. In order to be placed at the Center, Nanayakkara had to agree to several conditions, referred to as "stipulations." The stipulations required that Nanayakkara: enroll in a sex offender therapy program with Forensic Treatment Services, Inc. ("FTS"); have no contact with his wife, his codefendant; and not enter Region 1, which included his residence in Ambler, Pennsylvania.

*2 16. Shortly after entering the Center, Krug

1998 WL 130104
(Cite as: 1998 WL 130104, *2 (E.D.Pa.))

modified the stipulations so that Nanayakkara could contact his wife by telephone and letter and travel to Region 1, once a week, to visit his hospitalized son.

17. FTS is a private entity that provides sex offender therapy to Center residents and others.

18. FTS required sex offenders to admit their guilt and discuss their offenses. According to FTS program guidelines, however, denial of guilt is not necessarily grounds for immediate exclusion from therapy. The FTS guidelines state that a sex offender should be excluded from the program after "maintain [ing] complete denial after 4-6 months." Prior to August 8, 1995, Nanayakkara admitted guilt in therapy sessions.

19. The Center required sex offenders to earn privileges, such as furloughs, by demonstrating progress in sex offender therapy.

20. Soon after arriving at the Center, Nanayakkara found work at Polymer Dynamics, a manufacturer of shoe parts, where his job included assisting in developing a computer system. Nanayakkara received an annual salary of $32,500.

21. Sometime prior to June 2, 1995, Nanayakkara learned that the Pennsylvania Senate Judiciary Committee ("Committee") was investigating the prison and parole systems in light of Robert "Mudman" Simon, a parole case with notoriety. Nanayakkara, a former cellblock neighbor of Simon, contacted the Committee and offered to testify.

22. In a letter to the Committee outlining his proposed testimony, Nanayakkara complained that the Pennsylvania Department of Corrections forced him to admit to a crime that he did not commit.

23. Nanayakkara testified before the Committee on June 2, 1995. He made allegations of widespread illegal activities at Graterford. Nanayakkara testified about drug trafficking, alteration of prison records and the complicity of unidentified Department of Corrections employees.

24. On June 7, 1995, an Allentown newspaper published an article describing Nanayakkara's Senate testimony. Krug read this article.

25. After Nanayakkara's testimony, Krug received

a large number of telephone calls from his supervisors and others in the Department of Corrections. Krug does not remember the details of these calls, but he remembers that the callers were negative and that many believed that Nanayakkara had fabricated his testimony.

26. After Nanayakkara testified before the Committee, he was interviewed by Department of Corrections investigators regarding the improprieties he alleged at Graterford. One of the investigators instructed Krug to submit a separation for Nanayakkara's inmate records insuring that he would not be reincarcerated at Graterford. This was a means of protecting Nanayakkara in case he was sent to prison in the future.

27. Nanayakkara's therapy at FTS was problematic from the start. He was resistant to therapy and made substantial changes in his descriptions of his sex offenses. During his individual treatment, Nanayakkara indirectly threatened Dr. Valliere, a female physician, with rape. Despite these problems, Dr. Valliere continued to treat Nanayakkara.

*3 28. Krug suspected that Nanayakkara was seeing his wife in violation of his stipulation for entry into the Center. Krug did not, however, act on his suspicions.

29. Krug and Shuey conferred several times concerning Nanayakkara. Shuey increased his furlough privileges but did not permit the full weekend furloughs he wanted in light of his treatment problems. The denial of weekend furloughs was not retaliatory.

30. On July 25, 1995, Nanayakkara left Shuey a written request for a check from his prison account to be made payable to the U.S. District Court for $120. Pursuant to general instructions she had received from her supervisors at the Center, Shuey asked what the check was for and when it was needed. In a written response, Nanayakkara stated he needed it for a filing fee for a court matter.

31. Shuey did not understand what a filing fee was, and she wanted to verify that Nanayakkara did not need the check to pay a criminal fine or for some other similar reason.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

32. On July 30, 1995, Nanayakkara mailed a civil complaint to the Court together with an application for in forma pauperis status. The Court granted the in forma pauperis status and allowed the complaint to be filed. Sometime later the complaint was dismissed as moot.

33. The short delay in filing the Complaint caused no adverse impact on Nanayakkara and was not retaliatory.

34. On or about August 1, 1995, Dr. Valliere and Shuey had a telephone conversation about Nanayakkara. During that conversation, Shuey learned that Dr. Valliere had scheduled a Multi-Disciplinary Team ("MDT") meeting for August 8, 1995.

35. All Center sex offenders who previously appeared at an MDT meeting were subsequently discharged from the program and sent back to prison.

