Law Clerk's Copy



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHARLES ISELEY,** | : | |
| **Plaintiff** | : | |
| **v.** | : | **No. 1:00-CV-00577** |
| | : | **(Judge Kane)** |
| **W. CONWAY BUSHEY, et al.,** | : | |
| **Defendants** | : | |

FILED
HARRISBURG
DEC 0 7 2000
MARY E. D'ANDREA, CLERK
Per ______
DEPUTY CLERK

**DEFENDANTS' BRIEF IN RESPONSE TO**
**PLAINTIFF'S MOTION TO CEASE RETALIATION**

**STATEMENT OF RELEVANT FACTS**

This is a civil rights action brought pursuant to 42 U.S.C. §1983 alleging violations of various amendments to the United States Constitution. Plaintiff, Charles Iseley, is a pro se prisoner currently incarcerated at the State Correctional Institution at Coal Township, Pennsylvania ("SCI-Coal"). Defendants are numerous employees or former employees of the Pennsylvania Department of Corrections ("DOC"), or employees of the Pennsylvania Board of Probation and Parole ("Board").

On November 19, 2000, Iseley filed a Motion to Cease Retaliation, a supporting brief and a declaration. Iseley argues that defendants continue to retaliate against him by stealing his legal material and property. In addition, he states that defendants are withholding the identities of defendants Moe and Doe, and continue to include false information and statements in their pleadings. This brief is filed in response to Iseley's motion.

## QUESTIONS PRESENTED

**DID THE DEFENDANTS RETALIATE AGAINST ISELEY ?**

**A. WHETHER DEFENDANTS' FAILURE TO IDENTIFY "JOHN DOE" DEFENDANTS ESTABLISHES A CLAIM OF RETALIATION ?**

**B. WHETHER ISELEY HAS FAILED TO ESTABLISH A CLAIM OF RETALIATION REGARDING HIS TRANSFER ?**

**C. WHETHER ISELEY HAS FAILED TO ESTABLISH A CLAIM OF RETALIATION REGARDING HIS ALLEGED MISSING LEGAL MATERIAL AND PROPERTY ?**

## ARGUMENT

**THE DEFENDANTS' ACTIONS WERE NOT RETALIATORY TO ISELEY**

### I. The Standard for Retaliation

A party claiming unconstitutional retaliation must allege that the constitutionally protected conduct was a substantial or motivating factor influencing the alleged retaliation and that the retaliation would not have occurred but for the protected conduct. Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1997). Following the Court's decision in Mt. Healthy, the Third Circuit recognized that "in order to prevail on a retaliation claim, a plaintiff must prove: (1) that he engaged in a protected activity; (2) that he was subject to adverse actions by a state actor; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take

adverse action." Nanayakkara v. Krug, et.al., 1998 WL 130104 (E.D. Pa. March 17, 1998)[1] *quoting* Anderson v. Davila, 125 F 3d 148, 160 (3d Cir. 1997). If the plaintiff proves these elements, the burden shifts to the state actor to prove that it would have taken the same action without the constitutional factors. In the prison context, the state actor may rebut the plaintiff's claim by showing that their actions were motivated by legitimate penological objectives. Nanayakkara, supra. at *6.

**A. Iseley Has Failed to Establish That Defendants' Failure to Identify Defendants "Moe and "Doe" Was Retaliatory**

Iseley, in his brief and declaration, states that defendants still refuse to identify the John Doe defendants. Although he makes the conclusory allegations of retaliation, he offers no facts or evidence how this retaliation occurred or that adverse consequences resulted.

In paragraph 4 of the complaint, plaintiff identified "Jane Doe, true name currently unknown, is a PBPP employee," and in paragraph 5, plaintiff identifies "Mike Moe, true name currently unknown, is a PBPP employee." Paragraph 6 of the complaint references that [t]he above defendants can be reached at the Pa. Board of Probation and Parole, P.O. Box 1611, 3101 North Front Street, Harrisburg, PA 17105. Paragraphs 129-134 of the complaint allege that interviews took place among defendants Grow, Moe and Doe on February 17, 1999.

In addition, in ¶ 38 of the complaint, Iseley identifies a defendant by the name of "Fred Foe" as a guard of the rank of lieutenant at SCI-Mahanoy, and in ¶ 39 he identifies a "Harry Hoe" as a guard of the rank of sergeant at SCI-Mahanoy.

---

[1]Pursuant to LR 7.8, a copy of this decision is attached as Exhibit "A".

Federal Rule of Civil Procedure 8(b) provides, in part that:

> "a party shall state in short and plain terms the party's defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies. If a party is without knowledge or information sufficient to form a belief as to the truth of an averment, the party shall so state and this has the effect of a denial."

F.R.C.P. 8(b).

A party denying an averment based upon a lack of knowledge or information has the duty to reasonably investigate whether the information exists and how difficult it would be to find. Based upon the information presented in the complaint, defendants conducted a reasonable investigation of the information available in Iseley's DOC file and his file maintained by the Board. Defendants, relying on the good faith belief that the identity of "Doe," "Moe," "Foe" and "Hoe" could not be determined with certainty, answered those paragraphs in the complaint stating that, after a reasonable investigation, they were without sufficient knowledge or information to form a belief who the plaintiff was referring to as Jane Doe, Mike Moe, Fred Foe or Harry Hoe. (See Defendants' Answer to the Complaint, ¶¶ 4-6; 38-39; 129-134). Moreover, Iseley's complaint fails to allege any specific actions on the part of defendants "Foe" and "Hoe."

In addition, Iseley has available to him, pursuant to F.R.C.P. 26, the mechanism to conduct discovery by way of interrogatories or document production request(s) in order to attempt to discover the identity of who he terms the "John Doe" defendants. Iseley recently filed discovery which may assist him in the identification of who these individuals may be. [2] Therefore, his

---

[2]On November 27, 2000, counsel for defendants received a Second Request for Production of Documents and Interrogatories directed to defendants Horn and Bushey. These discovery requests are currently being reviewed. Whether these requests will assist Iseley in identifying the "John Doe" defendants is currently unknown.

allegation concerning retaliation by the defendants in withholding the identity of these individuals is premature. Here, Iseley simply has failed to allege facts that give rise to a claim of retaliation where defendants failed to identify the "John Doe" defendants.

**B. Iseley Has Failed to Establish That His Transfer To SCI-Graterford and His Subsequent Return to SCI-Coal Township Was Retaliatory**

In his declaration, Iseley alleges that he should have been transferred back to SCI-Coal Township within two weeks of his court date. He further alleges that he was held at SCI-Graterford to be kept away from his legal materials. Iseley alleges retaliation, but fails to establish that he has a protected right to be transferred from one institution to another at the time he believes is suitable. Furthermore, Iseley's pleadings contain no specific allegations that reflect the involvement of any defendants, or that he suffered from any adverse action because of the alleged transfer related retaliation.

It is well established that a prisoner a has no constitutional right to be or not to be transferred, or to be confined or not to be confined in any particular prison. Olim v. Wakinekona, 461 U.S. 238 (1982); Meachum v. Fano, 427 U.S. 215 (1976); Montanye v. Haynes, 427 U.S. 236 (1976). Here, Iseley has failed to establish a fundamental element in his retaliation claim- that he was engaged in protected activity. Transfer to or from one correctional facility at a time suitable to the prisoner is not a federally protected right. Iseley cannot establish a claim of retaliation based upon the timing of his transfer from SCI-Graterford back to SCI-Coal Township.