36. Nanayakkara knew of this procedure and feared that his MDT meeting would result in his being returned to prison.

37. When Krug learned of the MDT meeting, he spoke with his immediate supervisor, Mr. O'Connor and with Mr. Livingood, who is a Department of Corrections official, and who was a contact person for the Commissioner of Corrections. Krug reported his concern that returning Nanayakkara to a prison two months after his Senate testimony might appear to be retaliatory. Mr. O'Connor told Krug to treat Nanayakkara as he would any other inmate.

38. On August 3, 1995, Krug learned that a television program was interested in interviewing Nanayakkara. Krug forwarded this information to Nanayakkara and requested a prompt written response.

39. On August 7, 1995, the day before the scheduled MDT meeting, Krug called Nanayakkara to clarify whether he planned to appear on the television show. Nanayakkara expressed concern that he was going to be returned to prison and he arranged to meet Krug at the Center. After clarifying that he would not appear on the television show, Nanayakkara complained about his lack of furloughs. Krug informed him that he could not get

furloughs without Dr. Valliere's recommendation, but that if he was out of the FTS program, Krug could find an alternate program for him which would not require Dr. Valliere's approval. The "alternate program" that Krug had in mind was prison.

*4 40. Nanayakkara told Krug that he was innocent of the offenses for which he was convicted. He stated that he never had forced or consensual sex with his victim and that he was tired of lying about these matters. Krug caused Nanayakkara to reasonably believe that he could deny his guilt and be placed in a more liberal "alternate program" with increased furlough opportunities.

41. Krug knew that if Nanayakkara denied his guilt at the MDT meeting he would be removed from the FTS program and sent back to prison. Krug was careful not to advise Nanayakkara of the consequences of his denial of guilt.

42. On August 8, 1995, Krug, Shuey and Dr. Valliere participated in a MDT meeting with Nanayakkara.

43. Prior to Nanayakkara's arrival at the meeting, Krug informed Dr. Valliere that Nanayakkara had told him that he never had forced or consensual sex with his victim.

44. At the MDT meeting, Krug asked Nanayakkara if he had admitted lying about accepting responsibility for his criminal acts and Nanayakkara agreed he had.

45. Nanayakkara assented to Krug's version of their meeting, believing that they had come to an agreement whereby he would be removed from the FTS treatment program so that he could be placed in another program with more liberal furlough signouts. Nanayakkara informed both Dr. Valliere and Krug that he hoped that he would be able to stay in another treatment program. Krug avoided any extensive discussion of Nanayakkara's future.

46. Dr. Valliere discharged Nanayakkara from the FTS treatment program based upon his recantation.

47. After the MDT meeting, Krug prepared a formal charge of misconduct against Nanayakkara for failing to complete the sex offender program and

1998 WL 130104
(Cite as: 1998 WL 130104, *4 (E.D.Pa.))

for lying to employees at Graterford, Waymart and the Center. Later in the day, Nanayakkara was arrested and transported to Lehigh County Jail and two days later was moved to SCI-Frackville.

48. After Nanayakkara was returned to prison, Shuey prepared a "closing summary." This document is prepared to summarize a resident's progress at the Center. Krug participated in the preparation of the closing summary. The document states: "While a resident at the center, Nanayakkara testified at a Senate hearing, in Harrisburg regarding Robert 'Mudman' Simon. Nanayakkara did not ever believe that his testimony and newspaper interviews would ever have any repercussions in his life. He seemed to think he was omnipotent and invincible."

49. Unsupported testimony of Nanayakkara is totally unreliable. He admits that he previously lied under oath when he proclaimed his innocence at his criminal trial. He will tell anything to anyone if he believes it suits his purposes.

50. Nanayakkara will profess guilt or innocence for his crimes depending on the situation and his ends. He completely denied his guilt during his criminal trial and maintained that denial until 1995. In early 1995, he admitted guilt while seeking transfer to the Center and at the beginning of his therapy. In June of 1995, he vehemently denied his guilt in a letter to the Senate Judiciary Committee and in a newspaper interview. He admitted his guilt in an October 1995 letter to a Judge and then denied his guilt in a December 1995 affidavit that related to a habeas corpus petition. In this case, Nanayakkara admits that he is guilty of most of the crimes for which he was convicted.

*5 51. The only testimony of Nanayakkara that is credible is where he has been adequately corroborated by other witnesses or documents.

52. The finding of this court in favor of Nanayakkara and against Krug is based primarily on Krug's testimony at trial.

53. Krug was primarily responsible for the decision to return Nanayakkara to prison. Krug had significant control over the lives of Center residents. Krug's testimony that Dr. Valliere was responsible for the decision to return Nanayakkara to prison is

not credible. Krug encouraged Nanayakkara to recant his guilt at the August 7, 1995, meeting and encouraged him to repeat this recantation in the August 8, 1995, MDT meeting. Krug knew that Nanayakkara's recantation at the MDT meeting would mean that his staff and Dr. Valliere would concur with his decision to return Nanayakkara to prison.