**C. Iseley Has Failed To Establish That His Legal Materials And Property Allegedly Disappeared For Retaliatory Reasons**

In his brief Iseley makes the bald claim that he continues to be retaliated against by the defendants' stealing his legal materials and property. Iseley attempts to support this claim in a declaration, stating that undersigned counsel knew he was being held at SCI-Graterford to keep him from his legal material and that counsel ignored a letter he wrote concerning the property. He further states that when he returned to SCI-Coal Township he learned that all his legal material at Graterford disappeared as well as the legal material he had at SCI-Coal Township. Finally, Iseley states that he has not received the rest of his legal property from SCI-Mahanoy, and that all of his research as well as legal papers are gone.[3]

Assuming that Iseley is attempting to assert a retaliation claim rooted in a denial of access to the courts, he must show an actual injury. In Lewis v. Casey, 518 U.S. 343, 351-52 (1996), the Court expressly held that an inmate alleging denial of access to the courts must show actual injury and demonstrate that the alleged shortcoming hindered his efforts to pursue a legal claim. Lewis requires that the inmate must point to evidence of actual or imminent interference with access to the courts, for example, that his complaint was dismissed for failure to satisfy some technical

[3]Iseley continues to alleges that he has not received the rest of his legal property from SCI-Mahanoy, and that all of his research as well as his legal papers are gone. This matter was the subject of Iseley's Motion for Adequate Access to the Courts (filed May 22, 2000, and briefed by defendants on July 3, 2000), and his Motion for Judgment/Sanctions (filed June 26, 2000, and briefed by defendants on July 14, 2000). For brevity reasons, defendants will not revisit this claim; rather, they incorporate their briefs filed July 3, 2000 and July 14, 2000 as a response to this repeated argument.

requirement that he could not have known, or that he suffered arguable harm that he wished to bring before the courts, but was so stymied that he could not file a complaint. Id.

Here, Iseley alleges that his legal materials were stolen or that they disappeared for allegedly retaliatory reasons. Iseley's claim falls short of the standard as enunciated by Lewis. Iseley makes no mention of any filing deadline being missed or that his efforts to pursue legal claims were hindered.[4] Iseley has simply failed to show the required actual injury as to his transfer and to the allegations concerning the alleged missing legal materials and property.

Iseley was informed by undersigned counsel that his property was mailed from SCI-Graterford to SCI-Coal Township on November 14, 2000, and that the property would arrive in three to five days. (See Exhibit "B" attached). Furthermore, Iseley filed a grievance with the grievance coordinator at SCI-Coal Township regarding the alleged missing legal materials and property. (See Unsworn Declaration of Kandis Dascani, Attached as Exhibit "C"). In her declaration, Ms. Dascani states that on November 6, 2000, she received Grievance No. 0622-00 from Iseley dated November 5, 2000, concerning his legal material. (Id. at ¶5). Pursuant to the Department of Corrections' Administrative Directive 804, Dascani referred the matter to be investigated. (Id. at ¶5 ).

Lt. Mattis conducted an investigation concerning Grievance No. 0622-000 and reported the results of his investigation to Ms. Dascani. Attached to Ms. Dascani's declaration is a true and correct copy of Lt. Mattis' report of his investigation. (See Exhibit "C" attached to Dascani's Declaration). A box of Iseley's property was received at SCI-Coal Township from SCI-Graterford on November 16, 2000. (Id. at ¶ 7 (a)). The contents were inventoried by Iseley on November 17,

---

[4]To the contrary, Iseley was able to prepare and file a Motion for Temporary Restraining Order, as well as numerous other documents in this case during this time period.

2000. (Id. at ¶ 7 (a)). After the inventory was complete, Iseley alleged that he still was missing legal materials, but that those documents were never at SCI-Coal Township. (Id. at ¶ 7 (b)). Rather, according to Ise[illegible] received them while at SCI-Graterford. (Id. at ¶ 7 (c)).

Iseley further grieved that he left legal materials in his cell when he was transferred to SCI-Graterford. (Id. at ¶ 7 (d)). Lt. Mattis also investigated this claim, and Officer Shay reported to him that he recalled packing Iseley's cell, and did not recall any legal materials in his cell. (Id. at ¶7 (d) and (e)). As a result of his investigation, Lt. Mattis did not find that SCI-Coal was responsible for any mishandling of Iseley's legal material. (Id. at ¶8).

Finally, Iseley has available to him, pursuant to DOC-ADM 804, an appeal process by which he may appeal the response to his grievance. Iseley may appeal the response to Grievance No. 0622 -00 to the Superintendent of SCI-Coal Township, and then may seek review of the grievance to the DOC Office of Inmate Grievances and Appeals. (Id. at ¶9 ). To date Iseley has not appealed Grievance No. 0622-00. (Id. at ¶ 10).

In light of the fact that the matter concerning the missing property was investigated pursuant to the grievance process as outlined by DOC-ADM 804, and the fact that Iseley has received his property from SCI-Graterford, his claims of retaliation are without merit. Any appeal of this grievance concerning the missing legal materials has yet to be exhausted pursuant to the administrative review process, DOC-ADM 804. Therefore, any remaining claim of retaliation before this Court concerning this matter is premature at best.

## CONCLUSION

For the foregoing reasons, plaintiff's motion to cease retaliation should be denied.

Respectfully submitted,

**D. MICHAEL FISHER**
**Attorney General**

By: ______________________
**MARYANNE M. LEWIS**
**Deputy Attorney General**

**SUSAN J. FORNEY**
**Chief Deputy Attorney General**
**Chief, Litigation Section**

**Office of Attorney General**
**15th Flr., Strawberry Sq.**
**Harrisburg, PA 17120**
**FAX: (717) 772-4526**
**Direct Dial: (717) 787-9719**

**DATE: December 7, 2000**

EXHIBIT "A"

H

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

Amitha NANAYAKKARA, Plaintiff,
v.
Edward KRUG and Tonya Shuey, Defendants.

No. CIV. A. 95-CV-6418.

March 17, 1998.

J. M. KELLY, J.

*1 The court has considered the evidence that has been presented in this case and is prepared to make its Findings of Fact and Conclusions of Law and decision.

FINDINGS OF FACT

1. Plaintiff, Amitha Nanayakkara ("Nanayakkara"), is a 54 years old native of Sri Lanka, who immigrated to this country in 1980. He eventually brought over his wife and four sons.

2. Defendant, Edward Krug ("Krug"), is the Director of the Allentown Community Corrections Center ("Center") in Allentown, Pennsylvania.

3. Defendant, Tonya Shuey ("Shuey"), was the counselor assigned to Nanayakkara. Shuey began work as a counselor at the Center in 1993. She was assigned to counsel sex offenders in 1995.

4. In 1988, Nanayakkara was found guilty of the following offenses: rape, involuntary deviate sexual intercourse, indecent assault, unlawful restraint, false imprisonment, indecent exposure, simple assault, terroristic threats and conspiracy. He was sentenced to prison for a term of four to ten years.

5. Mrs. Nanayakkara was found guilty of conspiracy and served a lesser term.

6. Mr. & Mrs. Nanayakkara appealed their convictions, which convictions were affirmed.

7. In November of 1991, they appeared at their respective prison assignments to begin serving their sentences.

8. Nanayakkara was initially incarcerated at SCI-Graterford ("Graterford").

9. While at Graterford, Nanayakkara participated in a sex offender treatment program run by J.J. Peters Institute. While in the Peters program, Nanayakkara apparently described some of the details of his offense, but he did not admit to rape or the other sex offenses for which he was convicted.

10. Nanayakkara was transferred from Graterford to SCI-Waymart ("Waymart") in August, 1994.

11. While at Waymart, he was permitted a furlough on one occasion to see a son who is a quadriplegic and who was hospitalized in Abington Township. In February of 1995, he was granted a second furlough during which he returned to his home in Ambler, Pennsylvania, and spent time with his wife (who had been paroled) and his children.

12. Nanayakkara participated in sex offender treatment at Waymart. He claims that it was at Waymart that he first learned that rape encompassed any instance in which a woman did not consent to sex and was not restricted to instances where violence was threatened. While at Waymart, Nanayakkara began to admit guilt for his offenses.

13. In March, 1995, Nanayakkara was transferred to the Center at Allentown. The Center houses state prisoners on "pre-release" status. Center residents are permitted to hold jobs and take extended furloughs. One of its goals is to facilitate the prisoners' adjustment to society.

14. Defendant Edward Krug was the Director of the Center at the time Nanayakkara was admitted to that institution.

15. In order to be placed at the Center, Nanayakkara had to agree to several conditions, referred to as "stipulations." The stipulations required that Nanayakkara: enroll in a sex offender therapy program with Forensic Treatment Services, Inc. ("FTS"); have no contact with his wife, his codefendant; and not enter Region 1, which included his residence in Ambler, Pennsylvania.