54. Krug testified that he did not decide to return Nanayakkara to prison until after the August 8, 1995 MDT meeting. This testimony is not credible. Krug had discussed the matter with his supervisors and decided to return Nanayakkara to prison before the MDT meeting.

55. At trial, Krug testified that the August 7, 1995 meeting was the first time that he heard Nanayakkara claim that he was innocent. This testimony is not credible. Krug read a June 7, 1995, newspaper article in which Nanayakkara claims that he is innocent. Krug was aware of at least some of Nanayakkara's claims of innocence, but he did not remove him from the Center for this reason.

56. Retaliatory animus was a substantial factor in Krug's decision to return Nanayakkara to prison.

57. Krug's actions were not motivated by legitimate goals of the correctional institution, such as concern for community safety or institutional discipline.

58. The State did not establish that it would have returned Nanayakkara to prison on the basis of his dishonesty and difficulty in therapy.

59. There is insufficient evidence that Defendant Tonya Shuey ever deprived Nanayakkara of any of his constitutional rights. Shuey did not have significant decision-making authority.

60. Nanayakkara lost a job that paid him $32,500 per year. He was returned to prison for two years. Nevertheless, Nanayakkara was dishonest and resistant to therapy. It is more likely than not that Nanayakkara would have been returned to prison within a year of August, 1995, for violating Center rules and failure in therapy. Therefore, Nanayakkara is entitled to $32,500 as reasonable compensatory damages.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

61. Nanayakkara did not offer sufficient evidence to support his claim for damages for pain and suffering and emotional injuries. The only evidence offered to support these damage claims was the Plaintiff's own testimony, and the testimony of a psychologist who spoke with him on the telephone for one hour. The psychologist testified that Nanayakkara's emotional problems were caused by a number of factors. This is not sufficient to support Nanayakkara's claim for emotional distress or pain and suffering damages.

## CONCLUSIONS OF LAW

*6 1. This is a civil rights case brought under 42 U.S.C. § 1983. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

Retaliation

2. To prevail on a claim brought under 42 U.S.C. § 1983, the plaintiff must prove that a person acting under color of state law deprived him of his constitutional rights. Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

3. "An individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." Anderson v. Davila, 125 F.3d 148, 160 (3d Cir.1997)(citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

4. While the state may properly curtail many of a prisoner's rights, prisoners retain the right to petition the government and speak to the press. See Pell v. Procunier, 417 U.S. 817, 822 (1974); Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Milhouse v. Carlson, 625 F.2d 371, 374 (3d Cir.1981).

5. Government action against a prisoner, in retaliation for the exercise of First Amendment rights, is actionable under § 1983. Milhouse, 625 F.2d 371, 374 (3d Cir.1981). "[A]n otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech." Anderson, 125 F.3d at 161.

6. In order to prevail on a retaliation claim, a plaintiff must prove: (1) that he engaged in protected activity; (2) that he was subject to adverse actions by a state actor; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take adverse action. Anderson, 125 F.3d at 161. If the plaintiff proves these elements, the burden shifts to the state actor to prove that it would have taken the same action without the unconstitutional factors. Mt. Healthy, 429 U.S. at 287. In the prison context, the state actor may rebut the Plaintiff's claim by showing that their actions were motivated by legitimate penological objectives.

7. Testimony at a state Senate Committee hearing and participation in newspaper interviews are protected First Amendment activities.

8. Transfer from a Community Corrections Center, where an inmate has significant liberties, to a State Correctional Institution, is an adverse action.

9. Krug made the decision to return Nanayakkara to prison.

Causation

10. In order to prevail on a retaliation claim, a plaintiff must prove that their protected activity was a substantial motivating factor in the state actor's decision to take adverse action against them. See Hall v. Evans, 842 F.2d 337 (11th Cir.1988)(No. 86-8782, unpublished slip op. at 2). See also Wood v. Cohen, No. 96-3707, 1998 WL 88387 at *8 (E.D.Pa.1998).

*7 11. Nanayakkara proved that retaliatory animus was a substantial factor in Krug's decision to return him to prison.

12. The State contends that prisoners should be required to prove that there was no legitimate penological justification for a challenged decision. Under this formulation, the existence of any legitimate objective would insulate state actors from liability, even if the official did not base their decision on that objective. This standard is not sufficient to protect constitutional rights. The State must do more than prove that proper reasons for a challenged decision existed in the abstract. If an individual proves that retaliatory animus was a

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

1998 WL 130104
(Cite as: 1998 WL 130104, *7 (E.D.Pa.))

Page 6

substantial factor in an adverse decision by a state actor, the state actor must prove that they would have taken the same action against the individual, at the same time, on the basis of the proper reasons alone. See Mt. Healthy, 429 U.S. at 287. [FN1] The state actor could meet this burden by showing that they were motivated by a concern for community safety or institutional discipline.