*2 16. Shortly after entering the Center, Krug

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

modified the stipulations so that Nanayakkara could contact his wife by telephone and letter and travel to Region 1, once a week, to visit his hospitalized son.

17. FTS is a private entity that provides sex offender therapy to Center residents and others.

18. FTS required sex offenders to admit their guilt and discuss their offenses. According to FTS program guidelines, however, denial of guilt is not necessarily grounds for immediate exclusion from therapy. The FTS guidelines state that a sex offender should be excluded from the program after "maintain [ing] complete denial after 4-6 months." Prior to August 8, 1995, Nanayakkara admitted guilt in therapy sessions.

19. The Center required sex offenders to earn privileges, such as furloughs, by demonstrating progress in sex offender therapy.

20. Soon after arriving at the Center, Nanayakkara found work at Polymer Dynamics, a manufacturer of shoe parts, where his job included assisting in developing a computer system. Nanayakkara received an annual salary of $32,500.

21. Sometime prior to June 2, 1995, Nanayakkara learned that the Pennsylvania Senate Judiciary Committee ("Committee") was investigating the prison and parole systems in light of Robert "Mudman" Simon, a parole case with notoriety. Nanayakkara, a former cellblock neighbor of Simon, contacted the Committee and offered to testify.

22. In a letter to the Committee outlining his proposed testimony, Nanayakkara complained that the Pennsylvania Department of Corrections forced him to admit to a crime that he did not commit.

23. Nanayakkara testified before the Committee on June 2, 1995. He made allegations of widespread illegal activities at Graterford. Nanayakkara testified about drug trafficking, alteration of prison records and the complicity of unidentified Department of Corrections employees.

24. On June 7, 1995, an Allentown newspaper published an article describing Nanayakkara's Senate testimony. Krug read this article.

25. After Nanayakkara's testimony, Krug received a large number of telephone calls from his supervisors and others in the Department of Corrections. Krug does not remember the details of these calls, but he remembers that the callers were negative [illegible] that many believed that Nanayakkara had [illegible]ated his testimony.

26. After Nanayakkara testified before the Committee, he was interviewed by Department of Corrections investigators regarding the improprieties he alleged at Graterford. One of the investigators instructed Krug to submit a separation for Nanayakkara's inmate records insuring that he would not be reincarcerated at Graterford. This was a means of protecting Nanayakkara in case he was sent to prison in the future.

27. Nanayakkara's therapy at FTS was problematic from the start. He was resistant to therapy and made substantial changes in his descriptions of his sex offenses. During his individual treatment, Nanayakkara indirectly threatened Dr. Valliere, a female physician, with rape. Despite these problems, Dr. Valliere continued to treat Nanayakkara.

*3 28. Krug suspected that Nanayakkara was seeing his wife in violation of his stipulation for entry into the Center. Krug did not, however, act on his suspicions.

29. Krug and Shuey conferred several times concerning Nanayakkara. Shuey increased his furlough privileges but did not permit the full weekend furloughs he wanted in light of his treatment problems. The denial of weekend furloughs was not retaliatory.

30. On July 25, 1995, Nanayakkara left Shuey a written request for a check from his prison account to be made payable to the U.S. District Court for $120. Pursuant to general instructions she had received from her supervisors at the Center, Shuey asked what the check was for and when it was needed. In a written response, Nanayakkara stated he needed it for a filing fee for a court matter.

31. Shuey did not understand what a filing fee was, and she wanted to verify that Nanayakkara did not need the check to pay a criminal fine or for some other similar reason.

32. On July 30, 1995, Nanayakkara mailed a civil complaint to the Court together with an application for in forma pauperis status. The Court granted the in forma pauperis status and allowed the complaint to be filed. Sometime later the complaint was dismissed as moot.

33. The short delay in filing the Complaint caused no adverse impact on Nanayakkara and was not retaliatory.

34. On or about August 1, 1995, Dr. Valliere and Shuey had a telephone conversation about Nanayakkara. During that conversation, Shuey learned that Dr. Valliere had scheduled a Multi-Disciplinary Team ("MDT") meeting for August 8, 1995.

35. All Center sex offenders who previously appeared at an MDT meeting were subsequently discharged from the program and sent back to prison.

36. Nanayakkara knew of this procedure and feared that his MDT meeting would result in his being returned to prison.

37. When Krug learned of the MDT meeting, he spoke with his immediate supervisor, Mr. O'Connor and with Mr. Livingood, who is a Department of Corrections official, and who was a contact person for the Commissioner of Corrections. Krug reported his concern that returning Nanayakkara to a prison two months after his Senate testimony might appear to be retaliatory. Mr. O'Connor told Krug to treat Nanayakkara as he would any other inmate.

38. On August 3, 1995, Krug learned that a television program was interested in interviewing Nanayakkara. Krug forwarded this information to Nanayakkara and requested a prompt written response.

39. On August 7, 1995, the day before the scheduled MDT meeting, Krug called Nanayakkara to clarify whether he planned to appear on the television show. Nanayakkara expressed concern that he was going to be returned to prison and he arranged to meet Krug at the Center. After clarifying that he would not appear on the television show, Nanayakkara complained about his lack of furloughs. Krug informed him that he could not get furloughs without Dr. Valliere's recommendation, but that if he was out of the FTS program, Krug could find an alternate program for him which would not require Dr. Valliere's approval. The "alternate program" that Krug had in mind was prison.

*4 40. Nanayakkara told Krug that he was innocent of the offenses for which he was convicted. He stated that he never had forced or consensual sex with his victim and that he was tired of lying about these matters. Krug caused Nanayakkara to reasonably believe that he could deny his guilt and be placed in a more liberal "alternate program" with increased furlough opportunities.

41. Krug knew that if Nanayakkara denied his guilt at the MDT meeting he would be removed from the FTS program and sent back to prison. Krug was careful not to advise Nanayakkara of the consequences of his denial of guilt.

42. On August 8, 1995, Krug, Shuey and Dr. Valliere participated in a MDT meeting with Nanayakkara.

43. Prior to Nanayakkara's arrival at the meeting, Krug informed Dr. Valliere that Nanayakkara had told him that he never had forced or consensual sex with his victim.

44. At the MDT meeting, Krug asked Nanayakkara if he had admitted lying about accepting responsibility for his criminal acts and Nanayakkara agreed he had.

45. Nanayakkara assented to Krug's version of their meeting, believing that they had come to an agreement whereby he would be removed from the FTS treatment program so that he could be placed in another program with more liberal furlough signouts. Nanayakkara informed both Dr. Valliere and Krug that he hoped that he would be able to stay in another treatment program. Krug avoided any extensive discussion of Nanayakkara's future.

46. Dr. Valliere discharged Nanayakkara from the FTS treatment program based upon his recantation.

47. After the MDT meeting, Krug prepared a formal charge of misconduct against Nanayakkara for failing to complete the sex offender program and

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

for lying to employees at Graterford, Waymart and the Center. Later in the day, Nanayakkara was arrested and transported to Lehigh County Jail and two days later was moved to SCI-Frackville.

48. After Nanayakkara was returned to prison, Shuey prepared a "closing summary." This document is prepared to summarize a resident's progress at the Center. Krug participated in the preparation of the closing summary. The document states: "While a resident at the center, Nanayakkara testified at a Senate hearing, in Harrisburg regarding Robert 'Mudman' Simon. Nanayakkara did not ever believe that his testimony and newspaper interviews would ever have any repercussions in his life. He seemed to think he was omnipotent and invincible."

49. Unsupported testimony of Nanayakkara is totally unreliable. He admits that he previously lied under oath when he proclaimed his innocence at his criminal trial. He will tell anything to anyone if he believes it suits his purposes.