> FN1. Courts are divided over the proper standard for proving causation in First Amendment retaliation cases involving prisoners. See, e.g., McDonald v. Hall, 610 F.2d 16, 18 (1st Cir.1979)(requiring prisoner to prove that adverse action would not have occurred but for retaliation); Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir.1994)(requiring prisoner to prove that there was no legitimate penological justification for challenged action); Abdul-Akbar v. Department of Corrections, 910 F.Supp. 986 (D.Del.1995)(same), aff'd, 111 F.3d 125 (3d Cir.1997) (Table); cert. denied, 522 U.S. 852, 118 S.Ct. 144, 139 L.Ed.2d 91 (1997).
> The Third Circuit has not addressed this issue in a published opinion. In an unpublished opinion, Brooks-Bey v. Kross, No. 94-7650, slip op. at 8 n.1 (3d Cir.1995), the court rejected the "but for" test to the extent that it places a greater evidentiary burden on the plaintiff." While unpublished opinions are not binding on this court, the Brooks-Bey opinion is instructive.
> In this case, while legitimate reasons for Krug's actions existed in the abstract, his decision was not based on those factors alone. Nanayakkara proved that "but for" his protected activities, he would not have been returned to prison.

13. The State did not establish that it would have returned Nanayakkara to prison on the basis of his dishonesty and difficulty in therapy. Krug was not motivated by legitimate goals of the correctional institution. Nanayakkara did not threaten community safety or institutional discipline. If Nanayakkara had not testified before the Senate Committee, he would not have been returned to prison on August 8, 1995.

Qualified Immunity

14. Government officials performing discretionary functions are shielded from liability for money damages, provided their conduct does not transgress "clearly established statutory or constitutional rights" of which a reasonable public official would know. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); see also Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Grant v. City of Pittsburgh, 98 F.3d 116, 123-24 (3d Cir.1996).

15. "An act taken in retaliation for the exercise of a constitutional right is actionable under section 1983 even if the act, when taken for different reasons, would have been proper." Franco v. Kelly, 854 F.2d 584, 590 (2d Cir.1988) (quoting Howland v. Kilquist, 833 F.2d 639, 644 (7th Cir.1987)).

16. It is well-settled that prison officials cannot take retaliatory action against a prisoner for exercising First Amendment rights. See Brooks v. Andolina, 826 F.2d 1266, 1268-69 (3d Cir.1987); Milhouse, 625 F.2d at 374.

17. Nanayakkara proved, by a preponderance of the evidence, that Krug's decision to return him to prison was motivated by retaliatory animus. [FN2] Therefore, Krug is not protected by qualified immunity.

> FN2. In cases that require proof of a government officials' unconstitutional motive, the Third Circuit has held that the plaintiff must prove improper motive by a preponderance of the evidence. Grant v. City of Pittsburgh, 98 F.3d 116, 125-26 (1996). Nanayakkara met this standard, but he did not prove Krug's improper motive by clear and convincing evidence. See, Crawford-El v. Britton, 93 F.3d 813 (D.C.Cir.1996)(en banc), cert. granted, 520 U.S. 1273, 117 S.Ct. 2451, 138 L.Ed.2d 210 (1997).

*8 AND NOW this the day of March, 1998, based upon the attached Findings of Fact and Conclusions of Law, it is hereby ORDERED that:
1. Judgment is entered in favor of Plaintiff Amitha Nanayakkara and against Defendant Edward Krug, in the amount of $32,500.00.
2. Judgment is entered in favor of Defendant Tonya Shuey and against Plaintiff Amitha Nanayakkara.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,                          :
                                         :
    Plaintiff                       :
                                         :
    v.                              :          No. 1:00-CV-00577
                                         :          (Judge Kane)
W. CONWAY BUSHEY, et al.,                :
                                         :
    Defendants                      :

## CERTIFICATE OF SERVICE

I, Maryanne M. Lewis, Deputy Attorney General, hereby certify that on this date I caused to be served the foregoing Defendants' Brief in Response to Plaintiff's Motion to Cease Retaliation Against Plaintiff, by depositing a copy of the same in the United States mail, postage prepaid, in Harrisburg, PA., addressed to the following:

Charles Iseley, #AM-9320
SCI-Coal Township
1 Kelley Drive
Coal Township, PA 17866-1020


MARYANNE M. LEWIS
DEPUTY ATTORNEY GENERAL

DATE: July 27, 2000