50. Nanayakkara will profess guilt or innocence for his crimes depending on the situation and his ends. He completely denied his guilt during his criminal trial and maintained that denial until 1995. In early 1995, he admitted guilt while seeking transfer to the Center and at the beginning of his therapy. In June of 1995, he vehemently denied his guilt in a letter to the Senate Judiciary Committee and in a newspaper interview. He admitted his guilt in an October 1995 letter to a Judge and then denied his guilt in a December 1995 affidavit that related to a habeas corpus petition. In this case, Nanayakkara admits that he is guilty of most of the crimes for which he was convicted.

*5 51. The only testimony of Nanayakkara that is credible is where he has been adequately corroborated by other witnesses or documents.

52. The finding of this court in favor of Nanayakkara and against Krug is based primarily on Krug's testimony at trial.

53. Krug was primarily responsible for the decision to return Nanayakkara to prison. Krug had significant control over the lives of Center residents. Krug's testimony that Dr. Valliere was responsible for the decision to return Nanayakkara to prison is not credible. Krug encouraged Nanayakkara to recant his guilt at the August 7, 1995, meeting and encouraged him to repeat this recantation in the August 8, 1995, MDT meeting. Krug knew that Nanayakkara's recantation at the MDT meeting would mean that his staff and Dr. Valliere would concur with his decision to return Nanayakkara to prison.

54. Krug testified that he did not decide to return Nanayakkara to prison until after the August 8, 1995 MDT meeting. This testimony is not credible. Krug had discussed the matter with his supervisors and decided to return Nanayakkara to prison before the MDT meeting.

55. At trial, Krug testified that the August 7, 1995 meeting was the first time that he heard Nanayakkara claim that he was innocent. This testimony is not credible. Krug read a June 7, 1995, newspaper article in which Nanayakkara claims that he is innocent. Krug was aware of at least some of Nanayakkara's claims of innocence, but he did not remove him from the Center for this reason.

56. Retaliatory animus was a substantial factor in Krug's decision to return Nanayakkara to prison.

57. Krug's actions were not motivated by legitimate goals of the correctional institution, such as concern for community safety or institutional discipline.

58. The State did not establish that it would have returned Nanayakkara to prison on the basis of his dishonesty and difficulty in therapy.

59. There is insufficient evidence that Defendant Tonya Shuey ever deprived Nanayakkara of any of his constitutional rights. Shuey did not have significant decision-making authority.

60. Nanayakkara lost a job that paid him $32,500 per year. He was returned to prison for two years. Nevertheless, Nanayakkara was dishonest and resistant to therapy. It is more likely than not that Nanayakkara would have been returned to prison within a year of August, 1995, for violating Center rules and failure in therapy. Therefore, Nanayakkara is entitled to $32,500 as reasonable compensatory damages.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

61. Nanayakkara did not offer sufficient evidence to support his claim for damages for pain and suffering and emotional injuries. The only evidence offered to support these damage claims was the Plaintiff's own testimony, and the testimony of a psychologist who spoke with him on the telephone for one hour. The psychologist testified that Nanayakkara's emotional problems were caused by a number of factors. This is not sufficient to support Nanayakkara's claim for emotional distress or pain and suffering damages.

CONCLUSIONS OF LAW

*6 1. This is a civil rights case brought under 42 U.S.C. § 1983. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

Retaliation

2. To prevail on a claim brought under 42 U.S.C. § 1983, the plaintiff must prove that a person acting under color of state law deprived him of his constitutional rights. Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

3. "An individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." Anderson v. Davila, 125 F.3d 148, 160 (3d Cir.1997)(citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ).

4. While the state may properly curtail many of a prisoner's rights, prisoners retain the right to petition the government and speak to the press. See Pell v. Procunier, 417 U.S. 817, 822 (1974); Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Milhouse v. Carlson, 625 F.2d 371, 374 (3d Cir.1981).

5. Government action against a prisoner, in retaliation for the exercise of First Amendment rights, is actionable under § 1983. Milhouse, 625 F.2d 371, 374 (3d Cir.1981). "[A]n otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech." Anderson, 125 F.3d at 161.

6. In order to prevail on a retaliation claim, a plaintiff must prove: (1) that he engaged in protected activity; (2) that he was subject to adverse actions by a state actor; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take adverse action. Anderson, 125 F.3d at 161. If the plaintiff proves these elements, the burden shifts to the state actor to prove that it would have taken the same action without the unconstitutional factors. Mt. Healthy, 429 U.S. at 287. In the prison context, the state actor may rebut the Plaintiff's claim by showing that their actions were motivated by legitimate penological objectives.

7. Testimony at a state Senate Committee hearing and participation in newspaper interviews are protected First Amendment activities.

8. Transfer from a Community Corrections Center, where an inmate has significant liberties, to a State Correctional Institution, is an adverse action.

9. Krug made the decision to return Nanayakkara to prison.

Causation

10. In order to prevail on a retaliation claim, a plaintiff must prove that their protected activity was a substantial motivating factor in the state actor's decision to take adverse action against them. See Hall v. Evans, 842 F.2d 337 (11th Cir.1988)(No. 86-8782, unpublished slip op. at 2). See also Wood v. Cohen, No. 96-3707, 1998 WL 88387 at *8 (E.D.Pa.1998).

*7 11. Nanayakkara proved that retaliatory animus was a substantial factor in Krug's decision to return him to prison.

12. The State contends that prisoners should be required to prove that there was no legitimate penological justification for a challenged decision. Under this formulation, the existence of any legitimate objective would insulate state actors from liability, even if the official did not base their decision on that objective. This standard is not sufficient to protect constitutional rights. The State must do more than prove that proper reasons for a challenged decision existed in the abstract. If an individual proves that retaliatory animus was a

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

substantial factor in an adverse decision by a state actor, the state actor must prove that they would have taken the same action against the individual, at the same time, on the basis of the proper reasons alone. See Mt. Healthy, 429 U.S. at 287. [FN1] The state actor could meet this burden by showing that they were motivated by a concern for community safety or institutional discipline.

FN1. Courts are divided over the proper standard for proving causation in First Amendment retaliation cases involving prisoners. See, e.g., McDonald v. Hall, 610 F.2d 16, 18 (1st Cir.1979)(requiring prisoner to prove that adverse action would not have occurred but for retaliation); Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir.1994) (requiring prisoner to prove that there was no legitimate penological justification for challenged action); Abdul-Akbar v. Department of Corrections, 910 F.Supp. 986 (D.Del.1995)(same), aff'd, 111 F.3d 125 (3d Cir.1997) (Table); cert. denied, 522 U.S. 852, 118 S.Ct. 144, 139 L.Ed.2d 91 (1997). The Third Circuit has not addressed this issue in a published opinion. In an unpublished opinion, Brooks-Bey v. Kross, No. 94-7650, slip op. at 8 n.1 (3d Cir.1995), the court rejected the "but for" test to the extent that it places a greater evidentiary burden on the plaintiff." While unpublished opinions are not binding on this court, the Brooks-Bey opinion is instructive.
In this case, while legitimate reasons for Krug's actions existed in the abstract, his decision was not based on those factors alone. Nanayakkara proved that "but for" his protected activities, he would not have been returned to prison.

13. The State did not establish that it would have returned Nanayakkara to prison on the basis of his dishonesty and difficulty in therapy. Krug was not motivated by legitimate goals of the correctional institution. Nanayakkara did not threaten community safety or institutional discipline. If Nanayakkara had not testified before the Senate Committee, he would not have been returned to prison on August 8, 1995.

Qualified Immunity

14. Government officials performing discretionary functions are shielded from liability for money damages, provided their conduct does not transgress "clearly established statutory or constitutional rights" of which a reasonable public official would know. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); see also Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Grant v. City of Pittsburgh, 98 F.3d 116, 123-24 (3d Cir.1996).

15. "An act taken in retaliation for the exercise of a constitutional right is actionable under section 1983 even if the act, when taken for different reasons, would have been proper." Franco v. Kelly, 854 F.2d 584, 590 (2d Cir.1988) (quoting Howland v. Kilquist, 833 F.2d 639, 644 (7th Cir.1987)).

16. It is well-settled that prison officials cannot take retaliatory action against a prisoner for exercising First Amendment rights. See Brooks v. Andolina, 826 F.2d 1266, 1268-69 (3d Cir.1987); Milhouse, 625 F.2d at 374.

17. Nanayakkara proved, by a preponderance of the evidence, that Krug's decision to return him to prison was motivated by retaliatory animus. [FN2] Therefore, Krug is not protected by qualified immunity.

FN2. In cases that require proof of a government officials' unconstitutional motive, the Third Circuit has held that the plaintiff must prove improper motive by a preponderance of the evidence. Grant v. City of Pittsburgh, 98 F.3d 116, 125-26 (1996). Nanayakkara met this standard, but he did not prove Krug's improper motive by clear and convincing evidence. See, Crawford-El v. Britton, 93 F.3d 813 (D.C.Cir.1996)(en banc), cert. granted, 520 U.S. 1273, 117 S.Ct. 2451, 138 L.Ed.2d 210 (1997).

*8 AND NOW this the day of March, 1998, based upon the attached Findings of Fact and Conclusions of Law, it is hereby ORDERED that:

1. Judgment is entered in favor of Plaintiff Amitha Nanayakkara and against Defendant Edward Krug, in the amount of $32,500.00.
2. Judgment is entered in favor of Defendant Tonya Shuey and against Plaintiff Amitha Nanayakkara.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

**EXHIBIT "B"**



COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL

**November 17, 2000**

MIKE FISHER
ATTORNEY GENERAL

**15th Floor, Strawberry Sq.**
**Harrisburg, PA 17120**
**DIRECT DIAL: (717) 787-9719**
**FAX: (717) 772-4526**

**Charles Iseley, #AM-9320**
**SCI-Coal Township**
**1 Kelley Drive**
**Coal Township, PA 17866**

**Re: Iseley v. Bushey,**
**No. 1:00-CV-00577**

**Dear Mr. Iseley:**

I write to respond to your November 5, 2000 letter. It is my understanding that your property was mailed from SCI-Graterford to SCI-Coal Township on November 14, 2000, and should arrive within in three to five days. When your property arrives you will be promptly notified.

I also understand that you filed a grievance concerning the legal materials you claim were left behind at SCI-Coal Township and are now missing. This matter is currently being investigated pursuant to the inmate grievance process as dictated by DOC-ADM 804. Once SCI-Coal has completed the investigation, you will receive a response to your grievance. I have requested that the grievance coordinator also inform me of the result of their investigation. Until that investigation is complete, I cannot properly address your allegation.

Very truly yours,

Maryanne M. Lewis
Deputy Attorney General

**EXHIBIT "C"**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHARLES ISELEY,** | : | |
| | : | |
| **Plai...** | : | |
| | : | |
| **v.** | : | **No. 1:00-CV-00577** |
| | : | **(Judge Kane)** |
| **W. CONWAY BUSHEY, et al.,** | : | |
| | : | |
| **Defendants** | : | |

**DECLARATION OF KANDIS DASCANI**

I, **KANDIS DASCANI**, hereby state subject to the penalty of perjury that the following is true and correct based upon my personal knowledge:

1. I am employed by the Pennsylvania Department of Corrections ("DOC") as the Assistant to the Superintendent at the State Correctional Institution at Coal Township, Pennsylvania ("SCI-Coal Township"). I have held that position since February 14, 1993, and have been employed by the DOC since July 10, 1986.

2. As the Assistant to the Superintendent of SCI-Coal Township, I am familiar with the rules and regulations governing the inmates at the prison . As part of my duties, I act as the grievance coordinator at SCI-Coal Township.

3. The DOC has established a Consolidated Inmate Grievance System. This review process is available to all state prisoners and is set forth in the Department of Corrections Administrative Directive ("DOC-ADM") 804. (See Exhibit "A" attached, which is a true and correct copy of DOC-ADM 804). As grievance coordinator, I am familiar with the procedures governing the grievance process for prisoners. DOC-ADM 804 provides that, after an attempted informal resolution of the problem, the inmate may submit a written grievance or complaint to the Grievance Coordinator. An

appeal from the decision of the Grievance Officer may be made in writing to the prison superintendent, and a final written appeal may be presented to the DOC Office of Inmate Grievances and Appeals.

4. Charles Iseley, is an inmate currently housed at SCI-Coal Township. On August 17, 2000, Iseley was temporarily transferred to SCI-Graterford for a court appearance. On November 3, 2000, Iseley returned to SCI-Coal Township from SCI-Graterford.

5. On November 6, 2000, I received Grievance No. 0622-00, dated November 5, 2000 from Iseley. (See Exhibit "B" attached). Pursuant to Department of Corrections Administrative Directive 804, I processed the grievance and assigned the matter to be investigated.

6. Lt. Mattis, as the Grievance Officer, conducted an investigation concerning Grievance No. 0622-00. On November 28, 2000, Lt. Mattis responded to Iseley's grievance and informed me of the results of his investigation. (See Exhibit "C" attached).

7. Mattis' investigation revealed the following:

a) Mattis addressed Iseley's claim alleging the disappearance of his legal material, including a personal interview of Iseley. A box of Iseley's property was sent to SCI-Coal Township from SCI-Graterford on November 16, 2000.

b) Iseley inventoried the property on November 17, 2000, and upon completion of the inventory, Iseley continued to allege that he was missing legal materials.

c) According to Iseley, the missing documents were never at SCI-Coal Township, but he received them while at SCI-Graterford.

d) Mattis also investigated Iseley's claim that he left legal materials in his cell when he was temporarily transferred to SCI-Graterford.

e) Officer Shay reported to Mattis that he recalled packing Iseley's cell, and did not recall any legal materials in his cell.

8. As a result of his investigation, Lt. Mattis reported to me that he did not find that SCI-Coal was responsible for any mishandling of Iseley's legal materials. (See Exhibit "C" attached).

9. As noted in ¶ 3, Iseley has available to him, pursuant to DOC-ADM 804, an appeal, process. This appeal process includes a review of response to his grievance to the Superintendent and the DOC Office of Inmate Grievances and Appeals.

10. To date Iseley has not appealed the initial response to Grievance No. 0622-00.

12/6/00
**DATE**

Kandis K Dascani
**KANDIS DASCANI**
**Assistant to the Superintendent at**
**SCI-Coal Township**

**Exhibit "A"**



**POLICY STATEMENT**

**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: | | Policy Number: |
|---|---|---|
| **Consolidated Inmate Grievance Review System** | | **DC-ADM 804** |
| **Date of Issue:** July 20, 1994 | **Authority:** Joseph D. Lehman, Commissioner | **Effective Date:** Oct. 20, 1994 |

## I. AUTHORITY

The Authority of the Commissioner of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. PURPOSE

It is the purpose of this Administrative Directive to establish policy regarding the Consolidated Inmate Grievance Review System and to ensure that inmates have an avenue through which resolution of specific problems can be sought.

This directive sets forth procedures for the review of Inmate Grievances not already covered by other Administrative Directives and policies. It also provides the method through which review procedures established by other directives are to be integrated with the procedures outlined in this directive.

## III. APPLICABILITY

This policy is applicable to all employees of the Department of Corrections and all inmates under the jurisdiction of the Department of Corrections and to those individuals and groups who have business with or use the resources of the Department of Corrections.

## IV. DEFINITIONS

A. Grievance -

The formal written expression of a complaint submitted by an inmate related to a problem encountered during the course of his/her confinement.

B. Grievance Coordinator -

The Corrections Superintendent's Assistant in an institution or the Assistant to the Regional Director in Community Corrections who is responsible for the overall administration of the Inmate Grievance System in that facility\region. This includes all data collection, tracking and statistical reporting. At the direction of the Facility Manager or Community Corrections Regional Director, the Grievance Coordinator may be called upon to provide Initial Review of certain grievances.

C. Grievance Officer -

An appropriate Department Head or Management Level staff person designated by the Facility Manager or CC Regional Director to provide Initial Review of an inmate grievance arising from his/her specific area of responsibility, e.g., a Unit Manager would be assigned to provide Initial Review of a grievance from the housing unit. If the grievance arises from the Food Services Area, the Grievance Officer designated by the Facility Manager shall be the Food Services Manager, likewise, the Corrections Health Care Administrator would be the Grievance Officer for a grievance related to a Health Care issue.

D. Central Office Review Committee **(CORC)** -

A committee of at least three (3) Central Office staff appointed by the Commissioner of Corrections to include the Commissioner, Executive Deputy Commissioner and Chief Counsel or their designees.

With the exception of appeals from disciplinary action under DC-ADM 801 and appeals arising from Health Care or medical treatment grievances, the CORC Shall have responsibility for direct review of all Inmate Appeals for Final Review.

E. Central Office Medical Review Committee **(COMRC)** -

A committee appointed by the Commissioner to include the Director of the Bureau of Health Services and relevant Bureau staff. The COMRC shall have responsibility for direct review of grievance appeals related to Health Care and medical treatment issues.

F. Initial Review -

The first step in the formal Inmate Grievance Process for all issues except those already governed by other specified procedures (see VI E). All reviews conducted below the level of Facility Manager or Regional Director are considered initial reviews.

G. Appeal from Initial Review -

The first level of appeal of a decision rendered at Initial Review. This appeal is directed to the Facility Manager or Community Corrections Regional Director.

**An appeal of the Initial Review decision on a grievance related to a Health Care or Medical issue shall be submitted directly to the COMRC at Central Office.**

**Only issues raised at Initial Review shall be appealed.**

H. Final Review -

Upon completion of Initial Review and appeal from Initial Review, an inmate may seek Final Review from the Central Office Review Committee **(CORC)**, for any issue involving continued non-compliance with Department of Corrections directives or policy, the ICU Consent Decree or other law.

## V. POLICY

A. It is the policy of the Pennsylvania Department of Corrections that every individual committed to its custody shall have access to a formal procedure - the Consolidated Inmate Grievance Review System - through which the resolution of problems or other issues of concern arising during the course of confinement may be sought. For every such issue there shall be a forum for review and an avenue of appeal, but only one.

B. Informal Resolution of Problems - All inmates are expected to attempt to resolve problems or differences with staff on an informal basis through direct contact or by sending a request slip to appropriate staff. Action taken by the inmate to resolve the situation must be indicated on the grievance form, Section B.

The Grievance Form, DC 804, Part I, is available in each Housing Unit or upon request from Unit staff. This is the proper form to be used for submission of a grievance and it should be completed according to the directions provided.

**It is required that a genuine effort be made to resolve the problem before the grievance system is used. The inmate must document these efforts in Section B of the Grievance Form. Failure to do so may result in the grievance being returned to the inmate without action. The inmate may then refile the grievance with Section B properly completed.**

C. Any inmate using the grievance system shall do so in good faith and for good cause.

No one shall be punished, retaliated against or otherwise harmed for good faith use of this grievance system.

Deliberate misuse of the grievance system may result in restricted access or disciplinary action, at the discretion of the Facility Manager.

D. It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review. See VI., C. 1.

E. The Inmate Grievance Review System is intended to deal with a wide range of issues, procedures or events which may be of concern to inmates. It is not meant to address incidents of an urgent or emergency nature. When faced with such an event, the inmate should contact the nearest staff member for immediate assistance.

## VI. PROCEDURES

A. A Grievance shall be submitted to the Grievance Coordinator in the following manner.

1. All grievances shall be in writing and in the format provided on the forms supplied by the institution (DC-804 Part 1). See Section V., B.

2. All grievances shall be presented individually. Any grievance submitted by a group of inmates will not be processed, however, if the Grievance Coordinator believes that the issue being grieved is legitimate, it will be referred to appropriate Management Staff for review.

3. Only an inmate who has been personally affected by a Department or institution action or policy shall be permitted to seek review of a grievance or appeal. The inmate grievant must sign the grievance or appeal.

4. All grievances and appeals must be presented in good faith. They shall include a brief statement of the facts relevant to the claim. The text of the grievance must be legible and presented in a courteous manner. The inmate should identify any persons who may have information which could be helpful in resolving the grievance. The inmate may also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, the ICU Consent Decree or other law. The inmate may request to be personally interviewed prior to the decision on Initial Review. Any inmate who submits a grievance containing false and malicious information may be subject to disciplinary action.

5. Grievances and appeals based on different events should be presented separately, unless it is necessary to combine the issues to support the claim. The Grievance Officer may combine multiple grievances which relate to the same subject.

**NOTE:** At any point in the grievance process, the inmate has the right to withdraw the grievance.

B. Initial Review

1. Initial Review Procedures must be completed before Appeal from Initial Review or Final Appeal may be sought. Any claims of violation of the ICU Consent Decree must be raised through this grievance procedure before they may be addressed by any court.

2. Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause.

3. The Grievance Coordinator will forward the grievance to the appropriate Grievance Officer for investigation and resolution. The inmate grievant and other persons having personal knowledge of the subject matter may be interviewed. A grievant who has requested a personal interview, shall be interviewed.

4. Within ten (10) working days of receipt of the grievance by the Grievance Officer, the grievant shall be provided a written response to the grievance to include a brief rationale, summarizing the conclusions and any action taken or recommended to resolve the issues raised in the grievance.

   The Grievance Coordinator may authorize an extension of up to an additional ten (10) working days if the investigation of the grievance is pending. If an extension is necessary, the grievant shall be so advised in writing.

C. Appeal from Initial Review

1. An Initial Review Decision of a grievance on a Health Care or medical treatment issue may be appealed directly to the Central Office Medical Review Committee for Final Review within five (5) days of receipt by the inmate of the Initial Review decision. A grievance for which the Corrections Health Care Administrator conducted the Initial Review will usually be considered a Medical Grievance.

   All other appeals will be submitted as follows.

2. An inmate may appeal an initial review decision to the Facility Manager or Community Corrections Regional Director in writing, within five (5) days from the date of receipt by the inmate of the Initial Review decision. **The inmate must appeal in this manner prior to seeking Final Review. Only issues which were raised for initial review may be appealed.**

3. All appeals must conform to the requirements specified in Section VI A of this directive. The appeal must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any initial review decision will be permitted.

4. The Facility Manager or Regional Director must notify the inmate of his/her decision within ten (10) working days after receiving the appeal. This decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision.

D. Final Review

1. Any inmate who is dissatisfied with the disposition of an Appeal from Initial Review decision, may, within seven (7) days of receiving the decision, appeal any issue related to non-compliance with the ICU Consent Decree, other law, Department directive or policy, for final review. Only issues raised at the Initial Review and Appeal level may be referred for Final Review.

2. Final Review will not be permitted until the inmate has complied with all procedures established for Initial Review and Appeal from Initial Review. Exceptions may be made for good cause.

3. Final Review of all appeals will be sent directly to the CORC except the following:

   a. Medical Grievances which will be reviewed by COMRC.

   b. Requests for Final Review of appeals from disciplinary actions which were processed through DC-ADM 801. These will be reviewed by the Office of the Chief Counsel which may respond directly to the inmate or refer the appeal to the Central Office Review Committee **(CORC)** for further reviews.

The address of the **CORC/COMRC** is:

**PA DEPARTMENT OF CORRECTIONS**
**CENTRAL OFFICE REVIEW COMMITTEE**
**PO BOX 598/2520 LISBURN ROAD**
**CAMP HILL, PA 17001-0598**

4. Requests for Final Review must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any second level (Appeal from Initial Review) decision will be permitted.

5. The CORC\COMRC, or any member thereof, may require additional investigation to be made prior to a decision on a Final Review appeal.

6. The CORC\COMRC will review all issues properly raised according to the above procedures. It may also review and consider any other related matter.

7. For all Appeals receiving Final Review, the CORC/COMRC will issue its decision within twenty-one (21) days after receipt of an appeal. The decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision. The committee shall notify the grievant and Facility Manager/Regional Director of its decision and rationale.

8. The Chief Counsel will notify counsel for the ICU class of disposition by the CORC/COMRC of any matter raised on Final Review alleging a violation of the ICU Consent Decree.

E. Exceptions

Initial Review and Appeal from Initial Review of issues related to the following Administrative Directives shall be in accordance with procedures outlined therein, and will not be reviewed by the Grievance Officer or Grievance Coordinator.

1. DC ADM 805 - Policy & Procedures for Obtaining Pre-Release Transfer.
2. DC ADM 801 - Inmate Disciplinary and Restricted Housing Unit Procedures. See DC-ADM 801 VI., G & I
3. DC ADM 802 - Administrative Custody Procedures. See DC-ADM 802, VI, B, 1,2. Appeal from Initial Review, see DC-ADM 802, VI, B, 4, a.

4. DC-ADM 814 - Incoming Publications

See 814-IIIB, Appeal from Initial Review, see 814-IIID.

Additionally, there may be other kinds of issues for which Initial Review Procedures have been previously established by Administrative Memorandum or Policy Statement.

F. Admissions and Review

1. All proceedings pursuant to this directive are in the nature of settlement negotiations and will, therefore, be inadmissible before any court or other tribunal in support of any claim made against the Commonwealth or any employee. No resolution of any grievance offered as a result of this procedure shall be admissible before any court or other tribunal as an admission of violation of the ICU Consent Decree or any State or federal law.

2. No decision rendered as a result of the processing of a grievance shall be reviewable by any court unless it establishes a system or institution-wide violation of the decree.

G. Completion of Review After Transfer

Any inmate who is transferred after the filing of a grievance or appeal, but prior to the completion of the appeal process, may continue to pursue the grievance or appeal by notifying the Facility Manager or Regional Director of the facility in which confined when the grievance was filed. Adjustments in the various time limitations may be made to facilitate review.

## VII. SUSPENSION DURING EMERGENCY

In an emergency situation or extended disruption of normal institutional operation, any provision or section of this policy may be suspended by the Commissioner or his/her designee for a specific period of time.

## VIII. RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility so as to be consistent with law and to permit the accomplishment of the purpose of the policies of the Department of Corrections.

## IX. SUPERSEDED POLICY AND CROSS-REFERENCE

This directive revises the Inmate Grievance System (DC-ADM 804, MAY 1, 1984), and supersedes the pilot grievance system in effect at selected DOC institutions. It does not supersede or repeal any portion of any other directive or policy statement. Where this directive is inconsistent with any other directive or policy, both shall be interpreted so as to provide full review of all issues raised, consistent with the scope and purpose of this directive. Conflicts will most frequently occur at the Initial Review level, where other directives establish committees to review specific issues.

Cross References: DC-ADM 801, DC-ADM 802

ACA Cross-References: 3-4271

Joseph D. Lehman,
Commissioner

cc: Executive Deputy Commissioner Reid
Deputy Commissioner Clymer
Deputy Commissioner Fulcomer
Acting Deputy Commissioner Beard
All Superintendents
CCC Directors (4)
File



**Bulletin**
**Commonwealth of Pennsylvania • Department of Corrections**

| To: | Policy Subject: |
|---|---|
| **Superintendents**<br>**Boot Camp Commander**<br>**Regional Directors**<br>**Executive Staff** | **DC-ADM 804**<br>**CONSOLIDATED INMATE GRIEVANCE REVIEW SYSTEM** |
| | **Policy Number:** **DC-ADM 804-1** |
| | **Policy Issue Date:** **July 20, 1994** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| April 2, 1996 | Martin F. Horn | May 20, 1996 |

The purpose of this Bulletin is to include medical grievances in the regular grievance process and to **discontinue** the Central Office Medical Review Committee (COMRC). .

It is important that the Superintendent be aware of all functions within the institution. Similarly, it is essential that the Bureau of Health Care Services be included in the CORC process, to include review by the Chief Counsel's office with respect to medical grievances. Therefore, all grievances, including those relating to medical issues, are to be processed in the same manner. The grievance coordinator will continue to forward medical grievances to the CHCA for initial review. Then, the Superintendent will be responsible for the Appeal from Initial Review, as for all other grievances.

Final Appeal of medical grievances will no longer be forwarded to the COMRC. The Central Office Review Committee (CORC) will process the appeals. The Director of the Bureau of Health Care Services, or designee, will participate as a member of CORC for all medical grievance appeals.

The following sections of DC-ADM 804 are to be **discontinued:**

IV.E.: Definition of COMRC

IV.G.: "An appeal of the Initial Review decision on a grievance related to a Health Care or Medical issue shall be submitted directly to the COMRC at Central Office.

V.D.: "It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review."



BULLETIN

Commonwealth of Pennsylvania • Department of Corrections

| To: | Policy Subject: |
|---|---|
| Superintendents<br>Boot Camp Commander<br>Regional Directors<br>Executive Staff | Consolidated Inmate Grievance Review System |
| | Policy Number: DC-ADM 804-1 |
| | Policy Issue Date: July 20, 1994 |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| April 2, 1996 | | May 20, 1996 |

The purpose of this Bulletin is to include medical grievances in the regular grievance process and to **discontinue** the Central Office Medical Review Committee (COMRC).

It is important that the Superintendent be aware of all functions within the institution. Similarly, it is essential that the Bureau of Health Care Services be included in the CORC process, to include review by the Chief Counsel's office with respect to medical grievances. Therefore, all grievances, including those relating to medical issues, are to be processed in the same manner. The grievance coordinator will continue to forward medical grievances to the CHCA for initial review. Then, the Superintendent will be responsible for the Appeal from Initial Review, as for all other grievances.

Final Appeal of medical grievances will no longer be forwarded to the COMRC. The Central Office Review Committee (CORC) will process the appeals. The Director of the Bureau of Health Care Services, or designee, will participate as a member of CORC for all medical grievance appeals.

The following sections of DC-ADM 804 are to be **discontinued**:

IV.E.: Definition of COMRC

IV.G.: "An appeal of the Initial Review decision on a grievance related to a Health Care or Medical issue shall be submitted directly to the COMRC at Central Office.

V.D.: "It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review."

VI.C.1.: "An Initial Review decision of a grievance on a Health Care or Medical Treatment issue may be appealed directly to the Central Office Medical Review Committee for Final Review within five days of receipt by the inmate of the Initial Review decision. A grievance for which the Corrections Health Care Administrator conducted the Initial Review will usually be considered a Medical Grievance."

VI.D.3.a: a. "Medical Grievances which will be reviewed by COMRC."

The following sections of DC-ADM 804 are **modified** as follows:

VI.D.3.: Delete "except the following."

VI.D.5.: Delete, "COMRC"

VI.D.6.: Delete, "COMRC"

VI.D.7.: Delete, "COMRC"

VI.D.8.: Delete, "COMRC"



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| **To:** Executive Staff<br>Superintendents<br>Regional Directors | **Policy Subject:** Consolidated Inmate Grievance Review System<br>**Policy Number:** DC-ADM 804-2<br>**Policy Issue Date:** July 20, 1994 | |
|---|---|---|
| **Date of Issue:** October 1, 1997 | **Authority:** Martin F. Horn | **Effective Date:** November 1, 1997 |

The procedures for appeal to final review under DC-ADM 804, VI, D, 5-7, are amended as follows:

(1) The Chief Hearing Examiner will replace the Central Office Review Committee (CORC) at final review of all grievance appeals. The Chief Hearing Examiner will perform all functions previously performed by CORC.

(2) In reviewing grievances submitted for final review, the Chief Hearing Examiner will review the initial grievance and response, any appeals therefrom and the responses thereto and the issues appealed to final review.

(3) The Chief Hearing Examiner will review health care related grievances with the Bureau of Health Care. Appeals raising legitimate legal issues, including but not limited to access to courts and sentencing issues, will be reviewed with an attorney prior to response.

(4) Upon completion of final review, the Chief Hearing Examiner will respond directly to the inmate in all cases where the position taken by the institution is upheld.

(5) In all cases where the action of the Grievance Coordinator, PRC, Incoming Publication Review Committee, or Superintendent is reversed or amended, or where a matter is remanded, the Chief Hearing Examiner will prepare a letter to the inmate and a memorandum to the Superintendent. The Chief Hearing Examiner will forward the letter and memorandum to the appropriate Regional Deputy Commissioner for review and signature.

(6) The Chief Hearing Examiner will be responsible for assuring that:

(a) appeals to final review are responded to in a timely fashion;
(b) records pertaining to such appeals are maintained properly; and
(c) counsel for the ICU class is notified of the disposition at final review of any matter raised to final review alleging a violation of the <u>ICU vs Shapp</u> Consent Decree.

It is the intent of the Department of Corrections to provide inmates with a complete and timely review of all appeals properly raised to final review. These amendments have been established to ensure timeliness at final review while continuing to provide a thorough, impartial review of the issues.



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| | |
|---|---|
| **To:** Executive Staff<br>Superintendents<br>Regional Directors<br>Boot Camp Commander | **Policy Subject:** Consolidated Inmate Grievance Review System |
| | **Policy Number:** DC-ADM 804-3 |
| | **Policy Issue Date:** July 20, 1994 |

| **Date of Issue:** | **Authority:** | **Effective Date:** |
|---|---|---|
| October 21, 1997 | Martin F. Horn | November 1, 1997 |

The purpose of this bulletin is to facilitate timely responses from the Chief Hearing Examiner's Office to all appeals to final review.

(1) All appeals to final review should be addressed to the Chief Hearing Examiner,

Chief Hearing Examiner
1451 S. Market Street
Elizabethtown, PA 17022

Appeals which are addressed to the Commissioner, Chief Counsel, to other Central Office staff, are of course, delivered to these individuals first, then have to be referred to the Chief Hearing Examiner. Improperly addressed appeals may cause a delay in the response to final appeal.

(2) Inmates appealing to final review are responsible for providing the reviewing body with any available paperwork relevant to the appeal. A proper appeal to final review should include photocopies of the initial grievance, initial grievance response, and the Superintendent's response. Appeals without proper records will be reviewed, but the review will be delayed until the appropriate paperwork can be obtained.



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| **To:** | **Policy Subject:** |
| --- | --- |
| Executive Staff<br>Superintendents<br>CCC Regional Directors<br>Boot Camp Commander | Consolidated Inmate Grievance Review System |
| | **Policy Number:** DC-ADM 804-4 |
| | **Policy Issue Date:** July 20, 1994 |

| **Date of Issue:** | **Authority:** | **Effective Date:** |
| --- | --- | --- |
| April 29, 1998 | Martin F. Horn | May 1, 1998 |

The purpose of this bulletin is to amend the section VI. Procedures, A.4. to read,

"All grievances and appeals must be presented in good faith. They shall include a brief statement of the facts relevant to the claim. The text must be legible and presented in a courteous manner. The Grievant should identify any persons who may have information which could be helpful in resolving the grievance. The Grievant may specifically raise any claims concerning violations of Department of Corrections directives, regulations, court orders, or other law. The Grievant may also include a request for compensation or other legal relief normally available from a court. The inmate may request to be personally interviewed at initial review. Any inmate who submits a grievance containing false information may be subject to disciplinary action. Inmates who have not already completed final review may request compensation or legal relief on appeal to final review."

And to amend Section VI. Procedures, B. Initial Review, 2. to read:

"Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause. Such extensions will normally be granted if the events complained of would state a claim of violation of federal right.




BULLETIN
Commonwealth of Pennsylvania • Department of Corrections

| TO: | Policy Subject: |
|---|---|
| Executive Staff<br>Superintendents<br>Boot Camp Commander<br>Regional Directors | Consolidated Inmate Grievance Review System |
| | Policy Number: DC-ADM 804-05 |
| | Policy Issue Date: July 20, 1994 |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| October 30, 2000 | Martin F. Horn | November 1, 2000 |

Effective November 1, 2000, all final appeals of inmate grievances shall be handled by the Secretary's Office of Inmate Grievances and Appeals. Therefore, any final appeal to be submitted on or after November 1, 2000, should be sent to the following address:

Chief, Secretary's Office of Inmate Grievances and Appeals
Department of Corrections
2520 Lisburn Road, P.O. Box 598
Camp Hill, PA 17001-0598

**Exhibit "B"**

**Exhibit "C"**

DC-804
PART 1

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
P.O. BOX 598
CAMP HILL, PA. 17001-0598

OFFICIAL INMATE GRIEVANCE 00 NOV -6 AM 10:34

GRIEVANCE NO. 0622-00

| TO: GRIEVANCE COORDINATOR Dascani | INSTITUTION Coal | DATE 20001105 |
|---|---|---|
| FROM: (Commitment Name & Number) C. Isley AM-9320 | INMATE'S SIGNATURE C. Isley | |
| WORK ASSIGNMENT Nil | QUARTERS ASSIGNMENT RHU A-1 | |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance:

On Nov 2, 2000, I was transferred from Graterford back to here. In the receiving room I was informed by the property sgt. that the legal material that was in the box "disappeared" and that the other box of legal material and other property not sent by Graterford must be taken care of by mailing a letter to Graterford myself. I sent the letter along with cash slips and mailing label but have no idea if my property is in the property at Graterford or still in the hole (L-Blk) down there.

Moreover, on Nov 3, 2000, I was informed by prison guard Greene that all the legal material that I left here which I had in my cell had disappeared even though he saw it there in the storage room the prior day. He claimed he had nothing to do with my missing legal material and informed me that the sgt advised me to ask the 6-2 shift the next day. I complied by asking the 6-2 sgt who told me that it was 2-10 shift. I am representing myself in numerous legal actions. I request a personal interview. I want all my legal property returned.

B. Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff

Staff contacted: Property Room Sgt., RHU Sgt (6-2), Prison Guard Greene, RHU Sgt (2-10).

Your grievance has been received and will be processed in accordance with DC-ADM 804.

K K Dascani
Signature of Grievance Coordinator

11/7/00
Date

Coordinator Copy CANARY—File Copy PINK—Action Return Copy GOLDENROD—Inmate Copy

DC-804
PART IICOMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
P.O. BOX 598
CAMP HILL, PA 17001

00 DEC -4 PM 1:39

OFFICIAL INMATE GRIEVANCE
INITIAL REVIEW RESPONSE

GRIEVANCE NO. #0622-00

| TO: (NAME & DC NO.) | INSTITUTION | QUARTERS | GRIEVANCE DATE |
|---|---|---|---|
| Charles Isley AM-9320 | SCI-COAL TOWNSHIP | RHU Pod 1 | November 5,2000 |

I have been assigned as grievance officer for your grievance.

You were afforded a personal interview regarding your grievance.

Your grievance alleges the disappearance of a box of legal material.
You returned from ATA from SCIG on November 3,2000 no legal material accompanied you.

I did locate the box to be at SCIG and it was sent to SCICT and received on November 16, 2000.

All contents received were inventoried by you on November 17th 2000, you still contend that you are missing specific legal documents.
You state that these specific legal documents were never at this institution but you received them while ATA at SCIG.

You also claim you left legal material in your cell here when you were transferred ATA to SCIG.
Officer Shay recalls packing your cell that date and does not recall any legal material in your cell.

I do not find this institution responsible for any mishandling of your legal material.

cc: Mrs. Dascani
DC-14
DC-15
Inmate
File

| Refer to DC-ADM 804 Section VIII, for instructions on grievance system appeal procedures. | SIGNATURE OF GRIEVANCE COORDINATOR<br>[signature]<br>Robert J. Mattis, C.O. III KKD | DATE<br>November 28, 2000 |
|---|---|---|

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHARLES ISELEY,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **No. 1:00-CV-00577** |
| | : | **(Judge Kane)** |
| **W. CONWAY BUSHEY, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## CERTIFICATE OF SERVICE

I, Maryanne M. Lewis, Deputy Attorney General, hereby certify that on this date I caused to be served the foregoing Defendants' Brief in Response to Plaintiff's Motion to Cease Retaliation, by depositing a copy of the same in the United States mail, postage prepaid, in Harrisburg, PA., addressed to the following:

Charles Iseley, #AM-9320
SCI-Coal Township
1 Kelley Drive
Coal Township, PA 17866-1020

**MARYANNE M. LEWIS**
**DEPUTY ATTORNEY GENERAL**

**DATE: December 7, 2000**