# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG

JUN 15 2001

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

CHARLES ISELEY,     :
    :
      Plaintiff     :
    :
    v.     :    No. 1:00-CV-00577
    :    (Judge Kane)
W. CONWAY BUSHEY, et al.,     :
    :
      Defendants     :

---

## DOCUMENTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,

**D. MICHAEL FISHER**
Attorney General

By:    **MARYANNE M. LEWIS**
Deputy Attorney General

**SUSAN J. FORNEY**
Chief Deputy Attorney General
Chief, Litigation Section

Office of Attorney General
15th Flr., Strawberry Sq.
Harrisburg, PA 17120
FAX: (717) 772-4526
Direct Dial: (717) 787-9719
DATE: June 15, 2001

# TABLE OF CONTENTS

DEFENDANTS' AMENDED STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE IN DISPUTE

UNSWORN DECLARATION OF ROBERT BITNER

UNSWORN DECLARATION OF KERMIT BREON

UNSWORN DECLARATION OF THOMAS CHESNEY

UNSWORN DECLARATION OF CAROL DOTTER

UNSWORN DECLARATION OF MARTIN L. DRAGOVICH

UNSWORN DECLARATION OF J. KANE

UNSWORN DECLARATION OF ROBERT MACKRETH

UNSWORN DECLARATION OF LAWRENCE MAHALLY

UNSWORN DECLARATION OF CHARLES MITCHELL

UNSWORN DECLARATION OF RICHARD SPAIDE

UNSWORN DECLARATION OF JAMES UNELL

UNSWORN DECLARATION OF TERRY WHITMAN

UNSWORN DECLARATION OF ROBERT YARNELL

UNSWORN DECLARATION OF MICHAEL YOURON

COMPLAINT FILED IN ISELEY v. BUSHEY

DEPOSITION TRANSCRIPT OF CHARLES ISELEY

WESTON v. COMMONWEALTH, et al.,
2001 WL 539 470 (3D Cir. (Pa))

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,         :
                                :

     Plaintiff         :
                                :

     v.           :     No. 1:00-CV-00577
                                :     (Judge Kane)

W. CONWAY BUSHEY, et al.,   :
                                :

     Defendants      :

## DEFENDANTS' AMENDED STATEMENT OF
## MATERIAL FACTS AS TO WHICH THERE
## IS NO GENUINE ISSUE IN DISPUTE

Defendants, pursuant to Middle District Rule 7.4 and through their counsel, submit that the following facts are material to this action and genuinely not in dispute:

1.     Plaintiff is Charles Iseley, an inmate currently incarcerated at the State Correctional Institution at Huntingdon, Pennsylvania ("SCI-Huntingdon").

2.     Defendants are Conway Bushey, Robert Meyers, Terry Whitman, Gregory Gaertner, Sam Mazzotta, Sara Craig, Charles Mitchell, Gregory Tressler, David Wakefield, Martin Horn and Robert Bitner, Martin Dragovich, Carol Dotter, Kermit Breon, Robert Novotney, J. Kevin Kane, Kerry Dennison,  Thomas Chesney,  Marva Cerullo,  Richard Spaide, Robert Yarnell, Sally Gennarini, James

Unell, John Corbacio, Thomas Hornung, Brenda Wildenstein, Michael Youron, John Eichenberger, Jerome Fryzel, Gerald Gavin, Lawrence MaHally, Bernie Birosaki, Steve Peek, Robert Mackreth, Brian Dropinski, Jason Grow, who at the time of the allegations contained in the complaint were employed at SCI-Rockview, SCI- Mahanoy, the Pennsylvania Department of Corrections or the Pennsylvania Board of Probation and Parole.

3.    On July 2, 1997, Iseley was transferred from SCI-Greene to SCI-Rockview. While at SCI-Rockview, Iseley's prescriptive program plan recommended educational and vocational programming, drug and alcohol programming and therapeutic community unit programming. The plan also recommended that Iseley remain misconduct free and maintain contact with his counselor. (See Whitman Dec.)

4.    On August 25, 1998, Iseley was placed in Administrative Custody pending an investigation of possible involvement in a fight. Information regarding the fight and identification of Iseley was provided by confidential sources of information. ("CSI") (See Mitchell Declaration)

5.    On August 31, 1998, hearing examiner Mitchell conducted an in-camera hearing with Lt. Eaton to determine the reliability of the confidential

sources of information utilized in the misconduct report. This type of hearing is in accordance with DC ADM 801. (Id.)

6.    The reliability hearing was conducted in-camera because the nature of the reliability of the evidence could, by itself, reveal the identity of the informants. Iseley, therefore was not present at this hearing. (Id.)

7.    At the reliability hearing, Lt. Eaton explained under oath how the informants were in a position to observe, what information the sources provided and that the information was corroborated by others. In addition, information was provided to the hearing examiner that the informant had provided information in the past that was proven to be reliable. (Id.)

8.    Hearing Examiner Mitchell found that the testimony of Lt. Easton and the informants met the reliability criteria as outlined in DC-ADM 801. (Id.)

9.    On September 2, 1998, Iseley had a hearing regarding Misconduct No. A122000. At the hearing Iseley pled not guilty and submitted his version of the incident. (Id.)

10.    After hearing the evidence, the hearing examiner believed Lt. Eaton's report and the CSI information over Iseley's denial. Iseley was sanctioned to 90 days Disciplinary Custody. (Id.)

11.    Iseley was found guilty of the misconduct because the hearing examiner based his finding on the credibility evidence, testimony, and reports. (Id.)

12.    On September 10, 1998, Iseley appealed Misconduct No. A 122000 to the Program Review Committee ("PRC"). The PRC reviewed the misconduct report, the reliability hearing report, Iseley's version and evidence presented, the hearing examiner's finding, the sanction, and the issues Iseley raised on appeal. Based upon their review, the PRC denied Iseley's appeal. (See Whitman Declaration)

13.    Iseley appealed the PRC decision regarding Misconduct No. A 122000 to the Chief Hearing Examiner of the DOC, Robert Bitner. Bitner reviewed the misconduct report, the hearing examiner's findings and reviewed the issues raised in Iseley's appeal. Based upon his review, Bitner denied Iseley's appeal of Misconduct No. A122000, on October 6, 1998. (See Bitner Declaration)

14.    On December 2, 1998, Iseley was transferred from SCI-Rockview to SCI-Mahanoy. Iseley was not assigned a job at SCI-Mahanoy in December of 1998, because he stated to the Initial Reception Committee that he did not want to work for so little pay. (Id., Chesney Declaration)

-4-

15.     On December 13, 1998, Iseley filed Grievance No. MAH-0457-98 alleging that he was harassed, threatened and fired from his job by corrections officer MacKreth.  (Id.)

16.     Carol Dotter, the grievance coordinator at SCI- Mahanoy, reviewed the grievance and found it to be false and without merit, based upon the information provided to her.  (See Dotter Dec., Grievance Record MAH-0457-98.)

17.     Iseley appealed Dotter's findings to the Superintendent on December 24, 1998.  On December 29, 1998, Superintendent Dragovich reviewed Iseley's original grievance, the grievance officer's findings and Iseley's appeal.   Dragovich found that Iseley did not have a job at SCI-Mahanoy and was belligerent with officer McKreth.   The Superintendent denied Iseley's appeal.  (See Dotter Dec., Grievance Record MAH-9457-98)

18.     Iseley appealed Grievance No. 0457-98 to the Chief Hearing Examiner of the DOC, Robert Bitner.  Bitner concurred with the Grievance Coordinator's and the Superintendent's responses and denied Iseley's appeal on January 13, 1999.  Bitner's findings were based upon his review of the grievance record.  (See Bitner Dec.)

19.     On December 14, 1998, Iseley went to Unit Manager's Chesney office and asked permission to go to the commissary, after the block's scheduled

commissary.  When Chesney refused the  request, Iseley became argumentative with Chesney.  Chesney then ordered Iseley to leave his office.  (See Chesney Dec.)

20.    Iseley refused to leave and began using obscene language.    Iseley was then issued Misconduct No. A 110205 for refusing to obey and order and using obscene language.  (See Chesney Dec.)

21.    On December 16, 1998, a hearing was held by hearing examiner Kermit Breon regarding Misconduct No. 110205.   Prior to the hearing, Iseley's witnesses were not permitted to be called as Iseley admitted that the staff witnesses he requested were not present at the time and place that the incident took place. (See Misconduct Record 110205)

22.    At the hearing Breon considered Chesney's report as well as Iseley's version.  Based upon the information presented, Breon believed Chesney's report that Iseley refused to obey an order and sanctioned Iseley to 30 days disciplinary custody.  ( Id.)

23.    Iseley then appealed the misconduct decision to the PRC. Upon review of the misconduct report record, Iseley's version, and  the hearing examiner's findings,  the PRC denied Iseley's appeal.  (See  Spaide Dec., Misconduct Record 110205)

24.    Iseley appealed Misconduct Report No. 110205 to the Chief Hearing Examiner of the DOC, Robert Bitner.    Bitner, based upon his review of the misconduct, the hearing examiner,s finding, Iseley's documentation and the PRC and superintendent review, denied the appeal.    (See Bitner Declaration)

25.    On December 17, 1998, Iseley submitted inmate grievance No. MAH-0462-98, alleging that his cell lights remain on at night in violation of his constitutional rights.    (See Grievance Record MAH 0462-98; Dotter Dec.)

26.    Carol Dotter, the Grievance Coordinator, responded to Iseley on December 17, 1998, explaining to him that the low intensity night lights are necessary for security in the L-5 unit.    (Id.)

27.    Iseley appealed Dotter's response to  Superintendent Dragovich  and to the Chief Hearing Examiner, Robert Bitner.    Both Bitner and Dragovich denied Iseley's appeal.    (See Grievance Record MAH 0482-98; Bitner Dec.)

28.    On December 26, 1998, Iseley filed Grievance No. MAH 0479-98, alleging he is not permitted to receive the alternative protein menu when pork is served.    On January 4, 1999, the Food Service Manager, Robert Yarnell advised Iseley that he would be allowed to receive te pork alternative if he signed up for the program.    Prior to January 4, 1999, Iseley had not signed up for the protein

alternative menu at SCI-Mahanoy.  (See Grievance Record MAH-0479-98, Dotter Dec.; Yarnell Dec.)

29.    Iseley appealed Yarnell's response to the Superintendent Dragovich and to the Chief Hearing Examiner, Robert Bitner.  After a review of the grievance record, both Bitner and Dragovich denied Iseley's appeal.  (Id.).

30.   In January, 1999, Iseley was placed on grievance restriction, pursuant to DOC-ADM 804, by Superintendent Dragovich.  Dragovich believed that Iseley was not making a good faith use of the grievance system, and  that Iseley was not making a legitimate effort to resolve problems before using the grievance system as outlined in ADM 804 §B.  (See Memorandum dated 1/3/99)

31.    On December 17, 1998,  Iseley was presented  with a mental health informed consent document which Iseley reviewed and signed.  On December 24, 1998, Iseley wrote the chief psychologist Youron and requested that his consent be revoked and that the original document be returned to him.  (See Grievance Record No. 0002-99;Youron Dec.)

32.    On December 24, 1998, Youron wrote to Iseley and informed him that his consent was revoked.  The original document was returned to Iseley and a note was made on his DC-14 that Iseley revoked his consent and that the document was returned to him.  (Id)

-8-

33.   On January 3, 1999, Iseley filed Grievance No. 0002-99 alleging that Dennsion misrepresented himself to Iseley as a member of the Board of Probation and Parole and that James Unell, the inmate program manager, did not explain matters to him satisfactorily.  (See Grievance No. 0002-99; Dotter Dec.)

34.   On January 14, 1999, Unell responded to Iseley informing him that his consent was withdrawn per his request on December 14, 1998, and that the original document was returned to him, and that all the elements of his grievance had been fully addressed.  (See Unell Dec.)

35.   On January 26, 1999, Iseley appealed Unell's response to Superintendent Dragovich, who after review of the grievance and Unells' response, informed Iseley that Dennsion and Unell followed proper procedures.  Dragovich denied Iseley's appeal.  (See Grievance Record No. 000299)

36.   Iseley further appealed Grievance No. MAH-0002-99 to the Chief Hearing Examiner Robert Bitner.  Bitner, who after a review of the grievance, the response, and the Superintendent's findings, denied the appeal.  (See Bitner Dec.)

37.   On March 4, 1999, Iseley submitted an inmate's request to staff member, directed to superintendent Dragovich.  Iseley alleged that Islamic materials were confiscated and that Lt. Gavin made threats of physical injury and racial slurs toward him.  (See Inmate Request To Staff Member dated 3/4/99)\

38.  Dragovich responded to Iseley on March 5, 1999 and informed him that the two letters in question were confiscated because they had no return address on them and contained material which violated DOC policy governing incoming publications. (Id.)

39.  On January 27, 1999, Iseley filed grievance No. MAH-0035-99, alleging that upon his release from the Restricted Housing Unit, he discovered items of his personal property missing, including twelve publications/magazines. (See Grievance Record No. MAH 0035-99; Dotter Dec.)

40.  On January 28, 1999, Lt. Mahally responded to Iseley's grievance informing him that his personal property inventory sheet that accompanied him to SCI-Mahanoy reflected that he had seven magazines/publications. Mahally further explained to Iseley that following his confinement to the RHU his property was packed and secured in the property room. (See Grievance Record No. MAH 0035-99.; Dotter Dec.)

41.  Iseley appealed the response to Grievance No. MAH-0035-99 to Dragovich and Bitner, who denied Iseley's appeal. (See Grievance Report No. MAH 0035-99; Bitner Dec.)

42.  In March of 1999, Iseley filed grievance No. MAH-0076-99 alleging that the medical department wrongfully charged him for sick call regarding a

-10-

chronic condition, that he was being charged for glasses that he did not want and that the medical department refused to refer him for corneal implants. (See Grievance Report No. MAH-0076-98; Dotter Dec.)

43. In his response to Iseley's grievance, Superintendent Dragovich informed Iseley that he did not order photo gray lenses or sign a cash slip for the photo grey lenses and that treatment of his visual imperfection would not be corrected through corneal transplants or photo refractive keratotomy because this procedure is cosmetic and be corrected through lenses. Dragovich denied Iseley's appeal of the grievance. Bitner, based upon the information and documentation provided, also upheld the responses provided to Iseley at the institutional level. (See Grievance Report No. MAH 0076-99; Bitner Dec.)

44. On March 15, 1999, Iseley's guitar bag was confiscated for security reasons because the case had excessive soft padding which could be used to conceal contraband. Iseley then filed Grievance No. MAH-0014-99 concerning the confiscation of the bag. It was explained to Iseley that the bag was confiscated for security reasons. (See Grievance Record No. MAH 0014-99)

45. In February of 1999, Iseley ordered a radio which he then wished to exchange and then receive a refund. Iseley refused to send out the cassette player to the vender for the refund; rather, he elected to file a grievance. Iseley filed

-11-

grievance No. MAH-0014-99 concerning the return of the radio. (See Grievance Record No. MAH-0014-99; Dotter Dec. )

46.     On August 27, 1999, a safety and security check was conducted on Iseley's cell. Officer Dropinski ordered Iseley to remove an air freshener from his light fixture. After given the order, Iseley aggressively approached Dropinski and threatened to harm him. Iseley was then issued Misconduct No. A27518, Threatening An Employee with Bodily Harm. (See Misconduct Report No. A27518; Dropinski Dec.)

47.     On August 30, 1999, a hearing was held regarding Misconduct No. A27518. After reviewing the misconduct report and Iseley's version, the hearing examiner found the officer's report credible and sanctioned Iseley to 60 days disciplinary custody. (See Kane's Dec.)

48.     In September, 1999 Chief Hearing Examiner Bitner reviewed Iseley's final appeal of Misconduct No. A27518. Based upon his review of the misconduct report and the hearing examiner's report, he denied Iseley's appeal. Bitner believed that there was sufficient evidence to sustain a finding of guilt. (See Bitner Dec.)

Respectfully submitted,

D. MICHAEL FISHER
Attorney General


By: _____
MARYANNE M. LEWIS
Deputy Attorney General

SUSAN J. FORNEY
Chief Deputy Attorney General
Chief, Litigation Section

Office of Attorney General
15th Flr., Strawberry Sq.
Harrisburg, PA  17120
FAX:  (717) 772-4526
Direct Dial:  (717) 787-9719

DATE:  June 15, 2001

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,                  :
                                 :
        Plaintiff               :
                                 :
    v.                          :         No. 1:00-CV-00577
                                 :         (Judge Kane)
W. CONWAY BUSHEY, et al.,        :
                                 :
        Defendants              :

## DECLARATION OF ROBERT BITNER

I, **ROBERT BITNER**, declare under the penalty of perjury in accordance with 28 U.S.C. §1746, that the following facts are true and correct and based upon my personal knowledge:

1.    I am currently employed as the Chief Hearing Examiner for the Pennsylvania Department of Corrections. I have held this position since June, 1986.

2.    Prior to Chief Hearing Examiner, I was a hearing examiner at the State Correctional Institution at Camp Hill (SCI-Camp Hill) from 1983 to 1986; and from 1974 to 1983 I was a corrections counselor. I have been employed by the DOC for approximately 26 years..

3.    Pursuant to Department of Corrections Administrative Directive, 801 ("DC-ADM 801"), all state prisoners under the jurisdiction of the Department of Corrections are afforded an administrative review of a misconduct.

4.    If an inmate is found guilty of a misconduct charge, he may appeal to the institutions Program Review Committee ("PRC") for initial review within fifteen days of the misconduct hearing.

5.    The inmate may proceed to the second level of appeal, and appeal the decision of the PRC to the Superintendent of the institution. An inmate may appeal the decision of the superintendent to a final appeal level. The final level is the Chief Hearing Examiner.

6.    As Chief Hearing Examiner, I review all final appeals of inmate Misconducts Reports, my duties and responsibilities include, but are not limited to reviewing the entire record and documentation concerning each misconduct.

7.    Prior to January 1, 2001, I also reviewed final appeals of all inmate grievances. Pursuant to Department of Corrections Administrative Directive, 804 "DC-ADM 804"), all state prisoners under the jurisdiction of the Department of Corrections are afforded an administrative review of misconduct.[1]

8.    In October 1998, I reviewed Charles Iseley, AM-9320 appeal of Misconduct No. A122000, Criminal Conspiracy to Commit Aggravated Assault. In accordance with DC-ADM 801, VI, I, 3, I reviewed the entire record of the misconduct. My review

---

[1] On January 1, 2001, DOC-ADM 804 was revised, whereby final appeal to inmate grievances or institution action or policy are now reviewed by the DOC Secretary's Office of Inmate Grievances and Appeals.

included a review of the misconduct report, the hearing report and related documents, his appeal of the Program Review Committee ("PRC") and the PRC response. In addition, I reviewed Iseley's appeal of the Superintendent's decision, the Superintendent's response and the issues Iseley raised to final review.

9.    On review of the record, I concurred with the hearing examiner, the PRC and the superintendent's findings. I found that the hearing examiner did not error in his finding of facts based upon the evidence presented and that procedures were followed pursuant to DC-ADM 801 §VI. For those reasons, I denied Iseley's appeal of Misconduct No. A122000. (See Exhibit "A" attached)

10.    In January 1999, I reviewed Iseley's appeal of Grievance No. MAH-0457-98 relating to Iseley's allegation that he was fired from his job. I reviewed the entire record of the grievance, including Iseley's initial grievance, the response, his appeal to the Superintendent, and the Superintendent's response. I also carefully reviewed the issues Iseley raised for final review. Upon completion of the review, I denied Iseley's appeal. My decision to deny Iseley's appeal of Grievance No. 04578 was based upon my review of the relevant documentation. (See Exhibit "B")

11.    In January 1999, I reviewed Iseley's final appeal of Misconduct No. A110205, Refusing to Obey an Order, Using Abusive Obscene Language to an Employee. I reviewed the entire record of the misconduct, including the misconduct report, the

-3-

hearing examiner's report and the related documents. I also reviewed his appeal to the PRC and their response and Iseley's appeal to the superintendent and his response. I also reviewed the issues Iseley raised on appeal. (See Exhibit "C" attached)

12.    Upon completion of my review, I denied Iseley's appeal. I found that the hearing examiner documented finding of fact based upon the evidence presented at the hearing to support the decision. I further found the sanction with the range of misconduct sanctions. I reviewed the responses provided by the PRC and the superintendent and denied Iseley's appeal of the Misconduct No. A110205. My decision to deny Iseley appeal of Misconduct No. A110205 was based upon my review of the relevant documentation. (Id.)

13.    In January, 1999, I received Iseley's final appeal of Grievance No. MAH-0462-98, relating to cell lights that remain on at night for security reasons. I reviewed the entire record of the grievance including Iseley's initial grievance, the response, his appeal to the Superintendent, and the Superintendent's response. I also carefully reviewed the issues Iseley raised for final review. (See Exhibit "D" attached)

14.    Upon my completion of the review, I upheld the responses provided by the staff at SCI-Mahanoy regarding the necessary security measures and the need for low intensity lighting in the cells. My decision to deny Iseley's appeal of Grievance No. 04578 was based upon my review of the relevant documentation. (Id.)

-4-

15.    In February 1999, I reviewed Iseley's appeal of Grievance No. MAH-0002-99, relating to his allegation of misrepresentations regarding consent forms. I reviewed the entire record of the grievance including Iseley's initial grievance, the response, his appeal to the Superintendent, and the Superintendent's response. I also carefully reviewed the issues Iseley raised for final review. My decision to deny Iseley's appeal of Grievance No. MAH-0002-99 was based upon my review of the relevant documentation. (See Exhibit "E" attached)

16.    In March, 1999, I reviewed Iseley's appeal of Grievance No. MAH-0035-99, regarding allegations that Iseley's property was missing. I reviewed the entire record of the grievance including Iseley's initial grievance, the response, his appeal to the Superintendent, and the Superintendent's response. My decision to deny Iseley's appeal of Grievance No. 0035-99 was based upon my review of the relevant documentation and information. (See Exhibit "F")

17.    In April, 1999, I reviewed Iseley's appeal of Grievance No. MAH-0076-99, regarding Iseley's allegations concerning various medical issues. I reviewed the entire record of the grievance including Iseley's initial grievance, the response, his appeal to the Superintendent, and the Superintendent's response. My decision to deny Iseley's appeal of Grievance No. 0076-99 was based upon my review of the relevant documentation. (See Exhibit "G" attached)

-5-

18.    In September, 1999, I reviewed Iseley's appeal of Misconduct No. A27518, Threatening An Employee or Their Family With Bodily Harm.  (See  Exhibit "H" attached)

19.    I reviewed the entire record of the Misconduct, including the Misconduct Report, related documents and Iseley's appeal.  Upon completion of the review I found that the evidence presented at the hearing supported the hearing examiner's finding of guilt, and denied Iseley's appeal.  (Id.)

20.    The decisions I made regarding Iseley's appeals of his misconduct and grievances were based upon my review of the documentation and information found in the record, pursuant to DOC-ADM 801..

June 7, 2001
DATE

Robert S. Bitner
**ROBERT BITNER**
**Chief Hearing Examiner**

**EXHIBIT "A'**

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
1451 N. MARKET STREET
ELIZABETHTOWN, PA 17022

OFFICE OF THE
CHIEF HEARING EXAMINER

October 6, 1998

State Correctional Institution
RECEIVED
OCT 13 1998
at Rockview
Superintendent's Office

Charles Isley, AM-9320
SCI Rockview

Re:    Misconduct No. A122000

Dear Mr. Isley:

     This is in response to your appeal to final review of the above numbered misconduct.

     In accordance with DC-ADM 801, VI, I., 3 as amended effective November 1, 1997, I have reviewed the entire record of this misconduct; including the misconduct report, the hearing report and related documents, your appeal to the Program Review Committee and their response, your appeal to the Superintendent and his response. I have also thoroughly reviewed the issues you raise to final review.

     The issues you raise to final review have already been addressed by the Program Review Committee and the Superintendent. On review of the record, this Office concurs with their responses. I find no persuasive basis from which to conclude that the Examiner erred in conducting the hearing. The Examiner specifically documented findings of fact based on evidence presented at the hearing to support the decision. The procedures followed were in complete accordance with DC ADM 801, §VI. The sanction imposed is within the presumptive range of misconduct sanctions, is not viewed to be disproportionate to the offense, and therefore will not be amended at this level.

     Your claim that the hearing examiner "lied" and said you were present for the in camera reliability hearing is not supported by the record. Your hearing was concluded well within the stipulated six (6) day limit.

     For the above-stated reasons, the responses provided by the Program Review Committee and the Superintendent are upheld in full. Your appeal must, therefore, be denied.

Sincerely,

Robert S. Bitner
Chief Hearing Examiner

DC- Wakefield
Whitmire
Gaertner
Harte
H. Ex.
Mazzitti
Case Record

RSB:ph
pc:    Superintendent Meyers

| SCIR-141 III [ X ] MISCONDUCT APPEAL [ ] PERIODIC REVIEW [ ] OTHER | COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS | | | |
|---|---|---|---|---|

| DC NUMBER | NAME | INSTITUTION | DATE OF REVIEW | NO. FROM PART 1 |
|---|---|---|---|---|
| AM9320 | Charles Isley | ROC | 09-10-1998 | A122000 |

**PROGRAM REVIEW COMMITTEE'S DECISION AND ITS RATIONALE**

Mr. Isley was found guilty on 09-03-1998 of a Class I-B #12, Violation of PA Crimes Code not in Category I, 903 Criminal Conspiracy to commit aggravated assault. He received a sanction of ninety (90) days disciplinary custody. He is now appealing the Hearing Examiner's decision based upon his belief that the procedures employed were contrary to law or Administrative Directive 801, the punishment is disproportionate to the offense, and the evidence was insufficient to support the decision.

In his appeal, Mr. Isley states that he was not present at the Reliability Hearing and did not know it occurred until later when he received his copy. He also states that he was sentenced on September 2 even though his testimony did not occur until September 3. He also states the Hearing Examiner did not take into consideration his issues and, in fact, does not believe there is sufficient documentation to support the charge or the decision. He also notes the punishment is beyond the guidelines and that there is a conspiracy to set him up. He states the confidential informants were not credible. Finally, he states that the Hearing Examiner was racially prejudiced.

In reviewing Mr. Isley's appeal as well as various documentation associated with the proceedings, PRC notes that the Hearing Examiner conducted the Reliability Hearing and provided a sanction, which was beyond the guidelines but met Administrative Directive 801 policy. The Hearing Examiner can provide a sanction beyond the presumptive range provided he give a rationale, which in this case was based on the extent of injury to the victim which was verified through a medical report. The final basis for the decision was the credibility of the investigation of Lt. Eaton, including the reliability of the CSIs over Mr. Isley and his witnesses. Such a determination is within the purview of the Hearing Examiner and sufficient basis for a decision of guilt. PRC notes that the Hearing Examiner did conduct a hearing on 09-02-1998 with Mr. Isley in which he took testimony from Mr. Isley. At that time, there was no Witness Form available nor was there any indications noted from Mr. Isley that witnesses were involved. The Hearing Examiner did continue processing his Findings of Fact and did arrive at a verdict. However, before giving the actual verdict, a Witness Form which was properly executed came to the Hearing Examiner's attention. At that time, he decided to continue the hearing to take additional testimony from Mr. Isley and his two witnesses. Mr. Isley did request the CSIs, however, they were not allowed. In taking additional testimony on 09-03-1998, the Hearing Examiner expanded his Findings of Fact. However, he did come to the same conclusion that Mr. Isley did participate as a conspirator in the aggravated assault on Michael Smith. Again, the evidence used to support the Hearing Examiner's decision was within the guidelines of Administrative Directive 801.

Mr. Isley also noted possible racial prejudice in an alleged statement made by Mr. Mitchell at the hearing. While PRC does not condone any such statements and is recommending further investigation of this by Security staff, there is extensive documentation that the Hearing Examiner afforded Mr. Isley the opportunity to defend himself within the 801 guidelines. Furthermore, the Hearing Examiner also was intent on carrying out such guidelines in the conduct of the initial hearing and the continuation to hear additional testimony. Mr. Isley was not found guilty on 09-02-1998. He was found guilty on 09-03-1998. He was provided all the information as per the 801 guidelines. PRC sustains the Hearing Examiner's decision in full.

**DECISION RELATIVE TO HEARING COMMITTEE'S VERDICT**

[ ] NOT APPLICABLE     [ X ] SUSTAIN     [ ] SUSTAIN-AMEND     [ ] REFER BACK FOR FURTHER STUDY     [ ] EXONERATE INMATE

| NAMES OF PROGRAM REVIEW COMMITTEE MEMBERS | SIGNATURES | DATE |
|---|---|---|
| D. J. Wakefield | *signature* | 9-10-98 |
| T. L. Whitman | *signature* | 9/10/98 |
| G. P. Gaertner | *signature* R.W. W. | 9/10/9 9-11-98 |

ORIGINAL - DC-15     COPY 2 - Inmate Cited     COPY 3 - Staff Member Reporting Misconduct     COPY 4 - Deputy Superintendent

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**State Correctional Institution at Rockview**
(814-355-4874)
September 15, 1998

**SUBJECT:**  Appeal of PRC Decision

**TO:**  Charles Isley, AM9320
Bldg-G

**FROM:**  R. W. Meyers
Superintendent

I have reviewed your misconduct number A122000, your version, the Hearing Examiner's report and sanction, and also the Program Review Committee's decision and rationale.

An investigation was also conducted by Captain Tressler and his findings are that the facts indicate that your allegations are completely unfounded.

After reviewing all information I find all procedures to be in compliance with Administrative Directive 801 and concur with the Program Review Committee's decision.

RWM:tad

cc:    Deputy Whitman
Deputy Wakefield
Dr. Gaertner
Mr. Harter
Hearing Examiner
Mr. Mazzotta
Case Record

COMMONWEALTH OF PENNSYLVANIA
SCI-ROCKVIEW

DATE: 9-4-98

SUBJECT: REQUEST FOR REVIEW OF HEARING EXAMINER ACTION

TO: Charles Isley, AM9320

FROM: Terry L. Whitman
Acting Deputy Superintendent for Facilities Management

Your request for a review of the decision of the Hearing Examiner has been received. A meeting has been scheduled with the Program Review Committee on or after 1:00 p.m. Thursday, September 10. Your presence is/is not required.

If your presence is required, you will be informed by your block officer as to the exact time to report to the Treatment Building for your appeal, or if applicable, the Program Review Committee will see you in your cell during their regular weekly visit to the RHU.

c: file
TLW:deh

DC-141    PART II E    COMMONWEALTH OF PENNSYLVANIA
MISCONDUCT HEARING APPEAL    DEPARTMENT OF CORRECTIONS

| DC Number | Name | | Institution | No. from PART |
|-----------|------|---|-------------|-----------|
| AM9320 | C. Isley | | Rockview | A122000 |

I was found guilty of misconduct # _A/22000_ on _980902_ (date) by the
Hearing Committee/Examiner, and I wish to appeal that decision on the following grounds:

Check Area(s) Involved

a. The procedures employed were contrary to law,
   Administrative Directive 801, or to the ICU
   Consent Decree;    [✓]

b. The punishment is disproportionate to the offense;    [✓]

c. The evidence was insufficient to support the decision.    [✓]

Below is a brief statement of the facts relevant to my claim(s). It includes the identity of all
persons who may have information which may be helpful in resolving this matter.

1. I was never present at the reliability hearing and did not even know it occurred until I received a copy of the decision days later.

2. The hearing examiner found me guilty and sentenced me on 980902 even though the hearing and witnesses' testimony and my testimony did not occur until 9809

3. The hearing examiner did not investigate or take into my consideration any of the issues raised in my version form

4. There was no evidence to support the false charge because even if it were true the conspiracy could have been for extortion, robbery, theft, harassment, intimidation, etc.

No where in the report does it state that I conspired to do something and if so how and what was involved.

5. The punishment is beyond the guidelines.

6. There was an active conspiracy to set me up for something I did not do.

7. The CSIs are not credible.

8. The hearing examiner found that I participated in the assault even though there is no evidence whatsoever to that effect.

9. When I informed the hearing examiner that I will see the board in January and that there was no evidence he told me that he did not care because he can just look at a nigger and tell he is guilty and that people like me should be killed.

Page 1 of 2

RM

**FORM DC-141** **PART I** **COMMONWEALTH OF PENNSYLVANIA**
Rev. 2-84

☒ MISCONDUCT REPORT ☐ OTHER **DEPARTMENT OF CORRECTIONS**

**A** 122000

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| AM9320 | Charles Isley | SCIR | 1230 hrs | 8-24-98 | 8-31-98 |

| Quarters | Place of Incident |
|---|---|
| DA/AC | Building A Cell 1-30 |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I |
|---|---|---|---|---|---|---|
| CF5358 | Michael Smith | X | | | | |
| DA9752 | Lewis Gay | X | | | | |

MISCONDUCT CHARGE OR OTHER ACTION Class I Category B 12- Violation of Pa. Crimes Code not in Category 1 - 903 Criminal Conspiracy To Commit Aggravated Assault

STAFF MEMBER'S VERSION On 8-24-98 CF5358 Michael Smith was a victim of an aggravated assault which took place in his assigned cell Building A cell 1-30. Two confidential source informants #105 and #106 have been identified as being in a position to observe the violation and gain knowledge of said violation. Both confidential source informants have corroborated each others account of the incident detailing how and when the aggravated assault occurred. On 8-24-98 at approx 1230 Hrs. DA9752 Lewis Gay and AM9320 Charles Isley went to CF5358 Michael Smith's cell A - 1-30. Smith was sitting on his chair in the cell. Gay entered the cell while Isley remained in the cell's doorway, blocking any attempt by Smith to depart.

see pg 2

IMMEDIATE ACTION TAKEN AND REASON

**PRE-HEARING CONFINEMENT**

| | IF YES | |
|---|---|---|
| | TIME | DATE |
| ☒ YES | already confined | |
| ☐ NO | | |

☒ REQUEST FOR WITNESSES AND REPRESENTATION

FORMS GIVEN TO INMATE

☒ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY     SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN CO |  |
|---|---|---|---|
| Paton COII | Crothers COIV | DATE | TIME 24 HOUR B |
| | | 8-31-98 | 1030 |

YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER

| DATE | TIME |
|---|---|
| 9-1-98 | 1035 |

Misconduct Category
☒ CLASS I ☐ CLASS 2

Signature of Person Serving Notice
Clarence R Lee

**NOTICE TO INMATE**

You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class I misconduct, any pre-release status you have will be revoked.

part 2 o[...]
122009

FORM DC-141    PART I    COMMONWEALTH OF PENNSYLVANIA    A-165501
Rev. 6-84

☑ MISCONDUCT REPORT ☐ OTHER    DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| AM9320 | Charles Isley | SCIR | 1230 hrs | 8-24-98 | 8-31-98 |

| Quarters | Place of Incident |
|---|---|
| DA/AC | Building A Cell 1-30 |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

SEE PAGE 1

**STAFF MEMBER'S VERSION** the cell. Gay had dark brown work gloves on and also a knit cap with holes cut out to serve as a mask Gay began to strike Smith in the face/head area an exuberant numerous times. The assault was in such excess that Smith was unable to defend himself. Shortly after the assault began, an officer started down this particular range. At this time, Isley alerted Gay and both departed the cell. At this time, Gay removed the mask which allowed for positive identification. Smith's injuries were discovered later on same date by corrections officers. Smith had numerous facial injuries documented by the med. dept. Medical incident/injury report and photographs available in the Security Office. Report delayed due to investigation.

**IMMEDIATE ACTION TAKEN AND REASON** Inmate already confined in DA/AC to remain confined as a threat to staff until misconduct hearing

**PRE-HEARING CONFINEMENT**

IF YES

☑ YES    TIME: already    DATE: confined
☐ NO

☑ REQUEST FOR WITNESSES AND REPRESENTATION    FORMS GIVEN TO INMATE    ☑ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY    SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN CO[...] |
| | | DATE | TIME 24 HOUR |
| | COI | 8-31-98 | 1030 |

YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER

| DATE | TIME |
|---|---|
| 9-1-98 | 1035 |

Misconduct Category
☑ CLASS I    ☐ CLASS 2

Signature of Person Serving Notice
Clarence R Lee

**NOTICE TO INMATE**
You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class I misconduct, any pre-release status you have will be revoked.

**DC-141    PART II B**
Rev. 6-84
DISCIPLINARY HEARING REPORT

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from P |
|---|---|---|---|---|---|
| AM9320 | Charles Isley | SCIR | 9/ 02 /98 | 0815 | A1220 |

| INMATE PLEA | ☐ Guilty  ☑ Not Guilty | ☐ No Plea  ☐ Other | Verdict | ☑ Guilty  ☐ Not Guilty |

**CHARGES**    Class I-B, #12 Violation of PA Crimes Code not in Category I, 903 Criminal Conspiracy to commit aggravated assault

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

PLEADS NOT GUILY #12       SUBMITS ANSWER

Has no knowledge of this incident. Never at Smith's cell
does know Gay from another jail Never participated in an assault on

Smith.

        H.Ex. believes CO3 Eaton's credible report and the CSI information over the
denail of inmate Isley that more likely than not inmate isley did conspire with and then
assist inmate Gay with an assault on CF5358 Smith by standing in the doorway to Smith's cell
and not allowing inmate Smith to exit the cell as the assault was in progress. Inmate Isley
would not be expected to stand in the doorway and assist inmate Gay as the CSI's state if he
were simply passing the cell as inmate do not want to become involved and likely pass the cell
going to their own cells so as not to get involved. They would not jump in and assist in an
assault unless they had and where involved with the assault and had previously planned to do
so. The CSI identification of inmate Gay as the Assaultor and Inmate Isley as the inmate
whom stood in the doorway blocking Smith's exit clearly establishes a preponderance of evid
that the two had planned previously to assault Smith and what both's role would be upon
arrival to the cell. H.Ex. notes this to be a very severe assault on inmate Smith and the
charge of Aggravated Assault warranted. Hex further finds a preponderance of evidence to be
that Isley Conspired with and then participated in the Assault on Smith along with inmate
Gay. H.Ex. sanctions above range as inmate Isley did conspire and then DID Participate in t
assault which was very severe in nature. Isley is not believed that he has no knowledge of
assault based on the CSI identification of Isley and his actions during the assault. These
CSI's would have no reason to lie about Isley's participation and H.Ex. notes this incident
occurred when Chow lines where returning to the block. Many inmates would be in the area an
have reason to see the assault as it occured and none would hvae called out there is an ass
in progress due to not wanting to be called a "Snitch" in fear of their own safety.

Guilty # 12

| | | |
|---|---|---|
| ☑ YES  ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | 90 Days D.C. effective |
| ☑ YES  ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES ☑ |
| ☑ YES  ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | PHOTO PACE. |
| ☑ YES  ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | MEO REPORT CF53 RECIBILITY HEARI |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature in dicates finished report with appendices. |
|---|---|
| C. MItchell | *C. Mc.* |
| | SIGNATURE OF HEARING EXAMINER/COORDINATOR |

**DC-141**    **PART II B**      **COMMONWEALTH OF PENNSYLVANIA**
Rev. 6-84
DISCIPLINARY HEARING REPORT      **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from P |
|---|---|---|---|---|---|
| Am9320 | Isley, Charles | Scsr | 9-03-98 | 0900 | A1220 |

| INMATE PLEA | ☐ Guilty    ☐ No Plea ☐ Not Guilty    ☐ Other | Verdict | ☐ Guilty ☐ Not Guilty |
|---|---|---|---|

**HEARING ACTION**

CHARGES     12 (Contind)          Pack # 2

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Hey Notr continue Hearne the 9-03-98 to Away Hey to
Property Document His Decision. After Document the Decision
& Prior to Gove the Decision Hey Record Atomey Ptitr
Request 2 Witness BOTH Allowd Notr Am9320 said
Noth About Wettesses on 9-02-98.

Scruggs - Was not on the Blow at this tome. In the
- Kotchn workn. It was Empossble for me to know
Whare Gay or Isley was. Doo Gat an Otter for
Involument on a Frett unknow Dnmatr same as Isley.
I was Lockd up Because I was supposdly standen
on the Range Whsre the Assault Occurd. She tou
me She had 10 INMATES that told me as Brse
Ther. She thoucht wr Dorr ther.

Gay - I Doo not Plan wetit, Nor Commit an Assault on
Another Inmatr with Am9320 Isley. Isley & I
had just come from Lunch I was to my Cell Dorr
know whtt Ite Doo After Partor. Doo Not Assault
Anyone.

| ☑ YES | ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | |
|---|---|---|---|
| ☑ YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | **SEE APPENDICES** ☐ |
| ☑ YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | |
| ☑ YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| Charles Morthu | *Che. me.* |
| | SIGNATURE OF HEARING EXAMINER/COORDINATOR |

**DC-141** **PART II B** **COMMONWEALTH OF PENNSYLVANIA**
Rev. 6-84
DISCIPLINARY HEARING REPORT **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from Par |
|---|---|---|---|---|---|
| Am 9320 | ISLEY, CHARLES | SCIR | 9-03-98 | 0900 | A12200 |

| INMATE PLEA | ☐ Guilty ☒ Not Guilty | ☐ No Plea ☐ Other | Verdict | ☒ Guilty ☐ Not Guilty | |

**HEARING ACTION**

CHARGES     12                                    PAGE # 3

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

HEY NOTES PREVIOUSLY DETERMINE THAT THE 2 CSI'S
ARE RELIABLE BASED ON THE RELIABILITY EVIDENCE PROVIDED BY
COIII EATON. INMATE SUGGS NOW COMES IN AND STATES
HE WAS CLEARED WITH BEING OUTSIDE THE CELL AS WELL
AS INMATE ISLEY & GAY WHEN THE ASSAULT OCCURRED. SUGGS
STATES COIII EATON TOLD HIM S/HE HAD 10 CSI'S WHO
IDENTIFIED HIM AS BEING PRESENT AT THE ASSAULT. HEY NOTES HAD
THE COIII HAD 10 CSI'S A MISCONDUCT WOULD CERTAINLY HAVE BEEN
ISSUED. ON 9-2-98 SUGGS WAS STILL AC DIVERSIFICATION STATUS. TODAY
9-03-98 SUGGS IS IN GENERAL POPULATION STATUS. HEY CLEARLY
DOES NOT BELIEVE THAT COIII EATON HAD 10 CSI'S WITH
IDing SUGGS AS BEING PRESENT OR A MISCONDUCT WOULD OVER BEEN ISSUED.
HEY NOTES MANY POSSIBILITIES EXIST THAT 1. SUGGS WAS
INVESTIGATED AS TO POSSIBLE INVOLVEMENT IN PLANNING THE
ASSAULT, 2. POSSIBLE THAT HE WAS PRESENT AT THE ASSAULT
& COIII COULD NOT GENERATE EVIDENCE TO ID SUGGS AS INVOLVED.
& COIII COULD NOT GENERATE EVIDENCE
     ISLEY CLAIMS THE C.S.I'S TO BE UNRELIABLE     (CONT.)

| | | The inmate has heard the decision and has been told the reason for it and what will happen. | |
|---|---|---|---|
| ☐ YES | ☐ NO | | |
| ☐ YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES |
| ☐ YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | ☐ |
| ☐ YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| C. MOULIN | *C.M.* |
| | SIGNATURE OF HEARING EXAMINER/COORDINATOR |

**DC-141** **PART II B**
Rev. 6-84
DISCIPLINARY HEARING REPORT

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from P |
|---|---|---|---|---|---|
| Am9320 | ISLEY, CHARLS | SCIR | 0900 | 9-3-98 | A1220 |

| INMATE PLEA | ☐ Guilty ☑ Not Guilty | ☐ No Plea ☐ Other | Verdict | ☑ Guilty ☐ Not Guilty |
|---|---|---|---|---|

**HEARING ACTION**

CHARGES    12 conrad                              PG#4

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

BECAUSE OF SOGC'S. IT MY NOTES THAT MAY POSSE BELETING O
SOGC'S POSSIBLE INVOLVEMENT DORS NOT RULE OUT
THE CREDIBILITY & RELIABILITY OF THE C.S.I.s. THE CS
INFORMATION IS STILL RELIABLE & BELIEVED OVER
ISLEY & HIS WITNESSES THAT MORE LIKELY THAN NOT
AM9320 DID PARTICIPATE IN PLANNING (AS DOCUMENT
EARLIER) & DID ACT ON THAT PLAN BY STANDING
AT THE CELL DOOR. PREPONDERANCE OF EVIDENCE TO
STAFF REPORT & C.S.I. IDENTIFICATION.

SANCTION ABOVE GUIDELINS
DUR TO SERIOUS NATURE OF
M.C. & SERIOUS INJURES TO
INMATE SMITH

GUELT #12
90 DAYS D.C.
EFF 8-26-98

| ☑ YES | ☐ NO | The inmate has heard the decision and been told the reason for it and what will happen. | |
|---|---|---|---|
| ☑ YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | **SEE APPENDICES** |
| ☑ YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | ☐ |
| ☑ YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| CHARLS MOTE HALL | One- |
| | SIGNATURE OF HEARING EXAMINER/COORDINATOR |

WHITE—DC 15        YELLOW—Inmate Cited        PINK—Staff Member Reporting Misconduct        GOLDENROD—Deputy Superintenden



CF 5358 Michael Smith
1850 hrs August 24, 1998



CF 5358 Michael Smith
1850 hrs August 24, 1998

## MEDICAL INCIDENT/INJURY REPORT

| PERSON INVOLVED | (Last Name) Smith | (First Name) Michael | (Middle Initial) | Reported To Dispensary: |
|---|---|---|---|---|
| | | | | Date: 8-04-98 |
| Male ☑ : Female ☐ : Age 28 SSN: 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 | | | | Time: 1745 ☑ AM ☐ PM |

| Date of Incident 8-24-98 | Time of Incident 12:30 ☐ A.M. ☑ P.M. | Exact Location of Incident A Bldg Cell 130 | | |
|---|---|---|---|---|
| **INMATE** ☑ | Inst. No. CFS358 | Housing Unit A-130 | Work Related ☐ Yes ☑ No | |

| | SUPERVISOR: |
|---|---|
| **EMPLOYEE** ☐ | Department _____ Job Title _____ |
| **VISITOR** ☐ | Home Address _____ Home Phone _____ |
| **OTHER** ☐ | Occupation _____ Reason for Presence at this Facility _____ |

| Property Involved ☐ : Equipment Involved ☐ : Describe N/A | Was person authorized to be at location of incident: ☐ Yes ☐ No |
|---|---|

Describe Exactly What Happened. Why It Happened. Action Taken. If an Injury, State Part of Body Injured. If Property or Equipment Damaged. Describe Damage. 1. Discription of Illness/Injury ⑤ "I fell out of bed I was sleeping rolled over"

Brought to Treatment Bldg Dispensary by Custody Lt Facer to be evaluated

(Continue on Reverse)

| Was Physician Notified? Yes ☐ No ☑ | Was Family Notified? Yes ☐ No ☑ |
|---|---|
| Was Person Involved Seen By A Physician? Yes ☐ No ☑ | Date __/__/__ Time __ A.M. P.M. | Where _____ | Physician's Name _____ |
| Was Person Involved Taken To A Hospital? Yes ☐ No ☑ | Date __/__/__ Time __ A.M. P.M. | Where _____ | By Whom _____ |

2. Initial Impression Illness/Injury
Ⓞ BP 116/66 P-88 R-1 ( unlab
Denies LOC, PERRL, neuro
intact, skin w/o, color pink
lungs clear all fields, + clear
SOB, Abd soft BS ⊕ x 4 quad
⊕ N/V Right eye lid swollen lower lid, hematoma
Right cheek Visual acuity 0.5 20/70 0.D. 20/50 uncorrected
wears Rx glasses — 0.0 sclera white, + blood or
discharge no d/c pain behind eye, EOM intact (cont) over

**TYPE OF INJURY**
1. Laceration ☐
2. Hematoma ☑
3. Abrasion ☑
4. Burn ☐
5. Non Apparent ☐
6. Other ☐
Specify _____

Indicate On Diagram Location of Injury



3. Treatment Rendered: Exam, VS, Visual Acuity + Tylenol 325 mg ɪɪɪ given
Ice,

| Follow-Up ⑨ S/C 8-25-98 to be eval / follow up ē PA-C |
|---|
| Date of Report 8-04-98 | Signature & Title of Person Preparing Report | Reviewing Authority B Ferguson RN S |

**DISPOSITION AFTER TREATMENT:**

1. Return to Block
2. Place in RHU                    ✓ ORA✓
3. Admit to Infirmary              _____
4. Admit to Community Hospital     _____
5. Return to Work                  _____
6. Refer to Physician's Line       _____
7. Refer to Family Physician       _____   (Employee)
8. Refer to Community Hospital     _____

---

**DISTRIBUTION:**

Original:   Medical File

Copies:     Superintendent           _____
            Deputy for Operations    _____
            Deputy for Treatment     _____
            Major                    _____
            Security Officer         _____
            Other                    _____

---

**CONTINUED FROM REVERSE:**   (Items 1 through 3)   (Indicate Item).

#2 ©. hematoma of mid/Right side forehead & open areas, upper lip between
nose/upper lip abrasion noted & bleeding noted, teeth intact denies
jaw pain. Abrasion Left posterior shoulder brush burn type & bleeding
abrasion Left mid/calf & drainage, c/o pain c̄ palpation of areas of
abrasions, & bony deformity noted

Ⓐ A/t Comfort

**DC-141**  **PART II B**  **COMMONWEALTH OF PENNSYLVANIA**
Rev. 6-84
DISCIPLINARY HEARING REPORT  **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from F |
|-----------|------|-------------|--------------|--------------|------------|
| AM9230 | Isley, Charles | SCIR | 8-31-98 | 1120 | A122000 |

| INMATE PLEA | ☐ Guilty  ☐ Not Guilty | ☐ No Plea  ☐ Other | Verdict | ☐ Guilty  ☐ Not Guilty |
|---|---|---|---|---|

## HEARING ACTION

CHARGES      RELIABILITY HEARING

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

   On 8-31-98 this Examiner conducted an IN-Camera hearing with Co3 Eaton to determine the reliability of the confidential ~~of the confidential~~ sources of information utilized in this misconduct report. The reliability hearing was conducted IN-Camera because the very nature of the reliability evidence could, by itself, reveal the identity of the informants. CO3 Eaton provided this Examiner with a preponderance of evidence that the informants meet the criteria outlined under D.C.ADM 801, Reliability.

   Specifically, CO3 Eaton explained under oath <u>HOW</u> the informants were in a position to observe as well as what information they provided that was cooberated by others and what information one provided in the past and how that information was proven to be reliable.

THE INFORMANTS MEET THE RELIABILITY CRITERIA IN D. C. ADM. 801.

| | | |
|---|---|---|
| ☑ YES  ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☑ YES  ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | |
| ☑ YES  ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | SEE APPENDICES  ☐ |
| ☑ YES  ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature in-dicates finished report with appendices. |
|---|---|
| Mr. Charles Mitchell | *C. Mc*  SIGNATURE OF HEARING EXAMINER/COORDINATOR |

**DC-141**  **PART II C**    COMMONWEALTH OF PENNSYLVANIA
Rev. 6-84    HEARING SUPPLEMENT
INMATE VERSION AND WITNESS STATEMENTS    DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | No. from PART |
|---|---|---|---|
| AM9320 | Charles Isley | SCIR | A122000 |

INMATE'S VERSION

Prisoner Isley pleads not guilty to the charge for the following reasons and requests that medical/investigation and other reports be altered into evidence and included and identified on the record.

1. There is no evidence whatsoever in the report that Isley conspired with anyone or conspired to do anything.

2. There is no evidence of assault because Smith has never stated that he was assaulted but has, in fact, adamantly denied to Lt. Eaton that he was assaulted and claims he received his injuries in a fall. If Smith were lying then Eaton, the security Lt. who investigated this matter, would most assuredly have issued him a misconduct report for lying to an employee. Since such a report was not issued then there is no evidence that an assault or conspiracy thereof occurred. Also, the 24 hour limit has elapsed.

3. The alleged "confidential source informants" are not credible. According to Eaton, as Gay and Scruggs will attest, she had well over ten informants who witnessed the alleged incident. Nonetheless, according to report, only two had similar stories. Two out of ten is not evidence of guilt but of innocence.

4. The alleged informants are not credible because, according to the report, they witnessed the alleged incident but did not report it to the guard at the alleged scene and did not report it to prison officials until about a week later allegedly. Moreover, if Smith went to work that day then why was not his injuries spec...

5. The report is patently false because, according to it, the informants positively identified Isley and Gay on Aug. 24, 1997. However, on the 26th Isley, Gay, and Scruggs all received other reports for allegedly fighting Smith and Isley and Gay did not receive misconduct reports until the 31st. It is perfectly clear from these facts that no identification could have really occurred and ergo the report is obviously false.

6. There is no physical evidence of guilt. There is no such thing as brown work gloves and if they were brown gloves from commissary then they are so thin that it is axiomatic that, by the physical evidence of injuries to Smith, the antagonist's hands would have been bruised, swollen, or broken. However, neither Isley, Scruggs, or Gay had any marks or injuries. Moreover, the relevant other reports received were for allegedly fighting Smith revealing the fact that Smith fought against his antagonist and must have injured him. No mask or gloves were used. Commissary gloves should be inspected.

7. The informants' story is absurd because: Why would Gay wear mask and gloves and Isley not? Why would they go into a cell with people right outside? Why would Gay remove his mask in front of everyone? What is the identity of the mysterious prison guard in the report who saw and heard nothing and the informants failed to inform? Why did Smith not cry out for help or in pain? Why does Smith claim he was not assaulted? Why were Isley, Scruggs, and Gay thrown in the hole for allegedly fighting Smith if the informants only saw Gay, as they claim? Since west wing just came back from lunch and the alleged incident occurred on the first level where everyone sits and hangs out until lockup, how come only two people allegedly witnessed the supposed incident? Why was Lewis not found until 5:30 pm?

8. It is clear from the above that the report is obviously, patently, and intentionally false and in violation of the Pa. Crimes Code. Isley did not see or hear anything or know anything because he was not present and had nothing to do with it. It would not have occurred if t...

WHITE – DC-15 ✓    YELLOW – Inmate Cited    PINK – Staff Member Reporting Misconduct    GOLDENROD – Deputy Superintendent

**DC-141**   **PART II A**    **COMMONWEALTH OF PENNSYLVANIA**
Rev. 6-84
INMATE REQUEST FOR       **DEPARTMENT OF CORRECTIONS**
REPRESENTATION AND WITNESSES

| DC Number | Name | Institution | Date | Number as on Pa... |
|---|---|---|---|---|
| Am9320 | Charles Isley | SCIR | 8-31-98 | A122000... |

You have been charged with a misconduct. You may request assistance and/or witnesses to appear at your hearing by completing the section(s) below.

In order to have assistance or witnesses at your hearing, you must complete this form and present all copies to one of your housing officers no later than 9:00 a.m. the first working day after you receive notice of the misconduct.

Assistance: ☐ I do not request assistance
☐ I request assistance by _____
(The person requested must be willing to assist you)

Witnesses: You may request witnesses in accord with DC-ADM 801. State the relevance and importance of the testimony the witness will give.

---

1. Name of Witness:    No.    If Inmate Quarters
   Gay    DA9752   EWAC 37
   Why is this person's testimony relevant and important?
   *Material witness to facts & codefendant*

DO NOT WRITE IN THIS SECTION
For Use by Hearing Examiner

Witness permitted? YES. If not, why not?

---

2. Name of Witness:    No.    If Inmate Quarters
   Scruggs    AK9691   EWAC 46
   Why is this person's testimony relevant and important?
   *Material witness to facts & ex-suspect*

Witness permitted? YES. If not, why not?

---

3. Name of Witness:   No. ?   If Inmate Quarters WW
   Confidential Source Informant ics or 106
   Why is this person's testimony relevant and important?
   *Gave false statement - Simply accusing prisoner Isley*

Witness permitted? NO If not, why not?
TO Avoid C.S.I.'s would
Identify Both to the inmat...
whom is claimed an an assault-
Allowed After Hearing commen...
on 9-02-98 Witnesses Allow...
C.O.e.

Hearing Examiner's Signature

---

*C. Isley*
Inmate's Signature

This section to be completed by Housing Officer only
Received completed form 1716 hours 8-31-98
     Time       Date

Housing Officer's Signature

---

**WHITE—DC-15**    **YELLOW—Inmate's Copy To Be Given After Action By Hearing Examiner**    **PINK—Staff Member Reporting Misconduct**

**EXHIBIT "B'**

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**1451 N. MARKET STREET**
**ELIZABETHTOWN, PA 17022**

OFFICE OF THE
CHIEF HEARING EXAMINER

January 13, 1999

```
┌─────────────────────────────┐
│         RECEIVED            │
│                             │
│         JAN 2 5 1999        │
│         SCI MAHANOY         │
│    SUPERINTENDENT'S OFFICE  │
└─────────────────────────────┘
```

Charles Isley, AM-9320
SCI Mahanoy

Re:    DC-ADM 804 - Final Review
       Grievance Nos. MAH-0449-98 and MAH-0457-98

Dear Mr. Isley:

This is to acknowledge receipt of your appeals to final review of the above numbered grievances.

In accordance with the provisions of DC-ADM 804, VI D, as amended effective November 1, 1997, I have reviewed the entire record of these grievances, including your initial grievance, the Grievance Officer's response, your appeal from initial review and the Superintendent's response. I have also carefully reviewed the issues you raise to final review.

Upon completion this review, it is the decision of this office to uphold the responses provided by staff at the institutional level. I find the issues raised for final review have been addressed by the Grievance Coordinator and the Superintendent, and their responses are reasonable and appropriate.

I concur with the responses already provided at the institution level. Accordingly, your appeals to final review must be denied.

Sincerely,

Robert S. Bitner
Chief Hearing Examiner

RSB:ph
pc:    Superintendent Dragovich

cc: Mrs Dotter
DC 15

file

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**SCI-Mahanoy**
**(717) 773-2158**

December 29, 1998

SUBJECT:    Appeal to Supt., Grievance MAH-0457-98

TO:    Charles Isley, AM-9320, J/A 15

FROM:    Martin L. Dragovich, Superintendent

Receipt of your appeal to Supt. of grievance MAH 0457-98 is acknowledged. In preparing this response, I have reviewed your original grievance, the grievance officer's response and your appeal to this office.

Your appeal is currently a moot issue inasmuch as you are now in the Restricted Housing Unit and cannot work even if we wanted to assign you a job. The question is, were you assigned a job? During the course of the investigation into your grievance, Mr. Chesney, your Unit Manager, indicated that you did not want a block job because it paid too little money. Accordingly, he did not assign you a block job; therefore, you cannot have been fired from a job. It is further evident that you were being belligerent with Officer McGreth who had to twice tell you to lock up and with whom you used obscenity. You claim an inmate clerk told you that you had a job but you were unable to identify him. Inmates cannot assign jobs to other inmates, only staff can. You will not be paid for a job that you were not assigned.

Based on the foregoing, your appeal is denied.

MLD:dy

cc:    Deputy Klem
       Deputy Novotney
       Mr. Chesney
       Officer McGreth
       Mrs. Dotter
       DC 15
       file

DC-135A

RECEIVED

DEC 2 8 1998

SCI MAHANOY
SUPERINTENDENT'S OFFICE

**COMMONWEALTH OF PENNSYLVANIA**

DEPARTMENT OF CORRECTIONS

**INMATE'S REQUEST TO STAFF MEMBER**

INSTRUCTIONS

*Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.*

| 1. TO: (NAME AND TITLE OF OFFICER) Dragovich, warden | | 2. DATE 98/2 24 |
|---|---|---|
| 3. BY: (INSTITUTIONAL NAME AND NUMBER) C. Isley AM-9320 | 4. COUNSELOR'S NAME Fisher | |
| 5. WORK ASSIGNMENT N/1 | 6. QUARTERS ASSIGNMENT XHU C-9 | |

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE. GIVE DETAILS.

I wish to appeal grievance #MAH-0457-98 because it is obviously illogical. Firstly, Dotter spoke to Chesney and Mackreth first, then me, and then them again to give them an opportunity to fabricate viable stories. Their story is essentially that I did not lock up, that I lied to Mackreth, and he did not issue me a misconduct 4/60, that I stated I did not want a block job and refused to work but Chesney did not issue a misconduct. That is utterly incredible and unbelievable.

I never stated I did not want a job. I worked that afternoon (and have yet to be paid for it). Chesney and Mackreth lied. I am not working until you pay me the money you owe me for working that afternoon. I do not care if it is only a few cents — you owe it to me. I worked and I want my money. Moreover, Dotter saw me on 981287 about the grievance and had the interview (in front of several) guards who have been harassing me about it. Obviously Dotter's action was to promote retaliation.

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

☐ TO DC-14 CAR ONLY          ☐ TO DC-14 CAR AND DC-15 IRS

STAFF MEMBER                                          DATE

**DC-804**
PART II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO. | MAH-0457-98

| TO: (Name & DC NO.) | INSTITUTION | QUARTERS | GRIEVANCE DATE |
|---|---|---|---|
| Charles Isley, AM-9320 | Mahanoy | J/A 15 | 12/13/98 |

The following is a summary of my findings regarding your grievance:

I spoke to Mr. Chesney and Officer Mackreth about this incident. Their reports of what happened are quite different than yours.

Officer Mackreth states he had to tell you twice to lock up. You became argumentative and used abusive language. He checked the roster for Block Workers and found your name was not on it. It appears the officer was trying to help you—not harass you.

You told me when we met on 12/17/98, that the Block Clerk said you had a job. However, he denied that statement when questioned.

Your Unit Manager reports you didn't want a block job. Instead of issuing you a misconduct for Refusing to Work, he allowed you the opportunity to seek employment elsewhere. Because he never hired you, no one could fire you.

You claim Mr. Chesney lied to cover up for the officer?? It's the officer's job to ensure all inmates are locked up after 9:00 p.m. Also, the officer gave you the benefit of the doubt and checked the roster and also checked with the Block Clerk.

I find your accusations to be false and your grievance without merit.

CMD:dy

cc:     Deputy Klem ✓
        Mr. Chesney ✓
        CO Mackreth ✓
        DC 15 ✓
        file ✓

| Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures. | SIGNATURE OF GRIEVANCE COORDINATOR *Carol M. Notter* | DATE 12/18/97 |

804
.1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA. 17001-0598**

CIAL INMATE GRIEVANCE                    GRIEVANCE NO. | MAH-0457-98

| GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| Dotter | Mahanoy | 981213 |
| t: (Commitment Name & Number) | INMATE'S SIGNATURE | |
| C. Isley AM-9320 | C. Isley | |
| K ASSIGNMENT | QUARTERS ASSIGNMENT | |
| Nil | JA-15 | |

**TRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

rief, clear statement of grievance:

On 981209 I was harassed and threatened and fired from my job (the first day) by prison guard Mackrely who opened my bell door after 9:10 p.m. count and did as already noted above. I notified the unit manager, Chesney, but he intentionally lied stating that I never had a job (I had worked that afternoon) and that there was no harassment/threats. It is clear that he lied because I never informed him of the name of the guard and consequently for the guard to know what was going on when he spoke to him reveals the utter veracity of my words. Chesney is covering up for the prison guard in retaliation for my not being gullible and refusing to conversate on any social level with him. He has already stated to other prisoners that he hates me. Personal interview requested.

Actions taken and staff you have contacted before submitting this grievance:

Actions taken: contacted staff

Staff contacted: unit mgr.

ur grievance has been received and will be processed in accordance with DC-ADM 804.

Carol Dotter
Signature of Grievance Coordinator                    12/14/98
                                                      Date

C-804
RT II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

FICIAL INMATE GRIEVANCE
TIAL REVIEW RESPONSE

GRIEVANCE NO. | MAH-0457-98

| : (Name & DC NO.)  Isley, Charles AM9320 | INSTITUTION  SCI-Mahanoy | QUARTERS  J/B 1015 | GRIEVANCE DATE  12/13/98 |

he following is a summary of my findings regarding your grievance:

At our initial interview Mr. Isley stated that he did not want a block job because he didn't want to work for that little money. He was never given a block job, therefore was never fired. Why Mr Isley worked that afternoon in question is unknown to me. I specificially informed him during our initial interview that if he refused a job, I could remove him from allowance pay, but I chose not to do so. I wanted to allow him the opportunity to seek a job elsewhere. The rest of the accusations are false and without merit.

TC/mb

*J. Chesney U. M.*

cc:   Deputy Klem
      Unit Manager: Chesney

| efer to DC-ADM 804, Section VIII,  or instructions on grievance  ystem appeal procedures. | SIGNATURE OF GRIEVANCE Officer | DATE |

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
1451 N. MARKET STREET
ELIZABETHTOWN, PA 17022

OFFICE OF THE
CHIEF HEARING EXAMINER

January 20, 1999

**RECEIVED**

JAN 2 5 1999

SCI MAHANOY
SUPERINTENDENT'S OFFICE

Charles Isley,  AM-9320
SCI Mahanoy

Re:     Misconduct No. A110205

Dear Mr. Isley:

This is in response to your appeal to final review of the above numbered misconduct.

In accordance with DC-ADM 801, VI, I., 3 as amended effective November 1, 1997, I have reviewed the entire record of this misconduct; including the misconduct report, the hearing report and related documents, your appeal to the Program Review Committee and their response, your appeal to the Superintendent and his response. I have also thoroughly reviewed the issues you raise to final review.

The issues you raise to final review have already been addressed by the Program Review Committee and the Superintendent. On review of the record, this Office concurs with their responses. I find no persuasive basis from which to conclude that the Examiner erred in conducting the hearing. The Examiner specifically documented findings of fact based on evidence presented at the hearing to support the decision. The procedures followed were in complete accordance with DC ADM 801, §VI. The sanction imposed is within the presumptive range of misconduct sanctions, is not viewed to be disproportionate to the offense, and therefore will not be amended at this level.

For the above-stated reasons, the responses provided by the Program Review Committee and the Superintendent are upheld in full. Your appeal must, therefore, be denied.

Sincerely,

Robert S. Bitner
Chief Hearing Examiner

cc: Dept (a)
SCI 15
Mr. Vaell
Ms. Braswage
file

RSB:ph
pc:    Superintendent Dragovich

**EXHIBIT "C"**

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
SCI Mahanoy

January 6, 1999

SUBJECT:    Appeal to Superintendent, Misconduct #A110205

TO:    Charles Isley, AM-9320, RHU C-9

*Martin L. Dragovich*

FROM:    Martin L. Dragovich, Superintendent

Receipt of your appeal to Superintendent of Misconduct #A110205 is acknowledged.  In preparing this response, I have reviewed your original misconduct, the Hearing Examiner's disposition, your appeal to PRC, their response and your appeal to this office.

It appears that you are appealing your misconduct based on your belief that:

a.    The procedures employed were contrary to law, Administrative Directive 801, or to the ICU Consent Decree;

c.    The evidence is insufficient to support the decision.

Your appeal to this office contains no new information that would cause me to arrive at a different conclusion than that of the PRC or the Hearing Examiner.  A review of the proceedings reveals no violations of the law, Administrative Directive 801, or the ICU Consent Decree.  You were not permitted to have your staff witnesses present as you indicated that none of them were present at the time and place of the incident.  The Hearing Examiner, therefore, denied them based on lack of relevance.  The impartial tribunal is the Hearing Examiner who is not an employee of this institution but rather works for the Department of Corrections.  You had the opportunity to be heard and your statements were recorded.  The evidence relied upon was the reporting staff member's version which was found more credible than your own and it is within the purview of the Hearing Examiner to determine credibility of witnesses and testimony.

Based upon the foregoing, your appeal is denied.

MLD:dy

cc:    Deputy Klem        Control
      Deputy Novotney    Ms. Bosavage
      Mrs. Cerullo       Mr. Unell
      Mr. Yarnell      - DC 15
      Mr. Spaide         file

**DC-135A**

**INMATE'S REQUEST TO STAFF MEMBER**

RECEIVED
JAN 06 1999
SUPERINTENDENT'S OFFICE

**COMMONWEALTH OF PENNSYLVANIA**

**DEPARTMENT OF CORRECTIONS**

**INSTRUCTIONS**

*Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.*

| 1. TO: (NAME AND TITLE OF OFFICER) Dragovich, warden | 2. DATE 990105 |
|---|---|

| 3. BY: (INSTITUTIONAL NAME AND NUMBER) C. Isley AM-9320 | 4. COUNSELOR'S NAME Fisher |
|---|---|

| 5. WORK ASSIGNMENT Nil | 6. QUARTERS ASSIGNMENT RHU C-9 |
|---|---|

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE.  GIVE DETAILS.

I wish to appeal misconduct #A110205 because PRC did not take any of my appeal issues into consideration, violating my rights. It is patently obvious that I was denied my rights pursuant to law To offer evidence, call witness, an impartial tribunal, to be heard, and not be retaliated against for exercising my rights. This is noted in my written version and PRC appeal. Moreover, the evidence is insufficient since the report and the decision both specifically state that I complied with the alleged order.

It is impossible for the PRC to state that they had nothing to support the appeal.

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

☐  TO DC-14 CAR ONLY                    ☐  TO DC-14 CAR AND DC-15 IRS

| STAFF MEMBER | DATE |
|---|---|

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

DC-141 Part III
Program Review Committee
__X__ Misconduct Appeal          _____ Periodic Review          _____ Other

| DC Number AM9320 | Name Isley, Charles | Institution SCI Mahanoy | Date of Review 12/30/98 | Misconduct # A110205 |
|---|---|---|---|---|

PROGRAM REVIEW COMMITTEE'S DECISION AND ITS RATIONALE

Inmate Isley appeals based on:

a.      The procedures employed were contrary to law, Administrative Directive 801, or to the ICU Consent Decree;

c.      The evidence was insufficient to support the decision.

The PRC has reviewed the available information concerning this misconduct including the report of Unit Manager Chesney, the findings of the Hearing Examiner, and inmate Isley's appeal.

Inmate Isley appeals that procedures employed were contrary to law, ADM 801, or the ICU Consent Decree. PRC finds nothing to support this appeal.

Inmate Isley also appeals that evidence was insufficient to support the decision. PRC notes that there was no new legitimate evidence to indicate a change of the Hearing Examiner's decision.

DECISION RELATIVE TO HEARING EXAMINER'S VERDICT
___ Not Applicable  _X_ Sustain ___ Amend ___ Refer Back for Further Study ___ Exonerate

| Names of Program Review Committee | Signatures | Date |
|---|---|---|
| Marva Cerullo, CHCA | *Marva Cerullo* | 12/31/98 |
| Robert Yarnell, Food Services Manager | *Robert Yarnell* | 12/31/96 |
| Richard Spaide, Unit Manager | *[signature]* | 12-31-98 |

81228

**DC-141   PART II E**          **COMMONWEALTH OF PENNSYLVANIA**
MISCONDUCT HEARING APPEAL          **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | No. from PART |
|-----------|------|-------------|---------------|
| AM-9320 | C. Isley | Mahaning | A110205 |

I was found guilty of misconduct # __A110205__ on __98/2/6__ (date) by the
Hearing Committee/Examiner, and I wish to appeal that decision on the following grounds:

Check Area(s) Involved

a. The procedures employed were contrary to law,
Administrative Directive 801, or to the ICU
Consent Decree;                                    [✓]

b. The punishment is disproportionate to the offense;   [ ]

c. The evidence was insufficient to support the decision.  [✓]

RECEIVED
DEC ?? 1998
Deputy Superintendent
Center Services

Below is a brief statement of the facts relevant to my claim(s). It includes the identity of all
persons who may have information which may be helpful in resolving this matter.

1. There was no evidence to support the charge. The false and retaliatory report clearly states that I complied with the alleged order

2. The H.E. was biased. This is clear and obvious in the fact that he did not take my defense into consideration at all. It is a fact that it was makeup day for commissary for my block (actually the entire prison) and that other prisoners went on the day in question. Despite these facts, the H.E. erroneously and intentionally ruled that the day in question was not a normally scheduled makeup commissary day for my block. He also did not consider any of the facts which established that the report was retaliatory in nature and utterly false.

3. The H.E. refused to allow me to offer any evidence (documents, etc.) to support the defense of a fabricated and false retaliatory report

4. The H.E. refused to call any of my witnesses

5. The H.E. erroneously ruled that I never addressed the incident but my written version pellucidly reveals that he is a vicious liar and just refused to even take my written version into account.

6. The H.E.'s blatant bias is evident in the fact that he ruled that I complied with the order but he still found me guilty. He did so in order to cover for Chesney and to keep me in prison for several more years for nothing

7. The H.E. ruled that I refused "orders" but never states which one and, in any event ruled that I complied.

8. Chesney and the H.E. have violated my rights by retaliating against me for filing grievances/lawsuits and the H.E. blatantly violated my hearing rights

FORM DC-141    PART I    COMMONWEALTH OF PENNSYLVANIA
Rev. 6-84

**A 110205**

MISCONDUCT REPORT ☐ OTHER    DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| M9320 | Isley, Charles | SCI MAH | 1420 | 12/14/98 | 12/14/98 |

| Quarters | Place of Incident |
|---|---|
| A1015 | Unit Managers Office |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

MISCONDUCT CHARGE OR OTHER ACTION    Class 1, b, 7 Refusing to Obey An Order
Class 1, C, 22 Using Abusive or Obscene Language to an Employee

STAFF MEMBER'S VERSION    Inmate Isley, AM9320 Came to my office to ask permission to go to commissary because he had no money on his account on Friday. I told him no and he became argumentative. I ordered him to leave my office. He continued to argue with me and began using obscene language "You let these other mother fuckers go. Why the fuck can't I go." I again ordered Mr Isley to leave my office. He then looked at me and said "your a real goofball." I ordered him a third time to leave my office. He finally complied.

_(signature)_

IMMEDIATE ACTION TAKEN AND REASON    Continue present status pending further action by the Hearing Examiner.

**PRE-HEARING CONFINEMENT**

| | IF YES | |
|---|---|---|
| | TIME | DATE |
| ☐ YES ☑ NO | N/A | N/A |

☑ REQUEST FOR WITNESSES AND REPRESENTATION    FORMS GIVEN TO INMATE    ☑ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY    SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| Thomas Lanny U.M. | CCJ Ito Byn | DATE  TIME 24 HOUR BA |
| | | 12-14-98  1730 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER DATE/TIME | | Misconduct Category | Signature of Person Serving Notice |
|---|---|---|---|
| 12/16/98    0 SUN | | ☑ CLASS I  ☐ CLASS 2 | Co'  S. Leachey LEACHE |

**NOTICE TO INMATE**
You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found

**DC-141** Rev. 6-84    **PART II B**

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
DISCIPLINARY HEARING REPORT

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from Part I |
|---|---|---|---|---|---|
| AM9320 | Isley | SCIMAH | 12/16/98 | 1005 | A110205 |

| INMATE PLEA | ☐ Guilty ☒ Not Guilty | ☐ No Plea ☐ Other | Verdict | ☒ Guilty ☒ Not Guilty #22 |
|---|---|---|---|---|

**HEARING ACTION**

CHARGES  B#7
C#22

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

HX Believes officers/Unit Mgrs. Report over his
Inmates Plea and Version - HX Notes he in his
Version Never really addresses the Incident
But deals with the Pretense of retaliation for
his filing grievances etc. HX Believes Inmate
Isley did refuse Orders to leave Unit Mgrs.
Office after being told "No" to his request for a
Commissary Pass to Shop after the Blocks
Scheduled Day. HX Believes repeated Orders
Were issued Prior to Inmate finally complying
and leaving the office.

Sanction:
30 Days DC
ER 12/16/98

| ☒ YES | ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. |
|---|---|---|
| ☒ YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. |
| ☒ YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. |
| ☒ YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. |

Witness Form
Version Form

SEE APPENDICES
☒

**NAME(S) OF HEARING EXAMINER/COMMITTEE**
(TYPED OR PRINTED)

K Breon

Hearing Report and all appended information must be signed. Signature in-
dicates finished report with appendices.

SIGNATURE OF HEARING EXAMINER/COORDINATOR

E.R.
12/16/

| DC-141 PART II C | COMMONWEALTH OF PENNSYLVANIA | | |
|---|---|---|---|
| Rev. 6-84  HEARING SUPPLEMENT<br>INMATE VERSION AND WITNESS STATEMENTS | DEPARTMENT OF CORRECTIONS | | |
| DC Number<br>Jm 9320 | Name<br>Isley, Charles | Institution<br>SCIMAH | No. from PART I<br>A110205 |

**INMATE'S VERSION**

Prisoner Isley pleads not guilty to both charges. He never used any abusive or obscene language and was never ordered to leave the office (even if he were, there is no evidence to support the charge of refusing to obey an order since the false misconduct report clearly states that he complied with the order).

On the date in question prisoner Isley asked Chesney to go to commissary since it was make up day because he was just transferred to this prison (and his money had only just arrived on Thursday. However, Chesney denied the request stating that the only excuse for not going on Friday is being on a visit. When Isley pointed out that he was aware of the fact Chesney had permitted other prisoners to do that day without any valid excuse, Chesney stated "So what. You like filing grievances. You like filing lawsuits. I guarantee you won't be on my block much longer. You're a troublemaker. You should never have been released from the RHU..." Prisoner Isley just left as Chesney continued talking and subsequently asked prison guard Leuchey and the 2-10 p.m. Sgt if he could go to the store. Isley asked Sausser, Chesney, Leuchey, and the Sgt in that order.

The testimony of the prison guards will reveal that at no time was Isley disrespectful or argumentative to any of them/request

Prisoner Isley wishes for the two grievances he filed against Chesney to be offered into evidence and in the record as well as the list of inmates who went to commissary on 9/12/4 from VA. It is a fact that one prisoner (Riggins) got out of the hole on saturday and was permitted to go to commissary as well as laundry workers whose pay wasn't on friday.

It is perfectly clear from the facts that Chesney fabricated the false charges against Isley in retaliation for his filing grievances/lawsuits in order to have Isley thrown in the hole and denied parole (he is scheduled to see the board in February).

In essence, there is no evidence to support the charge of refusing to obey an order because even if the false report were true it clearly states that Isley complied. There is no evidence to support the charge of using abusive or obscene language because the preponderance of the evidence clearly shows that Isley spoke to other prison guards — before and after Chesney — and made no such statements and was not argumentative and the evidence of retaliation against Isley from Chesney clearly appears from the grievances and request, that the charges are utterly false. Lastly, Isley is a black man born Philly. He would have said "mother fucker" and, in any event, the alleged statement is neither abusive or obscene.

**DC-141** Rev. 6-84 **PART II A**

INMATE REQUEST FOR REPRESENTATION AND WITNESSES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Date | Number as on Pa... |
|---|---|---|---|---|
| Am 9320 | Isley, Charles | SCI MAH | 12-14-98 | A110205 |

You have been charged with a misconduct. You may request assistance and/or witnesses to appear at your hearing b... completing the section(s) below.

In order to have assistance or witnesses at your hearing, you must complete this form and present all copies to one o... your housing officers no later than 9:00 a.m. the first working day after you receive notice of the misconduct.

**Assistance:** ☐ I do not request assistance
☐ I request assistance by _____
(The person requested must be willing to assist you)

**Witnesses:** You may request witnesses in accord with DC-ADM 801. State the relevance and importance of the testimony the witness will give.

| If Inmate | DO NOT WRITE IN THIS SECTION |
|---|---|
| 1. Name of Witness:    No.    Quarters | For Use by Hearing Examiner |
| 2-10  Sgt on JA on 981214 | |
| Why is this person's testimony relevant and important? | Witness permitted?    If not, why not? |
| Involved in incident alleged | *Denied* |
| 2. Name of Witness:    No.    Quarters | *denials indicates* |
| C.O. Sausser | *none of* |
| Why is this person's testimony relevant and important? | *the staff were* |
| Involved in incident alleged | *present at time* |
| 3. Name of Witness:    No.    Quarters | *place 91* |
| C.O. Leachey | *incident* |
| Why is this person's testimony relevant and important? | Witness permitted?    If not, why not? |
| Involved in incident alleged | |

_C. Isley_
**Inmate's Signature**

This section to be completed by Housing Officer only

Received completed form __0755__ hours __12/15/98__
                        Time              Date

_Sausser_
**Housing Officer's Signature**

_Breo_
**Hearing Examiner's Signature**

**EXHIBIT "D"**

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
1451 N. MARKET STREET
ELIZABETHTOWN, PA 17022

RECEIVED

JAN 28 1999

SCI MAHANOY
SUPERINTENDENT'S OFFICE

OFFICE OF THE
CHIEF HEARING EXAMINER

January 27, 1999

Charles Isley, AM-9320
SCI Mahanoy

Re:    DC-ADM 804 – Final Review
       Grievance Nos. MAH-0462-98 and MAH-0480-98

Dear Mr. Isley:

This is to acknowledge receipt of your appeal to final review of the above numbered grievances.

In accordance with the provisions of DC-ADM 804, VI D, as amended effective November 1, 1997, I have reviewed the entire record of these grievances; including your initial grievance, the Grievance Officer's response, your appeal from initial review and the Superintendent's response. I have also carefully reviewed the issues you raise to final review.

Upon completion this review, it is the decision of this office to uphold the responses provided by staff at the institutional level. I find the issues raised for final review have been addressed by the Grievance Coordinator and the Superintendent, and their responses are reasonable and appropriate.

Your appeal of MAH-0479-98 will not be accepted for final review as you have failed to properly complete appeal of this grievance from initial review.

I concur with the responses already provided at the institution level. Accordingly, your appeal to final review must be denied.

Sincerely,

Robert S. Bitner
Chief Hearing Examiner

CC: MRS. Dotter
DOS

RSB:ph
pc:    Superintendent Dragovich

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**SCI Mahanoy**
(717) 773-2158
January 11, 1999

SUBJECT:    Appeal to Superintendent
            Grievance #MAH-0462-98

TO:         Charles Isley
            AM-9320

FROM:       *Martin L. Dragovich*
            Martin L. Dragovich
            Superintendent
            SCI Mahanoy

Receipt of your appeal to Superintendent of grievance #MAH-0462-98 is acknowledged. In preparing this response, I have reviewed your original grievance, the Grievance Officer's response and your appeal to this office.

Having reviewed Mrs. Dotter's response, I find that it is accurate and complete. I would only add that this matter has previously been litigated and supported by the courts specifically as it relates to this institution. The response does answer your grievance, it only does not provide you with the answer you were looking for. Staff must be able to see in your cell at all times to conduct security and safety visual checks to ensure that you are not in any danger. These lights are low intensity and enable us to see in your cell at night and are part of the original design feature of this institution.

Based upon the foregoing, your appeal is denied.

MLD:pld

Cc:    Deputy Novotney
       Deputy Klem
       Lt. Fryzel
       Mrs. Dotter
       DC-15
       file

**DC-135A**

RECEIVED

JAN 1 1 1999

SCI MAHANOY
SUPERINTENDENT'S OFFICE

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

## INMATE'S REQUEST TO STAFF MEMBER

**INSTRUCTIONS**

Complete Items Number 1-7. If you follow instructions in preparing
your request, it can be disposed of more promptly and intelligently.

1. TO: (NAME AND TITLE OF OFFICER) Drayovich, warden

2. DATE 990/09

3. BY: (INSTITUTIONAL NAME AND NUMBER) C. Isley

4. COUNSELOR'S NAME Fisher

5. WORK ASSIGNMENT Nil

6. QUARTERS ASSIGNMENT RHU C-9

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE.   GIVE DETAILS.

I wish to appeal grievance # MAH-0462-98 because the response does not answer my grievance. I wish to know why the lights are kept on all evening, night and morning. The response simply states "for security". It does not state why. I wish to know what the "security" reason is. Being in perpetual light is psychological warfare/torture, as you well know

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

☐ TO DC-14 CAR ONLY                    ☐ TO DC-14 CAR AND DC-15 IRS

STAFF MEMBER                                                          DATE

**DC-804**
PART II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO. | MAH-0462-98

| TO: (Name & DC NO.) | INSTITUTION | QUARTERS | GRIEVANCE DATE |
|---|---|---|---|
| Charles Isley, AM-9320 | Mahanoy | RHU C-9 | 12/17/98 |

The following is a summary of my findings regarding your grievance:

The low-intensity night lights are necessary for security in the L-5 unit. Therefore, the procedures of putting the lights on from dusk until dawn will continue.

CMD:dy

cc:    Deputy Klem
       Deputy Novotney
       Lt. Fryzel
       DC 15
       file

| Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures. | SIGNATURE OF GRIEVANCE COORDINATOR  *Carol M. Dotter* | DATE  1/8/98 |
|---|---|---|

C-804
RT 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

FICIAL INMATE GRIEVANCE

GRIEVANCE NO. | MAH-0462-98

| : GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| Dotter | Mahanoy | 98/12/7 |

| :OM: (Commitment Name & Number) | INMATE'S SIGNATURE |
|---|---|
| E. Isley AM-9320 | E. Elsey |

| 'ORK ASSIGNMENT | QUARTERS ASSIGNMENT |
|---|---|
| Nil | RHU C-9 |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

: Brief, clear statement of grievance:

I wish to know why my cell light is remains on all evening and all night and half the morning. According to staff, it is policy. However having the cell light on all night is a violation of my constitutional rights as established by the federal courts. It is a form of sleep deprivation. No other prison has such a policy (at one time there was – but it was ceased by the courts) Consequently, I wish for this policy to be eradicated forthwith.

B. Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff
Staff contacted: RHU staff

Your grievance has been received and will be processed in accordance with DC-ADM 804.

C Dotter                                    12/18/98
Signature of Grievance Coordinator                      Date

**EXHIBIT "E"**

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
1451 N. MARKET STREET
ELIZABETHTOWN, PA 17022

OFFICE OF THE
CHIEF HEARING EXAMINER

February 17, 1999

```
RECEIVED

FEB 2 2 1999

SCI MAHANOY
SUPERINTENDENT'S OFFICE
```

Charles Isley, AM-9320
SCI Mahanoy

Re:    DC-ADM 804 - Final Review
       Grievance Nos. MAH-0002-99, MAH-0011-99
       **and** ROC-1015-98

Dear Mr. Isley:

This is to acknowledge receipt of your appeals to final review of the above numbered grievances.

In accordance with the provisions of DC-ADM 804, VI D, as amended effective November 1, 1997, I have reviewed the entire record of these grievances; including your initial grievance, the Grievance Officer's response, your appeal from initial review and the Superintendent's response. I have also carefully reviewed the issues you raise to final review.

Upon completion this review, it is the decision of this office to uphold the responses provided by staff at the institutional level. I find the issues raised for final review have been addressed by the Grievance Coordinator and the Superintendent, and their responses are reasonable and appropriate.

I concur with the responses already provided at the institution level. Accordingly, your appeals to final review must be denied.

Sincerely,

Robert S. Bitner
Chief Hearing Examiner

DC 15

RSB:ph
pc:    Superintendent Dragovich
       Superintendent Meyers

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
SCI Mahanoy
(717) 773-2158

January 26, 1999

SUBJECT:    Appeal to Superintendent, Grievance #MAH-0002-99

TO:         Charles Isley, AM-9320, RHU

FROM:       *Edward J. Klem for*
            Martin L. Dragovich, Superintendent

I am in receipt of your appeal from initial review which was received in this office on January 26, 1999.

A review of your appeal to this office contends that our psychologist, Mr. Dennison, misrepresented himself to you as a member of the parole board and that at the time the inmate program manager saw you for the initial review, the inmate program manager, Mr. Unell, did not explain things satisfactorily to you.

I have reviewed your initial inmate grievance, the initial review response, and your appeal to this office. I must first point out to you that use of the grievance system shall be done in good faith and for a good cause.

It is further noted that inmates must make a genuine effort to resolve the problem before the grievance system is utilized. In this particular case, I find no effort being made on your part.

Upon review of all the information presented, I find no violations of Department of Corrections policy.

The psychologist was following established and routine procedures relative to reports needed and requested by the parole board. You apparently misunderstood Mr. Dennison's explanation. Nonetheless, the subsequent explanation offered by the inmate program manager at the initial review response was comprehensive and sufficient. I further note that the inmate program manager had a personal interview with you and fully explained the issues you grieved.

Upon review of all the information presented, the response in findings of the grievance officer are sustained.

EJK:dy

cc:    Deputy Klem          Control
       Deputy Novotney      Ms. Bosavage
       Mr. Unell            DC 15
       Mr. Dennison         file
       Mrs. Dotter

**DC-135A**

**INMATE'S REQUEST TO STAFF MEMBER**

RECEIVED
JAN 1999
SUPT                OFFICE

**COMMONWEALTH OF PENNSYLVANIA**

**DEPARTMENT OF CORRECTIONS**

INSTRUCTIONS

*Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.*

| 1. TO: (NAME AND TITLE OF OFFICER) Dragovich, warden | 2. DATE 990123 |
|---|---|

| 3. BY: (INSTITUTIONAL NAME AND NUMBER) C. Isley AM-9320 | 4. COUNSELOR'S NAME Nil |
|---|---|

| 5. WORK ASSIGNMENT Nil | 6. QUARTERS ASSIGNMENT JB-16 |
|---|---|

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE.  GIVE DETAILS.

I wish to appeal grievances MAH-0002-99 and MAH-0011-99. The former is appealed because Dennison misrepresented himself to me and told me that I had to sign the form to be reviewed for parole — which was not true. Unell did not explain anything to me save for that the parole board and prison ~~staff~~ will draw negative inferences from my refusal. The psychology staff did not tell me anything as the only one I saw was Dennison. You should have informed the board why I refused to sign.

The latter grievance is appealed because I asked Cerullo the proper procedure to follow for the relevant referrals to be procured. However, she told me that they could not. Now she says something different. I have already signed up for sick call and was told I would be placed on the list to see the optometrist and ophthalmologist (I was scheduled to see an ophthalmologist in February at Rockview prison). I do not believe the grievance should have been sent to her since it was filed on her.

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

☐ TO DC-14 CAR ONLY                    ☐ TO DC-14 CAR AND DC-15 IRS

| STAFF MEMBER | DATE |
|---|---|

**DC-804**
**PART II**

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

| SCI MAHANOY RECEIVED |
|---|
| JAN 0 6 1999 |
| INMATE PROGRAM MANAGER |

● **OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO.   **MAH-0002-99**

| TO:  (Name & DC NO.) ISLEY, CHARLES AM-9320 | INSTITUTION SCI-MAHANOY | QUARTERS RHU | GRIEVANCE DATE 1/06/99 |
|---|---|---|---|

The following is a summary of my findings regarding your grievance:

This is in response to Grievance No. MAH-0002-99. I note that I spoke with you at length regarding this grievance in our meeting in the RHU on 1/14/99. I note the following: You acknowledged during our meeting that Mr. Dennison did <u>not</u> introduce himself as a Parole Board member. It was <u>your</u> assumption that he worked for the PBPP. You are now well aware that he is a Psychological Services Associate and a member of the Psychology Department. It is noted that Mr. Dennison presented a mental health informed consent document to you on 12/17/98. At that time you decided to sign the form after it was reviewed. On 12/24/98 you wrote a request to Mr. Youron, Chief Psychologist requesting that your consent be revoked and that the original document be returned to you. In response to your request slip, dated 12/24/98, Mr. Youron wrote back to you and informed you that your consent was, in fact, revoked. You acknowledged to me on 1/14/99 that you did receive the original document. Also, I note that a DC-14 entry was made indicating that you had revoked your consent. Be informed then, that at this point in time, we do <u>not</u> have your consent regarding the mental health informed consent policy/document. In accordance with the policy 7.3.1, I cautioned you that recipients of the reports (e.g.: staffing committees and the Parole Board) "may draw negative inferences" from your refusal. The psychology staff also gave you such counsel. I also explained to you the significance of your refusal and the impact of it. I remind you also that you may decide to give your consent at a later point in time. You stated that you fully understood our conversation. You also stated that you still wish to refuse to sign the mental health informed consent document.

In that all of the elements of your grievance have been fully addressed, I recommend no further action regarding this grievance.

rh/

cc:  Deputy Klem
     Mr. Youron
     Mr. Dennison
     file

| Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures. | SIGNATURE OF GRIEVANCE Officer *James Snell* | DATE 1/14/99 |
|---|---|---|

C-804
RT 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

SCI MAHANOY
RECEIVED
JAN 0 6 1999
INMATE PROGRAM MANAGER

FICIAL INMATE GRIEVANCE

GRIEVANCE NO. MAH-0062-99

| ): GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| Dotter | Mahanoy | 990103 |

| OM: (Commitment Name & Number) | INMATE'S SIGNATURE |
|---|---|
| C. Isley AM-9320 | C. Isley |

| ORK ASSIGNMENT | QUARTERS ASSIGNMENT |
|---|---|
| Nil | RHU C-9 |

**STRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

Brief, clear statement of grievance:

A person by the name of Dennison misrepresented himself to me in order to trick me into signing the Mental Health Informed Consent Document. He stated that I had to sign it to be evaluated for parole pursuant to the "Austin" litigation. I have since ascertained that he is not employed by the parole board and that I was not required to sign anything for parole evaluation. Consequently, I want the original of the document and any and all copies as I do not give permission for anything and my signature is invalid as it was attained illegally

Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff
Staff contacted: Brown, Yocom

ur grievance has been received and will be processed in accordance with DC-ADM 804.

C. Dotter                                          1/4/99

Signature of Grievance Coordinator                 Date

**EXHIBIT "F"**

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
1451 N. MARKET STREET
ELIZABETHTOWN, PA 17022

OFFICE OF THE
CHIEF HEARING EXAMINER

March 3, 1999

Charles Isley, AM-9320
SCI Mahanoy

Re:   DC-ADM 804 - Final Review
       Grievance No. MAH-0035-99

Dear Mr. Isley:

This is to acknowledge receipt of your appeal to final review of the above numbered grievance.

In accordance with the provisions of DC-ADM 804, VI D, as amended effective November 1, 1997, I have reviewed the entire record of this grievance; including your initial grievance, the Grievance Officer's response, your appeal from initial review and the Superintendent's response. I have also carefully reviewed the issues you raise to final review.

Upon completion this review, it is the decision of this office to uphold the responses provided by staff at the institutional level. I find the issues raised for final review have been addressed by the Grievance Coordinator and the Superintendent, and their responses are reasonable and appropriate.

I concur with the responses already provided at the institution level. Accordingly, your appeal to final review must be denied.

Sincerely,

Robert S. Bitner
Chief Hearing Examiner

RSB:ph
pc:   Superintendent Dragovich

cc: Depo (2)
Mrs. Bitter
DC 15

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**SCI-Mahanoy**
(717) 773-2158

February 17, 1999

SUBJECT:    Appeal to Supt., Grievance MAH-0035-99

TO:         Charles Isley, AM-9320, I/B 16

*Martin L Dragovich*

FROM:       Martin L. Dragovich, Superintendent

      Receipt of your appeal to Supt. of grievance MAH-0035-99 is acknowledged. In preparing this response, I have reviewed your original grievance, the Grievance Officer's response and your appeal to this office.

      As Lt. Mahally has already indicated, there are indications that you have at one time had seven magazines in your possession upon arrival at SCI Mahanoy. These items were not present in your cell when your property was packed following your confinement to the RHU on 12/16/98. Furthermore, when you were in the Property Room on 12/22/98 to pick up legal materials, you failed to make mention of any of these items missing from your property.

      Finally, you have presented no conclusive proof that you had the items in question in your property at the time you were placed in the Restricted Housing Unit. The presence of an item at the time of your arrival in this institution does not necessarily prove that it was present weeks, months, or years later as property can be lost, destroyed, stolen, given to another party, or mailed out. The institution does not assume responsibility for lost or stolen property unless it is due to the negligence of staff. This requires proof and in the absence of any proof in this instance, I must deny your grievance.

MLD:dy

cc:    Deputy Novotney
       Deputy Klem
       Mrs. Dotter
       Lt. Mahally
       DC 15
       file

**DC-804**
PART II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

| OFFICIAL INMATE GRIEVANCE | GRIEVANCE NO. | |
|---|---|---|
| INITIAL REVIEW RESPONSE | | MAH-0035-99 |

| TO: (Name & DC NO.) C. Isley AM-9320 | INSTITUTION SCI-Mahanoy | QUARTERS I/B 16 | GRIEVANCE DATE 1/28/99 |
|---|---|---|---|

The following is a summary of my findings regarding your grievance:

This is in response to your grievance concerning your property. The personal property inventory that accompanied you when you arrived at SCI-Mahanoy reflects that you had seven magazines.

Following your confinement to the RHU on 12/16/98, all of your property that was present in your cell was packed and removed by Sgt. Birosak. Your property was then secured in the Property Room until it was inventoried by Officer Peek. The Personal Property Inventory dated 12/17/98 does not show that any magazines were present with your property at that time. You received your copy of this inventory with your basic RHU issue.

Not only did the Property Room not receive any requests from you concerning any missing items while you were in the RHU, but you also failed to mention anything concerning these items when you were in the Property Room on 12/22/98 to pick up some legal material.

Based on the information above, I conclude that there were no magazines present with your property when it was packed and removed from your cell. Unless you can provide me with proof that these items were present with your property at the time of your confinement, I will take no further action on this matter.

In addition, excessive state-issued items do not require a Confiscation Slip as long as they are not related to a misconduct.

LPM:js

cc:    Deputy Novotney
       Deputy Klem
       Mrs. Dotter
       Records DC-15
       Sgt. Birosak
       COI Peek
       file

| Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures. | SIGNATURE OF GRIEVANCE COORDINATOR LP Mohan  COII | DATE 2/10/99 |
|---|---|---|

**DC-135A**

RECEIVED

FEB 17 1999

SCI MAHANOY
SUPERINTENDENT'S OFFICE

**COMMONWEALTH OF PENNSYLVANIA**

**DEPARTMENT OF CORRECTIONS**

**INMATE'S REQUEST TO STAFF MEMBER**

**INSTRUCTIONS**

*Complete Items Number 1-7. If you follow instructions in preparing
your request, it can be disposed of more promptly and intelligently.*

| 1. TO: (NAME AND TITLE OF OFFICER) Dragovich, warden | 2. DATE 990213 |
|---|---|
| 3. BY: (INSTITUTIONAL NAME AND NUMBER) C. Isley AM-9320 | 4. COUNSELOR'S NAME Nil |
| 5. WORK ASSIGNMENT Nil | 6. QUARTERS ASSIGNMENT IB-16 |

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE. GIVE DETAILS.

I wish to appeal grievance #MAH-0035-99 because I did not find out
the items were missing until after I got out of the hole. They were in my legal property
on 981228 when I checked it and took other legal material out. Moreover there
is a lot of property that was not on my inventory sheet. They took my
property and I wish to be reimbursed.

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

☐ TO DC-14 CAR ONLY                    ☐ TO DC-14 CAR AND DC-15 IRS

| STAFF MEMBER | DATE |
|---|---|

DC-804
PART 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

**OFFICIAL INMATE GRIEVANCE**                    GRIEVANCE NO. MAH-0035-9

| TO: GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| Dotter | Mahanoy | 990127 |
| FROM: (Commitment Name & Number) | INMATE'S SIGNATURE | |
| C. Isley AM-9320 | C. Isley | |
| WORK ASSIGNMENT | QUARTERS ASSIGNMENT | |
| N/A | IB-16 | |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance:

On 980114 I was released from the and some of my property was missing. I informed the sergeant who instructed me to write the property room, which I did - twice. The missing property consists of several brown socks and white boxer shorts (I had more than the limit because of the items given to me upon my arrival by clothing exchange) and all but save for two pornographic books. I received no confiscation slips and, according to other prisoners, it is common practice for pornographic books to be taken. However, those books were exhibits for my lawsuit in the Western District Federal court and therefore I want them returned immediately or to have confiscation slips. They were included in my inventory sheets (most of them) from Rockview prison. I have grievances to verify receipt of the others at Rockview. Else, I wish to be reimbursed.

B. Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff.
Staff contacted: Property Room Sgt., Property Room staff

Your grievance has been received and will be processed in accordance with DC-ADM 804.

C. Dotter
Signature of Grievance Coordinator

1/28/99
Date

WHITE—Grievance Coordinator Copy     CANARY—File Copy     PINK—Action Return Copy     GOLDENROD—Inmate Copy

**EXHIBIT "G"**

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
1451 N. MARKET STREET
ELIZABETHTOWN, PA 17022

RECEIVED

APR 1 9 1999

S
SUPERIN...          ...FICE

OFFICE OF THE
CHIEF HEARING EXAMINER

April 12, 1999

Charles Isley,  AM-9320
SCI Mahanoy

Re:    DC-ADM 804 - Final Review
       Grievance No. MAH-0076-99

Dear Mr. Isley:

This is to acknowledge receipt of your appeal to final review of the above numbered grievance.

In accordance with the provisions of DC-ADM 804, VI D, as amended effective November 1, 1997, I have reviewed the entire record of this grievance, including your initial grievance, the Grievance Officer's response, your appeal from initial review and the Superintendent's response. I have also carefully reviewed the issues you raise to final review with the Bureau of Health Care Services.

Upon completion this review, it is the decision of this office to uphold the responses provided by staff at the institutional level. I find the issues raised for final review have been addressed by the Grievance Coordinator and the Superintendent, and their responses are reasonable and appropriate.

I concur with the responses already provided at the institution level. Accordingly, your appeal to final review must be denied.

Sincerely,

Robert S. Bitner
Chief Hearing Examiner

RSB:ph
pc:    Superintendent Dragovich

cc: DC5

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**SCI Mahanoy**
**(717) 773-2158**
**March 24, 1999**

**SUBJECT:**   Appeal to Superintendent
Grievance #MAH-0076-99

**TO:**   Charles Eisley
AM-9320, I/B Unit

**FROM:**   Martin L. Dragovich
Superintendent
SCI Mahanoy

Receipt of your appeal to Superintendent of grievance #MAH-0076-99 is acknowledged. In preparing this response, I have reviewed your original grievance, the Grievance Officer's response and your appeal to this office.

 It appears that at least six responses have been prepared for request slips you sent to Medical regarding various different issues. As Mrs. Cerullo has noted, you cannot change an order after the fact with regard to glasses. You did not sign a cash slip for photogray lenses, therefore, none was ordered. You also claim that improper charges were filed against your account for sick call because you claim a chronic condition. Mrs. Cerullo's response reflects that she has no inmate requests on file regarding improper charges and instructed you to send her a request with the dates of said charges and it would be investigated. It is up to you to follow up in this regard. As for treatment of Hepatitis C, there is currently no treatment protocol for the treatment of this disease. This is currently being looked at by the Bureau of Health Care Services for the Department of Corrections and when one is available, it will be followed. In the meantime, experimental treatments are not permitted and only those treatments approved by the vendor will be permitted provided they are not contraindicated by other existing conditions. Treatment of your "visual imperfection" would not be corrected through corneal implants or photorefractive keratotomy, as this is done for cosmetic reasons and could be corrected through corrective lenses. Orthodontal referrals and treatment are only made if indicated by the dentist and again such referrals will be made only if medically indicated and not for cosmetic reasons.

It is apparent that you used the grievance system to argue a laundry list of complaints which apparently have already been addressed with you and which you do not wish to accept. Medical treatment is provided and referrals are made based upon competent medical judgment. Costly cosmetic procedures are not performed when less costly alternatives are available. An example, as noted earlier is corrective lenses as opposed to radial keratotomy.

Based upon the foregoing, your appeal is denied.
MLD:pld
Cc:   Deputy Novotney
Deputy Klem
Mrs. Potter
Mrs. Cerullo
DC-15
file

**DC-135A**

RECEIVED

MAR 24 1999

SCI MAHANOY
SUPERINTENDENT'S OFFICE

**COMMONWEALTH OF PENNSYLVANIA**

MAR 24 1999   **DEPARTMENT OF CORRECTIONS**

**INMATE'S REQUEST TO STAFF MEMBER**

**INSTRUCTIONS**

*Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.*

| 1. TO: (NAME AND TITLE OF OFFICER) Dragovich, warden | 2. DATE 990324 |
|---|---|

| 3. BY: (INSTITUTIONAL NAME AND NUMBER) E. Isley AM-9320 | 4. COUNSELOR'S NAME Nil |
|---|---|

| 5. WORK ASSIGNMENT Nil | 6. QUARTERS ASSIGNMENT IB-16 |
|---|---|

**7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE. GIVE DETAILS.**

I wish to appeal grievance MAH-0076-99 because the response is nonsensical. According to the medical dept I cannot receive laser surgery of any kind to correct my eye disorder nor can I receive any orthodontal treatment. Moreover, since I cannot have photogray lenses I do not want the glasses — I want my money back and I never received the glasses. Lastly, I did send a request slip concerning the wrongful charge of my account but nothing was done.

**8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)**

☐ TO DC-14 CAR ONLY          ☐ TO DC-14 CAR AND DC-15 IRS

| STAFF MEMBER | DATE |
|---|---|

**DC-804**
PART II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO.    | MAH 0076-99

| TO: (Name & DC NO.) | INSTITUTION | QUARTERS | GRIEVANCE DATE |
|---|---|---|---|
| Charles Isley    AM - 9320 | SCI Mahanoy | I/B | March 04, 1999 |

The following is a summary of my findings regarding your grievance:

Mr. Isley:

You did not sign a cash slip for photo gray lenses therefore they were not ordered. You cannot change your order after the fact. (Response to Inmate Request 2/18/99 twice).

Regarding ophthamologist and orthodontist see prior responses to Inmate Request dated 1/4/99, 2/3/99, 2/16/99, 2/26/99. Our responses do not change on four occasions why would they change now? I have no inmate request in my file regarding improper charges. Send an Inmate Request with the dates of said charges and someone will investigate.

cc:    Deputy Klem
       Deputy Novotney
       Carol Dotter
       Inmate Records
       File

| Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures. | SIGNATURE OF GRIEVANCE COORDINATOR  *Marvo J Cerullo* | DATE  3/18/99 |

DC-804
PART 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

**OFFICIAL INMATE GRIEVANCE**

GRIEVANCE NO. | MAH-0076-99

| TO: GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| Dotter | Mahanoy | 990304 |
| FROM: (Commitment Name & Number) | INMATE'S SIGNATURE | |
| C. Isley AM-9320 | C. Isley | |
| WORK ASSIGNMENT | QUARTERS ASSIGNMENT | |
| Nil | IB-16 | |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance:

I contacted Cerullo & Diaz concerning: The medical department's charging me, wrongfully, for sick call for a chronic condition; Being charged for glasses I do not want because they are not photogray; the medical department's allegation that there is no treatment for hepatitic C; the medical department's refusal to refer me to an ophthalmologist concerning my visual imperfection in my left eye; the medical department's refusal to refer me to an ophthalmologist for corneal implants or photorefractive keratechomy; The medical department's refusal for orthodental referrals/treatment. I wish to know why I am being denied adequate medical care.

B. Actions taken and staff you have contacted before submitting this grievance:

Actions Taken: Contacted staff
Staff contacted: Cerullo, Diaz

Your grievance has been received and will be processed in accordance with DC-ADM 804.

C. Dotter
Signature of Grievance Coordinator

3/5/99
Date

**WHITE**—Grievance Coordinator Copy    **CANARY**—File Copy    **PINK**—Action Return Copy    **GOLDENROD**—Inmate Copy

**EXHIBIT "H"**

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**1451 N. MARKET STREET**
**ELIZABETHTOWN, PA 17022**

OFFICE OF THE                                September 22, 1999
CHIEF HEARING EXAMINER

Charles Isley,  AM-9320
SCI Mahanoy

                          Re:    DC-ADM 801 - Final Review
                                 Misconduct No. A27518

Dear Mr. Isley:

        Your appeal of the above-referenced misconduct has been received by this office and is accepted for
final review.  I am accepting your appeal for final review without the benefit of having the records of your
appeals to the PRC and the Superintendent.  Since you neglected to include these records with your appeal,
I attempted to obtain them for you.  I have been unsuccessful due to your transfers from Mahanoy to Greene
to Pittsburgh.

        In accordance with DC-ADM 801, VI, I., 3, as amended effective November 1, 1997,  I have
reviewed the record of this misconduct; including the misconduct report, the hearing report and related
documents.  I have also thoroughly reviewed the issues you raise to final review.

        There is sufficient evidence in the misconduct report to sustain a finding of guilt.  At your hearing,
and in this appeal, you deny some of that evidence.  The only issue here is one of credibility.  DC-ADM 801,
§VI G, 5 d, provides that determinations of credibility shall be left to the judgement of the Hearing Examiner.
The Examiner discredited your denials and found credible the evidence related by the charging officer in the
misconduct report.  There is no basis for this office to overturn the Examiner's determination of credibility.
Therefore, the preponderance of the credible evidence presented at your hearing supports the finding of guilt
the Examiner made.

        Your allegations that Mr. Kane is "well known for his prejudice and is currently under investigation
for same" is unfounded and inaccurate.  Your opinions about Mr. Kane's qualifications to serve as a hearing
examiner are both inappropriate and irrelevant.

        For the above-stated reasons, I conclude that the issues raised do not require any further action on
this misconduct.  Your appeal must, therefore, be denied.

                                        Sincerely,

                                        Robert S. Bitner
                                        Chief Hearing Examiner

RSB:ph
pc:    Superintendent Dragovich

Re: Misconduct Appeal # A27518          Charles Isley, AM-930
     Grievance Appeal                    301 Morea Rd
                                          Frackville, PA 17932

Robert Bitner, chief hear. ex.
Pa. Dept. of Cor.                        990914
P.O. Box 598
Camp Hill, PA 17001

OFFICE
OF THE
SEP 17 1999
CHIEF
HEARING EXAMINER

Bitner:

    I wish to appeal the above misconduct because my appeal issues
were not addressed. The hearing examiner was biased and did not
even read my version and said that his guards do not lie. He is well
known for his prejudice and is currently under investigation for same.
He should not even be a hearing examiner considering how his father
was killed. Also, I was in prehearing confinement at 19:20 and not
20:10. The guard attempted to force me to throw out my legal work
in retaliation for my filing a lawsuit and when I refused he called
me a nigger and assaulted me and later threatened me with harm and
death while speaking racial slurs at me. I wish for he and I to
be given polygraphs to reveal who the lying vicious racist is.
    Moreover, my property, including my legal work concerning an up-
coming trial disappeared from my property several days after
my hearing. Quite clearly, you set me up to steal my trial documents
to hinder my legal progress.

I also wish to appeal the rejection of my grievance dated 990906 because the rejection is illogical. My property (legal work, books, magazines, chess set, etc.) are missing and (you are refusing to reimburse me or find my "lost" property. I cannot even ascertain everything that is missing because (I am not able to perform an adequate check of my property (being hand-cuffed with a belt and not allowed to remove anything from a box is not adequate).

Signed,

Charles Daly

NAME _E. Estler_

NUMBER _Am-9324_

301 MOREA ROAD
FRACKVILLE, PA 17932

Robert Bitner, Chief Hear. ex.
Pa. Dept. of Cor.
P.O. Box 598
Camp Hill, PA 17001

05/29/01  14:30 FAX 3673912          DOC TRNG ACAD          ☑008

SEP 21 '99  02:26PM SCI PITTSBURGH 412 880 0287          P.2/40

FORM DC-141    PART 1    COMMONWEALTH OF PENNSYLVANIA          **A    27518**
Rev 2-84

☑ MISCONDUCT REPORT ☐ OTHER    DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| AM-9320 | Isley, Charles | SCI-MAH | 1820hRS | 8-27-99 | 8-27-99 |

| Quarters | Place of Incident |
|---|---|
| IB-16 | IB cell #16 |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**    OFFICE OF THE

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | SEP 22 1999 | | |
| | | | | | CHIEF HEARING EXAMINER | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class 1. CAtegory A  I.N. threatening An Employer or their family with bodily hARm.

**STAFF MEMBER'S VERSION**

On the Above time And DAte, while conducting A sAfety And Security check on cell #16, Isley (AM-9320). Inmate Isley wAS ordered To Remove An Air freshner from his lightfixture. After Given the order, Inmate Isley jumped Down off of his Bunk And in A very Aggresive manner. ApproAcheD this officer with closed fists And stated "you Picked the Wrong person to be fucking with, get outta my cell before you get hurt. I, CO Dropinski, then closed Inmate Isleys cell Door And notified the T-Block control sergeant.

(Q)

**IMMEDIATE ACTION TAKEN AND REASON** Confine in the Restriced Housing Unit pending further action by the Hearing Examiner

**PRE-HEARING CONFINEMENT**

IF YES

| ☑ YES ☐ NO | TIME 2120 | DATE 8/27/99 | FORMS GIVEN TO INMATE ☑ REQUEST FOR WITNESSES AND REPRESENTATION | ☑ INMATE'S VERSION |
|---|---|---|---|---|

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY    SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| CO Dropinski/ | Capt. | DATE 8-27-99    TIME 24 HOUR BASE 2142 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | |
|---|---|---|
| DATE 8/29/99 | TIME 0800 | Misconduct Category ☑ CLASS 1 ☐ CLASS 2    Signature of Person Serving Notice CO Shaff |

**NOTICE TO INMATE**

You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have will be revoked.

WHITE—DC-15        YELLOW—Inmate Cited      PINK—Staff Member Reporting Misconduct      GOLDENROD—Deputy Superintendents

05/29/01 14:30 FAX 3673912 DOC TRNG ACAD ☑009

SEP 21 '99 02:27PM SCI PITTSBURGH 412 880 0287 P.3/4

DC-T41 Rev. 6-84 PART II B
DISCIPLINARY HEARING REPORT

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from Part I |
|---|---|---|---|---|---|
| AM9320 | Isley | SCI MAH | 8-30-99 | 12:10 | A27518 |

| | | | | |
|---|---|---|---|---|
| INMATE PLEA | ☐ Guilty ☒ Not Guilty | ☐ No Plea ☐ Other | Verdict | ☒ Guilty ☐ Not Guilty |

HEARING ACTION

CHARGES: Att/N Threats an employee - not guilty

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

Evidently States in attached version that he was threatened by Staff. The Staff assaulted him & pushed him in the cell & closing his door. Hold for the officer's report on the matter dated that he did [illegible] stated to the Staff "... get out of my cell before you get hurt." Hold this was said & I find it threat. Find him guilty of the charge of [illegible]

Sanction: 60 days DC eff 8-27-99 to 10-25-99

| | | |
|---|---|---|
| ☒ YES | ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. |
| ☒ YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. |
| ☒ YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. |
| ☒ YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. |

No witness [illegible]

SEE APPENDICES ☒

Version attached

NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED)

J. K. KANE

Hearing Report and all appended information must be signed. Signature indicates finished report with appendices.

[signature]

SIGNATURE OF HEARING EXAMINER/COORDINATOR

WHITE—DC-15 YELLOW—Inmate Cited PINK—Staff Member Reporting Misconduct GOLDENROD—Deputy Superintendent

05/29/01  14:31 FAX 3673912          DOC TRNG ACAD                    ☒010

SEP 21 '99  02:27PM SCI PITTSBURGH 412 880 0287                       P.4/4

| DC-141   PART II C | COMMONWEALTH OF PENNSYLVANIA | | |
|---|---|---|---|
| Rev. 6-84   HEARING SUPPLEMENT  INMATE VERSION AND WITNESS STATEMENTS | DEPARTMENT OF CORRECTIONS | | |
| DC Number | Name | Institution | No. from PART I |
| AM-9320 | Isley, Charles | SCI-MAH | A27518 |

**INMATE'S VERSION**

Prisoner Isley pleads not guilty to the false charge based on the following reasons:

He was confined (prehearing confinement) in his cell at 1820 hrs and not 2120. This is corroborated by the staff member's version. The Prehearing Confinement Section was written by someone else which is corroborated by the comparison of the handwriting.

He did not threaten anyone and is a Black man from Philly who has never spoken in the manner alleged.

He would never approach anyone with "closed fists" because he was a boxer and a boxing trainer and "closed fists" are in direct opposition to everything he was ever taught or has taught concerning fighting, and in direct conflict with anything he has ever done.

What actually occurred was that his cell was being searched and the guard ordered him to get rid of all his legal work save for a folder because allegedly it is a rule and a possible fire hazard. When it was explained that he had a trial next month and that he was not throwing any legal material away the guard stated that he was aware that Prisoner Isley was going to trial soon and he became abusive screaming threats and racial slurs. When prisoner Isley stated he wished to speak to the lieutenant the guard physically assaulted him by pushing him back into the cell forcing him to hit his head on the table and the guard slammed the door. Prisoner Isley then pushed the intercom button and informed the sgt. that he wished to speak to the lieutenant and of the assault but was told "so what". At 1900 hrs prisoner Isley again requested to speak to the lieutenant via the intercom but was told by the sergeant that he was confined by the lieutenant's orders. Each time thereafter that the guard made his rounds he would stop at prisoner Isley's cell and threaten him with physical injury, and make racist remarks, and ask him when he next would see the parole board.

Prisoner Isley is in fear for his life, freedom, and well being from this deranged racist vicious killer guard and wish to be separated from him to stop the guard from making good on his threats to "lock up and kill prisoner Isley." He is in serious need of assistance and wishes to press charges as soon as possible. Please help him because he is entitled his or life.

WHITE — DC-15     YELLOW — Inmate Cited     PINK — Staff Member Reporting Misconduct     GOLDENROD — Deputy Superintendent

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,           :

                :

    Plaintiff           :

                :

    v.               :     No. 1:00-CV-00577

                :     (Judge Kane)

W. CONWAY BUSHEY, et al.,   :

                :

    Defendants        :

## UNSWORN DECLARATION KERMIT BREON

I, **KERMIT BREON**, hereby declare under the penalty of perjury, that the following is true and correct and based upon by personal knowledge.

1.    I am currently employed by the Pennsylvania Department of Corrections ("DOC") as a Hearing Examiner. I have been employed as a hearing examiner for approximately eight years, conducting administrative factfinding hearings at SCI-Mahanoy, SCI-Coal Township, SCI-Huntingdon, SCI-Rockview and occasionally at SCI-Houtzdale. I have been employed by the DOC for 37 years.

2.    As a hearing examiner, I conduct administrative fact-finding proceedings concerning misconduct reports issued to inmates. My duties and responsibilities are governed by the DOC Administrative Directive, 801. These duties include but are not limited to the review of the evidence presented at the misconduct hearing, the

determination of relevant witnesses, the interview of the witnesses, the determination of the inmates guilty or innocence, and the imposition of sanctions.

3.    On December 14, 1998, Iseley was issued Misconduct No. A 110205 for refusing to obey and order and using obscene language. (See Exhibit "A" attached ).

4.    On December 16, 1998, I presided at the misconduct hearing of Charles Iseley regarding examiner  Misconduct No. 110205.   Prior to the hearing, Iseley's witnesses were not permitted as Iseley admitted that the staff witnesses he requested were not present at the time and place that the incident took place.

5.    According to the misconduct report,  Iseley went to Unit Manager's Chesney office and asked permission to go to the commissary, after the block's scheduled day. When Chesney refused the  request, Iseley became argumentative with Chesney.  Chesney then ordered Iseley to leave his office.  Iseley refused to leave and began using obscene language. (Id.)

6.    At the hearing, I considered Unit Manager Chesney's report as well as Iseley's version.   After a review of the information, documentation and evidence presented, I believed Chesney's report that Iseley refused to obey an order and sanctioned Iseley to 30 days disciplinary custody. (Id.)

-2-

7.    The finding of guilt and sanction imposed on Misconduct A110205 was not based upon Iseley's race, or for any discriminatory or retaliatory reasons.  Rather, I found Iseley guilty based on the credibility evidence, testimony, reports presented.

6/7/01
**DATE**

**KERMIT BREON**

-4-

**EXHIBIT "A"**

FORM DC-141    PART I    COMMONWEALTH OF PENNSYLVANIA
Rev. 6-84
☒ MISCONDUCT REPORT ☐ OTHER    DEPARTMENT OF CORRECTIONS

**A** 110205

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| AM9320 | Isley, Charles | SCI MAH | 1420 | 12/14/98 | 12/14/98 |

| Quarters | Place of Incident |
|---|---|
| JA1015 | Unit Managers Office |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

MISCONDUCT CHARGE OR OTHER ACTION    Class 1, b, 7 Refusing to Obey an Order
Class 1, c, 22 Using Abusive or Obscene Language to an Employee

STAFF MEMBER'S VERSION    Inmate Isley, AM9320 came to my office to ask permission to go to commissary because he had no money on his account on Friday. I told him no and he became argumentative. I ordered him to leave my office. He continued to argue with me and began using obscene language "you let these other mothers fuckers go. Why the fuck can't I go." I again ordered Mr. Isley to leave my office. He then looked at me and said "your a real goofball". I ordered him a third time to leave my office. He finally complied.

*TK*

IMMEDIATE ACTION TAKEN AND REASON    Continue present status pending Further Action by the Hearing Examiner.

| PRE-HEARING CONFINEMENT | | |
|---|---|---|
| | IF YES | |
| ☐ YES | TIME | DATE |
| ☒ NO | N/A | N/A |

FORMS GIVEN TO INMATE
☒ REQUEST FOR WITNESSES AND REPRESENTATION    ☒ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY    SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| Thomas Lenny U.M. | COIV Ha Ben | DATE | TIME 24 HOUR B... |
| | | 12-14-98 | 1730 |

YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER

| DATE | TIME |
|---|---|
| 12/16/98 | 0500 |

| Misconduct Category | Signature of Person Serving Notice |
|---|---|
| ☒ CLASS I ☐ CLASS 2 | Co S. Leachey LEACHE... |

**NOTICE TO INMATE**

You are scheduled for a hearing on this allegation on the date and time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class I misconduct, any pre-release status you have will be revoked.

**DC-141**  **PART II B**
Rev. 6-84
DISCIPLINARY HEARING REPORT

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from P |
|-----------|------|-------------|--------------|--------------|------------|
| AM9320 | Isley | SCDMAH | 12/16/98 | 1095 | A11020 |

| INMATE PLEA | ☐ Guilty  ☒ Not Guilty | ☐ No Plea  ☐ Other | Verdict | ☒ Guilty  ☒ Not Guilty #22 |
|---|---|---|---|---|

CHARGES  B#7
C#22

**HEARING ACTION**

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

HX Belives officer/Unit Mgrs. Report over his
Inmates Plea and Version — HX Notes he is in his
Version Never really addresses the Incident
But deals with the Pretense/retaliation for
his filing grievances etc. HX Belives Inmate
Isly did refuse Orders to leave Unit Mgrs
office after they told "No" to his request for a
Commissary Pass to Shop after the Blocks
Scheduled Day. HX Belives repeated Orders Comply
were issued Prior to Inmate finally Comply
and leaving the office.

Sanction:
30 Days DC
12/16/98

| | | |
|---|---|---|
| ☒ YES  ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | Witness Form  Version Form |
| ☒ YES  ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | |
| ☒ YES  ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | SEE APPENDICES ☒ |
| ☒ YES  ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

NAME(S) OF HEARING EXAMINER/COMMITTEE
(TYPED OR PRINTED)

Hearing Report and all appended information must be signed. Signature in-
dicates finished report with appendices.

V. Bloom

SIGNATURE OF HEARING EXAMINER/COORDINATOR

DC-141    PART II C    COMMONWEALTH OF PENNSYLVANIA
Rev. 6-84    HEARING SUPPLEMENT
INMATE VERSION AND WITNESS STATEMENTS    DEPARTMENT OF CORRECTIONS

| DC Number | Name | | Institution | No. from PART |
|-----------|------|--|-------------|---------------|
| Am 9320 | Isley, Charles | | SCI/MAH | A110205 |

INMATE'S VERSION

Prisoner Isley pleads not guilty to both charges. He never used any abusive or obscene language and was never ordered to leave the office (even if he were. There is no evidence to support the charge of refusing to obey an order since the false misconduct report clearly states that he complied with the order).

On the date in question prisoner Isley asked Chesney to go to commissary since it was my day because he was just transferred to this prison (and his money had only just arrived on Thursday. However, Chesney denied the request stating that the only excuse for not going on Friday is being on a visit. When Isley pointed out that he was aware of the fact Chesney had permitted other prisoners to go that day without any valid excuse, Chesney stated "So what. You like filing grievances. You like filing lawsuits. I guarantee you won't be in my block much longer. You're a troublemaker. You should never have been released from the RHU... Prisoner Isley just left as Chesney continued talking and subsequently asked prison guard Leachey and the 2-10 p.m. Sgt if he could go to the store. Isley asked Saussey, Chesney, Leachey, and the Sgt in that order.

The testimony of the prison guards will reveal that at no time was Isley disrespectful or argumentative to any of them request.

Prisoner Isley wishes for the two grievances he filed against Chesney to be offered into evidence and in the record as well as the list of inmates who went to commissary on 97/12/4 from JA. It is a fact that one prisoner (Riggins) got out of the hole on Saturday and was permitted to go to commissary as well as laundry workers whose pay wasn't on Friday.

It is perfectly clear from the facts that Chesney fabricated the false charges against Isley in retaliation for his filing grievances/lawsuits in order to have Isley thrown in the hole and denied parole (he is scheduled to see the board in February).

In essence, there is no evidence to support the charge of refusing to obey an order because even if the false report were true it clearly states that Isley complied. There is no evidence to support the charge of using abusive or obscene language because the preponderance of the evidence clearly shows that Isley spoke to other prison guards — before and after Chesney — and made no such statements and was not argumentative and the evidence of retaliation against Isley from Chesney clearly shows, from the grievances and request, that the charges are utterly false. Lastly, Isley is a Black man from Philly. He would have said "nut-not goofball" and, in any event, the alleged statement is neither abusive or obscene.

**DC-141**  **PART II A**    **COMMONWEALTH OF PENNSYLVANIA**
Rev. 6-84
INMATE REQUEST FOR
  REPRESENTATION AND WITNESSES    **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Date | Number as on P... |
|-----------|------|-------------|------|-------------------|
| AM 9320 | Isley, Charles | SCI MAH | 12-14-98 | A110205 |

You have been charged with a misconduct. You may request assistance and/or witnesses to appear at your hearing b...
completing the section(s) below.

In order to have assistance or witnesses at your hearing, you must complete this form and present all copies to one o...
your housing officers no later than 9:00 a.m. the first working day after you receive notice of the misconduct.

Assistance:  ☐  I do not request assistance
             ☐  I request assistance by _____
                  (The person requested must be willing to assist you)

Witnesses:      You may request witnesses in accord with DC-ADM 801. State the relevance and
                importance of the testimony the witness will give.

---

**1. Name of Witness:**    **No.**    **If Inmate Quarters**

2-10 Sgt on JA on 981214
Why is this person's testimony relevant and important?

Involved in incident alleged

---

**2. Name of Witness:**    **No.**    **If Inmate Quarters**

C.O. Sausser
Why is this person's testimony relevant and important?

Involved in incident alleged

---

**3. Name of Witness:**    **No.**    **If Inmate Quarters**

C.O. Leachey
Why is this person's testimony relevant and important?

Involved in incident alleged

---

**DO NOT WRITE IN THIS SECTION**
For Use by Hearing Examiner

Witness permitted?    If not, why not?

Denied
inmate indicated
None of
the staff were
present at time
of "Plan '9'
incident"

Witness permitted?    If not, why not?

Witness permitted?    If not, why not?

---

_C. Isley_
**Inmate's Signature**

This section to be completed by Housing Officer only
Received completed form __0755__ hours __12/15/98__
                          **Time**        **Date**

_Sharon Sausser_
**Housing Officer's Signature**

_Brior_
**Hearing Examiner's Signature**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,                          :
                                         :
    Plaintiff                        :
                                         :
    v.                               :    No. 3:00-CV-00577
                                         :    (Judge Kane)
W. CONWAY BUSHEY, <u>et</u> <u>al.</u>,           :
                                         :
    Defendants                       :

## UNSWORN DECLARATION
## OF THOMAS CHESNEY

    I, **THOMAS CHESNEY**, hereby declare under the penalty of perjury that the following is true and correct based upon my personal knowledge:

    1.    I am currently employed by the Pennsylvania Department of Corrections ("DOC"), as a Unit Manager at the State Correctional Institution at Coal Township, ("SCI-Coal Township"), Pennsylvania. At all times relevant to the complaint, I was employed at SCI-Mahanoy as a Unit Manager.

    2.    My duties and responsibilities as the Unit Manager at SCI-Mahanoy include, but are not limited to the supervision of the operation of the housing unit. This includes overseeing the care, custody and control of the inmates in the housing unit, supervision

of the corrections officers, counselors and clerks assigned to the unit.  In addition, I conduct initial interviews of inmates upon their arrival to the Unit.

    3.    In December , 1998, inmate Charles Iseley was assigned to my Unit, in cell J/B 105.  At the initial reception interview Iseley states that he did not want a block job because he did not want to work for that little money.    While on J block, Iseley did not have a job. (See Exhibit "A")

    4.    On December 13, 1998, Iseley filed Grievance No. MAH-0457-98 alleging that he was harassed, threatened and fired from is job by corrections officer McKreth. (Id.)

    5.    Carol Dotter, the grievance coordinator at SCI- Mahanoy reviewed the grievance contacted me and I informed her that Iseley did not have a job as a block worker. (Id)

    6.    On December 14, 1998, Iseley came to my office and asked permission to go to the commissary, after the block's scheduled commissary.  When I refused the request, Iseley became argumentative.    I then ordered Iseley to leave the office.   Iseley refused and began to use obscene language.   Finally, after the third order, Iseley left the office.  (See Exhibit "B" attached.)

    7.    I then issued Iseley   Misconduct No. A 110205 for refusing to obey and order and using obscene language.  (Id.)

6/7/0r
**DATE**

_U.M._

**THOMAS CHESNEY**

-3-

**EXHIBIT "A"**

C-804
ART 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA. 17001-0598**

OFFICIAL INMATE GRIEVANCE          GRIEVANCE NO. | MAH-0457-98

| TO: GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| Dotter | Mahanoy | 981213 |
| FROM: (Commitment Name & Number) | INMATE'S SIGNATURE | |
| C. Isley AM-9320 | C. Isley | |
| WORK ASSIGNMENT | QUARTERS ASSIGNMENT | |
| Nil | JA-15 | |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance:

On 981209 I was harassed and threatened and fired from my job (the first day) by prison guard Muckety who opened my cell door after 9:10 p.m. count and did as already noted above I notified the unit manager, Chesney, but he intentionally lied stating that I never had a job (I had worked that afternoon) and that there was no harassment/threats. It is clear that he lied because I never informed him of the name of the guard and consequently for the guard to know what was going on when he spoke to him reveals the utter veracity of my words. Chesney is covering up for the prison guard in retaliation for my not being gullible and refusing to conversate on any social level with him. He has already stated to other prisoners that he hates me. Personal interview requested.

B. Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff

Staff contacted: unit mgr.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Carol Dotter                              12/14/98
Signature of Grievance Coordinator          Date

DC-804
PART II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO. | MAH-0457-98

| TO: (Name & DC NO.) | INSTITUTION | QUARTERS | GRIEVANCE DATE |
|---|---|---|---|
| Charles Isley, AM-9320 | Mahanoy | J/A 15 | 12/13/98 |

The following is a summary of my findings regarding your grievance:

I spoke to Mr. Chesney and Officer Mackreth about this incident. Their reports of what happened are quite different than yours.

Officer Mackreth states he had to tell you twice to lock up. You became argumentative and used abusive language. He checked the roster for Block Workers and found your name was not on it. It appears the officer was trying to help you—not harass you.

You told me when we met on 12/17/98, that the Block Clerk said you had a job. However, he denied that statement when questioned.

Your Unit Manager reports you didn't want a block job. Instead of issuing you a misconduct for Refusing to Work, he allowed you the opportunity to seek employment elsewhere. Because he never hired you, no one could fire you.

You claim Mr. Chesney lied to cover up for the officer?? It's the officer's job to ensure all inmates are locked up after 9:00 p.m. Also, the officer gave you the benefit of the doubt and checked the roster and also checked with the Block Clerk.

I find your accusations to be false and your grievance without merit.

CMD:dy

cc:    Deputy Klem ✓
       Mr. Chesney ✓
       CO Mackreth ✓
       DC 15 ✓
       file ✓

| Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures. | SIGNATURE OF GRIEVANCE COORDINATOR  *Carol M. Klotter* | DATE  12/18/9 |
|---|---|---|

DC-804
PART II

**COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
P.O. BOX 598
CAMP HILL, PA 17001**

OFFICIAL INMATE GRIEVANCE
INITIAL REVIEW RESPONSE

GRIEVANCE NO. | MAH-0457-98

| TO: (Name & DC NO.)<br>Isley, Charles AM9320 | INSTITUTION<br>SCI-Mahanoy | QUARTERS<br>J/B 1015 | GRIEVANCE DATE<br>12/13/98 |
|---|---|---|---|

The following is a summary of my findings regarding your grievance:

At our initial interview Mr. Isley stated that he did not want a block job because he didn't want to work for that little money. He was never given a block job, therefore was never fired. Why Mr. Isley worked that afternoon in question is unknown to me. I specifically informed him during our initial interview that if he refused a job, I could remove him from allowance pay, but I chose not to do so. I wanted to allow him the opportunity to seek a job elsewhere. The rest of the accusations are false and without merit.

TC/mb

*T. Chesney U.M.*

cc:   Deputy Klem
      Unit Manager: Chesney

| Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures. | SIGNATURE OF GRIEVANCE Officer | DATE |
|---|---|---|

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,                    :
                                   :
    Plaintiff                  :
                                   :
    v.                         :       No. 1:00-CV-00577
                                   :       (Judge Kane)
W. CONWAY BUSHEY, et al.,          :
                                   :
    Defendants                 :


## UNSWORN DECLARATION OF CAROL DOTTER

I, **Carol Dotter**, hereby declare under the penalty of perjury that the following statements are true and correct and based upon my personal knowledge.

1.    I am currently employed by the Pennsylvania Department of Corrections ("DOC") as the Assistant to the Superintendent at the State Correctional Institution at Mahanoy ("SCI-Mahanoy").

2.    I have been employed in the capacity of Assistant to the Superintendent at SCI-Mahanoy since March 1993. In that capacity, I am familiar with the standard operating policies and procedures followed at SCI-Mahanoy and the DOC. I am also familiar with and have access to all records maintained by the institution in the course of regularly conducted business. As assistant to the Superintendent, I serve as the Grievance Coordinator at SCI-Mahanoy.

3.      As Grievance Coordinator, I am responsible for maintaining records of all grievances filed by inmates at SCI-Mahanoy.  In accordance with DOC-Administrative Directive 804 ("DC-ADM 804), the Consolidated Grievance System outlines the policies and procedures to be followed with respect to inmate grievances. This policy is found in the Inmate Handbook issued to all inmates.

4.      Inmate grievances are written on Official Inmate Grievance forms, which are available to all inmates.  Upon receipt of an Official Grievance, I review the grievance in order to make an appropriate assignment to staff for written response.  I also assign a number to the grievance.

5.      As outlined by DC-ADM 804, the grievance officer then responds in writing to the inmate within 10 working days informing him of the action taken concerning the grievance.  In addition copies are placed in the inmate's institutional file.

6.      Pursuant to DC-ADM 804, inmates may appeal the response of the grievance to the Superintendent and then to the Department of Corrections.  At the time of the allegations in Iseley's complaint, a final appeal of a grievance could be made to the Chief Hearing Examiner, Robert Bitner.

7.    On December 13, 1998, Iseley filed Grievance No. MAH-0457-98 alleging that he was harassed, threatened and fired from his job by corrections officer MacKreth.   (See Exhibit "A" attached)

8.    I  reviewed the  grievance and contacted Unit Manager Chesney and Officer Mackreth to verfiy the contents of Iseley's grievance.  Chesney informed me Iseley was never given a block job and therefore was never fired.    Officer Mackreth informed me that he had to tell Iseley twice to lock up and that he checked the roster for Block Workers and that Iseley's name was not on the roster.  Based upon the information provided to me by Chesney and Mackreth, I found Iseley's grievance to be false and without merit.  (Id.)

9.    On December 17, 1998, Iseley submitted inmate grievance No. MAH-0462-98, alleging that his cell lights remain on at night in violation of his constitutional rights.   I responded to Iseley on the same date, explaining to him that the Low intensity night lights are necessary for security in the L-5 unit.  (Id.)  (See Exhibit "B" attached)

10.    On December 26, 1998, Iseley filed Grievance No. MAH 0479-98, alleging he is not permitted to receive the alternative protein menu when pork is served. I forwarded the Grievance to  the Food Services Manager, Robert Yarnell for response.  On January 4, 1999, the Food Service Manager, Robert Yarnell advised

-3-

Iseley that he would be allowed to receive the pork alternative if he signed up for the program. (See Exhibit "C" attached)

11.    As Grievance Coordinator, I was aware of and received a copy of Superintendent Dragovich's January, 1999 memorandum placing Iseley on grievance restriction. (See Exhibit "D" attached)

12.    On January 3, 1999, Iseley filed Grievance No. 0002-99 alleging that Dennsion misrepresented himself to Iseley as a member of the Board of Probation and Parole and that James Unell, the inmate program manager did not explain matters to him satisfactorily.  (See Exhibit "E" attached)

13.    I contacted James Unell, Inmate Program Manager to investigate this grievance.  On January 14, 1999, Unell responded to Iseley informing him that his consent was withdrawn per his request on December 14, 1998, and that the original document was returned to him, and that all the elements of his grievance has been fully addressed.  (Id.)

14.    On January 27, 1999, Iseley filed grievance No. MAH-0035-99, alleging that upon his release from the Restricted Housing Unit, he discovered items of his personal property missing, including twelve publications/magazines.  (See Exhibit "F" attached.)

-4-

15.    I assigned Lt. Mahally to investigate the allegations contained in this grievance. On February 10, 1999, Lt. Mahally responded to Iseley's grievance informing him that his personal property inventory sheet that accompanied him to SCI-Mahanoy reflected that he had seven magazines/publications. Mahally further explained to Iseley that following his confinement to the RHU his property was packed and secured in the property room. (Id.)

16.    In March of 1999, Iseley filed grievance No. MAH-0076-99 alleging that the medical department wrongfully charged him for sick call regarding a chronic condition, that he was being charged for glasses that he did not want and that the medical department refused to refer him for corneal implants. (See Exhibit "G" attached)

17.    In his response to Iseley's grievance appeal, Superintendent Dragovich informed Iseley that he did not order photo gray lenses or sign a cash slip for the photo grey lenses and that treatment of his visual imperfection would not be corrected through a cosmetic procedure. Dragovich also explains that at the time, there was no treatment protocol for Hepatitis "C", and that it was being reviewed by the Bureau of Health Services. Dragovich denied Iseley's appeal of the grievance. (Id.)

18.    In March of 1999, Iseley ordered a radio which he then wished to exchange and then receive a refund. Iseley refused to send out the cassette player to

the vender for the refund; rather he elected to file a grievance.   (See Exhibit "H" attached)

19.    On May 1, 1999, Iseley    filed a  Grievance No. MAH-0014-99 concerning the confiscation of his guitar bag.  It was explained to Iseley that the bag was confiscated for security reasons.  (See Exhibit "I" attached)

6/15/01
**DATE/**

*Carol Dotter*

**CAROL DOTTER**
**Assistant to the Superintendent**
**SCI-Mahanoy**

-7-

**804**
F. 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

CIAL INMATE GRIEVANCE                    GRIEVANCE NO. | MAH-0457-98

| GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| Dotter | Mahanoy | 981213 |

| M: (Commitment Name & Number) | INMATE'S SIGNATURE |
|---|---|
| C. Isley AM-9320 | C. Isley |

| K ASSIGNMENT | QUARTERS ASSIGNMENT |
|---|---|
| Nil | JA-15 |

**TRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

brief, clear statement of grievance:

On 981209 I was harassed and threatened and fired from my job (the first day) by prison guard Mackrety who opened my cell door after 9:10 p.m. count and did as already noted above. I notified the unit manager, Chesney, but he intentionally lied stating that I never had a job (I had worked that afternoon) and that there was no harassment/threats. It is clear that he lied because I never informed him of the name of the guard and consequently for the guard to know what was going on when he spoke to him reveals the utter veracity of my words. Chesney is covering up for the prison guard in retaliation for my not being gullible and refusing to conversate on any social level with him. He has already stated to other prisoners that he hates me. Personal interview requested.

Actions taken and staff you have contacted before submitting this grievance:

Actions taken: contacted staff

Staff contacted: unit mgr.

ur grievance has been received and will be processed in accordance with DC-ADM 804.

Carol Dotter                                    12/14/98
Signature of Grievance Coordinator                    Date

DC-804
PART II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO.  | MAH-0457-98

| TO: (Name & DC NO.) | INSTITUTION | QUARTERS | GRIEVANCE DATE |
|---|---|---|---|
| Charles Isley, AM-9320 | Mahanoy | J/A 15 | 12/13/98 |

The following is a summary of my findings regarding your grievance:

I spoke to Mr. Chesney and Officer Mackreth about this incident. Their reports of what happened are quite different than yours.

Officer Mackreth states he had to tell you twice to lock up. You became argumentative and used abusive language. He checked the roster for Block Workers and found your name was not on it. It appears the officer was trying to help you—not harass you.

You told me when we met on 12/17/98, that the Block Clerk said you had a job. However, he denied that statement when questioned.

Your Unit Manager reports you didn't want a block job. Instead of issuing you a misconduct for Refusing to Work, he allowed you the opportunity to seek employment elsewhere. Because he never hired you, no one could fire you.

You claim Mr. Chesney lied to cover up for the officer?? It's the officer's job to ensure all inmates are locked up after 9:00 p.m. Also, the officer gave you the benefit of the doubt and checked the roster and also checked with the Block Clerk.

I find your accusations to be false and your grievance without merit.

CMD:dy

cc:    Deputy Klem ✓
       Mr. Chesney ✓
       CO Mackreth ✓
       DC 15 ✓
       file ✓

| Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures. | SIGNATURE OF GRIEVANCE COORDINATOR | DATE |
|---|---|---|
| | Carol M. Potter | 12/18/98 |

-804
RT II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

FICIAL INMATE GRIEVANCE
TIAL REVIEW RESPONSE

GRIEVANCE NO. | MAH-0457-98

| : (Name & DC NO.) Isley, Charles AM9320 | INSTITUTION SCI-Mahanoy | QUARTERS J/B 1015 | GRIEVANCE DATE 12/13/98 |

e following is a summary of my findings regarding your grievance:

At our initial interview Mr. Isley stated that he did not want a block job because he didn't want to work for that little money. He was never given a block job, therefore was never fired. Why Mr Isley worked that afternoon in question is unknown to me. I specifically informed him during our initial interview that if he refused a job, I could remove him from allowance pay, but I chose not to do so. I wanted to allow him the opportunity to seek a job elsewhere. The rest of the accusations are false and without merit.

TC/mb

*T. Chesney U. M.*

cc:    Deputy Klem
       Unit Manager: Chesney

Refer to DC-ADM 804, Section VIII,
for instructions on grievance

| SIGNATURE OF GRIEVANCE Officer | DATE |

**EXHIBIT "B"**

:04.
1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

IAL INMATE GRIEVANCE .                    GRIEVANCE NO.    MAH-0462-98

| RIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| Dotter | Mahanoy | 981217 |
| (Commitment Name & Number) | INMATE'S SIGNATURE | |
| C. Isley AM-9320 | C. Elsey | |
| ASSIGNMENT | QUARTERS ASSIGNMENT | |
| Nil | RHU C-9 | |

**TRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

rief, clear statement of grievance:

I wish to know why my cell light is remains on all evening and all night and half the morning. According to staff it is policy. However, having the cell light on all night is a violation of my constitutional rights as established by the federal courts. It is a form of sleep deprivation. No other prison has such a policy (at one time there was - but it was ceased by the courts) Consequently, I wish for this policy to be eradicated forthwith.

Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff
Staff contacted: RHU staff

our grievance has been received and will be processed in accordance with DC-ADM 804.

C. Dotter                                                    12/18/98

DC-804
PART II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

OFFICIAL INMATE GRIEVANCE
INITIAL REVIEW RESPONSE

GRIEVANCE NO.  | MAH-0462-98

| TO: (Name & DC NO.) | INSTITUTION | QUARTERS | GRIEVANCE DATE |
|---|---|---|---|
| Charles Isley, AM-9320 | Mahanoy | RHU C-9 | 12/17/98 |

The following is a summary of my findings regarding your grievance:

The low-intensity night lights are necessary for security in the L-5 unit.  Therefore, the procedures of putting the lights on from dusk until dawn will continue.

CMD:dy

cc:     Deputy Klem
        Deputy Novotney
        Lt. Fryzel
        DC 15
        file

| Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures | SIGNATURE OF GRIEVANCE COORDINATOR | DATE |
|---|---|---|
| | | 1/8/98 |

**EXHIBIT "C"**

C-804
RT 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA. 17001-0598**

FICIAL INMATE GRIEVANCE

GRIEVANCE NO. MAH-0479-98

| : GRIEVANCE COORDINATOR _Dotter_ | INSTITUTION _Mahanoy_ | DATE _98 12 26_ |
| OM: (Commitment Name & Number) _C. Isley AM-9320_ | INMATE'S SIGNATURE _C. Isley_ | |
| ORK ASSIGNMENT _Ni)_ | QUARTERS ASSIGNMENT _RHU C-9_ | |

**STRUCTIONS:**

1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

Brief, clear statement of grievance:

I do not eat pork and wish to know why I am not permitted to receive the alternate when pork is served.

. Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff.
Staff contacted: Dotter, Yarnell (illogical response.)

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_C. Dotter_                                            12/28/98
Signature of Grievance Coordinator                    Date

DC-804
PART II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO.   MAH 0479-98

| TO: (Name & DC NO.)<br>Charles Isley  AM9320 | INSTITUTION<br>SCI Mahanoy | QUARTERS<br>RHU | GRIEVANCE DATE<br>12/26/98 |
|---|---|---|---|

The following is a summary of my findings regarding your grievance:

Mr. Isley, you will be allowed to receive the protein alternative, if you sign up for the program. If you were medically approved, you would receive the alternate protein for both the dinner and supper meals.

cc:    Deputy Klem
       Grievance Coordinator
       Records
       File

| Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures. | SIGNATURE OF GRIEVANCE OFFICER<br>Robert Yarnell<br>Food Service Manager | DATE<br>1/4/99 |
|---|---|---|

**EXHIBIT "D"**

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI Mahanoy
(717) 773-2158
January 8, 1999

SUBJECT:    Appeal to Superintendent
           Grievance #MAH-0480-98

TO:        Charles Isley
           AM-9320, RHU Unit

FROM:      Martin L. Dragovich
           Superintendent
           SCI Mahanoy

Receipt of your appeal to Superintendent of grievance #MAH-0480-98 is acknowledged. In preparing this response, I have reviewed your original grievance, the Grievance Officer's response and your appeal to this office.

The institution reserves the right to deny you a razor if there is indication that you could use the razor as a weapon or could use it to harm yourself. This decision is based upon the inmate's prior history and inmates placed in the RHU are screened to determine whether or not a razor would pose a threat in their possession. As Lt. Fryzel indicated, it took a while to make this determination based on your rather extensive misconduct history but clearance was ultimately given. Use of a razor while in the RHU requires that you sign up and if you do not, none will be issued.

Based upon the foregoing, your grievance is denied.

Please also note that no action is being taken on grievance #MAH-0479-98 as you may file only one appeal at a time on a request slip. Furthermore, I am putting you on notice that I am placing you on a grievance restriction. It is evident to me that you are using the grievance system as a response of first resort in that you have filed seven grievances in only five weeks. You are not making a good faith use of the system nor are you making a legitimate effort to try to resolve problems before using the grievance system. Accordingly, I am limiting you to filing one grievance per month on legitimate issues that are directly related to your individual health and/or safety. This is not an imperative, meaning that you must file one a month and you will have to demonstrate that you made a legitimate effort under Section B of the grievance to try to resolve the problem before filing your grievance. The Grievance Coordinator, Mrs. Dotter will determine if you have exhausted all remedies and whether or not the grievance issue is legitimate as opposed to frivolous. The grievance restriction will be reviewed in July, 1999 to determine if it has served its intended purpose.
MLD:pld
Cc:    Deputy Novotney
       Deputy Klem
       Mrs. Dotter
       Mr. Chesney
       Lt. Fryzel
       DC-15
       file

**EXHIBIT "E"**

-804
T 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA. 17001-0598**

SCI MAHANOY
RECEIVED

JAN 0 6 1999

INMATE PROGRAM MANAGER

FICIAL INMATE GRIEVANCE                           GRIEVANCE NO. *MAH-0002-99*

| GRIEVANCE COORDINATOR *Dotter* | INSTITUTION *Mahanoy* | DATE *990103* |
| M: (Commitment Name & Number) *C. Isley AM-9320* | INMATE'S SIGNATURE *C. Isley* | |
| RK ASSIGNMENT *Nil* | QUARTERS ASSIGNMENT *RHU C-9* | |

**STRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

Brief, clear statement of grievance:

A person by the name of Denaison misrepresented himself to me in order to trick me into signing the Mental Health Informed Consent Document. He stated that I had to sign it to be evaluated for parole pursuant to the "Austin" litigation. I have since ascertained that he is not employed by the parole board and that I was not required to sign anything for parole evaluation. Consequently, I want the original of the document and any and all copies as I do not give permission for anything and my signature is invalid as it was attained illegally

Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff
Staff contacted: Brown, Yovron

ur grievance has been received and will be processed in accordance with DC-ADM 804.

*C. Dotter*                                          *1/4/99*
Signature of Grievance Coordinator                         Date

**DC-804**
**PART II**

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

SCI MAHANOY
RECEIVED

JAN 0 6 1999

INMATE PROGRAM MANAGER

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO.    **MAH-0002-99**

| TO: (Name & DC NO.)<br>**ISLEY, CHARLES AM-9320** | INSTITUTION<br>**SCI-MAHANOY** | QUARTERS<br>**RHU** | GRIEVANCE DATE<br>**1/06/99** |
|---|---|---|---|

The following is a summary of my findings regarding your grievance:

This is in response to Grievance No. MAH-0002-99. I note that I spoke with you at length regarding this grievance in our meeting in the RHU on 1/14/99. I note the following: You acknowledged during our meeting that Mr. Dennison did not introduce himself as a Parole Board member. It was your assumption that he worked for the PBPP. You are now well aware that he is a Psychological Services Associate and a member of the Psychology Department. It is noted that Mr. Dennison presented a mental health informed consent document to you on 12/17/98. At that time you decided to sign the form after it was reviewed. On 12/24/98 you wrote a request to Mr. Youron, Chief Psychologist requesting that your consent be revoked and that the original document be returned to you. In response to your request slip, dated 12/24/98, Mr. Youron wrote back to you and informed you that your consent was, in fact, revoked. You acknowledged to me on 1/14/99 that you did receive the original document. Also, I note that a DC-14 entry was made indicating that you had revoked your consent. Be informed then, that at this point in time, we do not have your consent regarding the mental health informed consent policy/document.

In accordance with the policy 7.3.1, I cautioned you that recipients of the reports (e.g.: staffing committees and the Parole Board) "may draw negative inferences" from your refusal. The psychology staff also gave you such counsel. I also explained to you the significance of your refusal and the impact of it. I remind you also that you may decide to give your consent at a later point in time. You stated that you fully understood our conversation. You also stated that you still wish to refuse to sign the mental health informed consent document.

In that all of the elements of your grievance have been fully addressed, I recommend no further action regarding this grievance.

rh/

cc:    Deputy Klem
       Mr. Youron
       Mr. Dennison
       file

| Refer to DC-ADM 804, Section VIII,<br>for instructions on grievance<br>system appeal procedures. | SIGNATURE OF GRIEVANCE Officer<br>*James Urell* | DATE<br>1/14/99 |
|---|---|---|

**EXHIBIT "F"**

C-804
PART 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

**OFFICIAL INMATE GRIEVANCE**

GRIEVANCE NO. MAH-0035-9?

| TO: GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| Dotter | Mahanoy | 990127 |

| FROM: (Commitment Name & Number) | INMATE'S SIGNATURE |
|---|---|
| C. Isley AM-9320 | C. Isley |

| WORK ASSIGNMENT | QUARTERS ASSIGNMENT |
|---|---|
| N/A | IB-16 |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance:

On 980114 I was released from the and some of my property was missing. I informed the sergeant who instructed me to write the property room, which I did – twice. The missing property consists of several brown sock and white boxer shirts (I had more than the limit because of the items given to me upon my arrival by clothing exchange) and all but save for two pornographic books. I received no confiscation slips and, according to other prisoners, it is common practice for pornographic books to be taken. However, these books were exhibits for my lawsuit in the Western District Federal Court and therefore I want them returned immediately or to have confiscation slips. They were included in my inventory sheets (most of them) from Rockview prison. I have grievances to verify receipt of the others at Rockview. Else, I wish to be reimbursed.

B. Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff.
Staff contacted: Property Room Sgt., Property Room staff

Your grievance has been received and will be processed in accordance with DC-ADM 804.

C. Dotter
Signature of Grievance Coordinator

1/28/99
Date

C-804
RT II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

FICIAL INMATE GRIEVANCE                                    GRIEVANCE NO.
ITIAL REVIEW RESPONSE                                                        MAH−0035−99

| O: (Name & DC NO.) | INSTITUTION | QUARTERS | GRIEVANCE DATE |
|---|---|---|---|
| . Isley  AM−9320 | SCI-Mahanoy | I/B  16 | 1/28/99 |

he following is a summary of my findings regarding your grievance:

This is in response to your grievance concerning your property. The personal property inventory that accompanied you when you arrived at SCI-Mahanoy reflects that you had seven magazines.

Following your confinement to the RHU on 12/16/98, all of your property that was present in your cell was packed and removed by Sgt. Birosak. Your property was then secured in the Property Room until it was inventoried by Officer Peek. The Personal Property Inventory dated 12/17/98 does not show that any magazines were present with your property at that time. You received your copy of this inventory with your basic RHU issue.

Not only did the Property Room not receive any requests from you concerning any missing items while you were in the RHU, but you also failed to mention anything concerning these items when you were in the Property Room on 12/22/98 to pick up some legal material.

Based on the information above, I conclude that there were no magazines present with your property when it was packed and removed from your cell. Unless you can provide me with proof that these items were present with your property at the time of your confinement, I will take no further action on this matter.

In addition, excessive state-issued items do not require a Confiscation Slip as long as they are not related to a misconduct.

LPM:js

cc:    Deputy Novotney
        Deputy Klem
        Mrs. Dotter
        Records DC-15
        Sgt. Birosak
        COI Peek
        file

---

Refer to DC-ADM 804, Section VIII,          SIGNATURE OF GRIEVANCE COORDINATOR          DATE

for instructions on grievance

**EXHIBIT "G"**

DC-804
PART 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

**OFFICIAL INMATE GRIEVANCE**     GRIEVANCE NO. | MAH-0076-99

| TO: GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| Dotter | Mahanoy | 990304 |
| FROM: (Commitment Name & Number) | INMATE'S SIGNATURE | |
| C. Isley AM-9320 | C. Isley | |
| WORK ASSIGNMENT | QUARTERS ASSIGNMENT | |
| Nil | IB-16 | |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance:

I contacted Cerullo & Diaz concerning: The medical department's charging me, wrongfully, for sick call for a chronic condition; being charged for glasses I do not want because they are not photogray; The medical department's allegation that there is no treatment for hepatitis C; The medical department's refusal to refer me to an opthalmologist concerning my visual imperfection in my left eye; the medical department's refusal to refer me to an ophthalmologist for corneal implants or photorefractive keratectomy; The medical department's refusal for orthodental referrals/treatment. I wish to know why I am being denied adequate medical care.

B. Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff
Staff contacted: Cerullo, Diaz

Your grievance has been received and will be processed in accordance with DC-ADM 804.

C. Dotter
Signature of Grievance Coordinator

3/5/99
Date

WHITE—Grievance Coordinator Copy     CANARY—File Copy     PINK—Action Return Copy     GOLDENROD—Inmate Copy

**DC-804**
**PART II**

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO. | MAH 0076-99

| TO: (Name & DC NO.) | INSTITUTION | QUARTERS | GRIEVANCE DATE |
|---|---|---|---|
| Charles Isley    AM - 9320 | SCI Mahanoy | I/B | March 04, 1999 |

The following is a summary of my findings regarding your grievance:

Mr. Isley:

You did not sign a cash slip for photo gray lenses therefore they were not ordered. You cannot change your order after the fact.  (Response to Inmate Request 2/18/99 twice).

Regarding ophthamologist and orthodontist see prior responses to Inmate Request dated 1/4/99, 2/3/99, 2/16/99, 2/26/99. Our responses do not change on four occasions why would they change now? I have no inmate request in my file regarding improper charges. Send an Inmate Request with the dates of said charges and someone will investigate.

cc:    Deputy Klem
       Deputy Novotney
       Carol Dotter
       Inmate Records
       File

Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures.

SIGNATURE OF GRIEVANCE COORDINATOR

*Marvo J. Cerullo*

DATE

3/18/99

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**SCI Mahanoy**
(717) 773-2158
March 24, 1999

**SUBJECT:**    Appeal to Superintendent
               Grievance #MAH-0076-99

**TO:**    Charles Eisley
           AM-9320, I/B Unit

*Martin L. Dragovich*

**FROM:**    Martin L. Dragovich
             Superintendent
             SCI Mahanoy

Receipt of your appeal to Superintendent of grievance #MAH-0076-99 is acknowledged. In preparing this response, I have reviewed your original grievance, the Grievance Officer's response and your appeal to this office.

It appears that at least six responses have been prepared for request slips you sent to Medical regarding various different issues. As Mrs. Cerullo has noted, you cannot change an order after the fact with regard to glasses. You did not sign a cash slip for photogray lenses, therefore, none was ordered. You also claim that improper charges were filed against your account for sick call because you claim a chronic condition. Mrs. Cerullo's response reflects that she has no inmate requests on file regarding improper charges and instructed you to send her a request with the dates of said charges and it would be investigated. It is up to you to follow up in this regard. As for treatment of Hepatitis C, there is currently no treatment protocol for the treatment of this disease. This is currently being looked at by the Bureau of Health Care Services for the Department of Corrections and when one is available, it will be followed. In the meantime, experimental treatments are not permitted and only those treatments approved by the vendor will be permitted provided they are not contraindicated by other existing conditions. Treatment of your "visual imperfection" would not be corrected through corneal implants or photorefractive keratotomy, as this is done for cosmetic reasons and could be corrected through corrective lenses. Orthodontal referrals and treatment are only made if indicated by the dentist and again such referrals will be made only if medically indicated and not for cosmetic reasons.

It is apparent that you used the grievance system to argue a laundry list of complaints which apparently have already been addressed with you and which you do not wish to accept. Medical treatment is provided and referrals are made based upon competent medical judgment. Costly cosmetic procedures are not performed when less costly alternatives are available. An example, as noted earlier is corrective lenses as opposed to radial keratotomy.

Based upon the foregoing, your appeal is denied.
MLD:pld
Cc:    Deputy Novotney
       Deputy Klem
       ~~Mrs. Potter~~
       Mrs. Cerullo
       DC-15
       file

**EXHIBIT "H"**

C-804
RT 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

FICIAL INMATE GRIEVANCE                GRIEVANCE NO. [          ]

| : GRIEVANCE COORDINATOR Dotter | INSTITUTION Mahanoy | DATE 990323 |
|---|---|---|
| OM: (Commitment Name & Number) C. Isley AM-9320 | INMATE'S SIGNATURE C. Isley | |
| ORK ASSIGNMENT Nil | QUARTERS ASSIGNMENT IB-16 | |

**NSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

Brief, clear statement of grievance:

On 990319 Birosak ordered me to send out a walkman cassette player to have my money refunded, However, he had previously ordered me to send out a walkman radio/cassette player to receive a refund and I complied. The second walkman should not have been sent because I wanted my money back. However, I have yet to recieve my money. I do not know why Birosak lied to me and ordered me to send the walkmans to a store for a refund. I ordered the original walkman from commissary - not any other store. Consequently, I want my money returned and the money I spent for postage which you forced me to spend.

B. Actions taken and staff you have contacted before submitting this grievance:

Actions Taken: Contacted staff
Staff Contacted: Birosak

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_____                                    _____
Signature of Grievance Coordinator                                 Date

# SCI MAHANOY

## ELECTRONICS ORDER FORM

| | |
|---|---|
| **V - #13CCE-1** $175.30<br>' Color Television, 181 channel capability, earphone jack,<br>annel cable compatible, color receiver, closed caption,<br>t decoder, front panel control of all functions, complete<br>screen display, high resolution, memory backup, 1<br>warranty on parts and labor. | **G.E. Super Radio III #2887** $48.25<br>High performance AM/FM portable radio, separate bass and treble<br>tone controls, dual speaker system (6-1/2" high sensitivity speaker<br>plus 2" tweeter), auto frequency control, headphone jack, wide<br>band tuning. |
| **A #E13332BC** $184.70<br>' Color Television, 181 channel tuning capability, earphone<br>k, auto programming, closed caption capability, picture reset,<br>Con picture tube, on screen time and channel display, multi-<br>nguage on-screen display, sleep timer, on screen menu system,<br>erage wattage within 46 watts. | **GPX #C477** $25.60<br>AM/FM stereo cassette player, auto reverse cassette deck,<br>play/stop/fast forward/rewind cassette functions, stereo headphone<br>jack, full range speakers, AC/DC, AC cord included, uses 4 "C"<br>batteries (not included). NO RECORDING CAPABILITY |
| **V #KT1210A3** $84.59<br>" Black and White Television with earphone jack, direct wired,<br>. approved, UL listed. | **Smith Corona - Display** $113.53<br>16-character liquid crystal display to view and edit current line, 75,000<br>word Spell-Right, Punctuation Check, Full-line memory correction,<br>Right Ribbon System, Word Find, 10 CPS Speed, right margin<br>justification, built-in abbreviations |
| **CA #RP1882** $35.62<br>. Digital AM/FM stereo tuner with station seek up/down, 20 station<br>eset (10 AM/10 FM), LCD display, search-up for preset stations,<br>pushbutton cassette operation, auto reverse for continuous play,<br>ass boost, lightweight plastic stereo headphones. NO CLOCK | **Smith Corona- Spellmate** $109.08<br>75,000 word Spell-right, Built-in abbreviations, full-line memory<br>correction, multi-language characters and symbols, WordEraser/<br>Line Eraser, Right Ribbon System, 10 CPS Speed, Word Swap,<br>Word Find |
| **WA HS-GS173** $27.83<br>eadphones stereo cassette with multi sound processor, classic/<br>p/rock/jazz, battery life indicator, tape selector, uses 2 "AA"<br>atteries. | **SMITH CORONA Office 2000** $161.39<br>24,000 Character editable memory, 2-line by 40-character liquid<br>crystal display, 90,000 word spell-right electronic dictionary, 3-line<br>memory correction, block move, copy, delete, insert, search,<br>replace, return, center, underscore, bold, indent, forms, layout, right<br>margin justification, punctuation check, 60 day memory backup, print<br>speed (cps) 12, word find, word eraser. |
| **CA #RP1812** $18.91<br>M/FM Personal Stereo cassette player, AM/FM stereo tuner,<br>-pushbutton cassette operation, automatic end of tape shutoff,<br>ass boost, lightweight plastic stereo headphones, operates on 2 "AA"<br>atteries not included. | **RCA AM/FM Walkman** $12.21<br>AM/FM Stereo headset radio, 2 built in antennas, lightweight<br>stereo headphones with adjustable headband, operates on 2 "AA"<br>batteries not included. |

*RECEIVED 5-23-99*
*B. Ruem*

*K.E. cly*

NMATE NAME: _C. Isley_
INMATE DOC#: _AM-9320_
HOUSING UNIT CELL#: _IB-16_

*OK*
*PAUL*

| ITEM | QUANTITY | PRICE |
|---|---|---|
| #2887 G.E. Super Radio | I | 48.25 |
| | | |
| | | |
| | | |
| | | TOTAL: 48.25 |

## PRICES INCLUDE 6% SALES TAX

# SCI MAHANOY

## ELECTRONICS ORDER FORM

| | |
|---|---|
| **KTV - #13CCE-1** $17.50<br>13" Color Television, 181 channel capability, earphone jack, channel cable compatible, color receiver, closed caption, text decoder, front panel control of all functions, complete on screen display, high resolution, memory backup, 1 year warranty on parts and labor. | **G E. Super Radio III #2887** $48.25<br>High performance AM/FM portable radio, separate bass and treble tone controls, dual speaker system (6-1/2" high sensitivity speaker plus 2" tweeter), auto frequency control, headphone jack, wide band tuning. |
| **RCA #E13332BC** $191.44<br>13" Color Television, 181 channel tuning capability, earphone jack, auto programming, closed caption capability, picture reset, Hi-Con picture tube, on screen time and channel display, multi-language on-screen display, sleep timer, on screen menu system, average wattage within 46 watts. | **GPX #C478** $26.71<br>AM/FM stereo cassette player, auto reverse cassette deck, play/stop/fast forward/rewind cassette functions, stereo headphone jack, full range speakers, AC/DC, AC cord included, uses 4 "C" batteries (not included). NO RECORDING CAPABILITY |
| **KTV #KT1210A3** $84.59<br>12" Black and White Television with earphone jack, direct wired, UL approved, UL listed. | **CANON Typestar #15 Portable Typewriter** $114.63<br>Built in 60,000 English word spell checker, paper feed, carrier return, tab, centering, right margin alignment, over 100 built in multilingual & special characters, one line correction memory, indent, 3 shading patterns, thermal transfer printer, AC/DC: power source.<br>NO TEXT OR STORABLE MEMORY.<br>Replacement Ribbons #CR-100 (2 pack) $11.12 |
| **RCA #RP1882** $35.62<br>PLL Digital AM/FM stereo tuner with station seek up/down, 20 station preset (10 AM/10 FM), LCD display, search-up for preset stations, 4-pushbutton cassette operation, auto reverse for continuous play, bass boost, lightweight plastic stereo headphones. NO CLOCK | |
| **AIWA HS-GS173** $27.83<br>Headphones stereo cassette with multi sound processor, classic/ pop/rock/jazz, battery life indicator, tape selector, uses 2 "AA" batteries. | **CANON QS210 Personal Typewriter** $124.64<br>Built in 60,000 word spell checker, beam marker, correction ribbon, quiet operation while printing, carbon copy mode, auto paper feed, auto paper eject, underline & print, page end lock, word delete paragraph indent, decimal tab, caps lock, 14 CPS speed, relocate function, superscript/subscript, right margin alignment, AC power source.<br>NO TEXT OR STORABLE MEMORY.<br>Replacement Correctable Ribbon (1 pc) #SC70 $5.00<br>Lift off correction tape (4 pack) #SC78 $5.00 |
| **RCA #RP1812** $18.91<br>AM/FM Personal Stereo cassette player, AM/FM stereo tuner, 3-pushbutton cassette operation, automatic end of tape shutoff, bass boost, lightweight plastic stereo headphones, operates on 2 "AA" batteries not included. | **SMITH CORONA Office 2000** $161.39<br>24,000 Character editable memory, 2-line by 40-character liquid crystal display, 90,000 word spell-right electronic dictionary, 3-line memory correction, block move, copy, delete, insert, search, replace, return, center, underscore, bold, indent, forms, layout, right margin justification, punctuation check, 60 day memory backup, print speed (cps) 12, word find, word eraser. |
| | **RCA AM/FM Walkman** $12.21<br>AM/FM Stereo headset radio, 2 built in antennas, lightweight stereo headphones with adjustable headband, operates on 2 "AA" batteries not included. |

*Electronic*
*Shop*
*OK*

INMATE NAME: C. Isley

INMATE DOC#: AM-9320

HOUSING UNIT CELL#: IB-16

RETURNED TO
VENDOR FOR
EXCHANGE

| ITEM | QUANTITY | PRICE |
|---|---|---|
| RCA #RP1882 | 1 | 35.62 |
| | | |
| | | |
| | | |

TOTAL: 35.62

2-5-99

## PRICES INCLUDE 6% SALES TAX

135

STATE CORRECTIONAL INSTITUTION AT
MAHANOY

INMATE PERSONAL PROPERTY RECEIPT

SCI MAH - MAIL ROOM    IB

Inmate Property Received

From: _____

Description and Quantity of Articles Received:

- Cassette Player

# _____

I understand the above listed approved articles become part of my personal property and I may not lend, give, sell, trade or exchange them with other inmates at this Institution.

Inmate Signature _____    Number _____

NOTE: 03-13-00 ISSUED with Inmate TO FOR SHIPMENT TO SCI-CORR

Attesting Officer Making Delivery _____    Date _____

The following disapproved articles are to be returned to the sender and a DC-138A cash slip will be sent to the Mail Room to cover the necessary postage.

RETURNED TO VENDOR FOR REFUND
INMATE REFUSED TO SEND IT OUT. WANTS TO FILE GRIEVANCE

Inmate Signature of _____    Number _____

Attesting Officer _____    Date 3-19-99

WHITE—Mail Room    YELLOW—Property Office    PINK—Inmate    GOLD—Block Officer

Addressed To: _____

Name: _____

No.: 199320

Rm 9320

**EXHIBIT "T"**

804
[ 1

# COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF CORRECTIONS
### P.O. BOX 598
### CAMP HILL, PA. 17001-0598

CIAL INMATE GRIEVANCE

GRIEVANCE NO. MAH-0146-99

| GRIEVANCE COORDINATOR Dotter | INSTITUTION Mahanoy | DATE 990501 |

| : (Commitment Name & Number) C. Isley AM-9320 | INMATE'S SIGNATURE C. Isley |

| K ASSIGNMENT Nil | QUARTERS ASSIGNMENT IB-16 |

**TRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

rief, clear statement of grievance:

On 990415 a lined guitar bag in the mail which was confiscated by the property room (confiscation #A000956). I do not understand because lined guitar bags, as opposed to lined guitar cases are permitted (if the bags were not lined they would offer no protection for the guitar and thus would be utterly useless while cases could be lined or unlined and protect the guitar. Numerous other prisoners have lined guitar bags (there is no such thing as an unlined guitar bag) and I wish to know why I am not permitted to have mine. I was instructed by Gregory to not purchase a lined guitar case and I complied and bought instead a guitar bag of the same type that other prisoners have.

Actions taken and staff you have contacted before submitting this grievance:

Actions Taken: Contacted staff
Staff Contacted: Novotney, Gregory, Mahally, property room

ur grievance has been received and will be processed in accordance with DC-ADM 804.

C. Dotter
**Signature of Grievance Coordinator**

5/3/99
Date



**-804**
T II

# COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF CORRECTIONS
### P.O. BOX 598
### CAMP HILL, PA 17001

ICIAL INMATE GRIEVANCE
IAL REVIEW RESPONSE

GRIEVANCE NO. | MAH~0146~99

| (Name & DC NO.) Isley, AM~9320 | INSTITUTION SCI~Mahanoy | QUARTERS I/B #16 | GRIEVANCE DATE 05/01/99 |
|---|---|---|---|

ı following is a summary of my findings regarding your grievance:

In regards to your grievance concerning your guitar case, as I informed you in my reply to your request dated 4/21/99, this particular case has excessive soft padding which raises some security concerns. These concerns are specific to the concealment of contraband, and for this reason they are not authorized to enter the institution.

The guitar cases that resemble this same style that are already inside the institution will be removed through attrition and as these inmates leave the institution.

I suggest you look into the hard style case with the thin lining to protect your guitar.

LPM:ms

cc:    Deputy Novotney
       Deputy Klem
       Ms. Dotter
       Records
       file

ıfer to DC-ADM 804, Section VIII,
r instructions on grievance

SIGNATURE OF GRIEVANCE COORDINATOR

DATE
5/10/99

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,          :

        Plaintiff         :

        v.           :     No. 1:00CV-00577

W. CONWAY BUSHEY, et al.,  :

        Defendants     :

## UNSWORN DECLARATION OF MARTIN L. DRAGOVICH

I, **MARTIN L. DRAGOVICH**, hereby declare under the penalty of perjury that the following is true and correct and based upon my personal knowledge:

1. I am currently employed by the Pennsylvania Department of Corrections ("DOC") as the Superintendent of the State Correctional Institution at Camp Hill, Pennsylvania ("SCI-Camp Hill"), and have held this position since July 17, 2000.

2. Prior to serving as Superintendent at SCI-Camp Hill, I served as the Superintendent at the State Correctional Mahanoy ("SCI-Mahanoy") in Frackville, Pennsylvania. At all times relevant to this complaint, I was Superintendent at SCI-Mahanoy.

3. As Superintendent at SCI-Mahanoy, I functioned as the administrative head of the institution. In the course of such employment, I have and have had reason to

be familiar with the standard policies and procedures followed at SCI- Mahanoy, as well as those of the Department, including inmate disciplinary procedures and record keeping practices concerning misconduct reports and inmate grievances.

4.   In properly administering the Commonwealth's penal system, various operational policies exist relating to a wide variety of subjects including, the treatment of prisoners which includes but is not limited to the security of inmates and staff, psychological and medical treatment   I am familiar with the various DOC Administrative Directives that impact inmates.

5.   Pursuant to DC-ADM 804, inmates may submit an appeal of a Inmate Grievance to me for review and decision.  Likewise, pursuant to DC-ADM 801, inmates may submit an appeal of an institutional Misconduct Report to me for review and decision.

6.  In December 1998,  Iseley appealed the findings of Grievance No. MAH-0457-98 to me.  In Grievance No. 457-98, Iseley alleged he was harassed, threatened and fired from his job.  I reviewed Iseley's grievance, the grievance coordinator's findings as well as the information provided to her from Officer MacKreth and Unit Manager Chesney. (See Exhibit "A" attached).

-2-

7.   I found that based upon the information provided that Iseley did not have a job at SCI-Mahanoy and was belligerent with officer McKreth.   I denied Iseley's appeal on December 29, 1999. (Id.)

8.   On January 5, 1999, Iseley appealed the decision of the Program Review Committee ("PRC") regarding Misconduct No. 110205, Refusing to Obey and Order, Using Abusive or Obscene Language.   (See Exhibit "B" attached)

9.   I reviewed the original misconduct, the Hearing examiner's disposition, Iseley's appeal to the PRC, their response and Iseley appeal my office. After a review of information and documentation, I denied Iseley's appeal.   (Id).

10.   On January 9, 1999, Iseley appealed the decision of the grievance coordinator regarding Grievance No. MAH- 0462-98 to me. In Grievance No. 0462-98, Iseley complained about low intensity cell lights. I reviewed Iseley's grievance, and the grievance coordinator's findings.   I found the grievance coordinator's response complete and accurate, in that the low intensity cell lights must remain on for security reasons.   I denied Iseley's appeal on January 11, 1999.   (See Exhibit "C")

11.   On December 26, 1998, Iseley filed Grievance No. MAH 0479-98, alleging he is not permitted to receive the alternative protein menu when pork is served. On January 4, 1999, the Food Service Manager, Robert Yarnell advised Iseley

-3-

that he would be allowed to receive the pork alternative if he signed up for the program. (Id)   (See Exhibit "D" attached)

12.   On January 8, 1999, I placed Iseley on grievance restriction, pursuant to DOC-ADM 804.   I believed that Iseley was not making a good faith use of the grievance system, and not making a legitimate effort to resolve problems before using the grievance system as outlined in ADM 804 §B. It was evident to me that Iseley was using the grievance system as a response of the first resort in that he filed seven grievance in only 6 weeks.  I limited Iseley to filing one grievance per month.  (Id.)

13.   On January 3, 1999, Iseley filed Grievance No. 002-99 alleging that Dennison misrepresented himself to Iseley as a member of the Board of Probation and Parole  and that James Unell, the inmate program manager did not explain matters to him satisfactorily.  (See Exhibit "E" attached)

14.   On January 14, 1999, Unell responded to Iseley informing him that his consent was withdrawn per his request and that the original document was returned to him and a note was made on his DC-14 (Treatment file) that his consent was revoked. (Id.)

15.   Iseley then appealed Unell's response to my office on January 23, 1999. Iseley's initial grievance, the initial response, and Iseley's appeal were reviewed. After a review of the information and documentation, the established and routine

-4-

procedures were followed relative to the reports needed and requested by the Parole Board. After a review of the grievance record, Iseley's appeal was denied. (Id.).

16.    On March 4, 1999, Iseley submitted an Inmate's Request to Staff Member, directed to me. Iseley alleged that Islamic materials were confiscated and that Lt. Gavin made threats physical injury and racial slurs toward him. (See Exhibit "F"attached )

17.    I responded to Iseley on March 5, 1999 and informed him that the two letters in question were confiscated because they had no return address on them and contained material which violated DOC policy governing incoming publications. (Id.)

18.    On January 27, 1999, Iseley filed grievance No. MAH-0035-99, alleging that upon his release from the Restricted Housing Unit, he discovered items of his personal property missing, including twelve publications/magazines. (See Exhibit "G" attached)

19.    On January 28, 1999, Lt. Mahally responded to Iseley grievance informing him that his personal property inventory sheet that accompanied him to SCI-Mahanoy reflected that he had seven magazines/publications. Mahally further explained to Iseley that following his confinement to the RHU his property was packed and secured in the property room. (Id.)

20.    Iseley appealed the response to Grievance No. MAH-0035-99 to my office. I reviewed Iseley's original grievance, the grievance's officers response and his appeal to my office. I found that Iseley presented no proof that he had the items in question in his property at the time he was placed in the RHU. On February 17, 1999, I denied Iseley's appeal. (Id.)

21.    In March of 1999, Iseley filed grievance No. MAH-0076-99 alleging that the medical department wrongfully charged him for sick call regarding a chronic condition, that he was being charged for glasses that he did not want and that the medical department refused to refer him for corneal implants. (See Exhibit "H" attached)

22.    In my response to Iseley's grievance, I informed Iseley that he did not order photo gray lenses or sign a cash slip for the photo grey lenses and that treatment of his visual imperfection would not be corrected through corneal transplants or photo refractive Keratotomy because this procedure is cosmetic and can be corrected through lenses. I also informed him that at that time there was no protocol treatment for Hepatitis C and that the Bureau of Health Services was looking into it. I denied Iseley's appeal of the grievance and Chief Hearing Examiner Bitner, based upon the information and documentation provided, also upheld the responses provided to Iseley at the institutional level. (Id.)

-6-

23. On April 15, 1999, Iseley's guitar bag was confiscated for security reasons because the case had excessive soft padding which could be used to conceal contraband. Iseley then filed a Grievance No. MAH-00146-99 concerning the confiscation of the bag. I explained to Iseley that the bag was confiscated for security reasons. I also referred the matter to Lt. Mahally for further investigation to determine if other guitar bags have been permitted in the institution. I encouraged Iseley to inform Lt. Mahally of any bags he was aware of in order to compare the two. (See Exhibit "I" attached)

6/7/01
**DATE**

_Martin R Dragovich_
**MARTIN L. DRAGOVICH**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,                    :
                                   :
    Plaintiff                 :
                                   :
v.                                 :     No. 1:00-CV-00577
                                   :     (Judge Kane)
W. CONWAY BUSHEY, et al.,          :
                                   :
    Defendants                :

## UNSWORN DECLARATION J. KANE

I, **J. KANE**, hereby declare under the penalty of perjury, that the following is true and correct and based upon by personal knowledge.

1.    I am currently employed by the Pennsylvania Department of Corrections ("DOC") as a Hearing Examiner. I have been employed as a hearing examiner for approximately sixteen years, conducting administrative factfinding hearings at SCI-Frackville, SCI-Mahanoy, SCI-Chester and occasionally at other facilities in the eastern region.

2.    As a hearing examiner, I conduct administrative fact-finding proceedings concerning misconduct reports issued to inmates. My duties and responsibilities are governed by the DOC Administrative Directive, 801. These duties include but are not limited to the review of the evidence presented at the misconduct hearing, the

determination of relevant witnesses, the interview of the witnesses, the determination of the inmates guilty or innocence, and the imposition of sanctions.

3.     On August 27, 1999, Iseley was issued Misconduct No. A27518 for Threatening and Employee With Bodily Harm. (See Exhibit "A" attached).

4.     On August 30, 1999, I presided at the misconduct hearing of Charles Iseley regarding examiner Misconduct No. A27518. According to the misconduct report, during a safety and security check of Iseley cell, Iseley threatened officer Dropinisky with physical harm when he ordered him to remove an air freshener from his light fixture. (Id.)

5.     At the hearing I considered officer's Dropinski's report as well as Iseley's version. After a review of the information, documentation and evidence presented, I believed Dropinski's report that Iseley threatened him with bodily harm and sanctioned Iseley to 60 days disciplinary custody. (Id.)

6.     The finding of guilt and sanction imposed on Misconduct A27518 was not based upon Iseley's race, or for any discriminatory or retaliatory reasons. Rather, I found Iseley guilty based on the credibility evidence, testimony, reports presented.

Case 1:98-cv-00677-YK-DB    Document 93    Filed 06/13/2001    Page 158 of 350

6-14-01
_____
**DATE**

_____
**J. KANE**

**EXHIBIT "A"**

05/29/01  14:30 FAX 3673912          DOC TRNG ACAD                            ☑008
                                                                             P.2/40 2

    SEP 21 '99  02:26PM SCI PITTSBURGH 412 880 0287

| FORM DC-141    PART I         COMMONWEALTH OF PENNSYLVANIA | | | A | 27518 |
| Rev. 8-84 | | | | |

☑ MISCONDUCT REPORT ☐ OTHER    DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| AM-9320 | Isley, Charles | SCI-MAH | 1820 hRS | 8-27-99 | 8-27-99 |
| Quarters | Place of Incident | | | | |
| IB-16 | IB cell #16 | | | | |

OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

OFFICE OF THE

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | SEP 2 2 1999 | | |
| | | | | | CHIEF | | |
| | | | | | HEARING EXAMINER | | |

MISCONDUCT CHARGE OR OTHER ACTION

Class 1. Category A  I.N. threatening an employee or their family
with bodily harm.

STAFF MEMBER'S VERSION

On the above time and date, while conducting a safety and
security check on cell#16, Isley (AM-9320). Inmate Isley was ordered
To remove an air freshner from his light fixture. After given the order,
Inmate Isley jumped down off of his bunk and in a very aggressive
manner. approached this officer with closed fists and stated "you
picked the wRong person to be fucking with, get outta my cell before
you get hurt. I, co Dropinski, then closed inmate Isleys cell door
and notified the T-Block Control Sergeant.

                                                                    (q)

IMMEDIATE ACTION TAKEN AND REASON  Confine in the Restricted Housing Unit
                                    pending further action by the Hearing Examiner

PRE-HEARING CONFINEMENT

|  | IF YES | | |
|---|---|---|---|
|  | TIME | DATE | |
| ☑ YES | 2120 | 8/27/99 | |
| ☐ NO | | | ☑ REQUEST FOR WITNESSES AND REPRESENTATION    ☑ INMATE'S VERSION |

FORMS GIVEN TO INMATE

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY    SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| | | DATE | TIME 24 HOUR BASE |
| Co Dropinski IB #_____ | Capt R Chie | 8-27-99 | 2142 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | Misconduct Category | Signature of Person Serving Notice |
|---|---|---|---|
| DATE | TIME | ☑ CLASS 1  ☐ CLASS 2 | Co Shift |
| 8/29/99 | 0800 | | |

NOTICE TO INMATE

You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class I misconduct, any pre-release status you have will be revoked.

WHITE —DC-15      YELLOW—Inmate Cited      PINK—Staff Member Reporting Misconduct      GOLDENROD—Deputy Superintendents

05/29/01 14:30 FAX 3673912 DOC TRNG ACAD ☑009

SEP 21 '99 02:27PM SCI PITTSBURGH 412 880 0287 P.3/4

DC-141 PART II B
Rev. 6-84
DISCIPLINARY HEARING REPORT

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from Part I |
|---|---|---|---|---|---|
| AM9320 | Isley | SCIMAH | 8-30-99 | 12:10 | A27518 |

| INMATE PLEA | ☐ Guilty ☒ Not Guilty | ☐ No Plea ☐ Other | Verdict | ☒ Guilty ☐ Not Guilty |
|---|---|---|---|---|

HEARING ACTION

CHARGES A#/N Threats an employee – not guilty

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

[illegible handwritten findings]

Sanction: 60 days DC
8-27-99
10-25-99

| | | |
|---|---|---|
| ☒ YES ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | no witness [illegible] |
| ☒ YES ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES ☒ |
| ☒ YES ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | Version attached |
| ☒ YES ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED)

J.K. KANE

Hearing Report and all appended information must be signed. Signature indicates finished report with appendices.

SIGNATURE OF HEARING EXAMINER/COORDINATOR

WHITE—DC-15 YELLOW—Inmate Cited PINK—Staff Member Reporting Misconduct GOLDENROD—Deputy Superintendent

05/29/01  14:31 FAX 3673912          DOC TRNG ACAD                    ☒010

SEP 21 '99  02:27PM SCI PITTSBURGH 412 880 0287              P.4/4

| DC-141'  PART II C | COMMONWEALTH OF PENNSYLVANIA | | |
|---|---|---|---|
| Rev. 6-84   HEARING SUPPLEMENT INMATE VERSION AND WITNESS STATEMENTS | DEPARTMENT OF CORRECTIONS | | |
| DC Number | Name | Institution | No. from PART I |
| Am-9320 | ISLEY, Charles | SCI-MAH | A27518 |

**INMATE'S VERSION**

Prisoner Isley pleads not guilty to the false charge based on the following reasons:

He was confined (prehearing confinement) in his cell at 1820 hrs and not 2120. This is corroborated by The staff member's Version. The Prehearing Confinement Section was written by someone else which is corroborated by the comparison of the handwriting.

He did not threaten anyone and is a Black man from Philly who has never spoken in the manner alleged.

He would never approach anyone with "closed fists" because he was a boxer and a boxing trainer and "closed fists" are in direct opposition to everything he was ever taught it has taught concerning fighting and in direct conflict with anything he has ever done.

What actually occurred was that his cell was being searched and the guard ordered him to get rid of all his legal work save for a folder because allegedly it is a rule and a possible fire hazard. When it was explained that he had a trial next month and that he was not throwing any legal material away the guard stated that he was aware that Prisoner Isley was going to trial soon and he became abusive uttering threats and racial slurs. When prisoner Isley stated he wished to speak to the lieutenant the guard physically assaulted him by pushing him back into the cell forcing him to hit his head on the table and the guard slammed the door Prisoner Isley then pushed the intercom button and informed the sgt. that he wished to speak to the lieutenant and of the assault but was told "so what". At 1900 hrs prisoner Isley again requested to speak to the lieutenant via the intercom but was told by the sergeant that he was confined by the lieutenant's orders. Each time thereafter that the guard made his rounds he would stop at prisoner Isley's cell and threaten him with physical injury and make racial remarks, and ask him when he next would see the parole board.

Prisoner Isley is in fear for his life, freedom, and well being from this trained racist vicious killer guard and wish to be seperated from him to stop the guard from making good on his threats to "lock up and kill prisoner Isley. He is in serious need of assistance and wishes to press charges as soon as possible. Please help him because he is terrified for his life.

WHITE – DC-15        YELLOW – Inmate Cited        PINK – Staff Member Reporting Misconduct        GOLDENROD – Deputy Superintendent

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,                    :
                                   :
    Plaintiff              :
                                   :
    v.                     :    No.  1:00-CV-00577
                                   :    (Judge Kane)
W. CONWAY BUSHEY, <u>et</u> <u>al.</u>,  :
                                   :
    Defendants             :

## UNSWORN DECLARATION OF
## <u>ROBERT MACKRETH</u>

    I, **Robert Mackreth,** hereby state under penalty of perjury that the following is true and correct and based upon my personal knowledge:

    1.    I am currently employed at the State Correctional Institute at Waymart ("SCI-Waymart") as a Correctional Officer.  I have been employed at SCI-Waymart since August 2, 1999.

    2.    At the time relevant to this complaint I was a Correctional Officer assigned primarily to JA Block at SCI-Mahanoy.

    3.    On December 13, 1997, inmate Charles Iseley was out on the J/A cell-block tier.  I ordered Iseley to return to his cell and lock-up.  Iseley refused my order informing me that he had a job as a Block Worker.

4.    I check the Block Worker's roster for block J/A and could not find Iseley's name on the list.  I again ordered Iseley to his cell.  Iseley then became belligerent and argumentative with me.

5.    Subsequent to Iseley's filing Grievance No. 0457-98 regarding his alleged block assignment, I was contacted by Carol Dotter, the Grievance Coordinator at SCI-Mahanoy.  Attached as Exhibit "A" is a true and correct copy of my statement to Dotter regarding Iseley's alleged block assignment.

6.    According to the Block Worker's roster and the information available, Iseley did not have a job on J/A block or anywhere else at SCI-Mahanoy in December, 1998.  (See Exhibit "A" attached).

7.    At no time did I engage in any retaliating or discriminating conduct or actions against Charles Iseley while he was incarcerated at SCI-Mahanoy or at any other time.

6-13-01
**DATE**

*Robert Mackreth*

**ROBERT MACKRETH**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,                    :
                                   :
      Plaintiff                   :
                                   :
      v.                          :    No. 1:00CV-00577
                                   :
W. CONWAY BUSHEY, et al.,          :
                                   :
      Defendants                  :

## UNSWORN DECLARATION OF LAWRENCE MAHALLY

I, **LAWRENCE MAHALLY**, hereby declare under the penalty of perjury that the following is true and correct based upon my personal knowledge:

1. I am currently employed by the Pennsylvania Department of Corrections ("DOC") as a Lieutenant at the State Correctional Institution Mahanoy ("SCI-Mahanoy") in Frackville, Pennsylvania. At the time relevant to this complaint I was a Non-Housing Zone Lieutenant.

2. As a Non-Housing Zone Lieutenant, I supervise Correctional Officers I and II assigned to non-housing areas such as administration building, visiting room, property room, and the medical department etc.

3.    On January 27, 1999, Iseley filed grievance No. MAH-0035-99, alleging that upon his release from the Restricted Housing Unit, he discovered items of his personal property missing, including twelve publications/magazines.  (See Exhibit A" attached).)

4.    On January 28, 1999, I responded to Iseley grievance informing him that his personal property inventory sheet that accompanied him to SCI-Mahanoy reflected that he had seven magazines/publications.  Mahally further explained to Iseley that following his confinement to the RHU on December 16, 1998, his property was packed and secured in the property room. The property inventory sheet dated December 17, 1998 does not show that any magazines were present with Iseley's property at that time.  (Id.)

5.    Furthermore, I explained to Iseley that the property room did not receive any requests from him concerning any missing items while he was in the RHU, and that he failed to mention anything concerning the alleged missing items when he was in the property room on December 22, 1998 to pick up some legal material.  Iseley could provide no proof of missing items in his property.  (Id.)

6.    In May, 1999, Iseley filed Grievance No. MAH-0146-99 regarding the confiscation of his guitar bag.  On May 10, 1999 I explained to Iseley that he bag was confiscated because that particular case has excess padding which raised security concerns.

-2-

06/12/01
**DATE**

*Lawrence L. Mahally*
**LAWRENCE MAHALLY**

-4-

**EXHIBIT "A"**

DC-804
PART II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

OFFICIAL INMATE GRIEVANCE
INITIAL REVIEW RESPONSE

GRIEVANCE NO.  | MAH–0035–99

| TO: (Name & DC NO.) C. Isley  AM-9320 | INSTITUTION SCI–Mahanoy | QUARTERS I/B  16 | GRIEVANCE DATE 1/28/99 |
|---|---|---|---|

The following is a summary of my findings regarding your grievance:

This is in response to your grievance concerning your property. The personal property inventory that accompanied you when you arrived at SCI-Mahanoy reflects that you had seven magazines.

Following your confinement to the RHU on 12/16/98, all of your property that was present in your cell was packed and removed by Sgt. Birosak. Your property was then secured in the Property Room until it was inventoried by Officer Peek. The Personal Property Inventory dated 12/17/98 does not show that any magazines were present with your property at that time. You received your copy of this inventory with your basic RHU issue.

Not only did the Property Room not receive any requests from you concerning any missing items while you were in the RHU, but you also failed to mention anything concerning these items when you were in the Property Room on 12/22/98 to pick up some legal material.

Based on the information above, I conclude that there were no magazines present with your property when it was packed and removed from your cell. Unless you can provide me with proof that these items were present with your property at the time of your confinement, I will take no further action on this matter.

In addition, excessive state-issued items do not require a Confiscation Slip as long as they are not related to a misconduct.

LPM:js

cc:    Deputy Novotney
       Deputy Klem
       Mrs. Dotter
       Records DC-15
       Sgt. Birosak
       COI Peek
       file

| Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures. | SIGNATURE OF GRIEVANCE COORDINATOR | DATE 2/10/99 |
|---|---|---|

DC-804
ART 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

**OFFICIAL INMATE GRIEVANCE**

GRIEVANCE NO. MAH-0035-9

| TO: GRIEVANCE COORDINATOR Dotter | INSTITUTION Mahanoy | DATE 990127 |
|---|---|---|
| FROM: (Commitment Name & Number) C. Isley AM-9320 | INMATE'S SIGNATURE C. Isley | |
| WORK ASSIGNMENT N.I | QUARTERS ASSIGNMENT IB-16 | |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance:

On 980114 I was released from the and some of my property was missing. I informed the sergeant who instructed me to write the property room, which I did – twice. The missing property consists of several brown sock and white boxer shirts (I had more than the limit because of the items given to me upon my arrival by clothing exchange) and all but save for two pornographic books. I received no confiscation slips and, according to other prisoners, it is common practice for pornographic books to be taken. However, these books were exhibits for my lawsuit in the Western District Federal Court and therefore I want them returned immediately or to have confiscation slips. They were included in my inventory sheet (most of them) from Rockview prison. I have grievances to verify receipt of the others at Rockview. Else, I wish to be reimbursed.

B. Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff.
Staff contacted: Property Room Sgt., Property Room staff

Your grievance has been received and will be processed in accordance with DC-ADM 804.

C Dotter
Signature of Grievance Coordinator

1/28/99
Date

**EXHIBIT "B"**

DC-135A

**COMMONWEALTH OF PENNSYLVANIA**

**DEPARTMENT OF CORRECTIONS**

INMATE'S REQUEST TO STAFF MEMBER

RECEIVED

MAY 1 7 1999

SCHMAHANOY
SUPERINTENDENT'S OFFICE

INSTRUCTIONS

Complete Items Number 1-7. If you follow instructions in preparing
your request, it can be disposed of more promptly and intelligently.

| 1. TO: (NAME AND TITLE OF OFFICER) Dragovich, Warden | | 2. DATE 990515 |
|---|---|---|
| 3. BY: (INSTITUTIONAL NAME AND NUMBER) C. Isley AM-9320 | | 4. COUNSELOR'S NAME Nil |
| 5. WORK ASSIGNMENT Nil | 6. QUARTERS ASSIGNMENT IB-16 | |

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE.   GIVE DETAILS.

I wish to appeal grievance MAH-0146-99 because I ordered what I was told to order. Gregory informed me, in writing, that lined guitar cases were not permitted (however, according to the grievance response, they are). Consequently, I purchased a guitar bag of the same type that other prisoners have and yet I am not allowed to have it. They were permitted when it was approved and purchased and I should be allowed to have it.

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

☐ TO DC-14 CAR ONLY                    ☐ TO DC-14 CAR AND DC-15 IRS

STAFF MEMBER                                          DATE

DC-804
PART II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

OFFICIAL INMATE GRIEVANCE
INITIAL REVIEW RESPONSE

GRIEVANCE NO. | MAH−0146−99

| TO: (Name & DC NO.) | INSTITUTION | QUARTERS | GRIEVANCE DATE |
|---|---|---|---|
| C. Isley, AM-9320 | SCI−Mahanoy | I/B #16 | 05/01/99 |

The following is a summary of my findings regarding your grievance:

In regards to your grievance concerning your guitar case, as I informed you in my reply to your request dated 4/21/99, this particular case has excessive soft padding which raises some security concerns. These concerns are specific to the concealment of contraband, and for this reason they are not authorized to enter the institution.

The guitar cases that resemble this same style that are already inside the institution will be removed through attrition and as these inmates leave the institution.

I suggest you look into the hard style case with the thin lining to protect your guitar.

LPM:ms

cc:    Deputy Novotney
       Deputy Klem
       Ms. Dotter
       Records
       file

Refer to DC-ADM 804, Section VIII,
for instructions on grievance

SIGNATURE OF GRIEVANCE COORDINATOR

DATE
5/10/99

DC-804
PART 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

OFFICIAL INMATE GRIEVANCE

GRIEVANCE NO. *MAH-0146-99*

| TO: GRIEVANCE COORDINATOR *Dotter* | INSTITUTION *Mahanoy* | DATE *990501* |
| FROM: (Commitment Name & Number) *C. Isley AM-9320* | INMATE'S SIGNATURE *C. Isley* | |
| WORK ASSIGNMENT *Nil* | QUARTERS ASSIGNMENT *IB-16* | |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance:

On 990415 a lined guitar bag in the mail which was confiscated by the property room (confiscation #A000956). I do not understand because lined guitar bags, as opposed to lined guitar cases are permitted (if the bags were not lined they would offer no protection for the guitar and thus would be utterly useless while cases could be lined or unlined and protect the guitar. Numerous other prisoners have lined guitar bags (there is no such thing as an unlined guitar bag) and I wish to know why I am not permitted to have mine. I was instructed by Gregory to not purchase a lined guitar case and I complied and bought instead a guitar bag of the same type that other prisoners have.

B. Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff
Staff Contacted: Novotney, Gregory, Mahally, property room

Your grievance has been received and will be processed in accordance with DC-ADM 804.

*C. Dotter*
Signature of Grievance Coordinator

*5/3/99*
Date

05/29/01  14:30 FAX 3673912          DOC TRNG ACAD                    ☑008

SEP 21 '99  02:26PM SCI PITTSBURGH 412 880 0287                    P.2/40 2

| FORM DC-141 Rev 2-84   PART I | COMMONWEALTH OF PENNSYLVANIA | | | | A   27518 |

☑ MISCONDUCT REPORT ☐ OTHER   **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| AM-9320 | Isley, Charles | SCI-MAH | 1820 hRS | 8-27-99 | 8-27-99 |

| Quarters | Place of Incident |
|---|---|
| IB-16 | IB cell #16 |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**   OFFICE OF THE

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | SEP 2 2 1999 | | |
| | | | | | CHIEF HEARING EXAMINER | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Class 1. Category A   i.N. threatening AN Employee or their family with bodily harm.

**STAFF MEMBER'S VERSION**

On the Above time And date, while conducting A safety And Security check on cell #16, Isley (AM-9320). Inmate Isley was ordered To Remove AN Air freshner from his light fixture. After given the order, Inmate Isley jumped down off of his bunk And in A very aggresive manner. Approached this officer with closed fists And stated "You Picked the wrong person to be fuckin with, get outta my cell before you get hurt. I, CO Dropinski, then closed Inmate Isley's cell door And Notified the T-Block control sergeant.

(9)

**IMMEDIATE ACTION TAKEN AND REASON**   Confine in the Restricted Housing Unit pending further action by the Hearing Examiner

**PRE-HEARING CONFINEMENT**

| | IF YES | |
|---|---|---|
| ☑ YES ☐ NO | TIME 2120 | DATE 8/27/99 |

FORMS GIVEN TO INMATE
☑ REQUEST FOR WITNESSES AND REPRESENTATION   ☑ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY   SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| CO Dropinski / Bull myth | Capt R Cee | DATE 8-27-99   TIME 24 HOUR BASE 2142 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | | Misconduct Category | Signature of Person Serving Notice |
|---|---|---|---|---|
| DATE 8/29/99 | TIME 0800 | | ☑ CLASS 1 ☐ CLASS 2 | CO Shaft |

**NOTICE TO INMATE**

You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class I misconduct, any pre-release status you have will be revoked.

WHITE —DC-15          YELLOW—Inmate Cited          PINK—Staff Member Reporting Misconduct          GOLDENROD—Deputy Superintendents

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,           :

          Plaintiff        :

          v.              :       No. 1:00-CV-00577
                      :       (Judge Kane)

W. CONWAY BUSHEY, et al.,   :

          Defendants    :

## UNSWORN DECLARATION CHARLES MITCHELL

I, **CHARLES MITCHELL**, hereby declare under the penalty of perjury, that the following is true and correct and based upon by personal knowledge.

1. I am currently employed by the Pennsylvania Department of Corrections ("DOC") as a Hearing Examiner. I have been employed as a hearing examiner for approximately eight years, conducting administrative factfinding hearings at SCI-Smithfield, SCI-Cresson, SCI-Huntingdon, SCI-Rockview and occasionally at SCI-Houtzdale. I have been employed by the DOC for 2 years.

2. As a hearing examiner, I conduct administrative fact-finding proceedings concerning misconduct reports issued to inmates. My duties and responsibilities are governed by the DOC Administrative Directive, 801. These duties include but are not limited to the review of the evidence presented at the misconduct hearing, the

determination of relevant witnesses, the interview of the witnesses, the determination of the inmates guilty or innocence, and the imposition of sanctions.

3.     On August 25, 1998, at approximately 6:00 p.m., Iseley was placed in Administrative Custody pending an investigation of possible involvement in a fight. (See Exhibit "A" attached).

4.     On August 31, 1998, hearing examiner Mitchell conducted an in-camera hearing with Lt. Eaton to determine the reliability of the confidential source of information utilized in the in the investigation.  This type of hearing is in accordance with DC ADM 801. ( See Exhibit "B" attached).

5 .    The reliability hearing was conducted in-camera because the nature of the reliability of the evidence could, by itself, reveal the identity of the informants.  Iseley, therefore was not present at this hearing. (                    ).

6.     At the reliability hearing, Lt. Eaton explained under oath how the informants were in a position to observe, what information the sources provided and that the information was corroborated by others.  In addition, information was provided to the hearing examiner that the informant had provided information in the past that was proven to be reliable. ( See Exhibit "A" ).

7.     I found that the informants met the reliability criteria as outlined in DC-ADM 801.

-2-

8.     On September 2, 1998, Iseley had a hearing regarding Misconduct No. A122000.  At the hearing Iseley pled not guilty and submitted his version of the incident. Id.).

9.     After hearing the evidence, I believed that Iseley more likely than not conspired with and assisted another inmate with an assault on inmate Smith by standing in the cell doorway and not allowing the inmate to exit the cell.  I relied on the credibility of Lt. Eaton's report and the CSI information over Iseley's denial and  sanctioned him to 90 days Disciplinary Custody.  (Id.).

10.    I found Iseley guilty  based on the credibility evidence, testimony, reports presented.  The finding of guilt and sanction imposed was not based upon Iseley's race, or for any discriminatory or retaliatory reasons.   I never made any racial or discriminatory remarks to Iseley before, during or after the misconduct  hearing or at any other time.

11.    At no time did I engage in any discriminatory or retaliatory conduct ro actions concerning inmate Charles Iseley for any reasons while he was incarcerated at SCI-Rockview or at any other time.

8.    On September 2, 1998, Iseley had a hearing regarding Misconduct No. A122000.  At the hearing Iseley pled not guilty and submitted his version of the incident. Id.).

9.    After hearing the evidence, I believed that Iseley more likely than not conspired with and assisted another inmate with an assault on inmate Smith by standing in the cell doorway and not allowing the inmate to exit the cell.  I relied on the credibility of Lt. Eaton's report and the CSI information over Iseley's denial and  sanctioned him to 90 days Disciplinary Custody.  (Id.).

10.    I found Iseley guilty  based on the credibility evidence, testimony, reports presented.  The finding of guilt and sanction imposed was not based upon Iseley's race, or for any discriminatory or retaliatory reasons.   I never made any racial or discriminatory remarks to Iseley before, during or after the misconduct  hearing or at any other time.

11.    At no time did I engage in any discriminatory or retaliatory conduct ro actions concerning inmate Charles Iseley for any reasons while he was incarcerated at SCI-Rockview or at any other time.


_____                    _____
**DATE**                                        **CHARLES MITCHELL**

10.     I found Iseley guilty based on the credibility of evidence, testimony, and reports presented.  The finding of guilt and sanction imposed was not based upon Iseley's race, or for any discriminatory or retaliatory reasons.  I never made any racial or discriminatory remarks to Iseley before, during or after the misconduct hearing or at any other time.

11.     At no time did I engage in any discriminatory or retaliatory conduct concerning inmate Charles Iseley for any reasons while he was incarcerated at SCI-Rockview or at any other time.


_5-30-01_
**DATE**


**CHARLES MITCHELL**
**Hearing Examiner**

RM
Page 1 of 2

FORM DC-141 PART I    COMMONWEALTH OF PENNSYLVANIA
Rev ?-84
☒ MISCONDUCT REPORT ☐ OTHER    DEPARTMENT OF CORRECTIONS    **A** 122000

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| AM9320 | Charles Isley | SCIR | 1230 hrs | 8-24-98 | 8-31-98 |

| Quarters | Place of Incident |
|---|---|
| DA/AC | Building A Cell 1-30 |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | |
|---|---|---|---|---|---|---|
| CFS358 | Michael Smith | X | | | | |
| DA9752 | Lewis Gay | X | | | | |

MISCONDUCT CHARGE OR OTHER ACTION  Class 1 Category **B** 12- Violation of Pa.
Crimes Code not in Category 1 - 903 Criminal Conspiracy To
Commit Aggravated Assault

STAFF MEMBER'S VERSION  On 8-24-98 CFS358 Michael Smith was a
victim of an aggravated assault which took place in his
assigned cell Building A cell 1-30. Two confidential
source informants #105 and #106 have been identified
as being in a position to observe the violation and
gain knowledge of said violation. Both confidential source
informants have corroborated each others account of the
incident detailing how and when the aggravated assault
occurred. On 8-24-98 at approx 1230 Hrs. DA9752 Lewis
Gay and AM9320 Charles Isley went to CFS358 Michael
Smith's cell A-1-30. Smith was sitting on his chair
in the cell. Gay entered the cell while Isley remained in
the cell's doorway, blocking any attempt by Smith to depart

IMMEDIATE ACTION TAKEN AND REASON                    see pg 2

**PRE-HEARING CONFINEMENT**

| | IF YES | |
|---|---|---|
| | TIME | DATE |
| ☒ YES | already confined | |
| ☐ NO | | |

FORMS GIVEN TO INMATE
☒ REQUEST FOR WITNESSES AND REPRESENTATION    ☒ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY    SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN |
|---|---|---|
| | | DATE | TIME 24 HOUR |
| | COTt | 8-31-98 | 1030 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | |
|---|---|---|
| DATE | TIME | Misconduct Category | Signature of Person Serving Not... |
| 9-1-98 | 1035 | ☒ CLASS 1  ☐ CLASS 2 | Clarence P Le... |

**NOTICE TO INMATE**
You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you s...
will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the heari...
committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are fou...
guilty of a Class 1 misconduct, any pre-release status you have will be revoked.

part 2...
12200...

FORM DC-141   PART I       COMMONWEALTH OF PENNSYLVANIA
REV. 8-94
☒ MISCONDUCT REPORT ☐ OTHER    DEPARTMENT OF CORRECTIONS      A-165501

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| AM330 | Charles Isley | SCIR | 1230 hrs | 8-24-98 | 8-31-98 |

| Quarters | Place of Incident |
|---|---|
| DA/AC | Building A Cell 1-30 |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

SEE PAGE 1

**STAFF MEMBER'S VERSION** the cell. Gay had dark brown work gloves on and also a knit cap with holes cut out to serve as a mask. Gay began to strike Smith in the face/head area an exuberant numerous times. The assault was in such excess that Smith was unable to defend himself. Shortly after the assault began, another officer started down this particular range. At this time, Isley, alerted Gay and both departed the cell. At this time, Gay removed mask which allowed for positive identification. Smith's injuries were discovered later on same date by corrections officers. Smith had numerous facial injuries documented by the med. dept. Medical incident/injury report and photographs available in the Security Office. Report delayed due to investigation.

**IMMEDIATE ACTION TAKEN AND REASON** Inmate already confined in RHU/AC - to remain confined as a threat to staff until misconduct hearing

**PRE-HEARING CONFINEMENT**

| | IF YES | |
|---|---|---|
| ☒ YES | TIME | DATE |
| ☐ NO | already | confined |

☒ REQUEST FOR WITNESSES AND REPRESENTATION

**FORMS GIVEN TO INMATE**   ☒ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY    SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN | |
|---|---|---|---|
| | | DATE | TIME 24 HOUR |
| | COII | 8-31-98 | 10 30 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | Misconduct Category | Signature of Person Serving Notice |
|---|---|---|---|
| DATE | TIME | ☒ CLASS I ☐ CLASS 2 | Clarence R Lee |
| 9-1-98 | 1035 | | |

**NOTICE TO INMATE**

You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class I misconduct, any pre-release status you have will be revoked.

| DC-141 | **PART II B** | **COMMONWEALTH OF PENNSYLVANIA** | | | |
|---|---|---|---|---|---|
| Rev. 6-84 DISCIPLINARY HEARING REPORT | | **DEPARTMENT OF CORRECTIONS** | | | |

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from |
|---|---|---|---|---|---|
| AM9320 | Charles Isley | SCIR | 9/ 02 /98 | 0815 | A122 |

| INMATE PLEA | ☐ Guilty ☑ Not Guilty | ☐ No Plea ☐ Other | Verdict | ☑ Guilty ☐ Not Guilty |
|---|---|---|---|---|

**HEARING ACTION**

CHARGES   Class I-B, #12 Violation of PA Crimes Code not in Category I, 903 Criminal Conspiracy to commit aggravated assault

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

PLEADS NOT GUILTY #12        SUBMITS ANSWER

    HAS NO KNOWLEDGE OF THIS INCIDENT. NEVER AT SMITH'S CELL

DOES KNOW GAY FROM ANOTHER JAIL NEVER PARTICIPATED IN AN ASSAULT

SMITH.

        H.Ex. believes CO3 Eaton's credible report and the CSI information over th
denail of inmate Isley that more likely than not inmate isley did conspire with and then
assist inmate Gay with an assault on CF5358 Smith by standing in the doorway to Smith's ce
and not allowing inmate Smith to exit the cell as the assault was in progress. Inmate Isle
would not be expected to stand in the doorway and assist inmate Gay as the CSI's state if
were simply passing the cell as inmate do not want to become involved and likely pass the
going to their own cells so as not to get involved. They would not jump in and assist in a
assault unless they had and where involved with the assault and had previously planned to
so. The CSI identification of inmate Gay as the Assaultor and Inmate Isley as the inmate
whom stood in the doorway blocking Smith's exit clearly establishes a preponderance of evi
that the two had planned previously to assault Smith and what both's role would be upon
arrival to the cell. H.Ex. notes this to be a very severe assault on inmate Smith and the
charge of Aggravated Assault warranted. Hex further finds a preponderance of evidence to b
that Isley Conspired with and then participated in the Assault on Smith along with inmate
Gay. H.Ex. sanctions above range as inmate Isley did conspire and then DID Participate in
assault which was very severe in nature. Isley is not believed that he has no knowledge of
assault based on the CSI identification of Isley and his actions during the assault. These
CSI's would have no reason to lie about Isley's participation and H.Ex. notes this inciden
occurred when Chow lines where returning to the block. Many inmates would be in the area a
have reason to see the assault as it occured and none would hvae called out there is an as
in progress due to not wanting to be called a "Snitch" in fear of their own safety.

Guilty # 12

| | | | |
|---|---|---|---|
| ☑ YES | ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | 90 Days D.C. effective |
| ☑ YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES ☑ |
| ☑ YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | PHOTO PACK. |
| ☑ YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | MED REPT CF5 RECOMBLETH HION |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature i dicates finished report with appendices. |
|---|---|
| C. MItchell | C. Me. SIGNATURE OF HEARING EXAMINER/COORDINATOR |

**DC-141** Rev. 6-84          **PART II B**          **COMMONWEALTH OF PENNSYLVANIA**
DISCIPLINARY HEARING REPORT                    **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Hearing Date | Hearing Time |
|---|---|---|---|---|
| Am9320 | Iskey Charles | Scm | 9-03-98 | 0900 |

**INMATE PLEA**  ☐ Guilty  ☐ Not Guilty  ☐ No Plea  ☐ Other

**Verdict**  ☐ Guilty  ☐ Not Guilty

**CHARGES**     12 (Cont'd)

**HEARING ACTION**

Pack #2

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

HEY NOTES CONTINUE HEARING TILL 9-03-98 TO AWAY HE[...]
PROPERLY DOCUMENT HIS DECISION. AFTER DOCUMENTING THE D[...]
& PRIOR TO GIVING THE DECISION HEY RECIVED A TIMELY [...]
REQUESTED 2 WITNESS BOTH ALLOWED NOTE Am9320 [...]
NOTH ABOUT WITNESSES ON 9-02-98.

SCRUGGS - WAS NOT ON THE BLOCK AT THIS TIME. E[...]
KITCHEN WORKER. IT WAS EMPOSSIBLE FOR ME TO K[...]
WHERE GAY OR ISKEY WAS. DID GET AN OTHER [...]
INVOLVMENT ON A FIGHT UNKNOW INMATE SAME AS IS[...]
I WAS LOCKED UP BECAUSE I WAS SUPPOSEDLY STA[...]
ON THE RANGE WHEN THE ASS AULT OCCURRED. SIT[...]
ME SHE HAD 10 INMATES THAT TOLD ME AS[...]
THERE. SHE THOUGHT WE DONE THIS.

GAY - I DID NOT PLAN WITH, NOR COMMIT AN ASSAULT [...]
ANOTHER INMATE WITH# Am9320 ISLEY. ISLEY & I[...]
HAD JUST COME FROM LUNCH I WENT TO MY CELL[...]
KNOW WHAT HE DID AFTER PARTIE. DID NOT ASSA[...]
ANYONE.

| | | |
|---|---|---|
| ☑ YES | ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. |
| ☑ YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. |
| ☑ YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. |
| ☑ YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. |

**SEE APPENDICES** ☐

**NAME(S) OF HEARING EXAMINER/COMMITTEE** (TYPED OR PRINTED)

Charles Mitchell

Hearing Report and all appended information must be signed. Signature [...] dicates finished report with appendices.

CRe. One.

**DC-141**
Rev. 6-84
**PART II B**
DISCIPLINARY HEARING REPORT

**COMMONWEALTH OF PENNSYLVANIA**
DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | Hearing Date | Hearing Time |
|---|---|---|---|---|
| Am 9320 | ISLEY, CHARLES | SCIR | 9-03-98 | 0900 |

| INMATE PLEA | | | | Verdict | |
|---|---|---|---|---|---|
| ☐ Guilty ☒ Not Guilty | ☐ No Plea ☐ Other | | | ☒ Guilty ☐ Not Guilty | |

CHARGES    12

HEARING ACTION

PART 3

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

HEY NOTES PREVIOUSLY DETERMINED THAT THE C...
ARE RELIABLE BASED ON THE RELIABILITY EVIDENCE PROV...
COII EATON. INMATE SUGGS NOW COMES IN AND STA...
HE WAS CHARGED WITH BEING OUTSIDE THE CELL AS W...
AS INMATE ISLEY & GAY WHEN THE ASSAULT OCCURRED. ...
STATES COII EATON TOLD HIM SITE HAD 10 CSI's...
IDENTIFIED HIM AS BEING PRESENT AT THE ASSAULT. HEY NOTES...
THE COII HAD 10 CSI's A MISCONDUCT WOULD CERTAINLY HAVE...
ISSUED. ON 9-2-98 SUGGS WAS STILL AT DIVERSIONARY STAT...
9-03-98 SUGGS IN IN GENERAL POPULATION STATUS. HEY CLEA...
DOES NOT BELIEVE THAT COII EATON HAD 10 CSTS WIT...
IDENID SUGGS AS BEING PRESENT OR A MISCONDUCT WOULD HAVE BEEN ...
HEY NOTES MANY POSSIBILITIES EXIST THAT 1. SUGGS WAS...
INVESTIGATED AS TO POSSIBLE INVOLVEMENT IN PLANNING THE...
ASSAULT, 2. POSSIBLE THAT HE WAS PRESENT AT THE ASSA...
9 COII COULD NOT GENERATE THE EVIDENCE TO ID SUGGS AS INVOL...

ISLEY CLAIMS THE CSI's TO BE UNRELIABLE...

(CONT.)

| | |
|---|---|
| ☐ YES ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. |
| ☐ YES ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. |
| ☐ YES ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. |
| ☐ YES ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. |

SEE APPENDICES
☐

NAME(S) OF HEARING EXAMINER/COMMITTEE
(TYPED OR PRINTED)

C. MOREAU

Hearing Report and all appended information must be signed. Signature...
dicates finished report with appendices.

COE

**DC-141**
Rev. 6-84

**PART II B**

DISCIPLINARY HEARING REPORT

**COMMONWEALTH OF PENNSYLVANIA**
DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | Hearing Date | Hearing Time |
|---|---|---|---|---|
| AM9320 | ISLEY, CHARLES | SCER | 0900 | 9-3-95 |

**INMATE PLEA**
☐ Guilty
☒ Not Guilty
☐ No Plea
☐ Other

**Verdict / HEARING ACTION**
☒ Guilty
☐ Not Guilty

**CHARGES**   12 comm'd

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**          PG#4

BECAUSE OF SOGC's. ISLEY NOTES THT MAY POSSIBLE
SOGC's POSSIBLE INVOLVEMENT DOES NOT RULE
THE CREDIBILITY & RELIABILITY OF THE CSI's. THE
INFORMATION IS STILL RELIABLE & BELIEVE OVER
ISLEY & HIS WITNESSES THAT MORE LIKELY THAN
AM9320 DID PARTICIPATE IN PLANNING (AS DOCUM
EARLIER) & DID ACT ON THAT PLAN BY STAB
AT THE CELL DOOR. PREPONDERANCE OF EVIDENCE
STAFF REPORT & C.S.I. IDENTIFICATION.

SANCTION ABOVE GIVEN
DUE TO SERIOUS NATURE OF
MC. & SERIOUS INJURIES TO
INMATE SMITH

GUILTY IS
90 DAYS DC
Eff 8-26.95

| | | |
|---|---|---|
| ☐ YES ☐ NO | | The inmate has heard the decision and has been told the reason for it and what will happen. |
| ☒ YES ☐ NO | | The circumstances of the charge have been read and fully explained to the inmate. |
| ☒ YES ☐ NO | | The opportunity to have the inmate's version reported as part of the record was given. |
| ☒ YES ☐ NO | | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. |

SEE APPENDICES ☐

**NAME(S) OF HEARING EXAMINER/COMMITTEE**
(TYPED OR PRINTED)

CHARLES MOTT HUN

Hearing Report and all appended information must be signed.
dicates finished report with appendices



CF 5358 Michael Smith
1850 hrs August 24, 1998



CF 5358 Michael Smith
1850 hrs August 24, 1998

## MEDICAL INCIDENT/INJURY REPORT

| PERSON INVOLVED | (Last Name) Smith | (First Name) Michael | (Middle Initial) |
|---|---|---|---|

**Reported To Dispensary:**
Date: 8.24.98
Time: 1745 PM

Male ☑ : Female ☐ : Age 28  SSN: 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

| | Inst. No. CF5358 | Housing Unit A-130 | Work Released ☐ Yes ☐ No |
|---|---|---|---|

**INMATE** ☑

Date of Incident 8-24-98   Time of Incident 12:30 ☐ A.M. ☑ P.M.   Exact Location of Incident: Bldg cell 130

**SUPERVISOR:**

**EMPLOYEE** ☐  Department _____   Job Title _____

**VISITOR** ☐  Home Address _____   Home Phone _____

**OTHER** ☐  Occupation _____   Reason for Presence at this Facility _____

Property Involved ☐ :  Equipment Involved ☐ :  Describe _____ N/A

Was person authorized to be at location of incident? ☐ Yes ☐ No

Describe Exactly What Happened. Why It Happened. Action Taken. If an Injury, State Part of Body Injured. If Property or Equipment Damaged. Describe Damage.  **1. Discription of Illness/Injury (S)** "I fell out of bed I was sleeping rolled over."

Brought to Treatment Bldg Dispensary by custody Lt Facer to be evaluated

(Continue on Reverse)

| Was Physician Notified? | Yes ☐ | No ☑ | Was Family Notified? | Yes ☐ | No ☑ |
|---|---|---|---|---|---|

Was Person Involved Seen By A Physician? Yes ☐ No ☑   Date / /   Time ___ A.M. P.M.   Where ___   Physician's Name ___

Was Person Involved Taken To A Hospital? Yes ☐ No ☑   Date / /   Time ___ A.M. P.M.   Where ___   By Whom ___

**2. Initial Impression Illness/Injury**

(O) BP 118/66 P 98 R-18 unlab Denies LOC, PERRL Neuro intact Skin wd. Color pink lungs clear all fields, o dob ⊕ABD soft BS ⊕x4 quad ⊕ N/V Right eye lid swollen lower lid, hema to on Right cheek Visual acuity O.S 20/70 O.D. 20/70 uncorrected wears Rx glasses — O.D sclera white, o blood or discharge no c/o pain behind eye, EOM intact (cat) ove

**TYPE OF INJURY**
1. Laceration ☐
2. Hematoma ☐
3. Abrasion ☑
4. Burn ☐
5. Non Apparent ☐
6. Other ☐
Specify _____

Indicate On Diagram Location of Inj



**3. Treatment Rendered:** Exam, VS, Visual acuity, Tylenol 325 mg III given Ice,

**Follow-Up** (P) S/C 8-25-98 to be eval./follow up c̄ PA-C —

Date of Report 8.24.90   Signature & Title of Person Preparing Report ___ Damota RN   Reviewing Authority ___ Ferguson RN S

**DISPOSITION AFTER TREATMENT:**

1. Return to Block
2. Place in RHU            ✓ OBAc
3. Admit to Infirmary      _____
4. Admit to Community Hospital  _____
5. Return to Work          _____
6. Refer to Physician's Line  _____
7. Refer to Family Physician  _____    (Employee)
8. Refer to Community Hospital  _____

**DISTRIBUTION:**

Original:   Medical File

Copies:   Superintendent
          Deputy for Operations    _____
          Deputy for Treatment     _____
          Major                    _____
          Security Officer         _____
          Other                    _____

**CONTINUED FROM REVERSE:**   (Items 1 through 3)   (Indicate Item).

Ⓞ. hematoma of mid/Right side forehead ⊤ open areas, upper lip between
nose/upper lip abrasion noted ⊕ bleeding noted, teeth/dent. devices
jaw pain. Abrasion Left posterior shoulder brush burn type ⊕ bleeding
abrasion Left midcalf ⊕ drainage, c/o pain c̄ palpation of areas of
Abrasions, ⊕ bony deformity noted

Ⓐ. A/t Comfort

**DC-141** **PART II B**    **COMMONWEALTH OF PENNSYLVANIA**
Rev. 6-84
DISCIPLINARY HEARING REPORT    **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from |
|---|---|---|---|---|---|
| AM9230 | Isley, Charles | SCIR | 8-31-98 | 1120 | A122000 |

| INMATE PLEA | ☐ Guilty ☐ Not Guilty | ☐ No Plea ☐ Other | Verdict | ☐ Guilty ☐ Not Guilty |
|---|---|---|---|---|

**HEARING ACTION**

CHARGES    RELIABILITY HEARING

FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

    On 8-31-98 this Examiner conducted an IN-Camera hearing with Co3 Eaton to determine the reliability of the confidential ~~of the confidential~~ sources of information utilized in this misconduct report. The reliability hearing was conducted IN-Camera because the very nature of the reliability evidence could, by itself, reveal the identity of the informants. CO3 Eaton provided this Examiner with a preponderance of evidence that the informants meet the criteria outlined under D.C.ADM 801, Reliability.

    Specifically, CO3 Eaton explained under oath <u>HOW</u> the informants were in a position to observe as well as what information they provided that was cooberated by others, and what information one provided in the past and how that information was proven to be reliable.

THE INFORMANTS MEET THE RELIABILITY CRITERIA IN D. C. ADM. 801.

| | | |
|---|---|---|
| ☑ YES   ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☑ YES   ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | |
| ☑ YES   ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | **SEE APPENDICES** ☐ |
| ☑ YES   ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| Mr. Charles Mitchell | *C. M.* |
| | SIGNATURE OF HEARING EXAMINER/COORDINATOR |

DC-141    PART II C
Rev. 6-84    HEARING SUPPLEMENT
INMATE VERSION AND WITNESS STATEMENTS

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | No. from PAR |
|---|---|---|---|
| AM9320 | Charles Isley | SCIR | A122009 |

INMATE'S VERSION

Prisoner Isley pleads not guilty to the charge for the following reasons and requests that medical/investigate and other reports be entered into evidence and included and identified on the record.

1. There is no evidence whatsoever in the report that Isley conspired with anyone or conspired to do anyth

2. There is no evidence of assault because Smith has never stated that he was assaulted but has, in fact, adamantly denied to Lt. Eaton that he was assaulted and claims he received his injuries in a fall. If Smith were lying then Eaton, the security Lt. who investigated this matter, would most assured have issued him a misconduct report for lying to an employee. Since such a report was not issued there is no evidence that an assault or conspiracy thereof occurred. Also the 24 hour limit has elap

3. The alleged "confidential source informants" are not credible. According to Eaton, as Gay and Scrugg will attest, she had well over ten informants who witnessed the alleged incident. Nonetheless, according report only two had similar stories. Two out of ten is not evidence of guilt but of innocence.

4. The alleged informants are not credible because, according to the report, they witnessed the alleged incid but did not report it to the guard at the alleged scene and did not report it to prison officials until a week later, allegedly. Moreover, if Smith went to work that day then why was not his injuries se

5. The report is patently false because, according to it, the informants positively identified Isley and Gay o Aug. 24, 1996. However, on the 26th Isley, Gay, and Scruggs all received other reports he allegedly fighting Smith and Isley and Gay did not receive misconduct reports until the 31st. It is perfectly clear from these facts that no identification could have really occurred and ergo the report is obviously false.

6. There is no physical evidence of guilt, there is no such thing as brown work gloves and it they were b gloves from commissary then they are as thin. Yet it is axiomatic that, by the physical evidence of injuries to Smith, the antagonist's hands would have been bruised, swollen, or broken. However, neither Isley, Scruggs, or Gay had any marks or injuries. Moreover, the relevant other report received were for allegedly fighting Smith revealing the fact that Smith fought against his antagonist and must have injured him. No mask or gloves were found. Commissary gloves should be inspec

7. The informants' story is absurd because: Why would Gay wear mask and gloves and Isley not Why would they go into a cell with people right outside? Why would Gay remove his mask in front of everyone? What is the identity of the mysterious prison guard in the report who saw and heard nothing and the informants failed to inform? Why did Smith not cry out for help or in pain? Why does Smith claim he was not assaulted? Why were Is Scruggs, and Gay thrown in the hole for allegedly fighting Smith if the informants only s Gay, as they claim? Since west wing just came back from lunch and the alleged incident occurred on the first level where everyone sits and hangs out until lockup, how come only people allegedly witnessed the supposed incident? Why was Lewis not found until 5:30 p

8. It is clear from the above that the report is obviously patently and intentionally false and in violation of the Pa. Crimes Code. Isley did not see or hear anything or know anything because he was not present and had nothing to do with it. It could not have occurred as

WHITE — DC-15    YELLOW — Inmate Cited    PINK — Staff Member Reporting Misconduct    GOLDENROD — Deputy Superinten

**DC-141    PART II A**
Rev. 6-84
INMATE REQUEST FOR
REPRESENTATION AND WITNESSES

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Date | Number as on |
|---|---|---|---|---|
| Am9320 | Charles Isley | SCIR | 8-31-98 | A122000 |

You have been charged with a misconduct. You may request assistance and/or witnesses to appear at your hearing b completing the section(s) below.

In order to have assistance or witnesses at your hearing, you must complete this form and present all copies to one your housing officers no later than 9:00 a.m. the first working day after you receive notice of the misconduct.

Assistance:  ☐ I do not request assistance
☐ I request assistance by _____
(The person requested must be willing to assist you)

Witnesses:    You may request witnesses in accord with DC-ADM 801. State the relevance and
importance of the testimony the witness will give.

---

1. Name of Witness:        No.        Quarters  *(If Inmate)*
   Gay            DA9752   EWAL 37
   Why is this person's testimony relevant and important?
   Material witness to facts & codefendant

**DO NOT WRITE IN THIS SECTION**
For Use by Hearing Examiner

Witness permitted? Yes. If not, why not?

---

2. Name of Witness:        No.        Quarters  *(If Inmate)*
   Scruggs        AK9691   EWAL 46
   Why is this person's testimony relevant and important?
   Material witness to facts & ex-suspect

Witness permitted? Yes. If not, why not?

---

3. Name of Witness:        No. ?        Quarters  WW  *(If Inmate)*
   Confidential Source Information 105 or 106
   Why is this person's testimony relevant and important?
   Gave false statement - simply treating prisoner Isley

Witness permitted? NO If not, why not?
TO Avow C.S.I.'s woul
IDentify BOTH TO THE INM
Whom is CItand in An Assistin-

Arrow After Hearing compl
ON 9-02-98 witnesses Auow.

*Core.*

Hearing Examiner's Signature

---

*C. Isley*
Inmate's Signature

This section to be completed by Housing Officer only
Received completed form  1716  hours  8-31-98
                          Time          Date

Housing Officer's Signature

**DC-141   PART II E**
MISCONDUCT HEARING APPEAL

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | No. from I |
|---|---|---|---|
| AM9320 | C. Isley | Rockview | A1220 |

I was found guilty of misconduct # ___A/22000___ on ___980902___ (date) by the
Hearing Committee/Examiner, and I wish to appeal that decision on the following grounds:

Check Area(s) Involved

a. The procedures employed were contrary to law,
Administrative Directive 801, or to the ICU
Consent Decree;   ☑

b. The punishment is disproportionate to the offense;   ☑

c. The evidence was insufficient to support the decision.   ☑

Below is a brief statement of the facts relevant to my claim(s). It includes the identity of all
persons who may have information which may be helpful in resolving this matter.

1. I was never present at the reliability hearing and did not even know it occurred un
I received a copy of the decision days later.

2. The hearing examiner found me guilty and sentenced me on 980902 even Though
the hearing and witnesses' testimony and my testimony did not occur until 980

3. The hearing examiner did not investigate or take into my consideration any
the issues raised in my version for me

4. There was no evidence to support the false charge because even if it were tru
the conspiracy could have been for extortion, robbery, Theft harassment, intimidation, e
No where in the report does it state that I conspired to do something and if so ho
and what was involved.

5. The punishment is beyond the guidelines.

6. There was an active conspiracy to set me up for something I did not do.

7. The CSIs are not credible.

8. The hearing examiner found that I participated in the assault even though th
is no evidence whatsoever to That effect.

9. When I informed the hearing examiner That I will see the board in January and that the
was no evidence he told me that he did not care because he can just look at a
nigger and tell he is guilty and That people like me should be killed.

WHITE—DC-15   YELLOW—Inmate

Not Logged

| FORM **DC-141**    **PART I**    **COMMONWEALTH OF PENNSYLVANIA** | **A** 121989 |
Rev. 6-84
☐ **MISCONDUCT REPORT** ☑ **OTHER**    **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| AM-9320 | Isley, Charles | SCIR | 1800 | 8-26-98 | 8-26-98 |

| Quarters | Place of Incident |
|---|---|
| AA/1045 | N/A |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

Other - Not A Misconduct

**STAFF MEMBER'S VERSION**

Inmate temporarily placed
in DA/Ac pending investigation
of possible involvement of a fight

6    9-3-98

**IMMEDIATE ACTION TAKEN AND REASON** — Inmate Confined to Bldg D Sec AA
Pending Investigation.

**PRE-HEARING CONFINEMENT**

| | IF YES | |
|---|---|---|
| | TIME | DATE |
| ☐ YES ☐ NO | 1815 | 8/26/98 |

☐ **REQUEST FOR WITNESSES AND REPRESENTATION**    **FORMS GIVEN TO INMATE**    ☐ **INMATE'S VERSION**

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY    SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN |
|---|---|---|
| | | DATE | TIME 24 HOUR |
| S.L. Barnes COII | H. Ceuleur COIV | 8-26-98 | 2010 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | Misconduct Category | Signature of Person Serving Not |
|---|---|---|
| DATE    TIME | ☐ CLASS I    ☐ CLASS 2 | Kev Hemk CO |
| Other | | |

**NOTICE TO INMATE**

You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you s
will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the heari
committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are fou
guilty of a Class I misconduct, any pre-release status you have may be revoked.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,                    :

      **Plaintiff**                    :

      v.                    :    No. 1:00-CV-00577

W. CONWAY BUSHEY, <u>et al.</u>,                    :

      **Defendants**                    :


## <u>UNSWORN DECLARATION OF RICHARD SPAIDE</u>

I, **RICHARD SPAIDE**,  hereby declare under the penalty of perjury that the following is true and correct based upon my personal knowledge:

1.    I am currently employed by the Pennsylvania Department of Corrections ("DOC") as a Corrections Unit Manager at State Correctional Institution Mahanoy ("SCI-Mahanoy") in Frackville, Pennsylvania.   I have been employed by the DOC for 15 years. At the time relevant to this complaint I was a Unit Manager of modular unit "I", at SCI-Mahanoy.

2.  As Unit Manager, I had overall responsibility for the management of the modular units.  I was part of the management team that included the corrections officers, therapists and counselors that worked on the unit. On occasion, I sit on the SCI-Mahanoy Program Review Committee, reviewing misconduct report appeals.

5.   In December of 1998, Iseley's appealed Misconduct Report No. A110205 to the Program Review Committee, ("PRC").   While I do not recall my actual review of the misconduct, attached as Exhibit "A" is a copy of the PRC decision and rationale, which contains my signature as well as the other members of the PRC who reviewed Iseley's appeal.  (See Exhibit "A" attached).

6.        According to the report, the PRC reviewed the available information concerning the misconduct, including the report of the Unit Manager Chesney, the findings of the hearing examiner and Iseley's appeal.  The PRC sustained the hearing examiners decision. (Id.)

7.   The PRC decision to sustain the hearing examiner's decision regarding Misconduct Report No. A 110205 was based upon the review of the relevant documentation, evidence, reports and documentation.    The PRC decision was not based upon any discriminatory or retaliatory motive.

6-8-01
**DATE**

**RICHARD SPAIDE**

**EXHIBIT "A"**

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

DC-141 Part III
Program Review Committee
__X__ Misconduct Appeal            _____ Periodic Review            _____ Other

| DC Number AM9320 | Name Isley, Charles | Institution SCI Mahanoy | Date of Review 12/30/98 | Misconduct # A110205 |
|---|---|---|---|---|

PROGRAM REVIEW COMMITTEE'S DECISION AND ITS RATIONALE

Inmate Isley appeals based on:

a.    The procedures employed were contrary to law, Administrative Directive 801, or to the ICU Consent Decree;

c.    The evidence was insufficient to support the decision.

The PRC has reviewed the available information concerning this misconduct including the report of Unit Manager Chesney, the findings of the Hearing Examiner, and inmate Isley's appeal.

Inmate Isley appeals that procedures employed were contrary to law, ADM 801, or the ICU Consent Decree. PRC finds nothing to support this appeal.

Inmate Isley also appeals that evidence was insufficient to support the decision. PRC notes that there was no new legitimate evidence to indicate a change of the Hearing Examiner's decision.

DECISION RELATIVE TO HEARING EXAMINER'S VERDICT
___ Not Applicable  _X_ Sustain  ___ Amend  ___ Refer Back for Further Study  ___ Exonerate

| Names of Program Review Committee | Signatures | Date |
|---|---|---|
| Marva Cerullo, CHCA | *Marva Cerullo* | 12/31/98 |
| Robert Yarnell, Food Services Manager | *Robert Yarnell* | 12/31/96 |
| Richard Spaide, Unit Manager | *[signature]* | 12-31-98 |

FORM **DC-141**   **PART I**   **COMMONWEALTH OF PENNSYLVANIA**    **A** 110205
Rev. 6-84

☒ MISCONDUCT REPORT ☐ OTHER   **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| AM9320 | Isley, Charles | SCI MAH | 1420 | 12/14/98 | 12/14/98 |

| Quarters | Place of Incident |
|---|---|
| JA1015 | Unit Managers Office |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION** Class 1, b, 7 Refusing to Obey an Order
Class 1, C, 22 Using Abusive or Obscene Language to an Employee

**STAFF MEMBER'S VERSION** Inmate Isley, AM9320 came to my office to ask permission to go to commissary because he had no money on his account on Friday. I told him no and he became argumentative. I ordered him to leave my office. He continued to argue with me and began using obscene language "you let these other mother fuckers go. Why the fuck can't I go." I again ordered Mr. Isley to leave my office. He then looked at me and said "your a real goofball." I ordered him a third time to leave my office. He finally complied.

AK

**IMMEDIATE ACTION TAKEN AND REASON** Continue present status pending Further Action by the Hearing Examiner.

**PRE-HEARING CONFINEMENT**

| | IF YES | |
|---|---|---|
| | TIME | DATE |
| ☐ YES ☒ NO | N/A | N/A |

**FORMS GIVEN TO INMATE**
☒ REQUEST FOR WITNESSES AND REPRESENTATION   ☒ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY   SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| | | DATE | TIME 24 HOUR BASE |
| Thomas Lanny U.M. | COW H. Ber | 12-14-98 | 1730 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | Misconduct Category | Signature of Person Serving Notice |
|---|---|---|---|
| DATE | TIME | ☒ CLASS 1  ☐ CLASS 2 | Co' D. Leachey LEACHE |
| 12/16/98 | 0800 | | |

**NOTICE TO INMATE**
You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class I misconduct, any pre-release status you have will be revoked.

12/16/

**DC-141**  **PART II A**      **COMMONWEALTH OF PENNSYLVANIA**
Rev. 6-84                           **DEPARTMENT OF CORRECTIONS**
**INMATE REQUEST FOR**
**REPRESENTATION AND WITNESSES**

| DC Number | Name | Institution | Date | Number as on Par |
|---|---|---|---|---|
| Am 9320 | IsLey, CharLes | SCI MAH | 12-14-98 | A110205 |

You have been charged with a misconduct. You may request assistance and/or witnesses to appear at your hearing by completing the section(s) below.

In order to have assistance or witnesses at your hearing, you must complete this form and present all copies to one of your housing officers no later than 9:00 a.m. the first working day after you receive notice of the misconduct.

Assistance:  ☐ I do not request assistance
             ☐ I request assistance by _____
             (The person requested must be willing to assist you)

Witnesses:   You may request witnesses in accord with DC-ADM 801. State the relevance and
             importance of the testimony the witness will give.

|  | DO NOT WRITE IN THIS SECTION<br>For Use by Hearing Examiner |
|---|---|
| **1. Name of Witness:**   No.   If Inmate   Quarters<br>2-10 Sgt on JA on 9812 14<br>Why is this person's testimony relevant and important?<br>*Involved in incident alleged* | Witness permitted?   If not, why not?<br>*Denied inadequate reguaats none of the Staff were Present at time & Place of incident* |
| **2. Name of Witness:**   No.   If Inmate   Quarters<br>C.O. Sausser<br>Why is this person's testimony relevant and important?<br>*Involved in incident alleged* | Witness permitted?   If not, why not? |
| **3. Name of Witness:**   No.   If Inmate   Quarters<br>C.O. Leachey<br>Why is this person's testimony relevant and important?<br>*Involved in incident alleged* | Witness permitted?   If not, why not? |

_C. Isley_
Inmate's Signature

This section to be completed by Housing Officer only
Received completed form  0755  hours  12/15/98
                          Time         Date

_Sausson_
Housing Officer's Signature

_Breon_
Hearing Examiner's Signature

**DC-141**
Rev. 6-84

**PART II B**
**DISCIPLINARY HEARING REPORT**

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | | Institution | Hearing Date | Hearing Time |
|---|---|---|---|---|---|
| AM9320 | Isley | | SCImah | 12/16/98 | 1845 |

**INMATE PLEA**
☐ Guilty
☒ Not Guilty
☐ No Plea
☐ Other

**CHARGES** B#7  C#22

**Verdict**
☒ Guilty
☐ Not Guilty

**HEARING ACTION**

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

Hrg Believes officer's/Unit Mgr's Report over Inmates Plea and Version - Hrg Notes he never really addresses the issue But deals with the Pretense of retaliation his filing grievances etc. Hrg Believes Isley did refuse orders to leave Unit Mgr office after being told "No" to his request for Commissary Pass to Shop after the Block's Scheduled Day. Hrg Believes repeated orders were issued Prior to Inmate finally complying and leaving the office.

Sanction;
30 Days DC
7/ 12/16/98

☒ YES    ☐ NO    The inmate has heard the decision and has been told the reason for it and what will happen.

☒ YES    ☐ NO    The circumstances of the charge have been read and fully explained to the inmate.

☒ YES    ☐ NO    The opportunity to have the inmate's version reported as part of the record was given.

☒ YES    ☐ NO    The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review.

Witness For
Version For

**SEE APPENDICES** ☒

**NAME(S) OF HEARING EXAMINER/COMMITTEE**
(TYPED OR PRINTED)

K. Brown

Hearing Report and all appended information must be signed. Si...
...icates finished report with appendices

**DC-141    PART II C**
Rev. 6-84    HEARING SUPPLEMENT
INMATE VERSION AND WITNESS STATEMENTS

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| DC Number | Name | | Institution | No. from PART I |
|---|---|---|---|---|
| Am 9320 | Isley, Charles | | SCI MAH | A110205 |

**INMATE'S VERSION**

Prisoner Isley pleads not guilty to both charges. He never used any abusive or obscene language and was never ordered to leave the office (even if he were, There is no evidence to support the charge of refusing to obey an order since the false misconduct report clearly states that he complied with the order).

On the date in question prisoner Isley asked Chesney to go to commissary since it was make up day because he was just transferred to this prison (and his money had only just arrived on thursday. However, Chesney denied the request stating that the only excuse for not going on friday is being on a visit. When Isley pointed out that he was aware of the fact Chesney had permitted other prisoners to do that day without any valid excuse Chesney stated "So what. You like filing grievances. You like filing lawsuits. I guarantee you won't be in my block much longer. You're a troublemaker. You should never have been released from the RHU... Prisoner Isley just left as Chesney continued talking and subsequently asked prison guard Heachey (and the 2-10 p.m. Sgt if he could go to the store. Isley asked Sausser, Chesney Heachey, and the Sgt in that order.

The testimony of the prison guards will reveal that at no time was Isley disrespectful or argumentative to any of them request

Prisoner Isley wishes for the two grievances and he filed against Chesney to be offered into evidence and in the record as well as the list of inmates who went to commissary on 9/12/4 from VA. It is a fact that one prisoner (Riggins) got out of the hole on saturday and was permitted to go to commissary as well as laundry workers whose pay wasn't on friday.

It is perfectly clear from the facts that Chesney fabricated the false charges against Isley in retaliation for his filing Grievances/lawsuits in order to have Isley thrown in the hole and denied parole (he is scheduled to see the board in February).

In essence, there is no evidence to support the charge of refusing to obey an order because even if the false report were true it cleary states that Isley complied. There is no evidence to support the charge of using abusive or obscene language because the preponderance of the evidence clearly shows that Isley spoke to other prison guards — before and after Chesney — and made no such statements and was not argumentative and the evidence of retaliation against Isley from Chesney clearly shines from the grievances and request that the charges are utterly false. Lastly, Isley is a black man from Philly. He would have said nothing but football" and, in any event, the alleged statement is neither abusive or obscene.

981228

**DC-141    PART II E    COMMONWEALTH OF PENNSYLVANIA**
MISCONDUCT HEARING APPEAL    DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | No. from PART |
|---|---|---|---|
| AM-9320 | C. Isley | Mahanoy | A110205 |

I was found guilty of misconduct # A110205 on 98/2/6 (date) by the
Hearing Committee/Examiner, and I wish to appeal that decision on the following grounds:

Check Area(s) Involved

a. The procedures employed were contrary to law, Administrative Directive 801, or to the ICU Consent Decree;  [✓]

b. The punishment is disproportionate to the offense;  [ ]

c. The evidence was insufficient to support the decision.  [✓]

RECEIVED DEC ? ? 1998 Deputy Superintendent Central Services

Below is a brief statement of the facts relevant to my claim(s). It includes the identity of all persons who may have information which may be helpful in resolving this matter.

1. There was no evidence to support the charge. The false and retaliatory report clearly states that I complied with the alleged order.

2. The H.E. was biased. This is clear and obvious in the fact that he did not take my defense into consideration at all. It is a fact that it was makeup day for commissary for my block (actually the entire prison) and that other prisoners went on the day in question. Despite these facts, the H.E. erroneously and intentionally ruled that the day in question was not a normally scheduled makeup commissary day for my block. He also did not consider any of the facts which established that the report was retaliatory in nature and utterly false.

3. The H.E. refused to allow me to offer any evidence (documents, etc.) to support the defense of a fabricated and false retaliatory report.

4. The H.E. refused to call any of my witnesses.

5. The H.E. erroneously ruled that I never addressed the incident but my written version pellucidly reveals that he is a vicious liar and just refused to even take my written version into account.

6. The H.E.'s blatant bias is evident in the fact that he ruled that I complied with the order but he still found me guilty. He did so in order to cover for Chesney and to keep me in prison for several more years for nothing.

7. The H.E. ruled that I refused "orders" but never states which one and, in any event, ruled that I complied.

8. Chesney and the H.E. have violated my rights by retaliating against me for filing grievances/lawsuits and the H.E. blatantly violated my hearing rights.

WHITE—DC-15    YELLOW—Inmate

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,                          :
                                         :
        Plaintiff                        :
                                         :
        v.                               :         No. 1:00CV-00577
                                         :
W. CONWAY BUSHEY, et al.,                :
                                         :
        Defendants                       :

## UNSWORN DECLARATION OF JAMES UNELL

I, **JAMES UNELL,** hereby declare under the penalty of perjury that the following

is true and correct based upon my personal knowledge:

1.      I am currently and at all times relevant to the allegations in the complaint,

employed by the Pennsylvania Department of Corrections ("DOC") Corrections

Classification and Program Manager at State Correctional Institution Mahanoy ("SCI-

Mahanoy") in Frackville, Pennsylvania.

2.      As Corrections Classification and Program Manager, I supervise Department

Heads Centralized Services Area, Records, Chaplain, Inmate Employment, Drug and

Alcohol Treatment, Activities, Education and Psychology.  Also, I am a regular member

of the Program Review Committee.

3.    In January, 1999, I received a copy of Inmate Grievance No. MAH 002-99, from the Grievance Coordinator.  After a review of Iseley's grievance, I spoke to Iseley in the Restricted Housing Unit regarding the grievance.  Iseley admitted to me that Mr. Dennison did not introduce himself as a Parole Board Member; rather it was only his assumption.   (See Exhibit "A" attached).

4.    I also interviewed Mr. Youron, Chief Psychologist who informed me that in December, 1998, Iseley wrote him and requested that his consent be revoked and that the original document be returned to him.   I learned that Youron wrote back to Iseley and informed him that his consent was revoked, and returned the original document to him. (Id.)

5.    At the January 14, 1999, meeting, Iseley admitted to me that he did receive the original document.  I also checked Iseley's DC014 (Treatment file) and an entry was made indicating that Iseley revoked his consent.   (Id)

6.    After I addressed Iseley's grievance, I recommended no further action be taken regarding this grievance to the Grievance coordinator.  Iseley received a copy of my initial review of the grievance.  (Id)

_June 8, 2001_                    _James Unell_
**DATE**                         **JAMES UNELL**

**EXHIBIT "A"**

**DC-135A**

RECEIVED
JUN 25 1999
SUPT    OFFICE

**INMATE'S REQUEST TO STAFF MEMBER**

**COMMONWEALTH OF PENNSYLVANIA**

**DEPARTMENT OF CORRECTIONS**

**INSTRUCTIONS**

Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.

| 1. TO: (NAME AND TITLE OF OFFICER) Dragovich, warden | 2. DATE 990123 |
|---|---|

| 3. BY: (INSTITUTIONAL NAME AND NUMBER) C. Isley AM-9320 | 4. COUNSELOR'S NAME Nil |
|---|---|

| 5. WORK ASSIGNMENT Nil | 6. QUARTERS ASSIGNMENT IB-16 |
|---|---|

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE.   GIVE DETAILS.

I wish to appeal grievances MAH-0002-99 and MAH-0011-99. The former is appealed because Dennison misrepresented himself to me and told me that I had to sign the form to be reviewed for parole — which was not true. Unell did not explain anything to me save for that the parole board and prison ~~men~~ will draw negative inferences from my refusal. The psychology staff did not tell me anything as the only one I saw was Dennison. You should have informed the board why I refused to sign.

The latter grievance is appealed because I asked Cerillo the proper procedure to follow for the relevant referrals to be procured. However, she told me that they could not. Now she says something different. I have already signed up for sick call and was told I would be placed on the list to see the optometrist and ophthalmologist (I was scheduled to see an ophthalmologist in February at Rockview prison). I do not believe the grievance should have been sent to her since it was filed on her.

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

☐ TO DC-14 CAR ONLY                    ☐ TO DC-14 CAR AND DC-15 IRS

| STAFF MEMBER | DATE |
|---|---|

**DC-804**
**PART II**

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

SCI MAHANOY
RECEIVED

JAN 0 6 1999

INMATE PROGRAM MANAGER

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO.    **MAH-0002-99**

| TO: (Name & DC NO.)<br>**ISLEY, CHARLES AM-9320** | INSTITUTION<br>**SCI-MAHANOY** | QUARTERS<br>**RHU** | GRIEVANCE DATE<br>**1/06/99** |
|---|---|---|---|

The following is a summary of my findings regarding your grievance:

This is in response to Grievance No. MAH-0002-99. I note that I spoke with you at length regarding this grievance in our meeting in the RHU on 1/14/99. I note the following: You acknowledged during our meeting that Mr. Dennison did not introduce himself as a Parole Board member. It was your assumption that he worked for the PBPP. You are now well aware that he is a Psychological Services Associate and a member of the Psychology Department. It is noted that Mr. Dennison presented a mental health informed consent document to you on 12/17/98. At that time you decided to sign the form after it was reviewed. On 12/24/98 you wrote a request to Mr. Youron, Chief Psychologist requesting that your consent be revoked and that the original document be returned to you. In response to your request slip, dated 12/24/98, Mr. Youron wrote back to you and informed you that your consent was, in fact, revoked. You acknowledged to me on 1/14/99 that you did receive the original document. Also, I note that a DC-14 entry was made indicating that you had revoked your consent. Be informed then, that at this point in time, we do not have your consent regarding the mental health informed consent policy/document. In accordance with the policy 7.3.1, I cautioned you that recipients of the reports (e.g.: staffing committees and the Parole Board) "may draw negative inferences" from your refusal. The psychology staff also gave you such counsel. I also explained to you the significance of your refusal and the impact of it. I remind you also that you may decide to give your consent at a later point in time. You stated that you fully understood our conversation. You also stated that you still wish to refuse to sign the mental health informed consent document.

In that all of the elements of your grievance have been fully addressed, I recommend no further action regarding this grievance.

rh/

cc:  Deputy Klem
     Mr. Youron
     Mr. Dennison
     file

Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures.

SIGNATURE OF GRIEVANCE Officer
*James Unell*

DATE
1/14/99

C-804
RT 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA. 17001-0598**

SCI MAHANOY
RECEIVED

JAN 0 6 1999

INMATE PROGRAM MANAGER

FICIAL INMATE GRIEVANCE

GRIEVANCE NO. MAH-0002-99

| D: GRIEVANCE COORDINATOR Dotter | INSTITUTION Mahanoy | DATE 990103 |
|---|---|---|
| IOM: (Commitment Name & Number) C. Isley AM-9320 | INMATE'S SIGNATURE C. Isley | |
| ORK ASSIGNMENT Nil | QUARTERS ASSIGNMENT RHU C-9 | |

**ISTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

Brief, clear statement of grievance:

A person by the name of Dennison misrepresented himself to me in order to trick me into signing the Mental Health Informed Consent Document. He stated that I had to sign it to be evaluated for parole pursuant to the "Austin" litigation. I have since ascertained that he is not employed by the parole board and that I was not required to sign anything for parole evaluation. Consequently, I want the original of the document and any and all copies as I do not give permission for anything and my signature is invalid as it was attained illegally

Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff
Staff contacted: Brown, Yourcon

ur grievance has been received and will be processed in accordance with DC-ADM 804.

C. Dotter                                                    1/4/99

Signature of Grievance Coordinator                          Date

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,           :

       Plaintiff         :

                     :

       v.              :      No. 1:00-CV-00577

                     :      (Judge Kane)

W. CONWAY BUSHEY, et al.,    :

                     :

      Defendants      :

## UNSWORN DECLARATION OF
## TERRY WHITMAN

I, **Terry Whitman,** hereby state under penalty of perjury that the following is true and correct and based upon my personal knowledge:

1.    I am presently employed by the Commonwealth of Pennsylvania, Department of Corrections ("DOC") as one of the Deputy Superintendents of the State Correctional Institute at Rockview ("SCI-Rockview"). I have held this position since July, 1995. In addition, I have been employed by the DOC for twenty-nine years.

2.    As Deputy Superintendent for Centralized Services, my duties and responsibilities include overseeing and supervising various departments of the prison, including but not limited to the culinary department, correctional industries, the records department, activities staff, the drug and alcohol staff, psychological and medical

department and the religious programming.  In addition, I am a member of the prison's Program Review Committee.

3.As Deputy Superintendent for Centralized Services, I am a member of SCI-Program Review Committee ("PRC").  As a member of the PRC I review inmates appeals concerning their misconducts, and have occasion to interview inmates who are housed in disciplinary custody in the Restricted Housing Unit ("RHU").

4.     While at SCI-Rockview, inmate Charles Iseley's prescriptive program plan recommended education and vocational programming, drug and alcohol programming and therapeutic community unit programming.  The plan also recommended that Iseley remain misconduct free.  (See Exhibit "A" attached.).

5.     As a member of the PRC, I received Iseley's appeal of Misconduct No. A122000, Conspiracy to Commit Aggravated Assault, on September 10, 1998.

6.     Members of the PRC who received Misconduct No. A122000 where Deputy Superintendent David Wakefield and Classification and Program Manager Gregory Gaertner and myself  (Id.)

7.     As a member of the PRC, I thoroughly reviewed the misconduct report, the hearing examiner's report and the information and documentation regarding the reliability hearing.  I also reviewed Iseley's version, the issues he raised  in the appeal and the various documentation associated with the hearing.

-2-

8.     I reviewed the hearing examiner's finding based upon the reliability of the investigation of Lt. Eaton and the reliability of the confidential source of information.

9.     The PRC further noted the extensive documentation that the hearing examiners efforts to afford Iseley the opportunity to defend himself.  The PRC also noted Iseley's allegation of a racial statement by Mitchell and recommended further investigation.

10.    Upon thorough review of the documentation and information regarding Misconduct No. A122000, the PRC sustained the hearing examiner's decision in full.

11.    The PRC's decision to sustain the hearing examiner's decision regarding Misconduct No. A122000 was based  review of the relevant documentation, evidence, reports and information.

_____                      _____
**Date**                                          **TERRY WHITMAN**

-3-

Case 1:00-cv-00377-YK-DB    Document 93    Filed 06/15/2001    Page 222 of 350

6/1/01
**Date**

TERRY WHITMAN

**EXHIBIT "A"**

MAY-25-00 THU 11:15                                                            P. 02

**DC-43**                          COMMONWEALTH OF PENNSYLVA ns
**PRESCRIPTIVE PROGRAM PLAN**              Department of Corrections

| DC NUMBER | NAME | INSTITUTION | DATE INITIATED |
|---|---|---|---|
| AM 9320 | Isley, Charles W | SCIR | 9/26/97 |

AREAS OF CONCERN

( ) Mental Health     ( ) Physical          (X) Assaultiveness
( ) Vocational        (X) Drug              ( ) Sexual
( ) Academic          (X) Alcohol           ( ) Escape
( ) Other

**RECOMMENDED ACTIONS**
(The following is a list of suggested programs and/or kinds of behavior which may help you with the weakness and/or problem areas):

1. Remain Misconduct free

2. Education (MR. Rossman)

3. Vocational Training (MR. Coffman)

4. Drug/Alcohol Evaluation - Therapy as prescribed (see your counselor)

5. TCU - (see your counselor)

6. Maintain contact with your counselor

_____                          Refuso To Sign
Signature of Staff Member                        Signature of Inmate

Tentative Progress Review (date) _12/97_

**RESULTS ACHIEVED** or reasons for lack of results

- Misconduct Free.
- None for Ed or Voc
- No D&A
- No TCU
- Has Not maintained contact with staff.

_____        _d-1-98_         No Show
Signature of Staff Member      Date Reviewed     Signature of Inmate

The two lists are not all inclusive and may change over time. Additional weaknesses and/or problem areas may be un-covered. Weaknesses and/or problem areas may be overcome or reduced in importance. Programs may be completed or additional programs may be indicated. These lists can and should be reviewed periodically to account for any pro-gress or lack of progress. You should request a review through your Counselor to discuss any changes and to keep your prescriptive program current.
While all participation in all programs is strictly voluntary, progress or lack of progress in dealing with weaknesses and/or problem areas will be one of the factors taken into consideration for all actions requiring staff support such as recom-mendations for program level changes, job changes, pre-release, commmutation, and parole.

MAY-25-00 THU 11:17

| DC-43 | COMMONWEALTH | P. 03 |

**PRESCRIPTIVE PROGRAM PLAN** — Department of Corrections

| DC NUMBER | NAME | INSTITUTION | DATE INIT |
|---|---|---|---|
| Am 9320 | Charles Isley | Roc | 4-1- |

AREAS OF CONCERN
( ) Mental Health    ( ) Physical    (✓) Assaultiveness
(✓) Vocational    (✓) Drug    ( ) Sexual
( ) Academic    (✓) Alcohol    ( ) Escape
( ) Other

**RECOMMENDED ACTIONS**
(The following is a list of suggested programs and/or kinds of behavior which may help you with the weakness and problem areas):

- Remain Misconduct Free
- Ed/Voc programming
- D&A programming
- TCU programming

R_____ CC    Signature of Staff Member

No Show    Signature of Inmate

Tentative Progress Review (date) _4-1-99_

**RESULTS ACHIEVED** or reasons for lack of results

Signature of Staff Member        Date Reviewed        Signature of Inmate

The two lists are not all inclusive and may change over time. Additional weaknesses and/or problem areas may be uncovered. Weaknesses and/or problem areas may be overcome or reduced in importance. Programs may be completed or additional programs may be indicated. These lists can and should be reviewed periodically to account for any progress or lack of progress. You should request a review through your Counselor to discuss any changes and to keep your prescriptive program current.
While all participation in all programs is strictly voluntary, progress or lack of progress in dealing with weaknesses and/or problem areas will be one of the factors taken into consideration for all actions requiring staff support such as recommendations for program level changes, job changes, pre-release, commmutation, and parole.

WHITE—DC-15        YELLOW—Inmate After Progress Review        PINK—Other        GOLDENROD—Inmate When Initiat

**EXHIBIT "B"**

| SCIR-141 III<br>[ X ] MISCONDUCT APPEAL  [ ] PERIODIC REVIEW  [ ] OTHER | COMMONWEALTH OF PENNSYLVANIA<br>DEPARTMENT OF CORRECTIONS | | | |
|---|---|---|---|---|
| DC NUMBER<br>AM9320 | NAME<br>Charles Isley | INSTITUTION<br>ROC | DATE OF REVIEW<br>09-10-1998 | NO. FROM PART<br>A122000 |

## PROGRAM REVIEW COMMITTEE'S DECISION AND ITS RATIONALE

Mr. Isley was found guilty on 09-03-1998 of a Class I-B #12, Violation of PA Crimes Code not in Category I, 903 Criminal Conspira to commit aggravated assault. He received a sanction of ninety (90) days disciplinary custody. He is now appealing the Hearing Examiner decision based upon his belief that the procedures employed were contrary to law or Administrative Directive 801, the punishment disproportionate to the offense, and the evidence was insufficient to support the decision.

In his appeal, Mr. Isley states that he was not present at the Reliability Hearing and did not know it occurred until later when he receiv his copy. He also states that he was sentenced on September 2 even though his testimony did not occur until September 3. He also states the Hearing Examiner did not take into consideration his issues and, in fact, does not believe there is sufficient documentation to supp the charge or the decision. He also notes the punishment is beyond the guidelines and that there is a conspiracy to set him up. He sta the confidential informants were not credible. Finally, he states that the Hearing Examiner was racially prejudiced.

In reviewing Mr. Isley's appeal as well as various documentation associated with the proceedings, PRC notes that the Hearing Examine conducted the Reliability Hearing and provided a sanction, which was beyond the guidelines but met Administrative Directive 801 polic The Hearing Examiner can provide a sanction beyond the presumptive range provided he give a rationale, which in this case was based the extent of injury to the victim which was verified through a medical report. The final basis for the decision was the credibility of t investigation of Lt. Eaton, including the reliability of the CSIs over Mr. Isley and his witnesses. Such a determination is within the purvi of the Hearing Examiner and sufficient basis for a decision of guilt. PRC notes that the Hearing Examiner did conduct a hearing on 09-0 1998 with Mr. Isley in which he took testimony from Mr. Isley. At that time, there was no Witness Form available nor was there a indications noted from Mr. Isley that witnesses were involved. The Hearing Examiner did continue processing his Findings of Fact and arrive at a verdict. However, before giving the actual verdict, a Witness Form which was properly executed came to the Hearing Examine attention. At that time, he decided to continue the hearing to take additional testimony from Mr. Isley and his two witnesses. Mr. Isl did request the CSIs, however, they were not allowed. In taking additional testimony on 09-03-1998, the Hearing Examiner expanded h Findings of Fact. However, he did come to the same conclusion that Mr. Isley did participate as a conspirator in the aggravated assault Michael Smith. Again, the evidence used to support the Hearing Examiner's decision was within the guidelines of Administrative Directi 801.

Mr. Isley also noted possible racial prejudice in an alleged statement made by Mr. Mitchell at the hearing. While PRC does not condo any such statements and is recommending further investigation of this by Security staff, there is extensive documentation that the Heari Examiner afforded Mr. Isley the opportunity to defend himself within the 801 guidelines. Furthermore, the Hearing Examiner also w intent on carrying out such guidelines in the conduct of the initial hearing and the continuation to hear additional testimony. Mr. Isley w not found guilty on 09-02-1998. He was found guilty on 09-03-1998. He was provided all the information as per the 801 guidelines. PR sustains the Hearing Examiner's decision in full.

| DECISION RELATIVE TO HEARING COMMITTEE'S VERDICT<br>[ ] NOT APPLICABLE   [ X ] SUSTAIN   [ ] SUSTAIN-AMEND   [ ] REFER BACK FOR FURTHER STUDY   [ ] EXONERATE INMATE | | |
|---|---|---|
| NAMES OF PROGRAM REVIEW COMMITTEE MEMBERS | SIGNATURES | DATE |
| D. J. Wakefield | *D.J.Wkfd* | 9-10-88 |
| T. L. Whitman | *T.L.Witt* | 9/10/98 |
| G. P. Gaertner | *G.P.Gaertner* | 9/10/9 |

R.W. M,    9-11-98

ORIGINAL - DC-15    COPY 2 - Inmate Cited    COPY 3 - Staff Member Reporting Misconduct    COPY 4 - Deputy Superintendent

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,                           :
                                          :
    Plaintiff                      :
                                          :
    v.                             :        No. 1:00CV-00577
                                          :        (Judge Kane)
W. CONWAY BUSHEY, et al.,                  :
                                          :
    Defendants                     :


## UNSWORN DECLARATION OF ROBERT YARNELL

I, **ROBERT YARNELL**, hereby declare under the penalty of perjury that the following is true and correct based upon my personal knowledge:

1.    I an currently employed by the Pennsylvania Department of Corrections, ("DOC") as the Correctional Food Service Manager at State Correctional Institution Mahanoy ("SCI-Mahanoy") in Frackville, Pennsylvania. I have been employed by the DOC for 14 years. At the time relevant to this complaint I was a Correctional Food Service Manager.

2.    As Food Service Manager, I am responsible for the overall operation of the Food Service Department at SCI-Mahanoy, which includes but is not limited to planning menus, supervision of employees, food handling and sanitation. On

occasion, I sit on the SCI-Mahanoy Program Review Committee, reviewing misconduct report appeals.

3.      As Food Service Manager, I am aware that some inmates elect to eat the protein menu substitute rather than what is provided on the master menu, for religious reasons. DC-ADM 819-3 provides that an exception to the master menu can be made for religious reasons. Inmates at SCI-Mahanoy who wish to receive the alternate protein menu for religious reasons simply submit a request slip to the Food Services Department. If an inmate is not on a any particular prescribed diet, he is permitted to receive the alternate protein menu.

4.      In December of 1998, I was contacted by Carol Dotter, Grievance Coordinator at SCI-Mahanoy to review an Inmate Grievance submitted by Charles Iseley. After I received the Grievance , I checked my records and could not locate any request from Iseley requesting the protein alternative. I responded to Iseley's Grievance on January 4, 1999 and advised him that if he will be allowed to receive the protein alternative, if he signs up for the program. (See Exhibit "A" attached)

5.      In December of 1998,  Iseley's appealed Misconduct Report No. A110205, Refusing To Obey an Order, Using Obscene Language, to the Program Review Committee, ("PRC").   While I do not recall my actual review of the misconduct, attached as Exhibit "B" is a copy of the PRC decision and rationale,

-2-

which contains my signature as well as the other members of the PRC who reviewed Iseley's appeal.  (See Exhibit "B" attached).

6.    According to the report, the PRC reviewed all the available information concerning the misconduct, including the report of the Unit Manager Chesney, the findings of the hearing examiner and Iseley's appeal.  The PRC found nothing to support Iseley's appeal and therefore sustained the hearing examiners decision. (Id.)

7.    My decision to sustain the hearing examiner's decision regarding Misconduct Report No. A 110205 was based upon the review of the relevant documentation, evidence, reports and documentation.

_6/11/01_
**DATE**

_Robert Yarnell_
**ROBERT YARNELL**

**EXHIBIT "A"**

DC-804
PART 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA. 17001-0598**

**OFFICIAL INMATE GRIEVANCE**

GRIEVANCE NO. MAH-0479-98

| TO: GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| Dotter | Mahanoy | 981226 |
| FROM: (Commitment Name & Number) | INMATE'S SIGNATURE | |
| C. Isley AM-9320 | C. Isley | |
| WORK ASSIGNMENT | QUARTERS ASSIGNMENT | |
| N/A | RHU C-9 | |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance:

I do not eat pork and wish to know why I am not permitted to receive the alternate when pork is served.

Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted staff.
Staff contacted: Dotter, Yarnell (illogical response.)

Your grievance has been received and will be processed in accordance with DC-ADM 804.

C. Dotter
Signature of Grievance Coordinator

12/28/98
Date

DC-804
PART II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO.   MAH 0479-98

| TO: (Name & DC NO.)<br>Charles Isley  AM9320 | INSTITUTION<br>SCI Mahanoy | QUARTERS<br>RHU | GRIEVANCE DATE<br>12/26/98 |
|---|---|---|---|

The following is a summary of my findings regarding your grievance:

Mr. Isley, you will be allowed to receive the protein alternative, if you sign up for the program.  If you were medically approved, you would receive the alternate protein for both the dinner and supper meals.

cc:    Deputy Klem
       Grievance Coordinator
       Records
       File

| Refer to DC-ADM 804. Section VIII,<br>for instructions on grievance<br>system appeal procedures. | SIGNATURE OF GRIEVANCE OFFICER<br><br>C. Robert Yarnell<br>Food Service Manager | DATE<br>1/4/99 |
|---|---|---|

**EXHIBIT "B"**

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

DC-141 Part III
Program Review Committee

__X__ Misconduct Appeal     ___ Periodic Review     ___ Other

| DC Number AM9320 | Name Isley, Charles | Institution SCI Mahanoy | Date of Review 12/30/98 | Misconduct # A110205 |
|---|---|---|---|---|

**PROGRAM REVIEW COMMITTEE'S DECISION AND ITS RATIONALE**

Inmate Isley appeals based on:

a.     The procedures employed were contrary to law, Administrative Directive 801, or to the ICU Consent Decree;

c.     The evidence was insufficient to support the decision.

The PRC has reviewed the available information concerning this misconduct including the report of Unit Manager Chesney, the findings of the Hearing Examiner, and inmate Isley's appeal.

Inmate Isley appeals that procedures employed were contrary to law, ADM 801, or the ICU Consent Decree. PRC finds nothing to support this appeal.

Inmate Isley also appeals that evidence was insufficient to support the decision. PRC notes that there was no new legitimate evidence to indicate a change of the Hearing Examiner's decision.

**DECISION RELATIVE TO HEARING EXAMINER'S VERDICT**
__ Not Applicable   _X_ Sustain   __ Amend   __ Refer Back for Further Study   __ Exonerate

| Names of Program Review Committee | Signatures | Date |
|---|---|---|
| Marva Cerullo, CHCA | *Marva J Cerullo* | 12/31/98 |
| Robert Yarnell, Food Services Manager | *Robert Yarnell* | 12/31/96 |
| Richard Spaide, Unit Manager | *[signature]* | 12-31-98 |

981228

**DC-141   PART II E      COMMONWEALTH OF PENNSYLVANIA**
MISCONDUCT HEARING APPEAL        **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | No. from PART |
|---|---|---|---|
| AM-9320 | C. Isley | Mahanoy | A110205 |

I was found guilty of misconduct # **A110205** on **98/2/6** (date) by the
Hearing Committee/Examiner, and I wish to appeal that decision on the following grounds:

Check Area(s) Involved

a. The procedures employed were contrary to law,
   Administrative Directive 801, or to the ICU
   Consent Decree;    [✓]

b. The punishment is disproportionate to the offense;    [ ]

c. The evidence was insufficient to support the decision.    [✓]

RECEIVED
DEC 2 9 1998
Deputy Superintendent
Central Services

Below is a brief statement of the facts relevant to my claim(s). It includes the identity of all
persons who may have information which may be helpful in resolving this matter.

1. There was no evidence to support the charge. The false and retaliatory report clearly state
that I complied with the alleged order.

2. The H.E. was biased. This is clear and obvious in the fact that he did not take my defense
into consideration at all. It is a fact that it was makeup day for commissary for my
block (actually the entire prison) and that other prisoners went on the day in question.
Despite these facts, the H.E. erroneously and intentionally ruled that the day in
question was not a normally scheduled makeup commissary day for my block. He also
did not consider any of the facts which established that the report was retaliatory in
nature and utterly false.

3. The H.E. refused to allow me to offer any evidence (documents, etc.) to support
the defense of a fabricated and false retaliatory report.

4. The H.E. refused to call any of my witnesses.

5. The H.E. erroneously ruled that I never addressed the incident but my written
version pellucidly reveals that he is a vicious liar and just refused to even take
my written version into account.

6. The H.E.'s blatant bias is evident in the fact that he ruled that I complied with the
order but he still found me guilty. He did so in order to cover for Chesney and to keep
me in prison for several more years for nothing.

7. The H.E. ruled that I refused "orders" but never states which one and, in any event,
ruled that I complied.

8. Chesney and the H.E. have violated my rights by retaliating against me for filing
grievances/lawsuits and the H.E. blatantly violated my hearing rights.

WHITE—DC-15     YELLOW—Inmate

FORM **DC-141**    **PART I**    **COMMONWEALTH OF PENNSYLVANIA**    **A** 110205
Rev. 6-84

☒ MISCONDUCT REPORT ☐ OTHER    **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| AM9320 | Isley, Charles | SCI MAH | 1420 | 12/14/98 | 12/14/98 |

| Quarters | Place of Incident |
|---|---|
| JA 1015 | Unit Managers Office |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**   Class 1, b, 7 Refusing to Obey An Order
Class 1, c, 22 Using Abusive or Obscene Language to an Employee

**STAFF MEMBER'S VERSION**   Inmate Isley, AM9320 Came to my office to ask permission to go to commissary because he had no money on his account on Friday. I told him no and he became argumentative. I ordered him to leave my office. He continued to argue with me and began using obscene language "you let these other mothers fuckers go. Why the fuck can't I go." I again ordered Mr. Isley to leave my office. He then looked at me and said "your a real goofball." I ordered him a third time to leave my office. He finally complied.

AK

**IMMEDIATE ACTION TAKEN AND REASON**    Continue present status pending further action by the Hearing Examiner.

**PRE-HEARING CONFINEMENT**

IF YES

| | TIME | DATE |
|---|---|---|
| ☐ YES | | |
| ☒ NO | N/A | N/A |

☒ REQUEST FOR WITNESSES AND REPRESENTATION    **FORMS GIVEN TO INMATE**    ☒ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY    SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| Thomas Lenny U.M. | C/O 1/c Boyer | DATE 12-14-98    TIME 24 HOUR BASE 1730 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | Misconduct Category | Signature of Person Serving Notice |
|---|---|---|---|
| DATE 12/16/98 | TIME 0800 | ☒ CLASS 1    ☐ CLASS 2 | C/O D. Leachey LEACHEY |

**NOTICE TO INMATE**

You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class I misconduct, any pre-release status you have will be revoked.

12/16

**DC-141**  Rev. 6-84  **PART II B**    **COMMONWEALTH OF PENNSYLVANIA**
DISCIPLINARY HEARING REPORT    **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from Part |
|---|---|---|---|---|---|
| AM9320 | Isley | SCIMAH | 12/16/98 | 1845 | A110205 |

| INMATE PLEA | ☐ Guilty ☒ Not Guilty | ☐ No Plea ☐ Other | Verdict | ☒ Guilty #7 ☒ Not Guilty #22 |
|---|---|---|---|---|

**HEARING ACTION**

CHARGES  B#7
C#22

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED**

HX Believes officers/Unit Mgrs Report over his
Inmates Plea and Version - HX Notes he in his
Version Never really addresses the incident
But deals with the Preious retaliation for
his filing grievances etc. HX Believes Inmate
Isley did refuse Orders to leave Unit Mgrs
office after they told "No" to his request for a
Commissary Pass to Shop after the Blocks
Scheduled Day. HX Believes repeated Orders Complied
Were issued Prior to Inmate finally Complying
and leaving the Office.

Sanction:
30 Days DC
EP 12/16/98

| | | | |
|---|---|---|---|
| ☒ YES | ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | Witness Form Version Form |
| ☒ YES | ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | |
| ☒ YES | ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | SEE APPENDICES ☒ |
| ☒ YES | ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED)

Hearing Report and all appended information must be signed. Signature indicates finished report with appendices.

K Breon

SIGNATURE OF HEARING EXAMINER/COORDINATOR    E.R. 12/16/9

DC-141    **PART II C**                    **COMMONWEALTH OF PENNSYLVANIA**
Rev. 6-84    HEARING SUPPLEMENT
INMATE VERSION AND WITNESS STATEMENTS        **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | | Institution | No. from PART I |
|---|---|---|---|---|
| Am 9320 | Isley, Charles | | SCIMAH | A110205 |

**INMATE'S VERSION**

Prisoner Isley pleads not guilty to both charges. He never used any abusive or obscene language and was never ordered to leave the office (even if he were, there is no evidence to support the charge of refusing to obey an order since the false misconduct report clearly states that he complied with the order).

On the date in question prisoner Isley asked Chesney to go to commissary since it was make up day because he was just transferred to this prison and his money had only just arrived on thursday. However, Chesney denied the request stating that the only excuse he not going on friday is being on a visit. When Isley pointed out that he was aware of the fact Chesney had permitted other prisoners to go that day without any valid excuse, Chesney stated "So what. You like filing grievances. You like filing lawsuits. I guarantee you won't be in my block much longer. You're a troublemaker. You should never have been released from the RHU... Prisoner Isley just left as Chesney continued talking and subsequently asked prison guard Leachey and the 2-10 p.m. Sgt. if he could go to the store. Isley asked Sausser, Chesney, Leachey, and the Sgt. in that order.

The testimony of the prison guards will reveal that at no time was Isley disrespectful or argumentative to any of them request.

Prisoner Isley wishes for the two grievances she filed against Chesney to be offered into evidence and in the record as well as the list of inmates who went to commissary on 991214 from VA. It is a fact that one prisoner (Riggins) got out of the hole on saturday and was permitted to go to commissary as well as laundry workers whose pay wasn't on friday.

It is perfectly clear from the facts that Chesney fabricated the false charges against Isley in retaliation for his filing grievances/lawsuits in order to have Isley thrown in the hole and denied parole (he is scheduled to see the board in february).

In essence, there is no evidence to support the charge of refusing to obey an order because even if the false report were true it clearly states that Isley complied. There is no evidence to support the charge of using abusive or obscene language because the preponderance of the evidence clearly shows that Isley spoke to other prison guards — before and after Chesney — and made no such statements and was not argumentative and the evidence of retaliation against Isley from Chesney clearly appears from the grievances and request, that the charges are utterly false. Lastly, Isley is a black man from Philly. He would have said nut not goofball and, in any event, the alleged statement is neither abusive or obscene.

**DC-141**  **PART II A**  **COMMONWEALTH OF PENNSYLVANIA**
Rev. 6-84  **DEPARTMENT OF CORRECTIONS**
INMATE REQUEST FOR
REPRESENTATION AND WITNESSES

| DC Number | Name | Institution | Date | Number as on Par |
|-----------|------|-------------|------|------------------|
| Am 9320 | Isley, Charles | SCI MAH | 12-14-98 | A 110205 |

You have been charged with a misconduct. You may request assistance and/or witnesses to appear at your hearing by completing the section(s) below.

In order to have assistance or witnesses at your hearing, you must complete this form and present all copies to one of your housing officers no later than 9:00 a.m. the first working day after you receive notice of the misconduct.

Assistance: ☐ I do not request assistance
☐ I request assistance by _____
(The person requested must be willing to assist you)

Witnesses: You may request witnesses in accord with DC-ADM 801. State the relevance and importance of the testimony the witness will give.

| | |
|---|---|
| **If Inmate**<br>1. Name of Witness:    No.    Quarters<br>2-10 Sgt on JA on 981214<br>Why is this person's testimony relevant and important?<br><br>Involved in incident alleged | **DO NOT WRITE IN THIS SECTION**<br>For Use by Hearing Examiner<br><br>Witness permitted?    If not, why not?<br><br>Denied<br>Inmates indicated |
| **If Inmate**<br>2. Name of Witness:    No.    Quarters<br>C.O. Sausser<br>Why is this person's testimony relevant and important?<br><br>Involved in incident alleged | Witness permitted?    If not, why not?<br>None of<br>the Staff were<br>Present at time<br>of Place of |
| **If Inmate**<br>3. Name of Witness:    No.    Quarters<br>C.O. Leachey<br>Why is this person's testimony relevant and important?<br><br>Involved in incident alleged | Witness permitted?    If not, why not?<br>incident |

_____
Inmate's Signature

This section to be completed by Housing Officer only
Received completed form 0755 hours 12/15/98
    Time    Date

_____
Housing Officer's Signature

_____
Hearing Examiner's Signature

WHITE—DC-15    YELLOW—Inmate's Copy To Be Given After Action By Hearing Examiner    PINK—Staff Member Reporting Miscond

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,                    :
                                   :
    Plaintiff               :
                                   :
    v.                      :        No. 1:00CV-00577
                                   :
W. CONWAY BUSHEY, <u>et al</u>.,  :
                                   :
    Defendants              :

## <u>UNSWORN DECLARATION OF MICHAEL R. YOURON</u>

I, **MICHAEL R. YOURON**, hereby declare under the penalty of perjury that the following is true and correct based upon my personal knowledge:

1.    I am currently employed by the Pennsylvania Department of Corrections ("DOC") at State Correctional Institution Mahanoy ("SCI-Mahanoy") in Frackville, Pennsylvania as the Chief Psychologist  At the time relevant to this complaint I was the Chief Psychologist at SCI-Mahanoy.

2.    As Chief Psychologist, I supervise and responsible for the administration the Psychology Department at SCI-Mahanoy.  This includes overseeing that the proper policies and procedures concerning the gathering of psychological information and reports are properly administered, including information gathered for the Pennsylvania Board of Probation and Parole.

3.     On December 24, 1998 Iseley wrote a request to me requesting that his consent be revoked regarding his Mental Health Informed Consent Document. Iseley further requested that the original document be returned to him. I responded to Iseley that his consent was, in fact, revoked and I returned the original document to him. I also made a note on his DC-15 (Treatment File), that Iseley revoked his consent regarding the Mental Health Informed Consent Document.

4.     In January, 1999 I was contacted by James Unell, who was reviewing a grievance submitted by Iseley.  (See Exhibit "A" attached)

5.     Unell accurately reported that Iseley's consent was revoked per his request, that the original document was returned to him, and that a note was made on his DC-14 to that effect.

-2-

_____6 - 8 - 01_____        *Michael R. Youron* al / P.R.
**DATE**                       **MICHAEL R. YOURON**

**EXHIBIT "A"**

**DC-804**
**PART II**

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

SCI MAHANOY
RECEIVED

JAN 0 6 1999

INMATE PROGRAM MANAGER

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO.   **MAH-0002-99**

| TO: (Name & DC NO.) **ISLEY, CHARLES AM-9320** | INSTITUTION **SCI-MAHANOY** | QUARTERS **RHU** | GRIEVANCE DATE **1/06/99** |
|---|---|---|---|

The following is a summary of my findings regarding your grievance:

This is in response to Grievance No. MAH-0002-99. I note that I spoke with you at length regarding this grievance in our meeting in the RHU on 1/14/99. I note the following: You acknowledged during our meeting that Mr. Dennison did <u>not</u> introduce himself as a Parole Board member. It was <u>your</u> assumption that he worked for the PBPP. You are now well aware that he is a Psychological Services Associate and a member of the Psychology Department. It is noted that Mr. Dennison presented a mental health informed consent document to you on 12/17/98. At that time you decided to sign the form after it was reviewed. On 12/24/98 you wrote a request to Mr. Youron, Chief Psychologist requesting that your consent be revoked and that the original document be returned to you. In response to your request slip, dated 12/24/98, Mr. Youron wrote back to you and informed you that your consent was, in fact, revoked. You acknowledged to me on 1/14/99 that you did receive the original document. Also, I note that a DC-14 entry was made indicating that you had revoked your consent. Be informed then, that at this point in time, we do <u>not</u> have your consent regarding the mental health informed consent policy/document. In accordance with the policy 7.3.1, I cautioned you that recipients of the reports (e.g.: staffing committees and the Parole Board) "may draw negative inferences" from your refusal. The psychology staff also gave you such counsel. I also explained to you the significance of your refusal and the impact of it. I remind you also that you may decide to give your consent at a later point in time. You stated that you fully understood our conversation. You also stated that you still wish to refuse to sign the mental health informed consent document.

In that all of the elements of your grievance have been fully addressed, I recommend no further action regarding this grievance.

rh/

cc:  Deputy Klem
     Mr. Youron
     Mr. Dennison
     file

| Refer to DC-ADM 804, Section VIII, for instructions on grievance system appeal procedures. | SIGNATURE OF GRIEVANCE Officer *James Unell* | DATE 1/14/99 |
|---|---|---|

-804
T 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

SCI MAHANOY
RECEIVED

JAN 0 6 1999

INMATE PROGRAM MANAGER

FICIAL INMATE GRIEVANCE                    GRIEVANCE NO. MAH-0002-99

| GRIEVANCE COORDINATOR Dotter | INSTITUTION Mahanoy | DATE 990103 |
|---|---|---|
| M: (Commitment Name & Number) C. Isley AM-9320 | INMATE'S SIGNATURE C. Isley | |
| RK ASSIGNMENT Nil | QUARTERS ASSIGNMENT RHU C-9 | |

**STRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

Brief, clear statement of grievance:

A person by the name of Dennison misrepresented himself to me in order to trick me into signing the Mental Health Informed Consent Document. He stated that I had to sign it to be evaluated for parole pursuant to the "Austin" litigation. I have since ascertained that he is not employed by the parole board and that I was not required to sign anything for parole evaluation. Consequently, I want the original of the document and any and all copies as I do not give permission for anything and my signature is invalid as it was attained illegally.

Actions taken and staff you have contacted before submitting this grievance:

Actions taken: Contacted Staff
Staff contacted: Crow, Yourom

ir grievance has been received and will be processed in accordance with DC-ADM 804.

C. Dotter

**Signature of Grievance Coordinator**                    1/4/99
                                                          Date

$150.00

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,
Plaintiff,

V.

W. CONWAY BUSHEY, JANE DOE,
MIKE MOE, ROBERT MEYERS,
TERRY WHITMAN, GREGORY GAERTNEY,
SAM MAZZIOTTA, SARA CRAIG,
CHARLES MITCHELL, TRESSLER,
WAKEFIELD, MARTIN HORN,
ROBERT BITNER, CAROL DOTTER,
MARTIN DRAGOVICH, K. BREON,
J. KEVIN KANE, NOVOTNEY,
K. DENNISON, THOMAS CHESNEY,
MARVA CERULLO, RICHARD SPAIDE,
ROBERT YARNELL, SALLY GENNARINI,
JAMES SHELL, JAMES CORBACI OV,
THOMAS HORNING, BRENDA WILDENSTEIN,
YOUNON, EICHENBERG, FRYZEL,
GAVIN, MAHALLY, FRED FOE,
BIROSAK, HARRY HOE, PEEK,
MACKRETH, DROZINSKY,
RBC Corp., RAA Corp., JASON CROW,
Defendants

FILED

JUL 29 1999

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

Civil Action No.

99 CV-5380

Jury Trial Demanded

CIVIL RIGHTS COMPLAINT

EXHIBIT
B

## Jurisdiction

1. This is a civil rights action authorized pursuant to 42 sections 1981, 1983, 1985 (3) and 1986, to redress the deprivation under color of state law, of rights secured by the United States Constitution. The court has jurisdiction under 28 USC section 1331 and 1343 and the aforementioned statutory provisions. Plaintiff further invokes the pendent jurisdiction of the court to hear and decide claims arising under state law. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. sections 2201 and 2202

## Plaintiff

2. Plaintiff, Charles Iseley, is a state prisoner imprisoned at Mahanoy state prison and is and was at all times relevant to this complaint a prisoner in the custody of the Pennsylvania Department of Corrections (hereinafter "DOC")

## Defendants

3. William Conway Bixler is the secretary of the Pennsylvania Board of Probation and Parole (hereinafter "PBPP")

4. Jane Doe, true name currently unknown

5. Mike Moe, true name currently unknown, is a PBPP employee

6. The above defendants can be reached at Pa. Bd. of Probation and Parole, P.O. Box 1661, 3101 North Front St, Harrisburg, PA 17105

7. Robert Meyers is the warden at Rockview state prison (hereinafter "RSP")

8. Terry Whitman is the deputy warden at RSP.

9. Gregory Gaertner is the deputy warden at RSP.

10. Sam Mazzotta is the grievance coordinator at RSP.

11. Sara Craig is a psychologist at RSP.

12. Charles Mitchell is a hearing examiner at RSP.

13. Tressler, first name unknown, is a prison guard of
rank of captain at RSP.

14. Wakefield, first name unknown, is a prison guard
rank of major at RSP.

15. The address for RSP is SCI-Rockview, Box
Bellefonte, PA 16823

16. Defendant Martin Horn is the secretary for the

17. Robert Bitner is the chief hearing examiner for the

18. Martin Dragovich is the warden at Mahanoy state
prison (hereinafter "MSP").

19. Carola Dotter is the grievance coordinator at MSP

20. X Brown is the hearing examiner at MSP

21. J. Kevin Kane is a hearing examiner at MSP.

22. Novotney, first name unknown, is the deputy warden MSP.

23. Dennison, first name unknown, is a psychologist at

24. Thomas Chesney is a unit manager at MSP.

25. Marva Cerullo is the healthcare administrator

26. Richard Spaide is a unit manager at MSP.

27. Robert Unrell is a MSP employee

28. Sally Gennarini is the mailroom supervisor at MSP.

29. James Unell is a MSP employee.

30. James Corbacio is the activities supervisor at MS

31. Thomas Hornung is the unit manager at MSP.

32. Brenda Wildenstein is a unit manager at MSP.

33. Youria, first name unknown is a psychologist sup
at MSP.

34. Eichenberg, first name unknown, is a prison guar
rank of lieutenant at MSP.

35. Finzel, first name unknown is a prison guard

36. Gavin, first name unknown, is a prison guard of the rank of lieutenant at MSP.

37. Mahally, first name unknown, is a prison guard of the rank of lieutenant at MSP.

38. Fred Foe, true name unknown, is a prison guard of the rank of lieutenant at MSP

39. Birosak, first name unknown, is a prison guard of the rank of sergeant at MSP.

40. Harry Hoe, true name unknown, is a prison guard of the rank of sergeant at MSP.

41. Peck, first name unknown, is a prison guard at MSP.

42. Mackreth, first name unknown, is a prison guard at MSP

43. Dropinsky, first name unknown, is a prison guard at MSP

45 AAA Corp, true identity unknown, provides optical optician services to MSP.

46. Jason Brow is a parole agent at MSP.

47. The address for MSP is SCI-Mahancy, 301 Rd., Frackville, PA 17932.

48. Each defendant is sued individually and in his/official capacity. At all times mentioned herein, each defendant acted under color of Pennsylvania law.

_Facts_

49. In the past, plaintiff has filed legal actions
numerous DOC employees at various state prisons inc
those at Greene, Graterford, Dallas, Camp Hill and Roc

50. Plaintiff was transferred from Greene state p
RSP on July 2, 1997, in retaliation for his filing legal
and was capriciously and arbitrarily kept in the hol
approximately three months in retaliation for his filin
actions and grievances against prison officials. Plai
was wrongfully retained in the hole by defendants
man, Gaertner and Meyers.

51. The day after plaintiff was released from the
was escorted to defendant Meyers's Office and infor
that "they" did not like troublemakers such as plainti
RSP and that if plaintiff would refrain from filing
actions and grievances they would try and arrange
to be transferred to another prison closer to home a
would not be harassed during the interim.

52. Nonetheless, that one not one as plai....

53. For example, plaintiff must secure a favora
recommendation for parole to make parole. In order to
same he must participate in his prescriptive program
(hereinafter, "PPP").

54. Plaintiff's, PPP at RSP consisted of participating
vcation program, drug program and stress and anger program a

55. However, plaintiff was informed by the education [...]
ment that there were no programs available for him [...]

Plaintiff was not permitted to attend the drug p[...]
because he was not allowed on the drug program prison b[...]

56. Moreover, it should be taken into considerati[...]
none of plaintiff's criminal charges were for narcotic[...]
has he ever tested positive for drug use or receive a[...]
conduct or other report for controlled substances or su[...]
thereof.

57. Plaintiff was not permitted to attend the stre[...]
anger program (temper control unit) because he was [...]
allowed on that program's prison block.

58. In addition, it should be noted that plainti[...]
completed a stress and anger program at another p[...]

59. Plaintiff notified defendants Mazzotta, B[...]
Horn, Meyers and Whitman regarding the inten[...]
and capricious and arbitrary [illegible] of his [...]
[illegible]

[illegible — obscured by dark smudge]

were thrown in the hole pending an inve[...]
alleged involvement in a fight on August 24, 1998[...]
6:00 p.m. of that date. The other two prisoners are re[...]

61. They were allegedly identified by numerous [...]
prisoners known as "confidential source informants[...]
allegedly witnessed them fighting another prisoner who [...]

62. Nevertheless, one of the other prisoners was releas from the hole because he had an alibi, revealing that t alleged witnesses to the alleged incident were incredible

63. On August 31, 1998, plaintiff received a misconduct report. The charge was Criminal Conspiracy To Commit Ag ravated assault concerning an alleged assault on anot prisoner on August 24, 1998, at 12:30 p.m.

64. The other prisoner received an identical charge p an additional charge of Aggravated assault.

65. Plaintiff received the misconduct report at 10:3 and had a hearing regarding same at 11:20 a.m. - less one hour after receiving the aforesaid relevant report. Th hearing examiner was defendant Mitchell.

66. Pursuant to state regulations, state law, and DO policy, plaintiff could not have a hearing in less than twenti four (24) hours after receipt of the pertinent misconc report and had a right to be present at the hearing to call witnesses of the _____ _____ _____ _____

_____ _____ _____ _____ and was not even made aware of the hearing until days late

68. Defendant Mitchell intentionally lied in his hearin report stating that plaintiff was present at the hearing' when plaintiff was not there.

69. On September 2, 1998, plaintiff had another hearin Defendant Mitchell was the hearing examiner. Defendant

Mitchell asked plaintiff three questions and had plaintiff escorted out by the prison guards.

70. Plaintiff was then notified by a prison guard that the hearing was continued and plaintiff was taken and thrown back in the hole. Plaintiff did not receive a copy of the decision or reason for the continuance despite requesting same numerous times.

71. On September 3, 1998, plaintiff's hearing continued and defendant Mitchell simply gave plaintiff a copy of the decision and sentence, which was drafted the prior day and prior to any testimony or evidence by plaintiff or his witnesses.

72. When plaintiff pointed this out, defendant Mitchell stated that it did not matter. Plaintiff requested his witnesses and to offer documentary/physical evidence and to have all his objections entered into the record but defendant Mitchell denied all save for the witnesses.

73. When plaintiff pointed out that there was no evidence to support the charge and that he saw the parole board and would have to spend many more years in prison as a result of the bogus charge, defendant Mitchell stated that he did not care because he can just look at a "nigger" and tell he is guilty and that people (i.e., "niggers") such as plaintiff should never be allowed out of prison but should be killed

75. There was no evidence that plaintiff conspired with anyone to commit aggravated assault.

76. There was no evidence that an assault even occurred as the alleged victim claimed he was not assa and was seen by numerous witnesses after the alleged assa was supposed to have occurred and he had no injuries (the alleged victim was allegedly severely injured).

77. The alleged victim did not receive a misconduc report for lying to an employee.

78. It is believed that defendant Mitchell was one a prison guard who was viciously and brutally raped and sodomized by black prisoners, with a cleaning utensil poss because of his superlative racism.

79. Plaintiff notified defendants Wakefield, Gaert Whitman, Meyers, Bitner, Tressler and Horn but they refused to assist plaintiff or denied his appeals in retalia for his filing prison grievances and legal actions and because

[illegible — obscured by scanning artifact]

defendants Meyers and Bitner who heard same in retaliation for plaintiff's filing prison grievances, legal actions and assertions of racism by DOC employe

81. Plaintiff's retaliatory transfer from Greene prison RSP was a result of defendant Varner's retaliatory actions against plaintiff for filing legal actions and prison grievances

82. In December of 1998 plaintiff was transferred RSP to MSP, in retaliation for filing legal actions and grievance

C I V 83. On December 1th, 1998, plaintiff exited his ce to work but was informed by defendant Mackreth "fuckin' lock up right now!". Plaintiff complied immediate

C I V 84. After the entire prison was locked down, at ap roximately 9:20 p.m., defendant Mackreth had plaint cell door opened and, in violation of DOC policy, en ered plaintiff's cell and informed him that he, plains is a "troublemaker" and a "stupid fuckin' asshole who w not have a job tomorrow.

C I V 85. Plaintiff was fired from his job the nex day.

C I V 86. Plaintiff apprised defendant Chesney of the wrongful employment termination but defendant Chesn prevaricated, stating that plaintiff never had a job.

C I V 87. It is a fact that plaintiff

C I V 88. The denial of the job and pay was in retaliation for plaintiff's filing legal actions and prison grievance

C I V 89. Plaintiff filed a prison grievance to defenda Dotter regarding the denial of his job and pay but it was denied in retaliation for plaintiff's filing legal ac and prison grievances.

90. Defendant Dotter intentionally lied in order [to]
cover up the wrongful retaliatory actions against pl[ain]-
tiff.

91. Plaintiff appealed to defendants Dragov[ich],
Bitner, and Horn who denied same in retaliati[on for]
plaintiff's filing legal actions and prison grievan[ces].

92. On December 12, 1998, plaintiff requested to [be]
permitted to go to the prison commissary, on makeup [day],
but was denied by defendant Chesney.

93. When plaintiff notified defendant Chesney [that]
he had allowed other prisoners to go and that it was
unfair to bar plaintiff, Defendant Chesney replie[d]
"So what! You like filing grievances. You like filing la[wsuits].
I guarantee you won't be on my block much longe[r].
You're a troublemaker. You should never have been re[leased]
from the RHU ...".

94. Plaintiff did not respond and simply exite[d]
the office while Chesney continued to rant and ra[ve and]
threaten plaintiff.

95. [illegible]
[illegible]
Chesney stating that plaintiff used [illegible]
language and refused an order to leave the office.

96. Plaintiff received the report in retaliation [for]
filing prison grievances and legal actions.

97. On December 16, 1998, plaintiff had a disciplinary hearing before defendant Breon concerning the afore-mentioned relevant false and retaliatory misconduct report.

98. However, defendant Breon refused to consider plain-tiff's defenses and refused to allow plaintiff to offer any documentary or exculpatory evidence and refused to take into consideration plaintiff's written and oral versions and refused plaintiff's witnesses for false and retaliatory purposes and reasons.

99. Defendant Breon was intentially biased against plaintiff and made illogical rulings supported by no evidence and found plaintiff guilty of refusing to obey an order in retaliation for plaintiff's filing legal actions and grievances.

100. There was insufficient evidence to support the charge because the false report and the biased hearing examiner specifically stated that plaintiff apparently complied with the alleged order (although none was given).

101. Defendant Breon was so biased that he utterly refused to ascertain any true facts concerning the incident

verdict he heard defendant Breon speaking
on the phone requesting orders on what should be done with plaintiff and agreeing to follow the orders given which apparently were to drop one charge and sentence plain-tiff to thirty (30) days in the hole. Plaintiff was then brought back into the hearing room and sentenced to thirty days in the for refusing to obey an order.

103. Clearly, plaintiff was set up. Plaintiff does know the identity of the person defendant Brecia spoke on phone to.

104. Plaintiff appealed to defendants Cerullo, Yo, Spaide, Dragovich, Bitner and Horn who denied in retaliation for plaintiff's filing legal actions and p grievances and because of his status as a prisoner.

C I ✓ 105. While plaintiff was in the hole he was den shaves, showers, recreation and harassed by defend Flyzel and Eichenberg who threatened plaintiff w physical harm and death in retaliation for his fi grievances and legal actions.

C I ✓ 106. Defendant Eichenberg often kicked plainti cell door and threatened to kill him in retaliation his filing lawsuits.

C I ✓ 107. Plaintiff's cell light was used as a psych weapon by being kept on from approximately 6:00 p.m. to (and 24 hrs. a day at times) in order to mentally, emotiona psychological damage plaintiff via disrupted sleep and sleep deprivation which adversely affected plain

C I ✓ 108. Plaintiff notified defendants Dotter, Drago Bitner, and Horn but they condoned and sanctione actions against plaintiff in retaliation for his fil legal actions and grievances.

109. Plaintiff, because of his Islamic beliefs, does eat pork.

110. While at MSP, plaintiff is not permitted to rec The alternative main course (non-animal protein substitu in lieu of The normal main course when pork is served.

111. Plaintiff informed defendants Yarnell, Dotter, Dragovich, Bitner and Horn via grievance and appeals thereof but they refused to assist plaintiff in retaliation for his filing legal actions and grievances.

112. In essence, the defendants are punishing plain fill for his Islamic beliefs and rewarding others for their beliefs (i.e., vegetarians).

113. At other state prisons, such as Rockview, Hunting et cetera, plaintiff is permitted to have a substitute wh pork is served.

114. Pursuant to DOC policy such a format is followed at other prisons but not at MSP.

115. In January of 1999, plaintiff was placed o retaliation for filing grievance grievance restriction was condoned and continued by defendants Horn and Bitner in retaliation for plaintiff filing legal actions and grievances.

116. In December 17, 1998, Defendant Dennison appear before plaintiff's prison cell gate in the nose and stated that plaintiff had to sign a paper, a psychiatric consent form, to be evaluated for parole.

117. Plaintiff apprised defendant Dennison that he never had to sign anything before to be seen by the parole board but defendant Dennison stated to plaintiff that it is a new policy and must be signed pursuant to the "Eatin Litigation". /

118. Based on the above, which was later to be found complete false, plaintiff placed his signature on the document so he could see the parole board.

119. Plaintiff ~~later~~ ascertained that defendant Dennison was not employed by the PBPP and that he did not have to sign any consent form to be reviewed for parole.

120. Plaintiff informed defendants Grow and Youron and the latter immediately informed the PBPP that plaintiff refused to sign the form to punish plaintiff for exercising his right

121. Defendant Youron did not state the reason why pl...

and plaintiff ...

122. Plaintiff filed a prison grievance and defendant Dotter and Unell responded via mendacity, stating that defendant did nothing wrong and that plaintiff was informed of numerous things by defendant Unell in person when, in truth, defendant Unell only told plaintiff one thing.

123. Plaintiff informed defendants Dragovich, Bitner and Horn via appeal but they denied same in retaliation for plaintiff's filing grievances and legal actions.

124. Defendants Dotter and Unell lied in order to retaliate against plaintiff for filing grievances and legal actions.

125. Defendant Dennison allegedly performed, approximately in December of 1998, a psychological evaluation of plaintiff in less than three minutes and did not inform plaintiff that such an evaluation was being performed or identify himself as a psychologist.

126. Approximately in November of 1998, Defendant C____ allegedly performed a psychological evaluation of plaintiff. However, the only thing plaintiff ever spoke to her about concerned his PPP and his transfer, pending, to another prison.

127. The relevant psychological evaluations were deliberately inadequately administered and intentionally included false and misleading information and were purposefully created to be detrimental to plaintiff in order to deny and quash any opportunity for plaintiff to make parole in retaliation for filing prison grievances and legal actions.

128. Defendant Bushey intentionally permits his agents, in violation of law, to capriciously and arbitrarily deny parole by relying on psychological and DOC reports which are deliberately include inadequate/false data and are capriciously and arbitrarily created to adversely affect the opportunity of plaintiff for parole. Defendant Bushey continues such actions and sanctions such acts in and retaliation against plaintiff for his filing grievances and actions.

129. On February 17, 1999, plaintiff was seen for a parole interview by defendants Grow, Doe and Moe

130. Plaintiff notified them of prison officials' intentional retaliation against him over many years for his filing grievances and legal actions and of their deliberate deletion of beneficial data from his files and intentional addition of adverse data and false data in his prison files to ensure adverse parole recommendations to guarantee parole denial to plaintiff.

131. Defendant Moe specifically notified plaintiff that he was well aware that plaintiff files numerous lawsuits and grievances and has even filed actions against the parole board which was stupid for plaintiff to do because plaintiff should expect retaliation for his actions.

132. Defendant Moe further stated to plaintiff that the only way plaintiff will ever make parole is if he ceases filing legal actions and prison grievances

133. When plaintiff noted that he felt it was unlawful to retaliate against him and allow retaliation against him for exercising his rights defendant Moe stated "Well, thats how things are".

134. Plaintiff was subsequently denied parole ie retaliation for his filing legal actions and grievances

135. In February of 1999, plaintiff received two letters in the mail which contained two letters and Islamic literature which was confiscated by defendant Gennarini. because of plaintiff's race or beliefs.

136. Defendant Gennarini refused to give plaintiff a reason for the confiscations.

137. On February 25, 1999, defendant, Gavin notified plaintiff in person, while referring to plaintiff as a, inter alia, "nigger" and threatening plaintiff with physical injury, that plaintiff mail was confiscated, the "muslim nigger stuff" is "gang related material" and that plaintiff is going in the "muslim nigger file".

138. Defendant Gavin further stated that plaintiff would be retaliated against via harassment and false misconduct reports for being a "muslim nigger" if plaintiff continued to complain. Plaintiff never received his Islamic literature.

139. Plaintiff contacted defendants Dragovich and Bitner concerning the aforementioned wrongful confiscation but they sanctioned, condoned and approved of the intentional discriminatory and unlawful confiscation in retaliation for his race, beliefs and filing of grievances and legal action.

140. In January of 1999 plaintiff was released from the hole and afterward discovered numerous items were missing from his personal property.

141. The missing property consisted of, inter alia, approximately twelve publications that were exhibits in a federal lawsuit in the Western District Court. Plaintiff never received any confiscation forms or reasons as to why his property was confiscated. Plaintiff's case has been seriously hampered by the denial of the publications since they were to be exhibits for appeal purposes in the Third Circuit Court of Appeals and in the Western District Court.

142. Plaintiff contacted defendants Dotter, Dragovich, Bither and Kson but they refused to assist plaintiff in retaliation for plaintiff's filing grievances and legal action.

143. On May 24, 1999, plaintiff was wrongfully charged $2.00 (two dollars) for a medical visit concerning a chronic condition.

144. However, pursuant to state regulations and law and DOC policy plaintiff is not to be charged for medical visits for chronic conditions.

145. As a result of the charge, which was improper, plaintiff had to pay an additional $5.00 surcharge.

146. Plaintiff attempted to be reimbursed for his stolen money and contacted defendants Cerullo, Dotter, Dragovich and Bither who all denied same in retaliation for plaintiff's filing grievances and legal actions.

147. Defendant ABC Corp specifically follows a pattern and practice of discriminating against prisoners by refusing to reimburse them for wrongful charges if possible and by charging wrongful fees to prisoners anyway.

148. On February 4, 1999, plaintiff was wrongfully charged $2.00 (two dollars) for a medical visit regarding a chronic condition.

149. However, pursuant to state regulations and law and DOC policy plaintiff is not to be charged for chronic condition medical visits.

150 Plaintiff attempted to be reimbursed for his shoe money and contacted defendants Cerullo, Diaz, Dotter and ~~CTA~~ ABC Corp. but nothing was done in retaliation for plaintiff's filing grievances and legal actions.

151 Defendant ~~CTA~~ ABC corp. specifically follows a pattern & practice of discriminating against prisoners by refusing reimburse them for wrongful charges and by wrongfully charging prisoners for fees they should not be charged for.

152 On February 11, 1999, plaintiff ordered a pair of prescription eyeglasses. On the same date plaintiff dispatched a written communication requesting that the lenses be made photo-gray but defendant Foe refused to alter or correct the order to deny plaintiff his money.

153 Plaintiff subsequently contacted defendants Bitner, Cerullo, Dotter, ABC Corp. and Dragovich who refused to or cancel the order or reimburse plaintiff for the glasses he has never received and does not want and their actions are in retaliation for plaintiff's filing grievances and legal actions.

154 Defendant ABC Corp. has a pattern and practice & policy of discrimination by not allowing plaintiff a refund because he is a prisoner but allowing refunds to others.

155 On April 15, 1999, a guitar bag was confiscated from ~~[illegible]~~ plaintiff's mail by prison officials despite the fact that such items are permitted and plaintiff had received prior approval from prison officials to possess one.

E.I. ── 156 Plaintiff subsequently contacted defendants Mahully, Novstney, Dragovich and Bitner for the return of his guitar bag but they refused in retaliation for plaintiff's filing grievances and legal actions.

157 Plaintiff has yet to receive or be reimbursed for his intentionally stolen guitar bag.

158 On January 15, 1999, plaintiff purchased a radio from the prison store.

159 Subsequently, plaintiff received a radio from the prison store which was not what he wanted.

160 Defendant Birosak, in retaliation for plaintiff's filing prison grievances, then ordered plaintiff to send the radio out, at plaintiff's expense, to an outside store for a refund despite the fact that plaintiff did not purchase it from that store but from the prison store.

161 On March 19, 1999, defendant Birosak informed plaintiff that the outside store sent plaintiff a different radio and then ordered plaintiff to mail the radio back to the outside store for a refund, at plaintiff's expense.

162 However, plaintiff refused to sign because he purchased the radio from the prison store and not the outside store, but defendant Birosak stated that plaintiff would never get his money back if he filed a grievance.

163 Plaintiff refused to sign a letter stated that he would file a prison grievance to get his money back.

164. Plaintiff contacted defendant Detter who re[...]
to assist plaintiff pursuant to the orders and sanctions [...]
defendants Dragovich, Bitner and Horn in retaliation [...]
for plaintiff's filing legal actions and grievances.

165. Plaintiff has yet to receive his money ba[...]
for the radio.

166. On August 27, 1999, plaintiff's cell was searched [...]
his legal material was read by defendant Dropinsky, who then [...]
plaintiff to throw all of his legal material in the trash save [...]
folder because plaintiff would be going to trial soon for a le[...]
lawsuit against numerous DOC employees.

167. When plaintiff refused and attempted, pursuant to DOC[...]
to speak to a superior officer, defendant Dropinsky became abusive [...]
aggressive, stated that plaintiff would not see anyone and referr[...]
plaintiff as a "nigger" and physically pushed plaintiff, [...]
only a towel and shower shoes, back into the cell causing him [...]
and fall backward, hitting his head on the steel table and his sho[...]
on the floor. Defendant Dropinsky slammed the cell door closed. Thi[...]
at 18:20.

168. Plaintiff informed defendant Hee, via cell interc[...]
the retaliatory and racially motivated assault on his person b[...]
told by defendant Hee "So what" in retaliation for h[...]
prison grievances and legal actions.

169. Subsequently, plaintiff again attempted to speak t[...]
superior officer by notifying defendant Hee via cell interc[...]
was informed by defendant Hee that he got what he deserve[...]
was locked in his cell pursuant to defendant Foe's order[...]

170. Defendant Dropinsky would then periodically come to plaintiff's cell door and taunt and threaten him with do[...] and refer to plaintiff as a "nigger", among other things[...] Told plaintiff he would not make parole.

171. Subsequently, plaintiff was thrown in the hole a[...] received a false and conspiratorially planned misconduc[...] report in retaliation for plaintiff's filing a legal action ag[...] prison officials. Specifically civil action number 96-1693 wh[...] was filed in the federal western district court of Pennsylvania[...] and was set for trial on September 20, 1999.

172. On August 30, 1999, plaintiff had a hearing bef[...] defendant Kane who refused to even read plaintiff's writt[...] version form and stated that plaintiff should not have both[...] writing one because his officers do not lie. Defendant Kane[...] refused to comply with state regulations, DOC policy and st[...] law because of plaintiff's status as a prisoner, black[...] and muslim. Plaintiff was found guilty and sentenced to 60 da[...]

173. Defendant Kane has a long and well known bias ag[...] the above and of violating prisoners' rights. It is belie[...] that the innate bias stems from the killing of his father [...] black prisoner who was a muslim.

174. Plaintiff appealed the decision to ~~defendants, Lor[...]~~ Dropinsk[...]
Wildenstein, Horning and Bitner but they refused to addres[...]
plaintiff's issues in retaliation for plaintiff's filing grievan[...]
and legal actions and because of his status as a prisoner.

175. On August 31, 1999, plaintiff ~~found~~ found out that [...] percentage of his personal property was missing, including almost all [...] legal material.

176. Plaintiff subsequently contacted, in person, defendants _____ and Peck and contacted, via written communication, defendants Novotney, Dragevich, Bitner, Dotter and Mahally, concerning his missing property but nothing has been done in retaliation for his filing prison grievances and legal actions and because he is a prisoner.

177. One box of missing legal material contained all of plaintiff's trial documents concerning his then upcoming federal trial set _____ on September 20, 1999. The denial of the legal material barred plaintiff from adequately representing himself in trial since he had none of the photocopies of documents (marked and ordered), possible examination and cross-examination questions for each witness, exhibits, notes, references and cross-references, etc., he required. Plaintiff believes that his legal material was intentionally taken by defendant Arpinsky in _____

178. Other missing property includes a chess set, numerous magazines (approximately eight which were exhibits in a legal action) among other things.

179. Plaintiff has thus far been unable to adequately _____ his property. To ascertain exactly what is missing as of this date.

180. In all instances concerning plaintiff's property, the pertinent defendants had care, custody and control of same and a duty to hold and/or track plaintiff's property or reimburse him for his losses or return the property to him.

181. In all instances regarding discipline, the pertinent defendants had a duty to ensure that plaintiff was not punished capriciously or arbitrarily or because of his race or his _____ or his status as a prisoner.

182. In all instance regarding plaintiff's _____ defendants had a duty not to wrongfully charge plaintiff _____

183. Plaintiff exhausted the available administrative remedies as far as he was permitted or he was allowed to prior to the filing of this complaint.

## Legal Claims

184. The facts, acts and conduct of defendants related disclose a concerted and systematic effort by the defendants and their agents to deprive plaintiff of constitutionally secured rights, including, but not limited to, those enumerated in the succeeding paragraphs.

## First Cause of Action

185. The actions of defendants violated plaintiff's First Amendment rights guaranteed under the United States Constitution when he was retaliated against for filing actions, retaliated against for filing grievances, retaliated against for not giving permission to his psychological records be disseminated, denied his legal material for trial, denied pork-free alternative meal, denied his Islamic literature.

## Second Cause of Action

186. The actions of defendants violated plaintiff's second Fourth Amendment rights guaranteed under the United States Constitution when he was denied employment and pay, denied opportunity to obtain a favorable parole recommendation, denied opportunity to obtain parole, denied accurate psychological reports, denied property and money.

Third Cause of Action

187 The actions of defendants violated plaintiff's s...
Eighth Amendment rights guaranteed under the United Sta...
Constitution when he was denied accurate psycholog...
records/file and when his cell lights were kept on all nig...
when he was denied showers and recreation.

Fourth Cause of Action

188. The actions of defendants violated plaintiff's ...
Fourteenth Amendment rights to procedural due process gua...
under the United States Constitution when he was deni...
opportunity to be heard, had a partial hearing examiner, d...
opportunity to offer evidence, denied his personal property, deni...
money, denied his employment and pay, and retaliated against...
filing legal actions or prison grievances and denied his Is...
literature, and capriciously and arbitrarily denied parole and funds...

Fifth Cause of Action

189. The actions of defendants violated plaintiff's s...
Fourteenth Amendment rights to substantive due process gu...
under the United States Constitution when he was punish...
of his race, punished because of his beliefs, he was denied a...
disciplinary proceeding, fand guilty with no evidence, deni...
personal property and money, retaliated against for filing leg...
or prison grievances and denied his Islamic literature an...
denied opportunity to make parole and not have inaccurate psyco...
information in his files

## Sixth Cause of Action

190. The actions of defendants violated plaintiff's sec[...] Fourteenth Amendment rights to equal protection guarantee[...] under the United States Constitution when he was denied [...] pork-free alternative meals, denied his Islamic literature an[...] punished for his status as a prisoner.

## Seventh Cause of Action

191. The actions of defendants violated plaintiff's sec[...] rights guaranteed under the laws of the Commonwealth of Penns[...] and the court has pendent jurisdiction to hear and adjudi[...] such claims which are in regard to, but not limited to :

    a) negligence
    b) gross negligence
    c) due process
    d) equal protection
    e) invasion of privacy
    f.) fictitious report
    g.) theft by unlawful taking or disposition

## Equity

192. The plaintiff has no plain, adequate or complete[...] at law to redress the wrongs described herein. Plaintiff ha[...] and will continue to be irreparably injured by the conduct [...] defendants unless the court grants the declaratory and inj[...] relief which plaintiff seeks.

## Relief

WHEREFORE, plaintiff prays and respectfully r
the court to enter a judgement granting him the following

A. A declaratory judgement that the defendants' ac
policies and practices herein described and complained
violated plaintiff's rights under the United States Constitu
and the laws of the Commonwealth of Pennsylvania

B. A permanent injunction which:

1) bars defendants from retaliating against plaint

2) allows plaintiff to receive the pork-free alter
   meal when pork is served

3) allows plaintiff to receive accurate only da
   his records/files

4) bars defendants and their agents from placing
   data in plaintiff's records/files

C. Compensatory damages from defendants, and e
of them, to plaintiff.

D. Punitive damages from defendants, and each of
to plaintiff.

E. A jury trial on all issues triable by jury.

F. Plaintiff's costs of this action

G. Such other and further relief as the court deem
proper or equitable.

Date: October 12, 1999

Respectfully submitte

Charles Isel

Charles Iseley, AM
301 Morea R
Frackville, PA 1793

## VERIFICATION

I declare, pursuant to 28 USC sec. 1746, that I have read the foregoing complaint and hereby verify under penalty of perjury that the matters asserted therein are true and correct to the best of my knowledge.

Date: October 12, 1999

Charlie Isley

Charles Isley

EXHIBIT - A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,
　　Plaintiff,
　　　v.
W. CONWAY BUSHEY, et al.,
　　Defendants.

## REQUEST FOR LEAVE TO PROCEED IN FORMA PAUPERIS

Plaintiff, Charles Iseley, pursuant to 28 U.S.C. sec. 1915 hereby respectfully requests the court for permission to proceed in forma pauperis in this matter for the following reasons:

1. Plaintiff has approximately fifty dollars on his prison account and has been unemployed for nearly twenty years and in prison for nearly that period of time.

2. The filing fee has been paid.

3. The prison officials refuse to give plaintiff an account statement covering the past six months unless the court itself requests it (see attached Exhibit "A").

4. Plaintiff requires his funds for personal hygiene items, medical services purchases, as well as for stationery supplies and postage costs/fees.

Date: October 22, 1999

Respectfully submitted,

Charles Iseley
Charles Iseley
AM-9320, 301 Morea
Frackville, PA 17932

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF

PENNSYLVANIA

* * * * * * * *

CHARLES ISELEY,          *

    Plaintiff          *    Case No.

    vs.                *    1:00-CV-00577

W. CONWAY BUSHEY

et. al,                  *

    Defendants         *

* * * * * * * *


DEPOSITION OF

CHARLES ISELEY

January 23, 2001



RECEIVED
Office of Attorney General

FEB 1 2 2001

Litigation Section


COPY


Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sergeant's Court Reporting Service, Inc.
(814) 536-8908

| Page 2 | Page |
|---|---|

**Page 2**

1 DEPOSITION

2 OF

3 CHARLES ISELEY, taken on behalf of

4 the Defendant herein, pursuant to the

5 Rules of Civil Procedure, taken

6 before me, the undersigned, Mariska

7 Jones, a Court Reporter and

8 Commissioner of Deeds in and for the

9 Commonwealth of Pennsylvania, at the

10 offices of SCI-Coal Township, One

11 Kelley Drive, Coal Township,

12 Pennsylvania, on Tuesday, January 23,

13 2001, at 10:15 a.m.

14

15

16

17

18

19

20

21

22

23

24

25

**Page**

1 I N D E X

2

3 WITNESS:  CHARLES ISELEY

4 EXAMINATION

5  by Attorney Lewis 7 - 168

6 CERTIFICATE 169

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 3**

1 A P P E A R A N C E S

2

3 Charles Iseley,

4 PRO SE

5

6 MARYANNE M. LEWIS, ESQUIRE

7 Deputy Attorney General

8 Litigation Section

9 Strawberry Square

10 Harrisburg, PA  17120

11 COUNSEL FOR DEFENDANT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page**

1 EXHIBIT PAGE

2

3                              PAGE

4 NUMBER  DESCRIPTION      IDENTIFIED

5 A      Misconduct Report

6        Number 122000        42

7 B      Civil Rights

8        Complaint            42

9 C      Misconduct Report

10       Number 110205        55

11 D     Inmate Grievance      71

12 E     Memo 2/17/99          81

13 F     Inmate Request to

14       Staff               101

15 G     Memo 4/12/99        117

16 H     Memo 5/18/99        119

17

18

19

20

21

22

23

24

25

**Page 6**

```
1 OBJECTION PAGE
2
3 ATTORNEY              PAGE
4 NONE MADE
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 8**

1 Q And I just want to refresh you
2 quickly about depositions. As you
3 know this is a device for gathering
4 information under the Civil Rules of
5 Procedure. It's oral testimony taken
6 under oath and a reporter's taking
7 down your responses. I'm going to
8 ask you a series of questions about
9 the facts and the allegations in your
10 complaint. I just need to put a
11 couple of these preliminary matters
12 on the record.
13 Now, you have two choices or
14 options regarding the reading and
15 signing of the deposition. The first
16 option is that you have the right to
17 read it, review it, and sign it as to
18 its accuracy and correctness. And if
19 you exercise that option the steno
20 will send you a copy of the
21 transcript, you have 30 days to
22 review it, to make the corrections,
23 sign it, and mail it back to her.
24 Depending on the length --- you have
25 to pay for the postage which could be

**Page 7**

1 P R O C E E D I N G S
2 ------------------------------------
3 CHARLES ISELEY, HAVING FIRST BEEN
4 DULY SWORN, TESTIFIED AS FOLLOWS:
5 ------------------------------------
6 DIRECT EXAMINATION
7 BY ATTORNEY LEWIS:
8 Q Good morning, Mr. Iseley.
9 Once again, I'm Maryanne Lewis of the
10 Pennsylvania Office of Attorney
11 General and represent the Defendants
12 in the lawsuit that you filed against
13 them. Before we get into the
14 deposition, there's some background
15 information that we need to put on
16 the record. This is the case of
17 Iseley versus Bushey et. al and it's
18 docketed to number 00-00577 filed in
19 the Middle District of Pennsylvania.
20 And we have a hearing today for the
21 purposes of taking your deposition in
22 regard to that complaint. Mr.
23 Iseley, have you ever been deposed
24 before?
25 A Yes.

**Page 9**

1 between $20 and $30.
2 The other option is that you
3 could waive the reading and signing
4 and assume and trust that the court
5 reporter who is a notary with the
6 Commonwealth review and take down
7 your testimony accurately. What do
8 you want to do concerning your
9 transcript?
10 A Send me a copy, I'll review
11 it.
12 Q You'll read and sign. The
13 second item we want put on the record
14 is in regard to any objections that
15 you may have concerning the questions
16 under the federal rules. If you feel
17 that a question is not appropriate or
18 proper, you have the right to object
19 to that question. If for some reason
20 you feel it's not relevant, you can
21 object on relevancy grounds. But for
22 the purpose of this deposition you
23 have to answer the question anyways
24 and then preserve it on the record
25 should it go to trial.

Page 6 - Page 9

Page 10

1 Or you can simply waive all
2 your objections until the time of
3 trial if we go to trial.  What do you
4 want to do concerning your
5 objections?  Do you want to put them
6 on the record now or hold them until
7 the time of trial?
8 AI'll know when I make an
9 objection.  I'll put it on the record
10 when I make an objection now.
11 Q.You'll put the objections on
12 the record, fine.  And the other
13 thing, and I think you know this,
14 you have to be mindful that we're
15 making a written record so your
16 responses have to be loud and clear
17 so the reporter can get everything
18 down.  If your answer is yes or no,
19 say it's yes or no, or I don't know,
20 she can't put down if you're
21 shrugging your shoulders.
22 If you don't understand a
23 question or it's unclear just ask me
24 to repeat it or rephrase it, do you
25 understand that?

Page 11

1 A.Yes.
2 Q.If later in the deposition
3 something comes to mind that you
4 remember concerning a question that
5 was asked before just stop me, we'll
6 amend your answer to that question,
7 do you understand that?
8 A.Yes.
9 Q.If you answer a question that
10 I ask then is it fair for me to
11 understand that you heard the
12 question and that you understood it?
13 A.Yes.
14 Q.Mr. Iseley, do you understand
15 that you're under oath today?
16 A.Yes.
17 Q.And you are obligated to tell
18 the truth?
19 A.Yes.
20 Q.Is there anything that would
21 prevent you from testifying
22 accurately such as being under the
23 influence of drug or alcohol?
24 A.No.
25 Q.I think that's it for the

Page 12

1 background information and we can
2 move into the facts of your
3 complaint.  I have a copy of the
4 complaint here if you would like to
5 review it.
6 Mr. Iseley, in your complaint
7 you state that you have filed legal
8 actions against numerous DOC
9 employees at various state prisons
10 including those at Greene,
11 Graterford, Dallas, Camp Hill, and
12 Rockview; is that correct?
13 A.Yes.
14 Q.Is there any other
15 institutions that you can remember
16 and I won't ask you to list every
17 case, but is there any other
18 correctional institutions that you
19 perhaps failed to mention?
20 A.It's a matter of record, I
21 don't know off the top of my head.
22 Q.Again, it's up to you if you
23 want to check the complaint here.
24 Mr. Iseley, in paragraph 50 of
25 your complaint, you state that you

Page 13

1 were transferred from Greene State
2 Prison to Rockview in July of 1997 in
3 retaliation for filing legal actions.
4 Why do you believe that this transfer
5 was in retaliation?
6 A I was never even released to
7 population at Greene, and when I went
8 to Greene I was suppose to go to
9 population.
10 Q.And why did you believe you
11 were to go to population?
12 A I didn't do anything.  I
13 didn't have any separations there.  I
14 was told when I got to Greene I would
15 be allowed in population.
16 Q.And why do you believe that
17 this was in retaliation?
18 A.The transfer?
19 Q.Yes.
20 A.Why else would it be?
21 Q.The only reason is because you
22 believe you were to go to population?
23 A No, the only reason is that I
24 had been in the hole for a year and a
25 half or a year.  I had never been in

Multi-Page™

1 population there.  I had separations
2 all over the state.  I'm not really
3 allowed anywhere.  It's suppose to be
4 a maximum security prison.
5 Therefore, I should have been allowed
6 in population.
7 **Q.At Rockview?**
8 A.No, we're talking about
9 Greene, that's just what you just
10 said.
11 **Q.But you said you were**
12 **transferred from Greene to Rockview?**
13 A.That's not what you said, now
14 you're talking about Rockview.
15 **Q.I'll read you the paragraph.**
16 **Look at this.  Plaintiff was**
17 **transferred from Greene to State**
18 **Prison at RSP, which I believe is**
19 **Rockview, in retaliation for filing**
20 **his legal actions.**
21 A.Correct.
22 **Q.Why do you believe your**
23 **transfer from Greene to Rockview was**
24 **in retaliation?**
25 A.Because I had been filing

1 numerous motions to go to population,
2 and lawsuits.
3 **Q.And that's the only reason you**
4 **believe that it was retaliation?**
5 A.And timing, I believe the next
6 week after that, the date of my
7 transfer, they were suppose to answer
8 a habeous corpus petition regarding
9 my going to population.
10 **Q.In what case, in what county,**
11 **we'll break that down?**
12 A.Greene.
13 **Q.It was in --- do you remember**
14 **the caption of the case?**
15 A.No.
16 **Q.And the case was pending in**
17 **what in what court?**
18 A.County Police Court.
19 **Q.And the habeous was**
20 **concerning?**
21 A.Going to population.
22 **Q.So while you were at Greene**
23 **you were not in population; is that**
24 **correct?**
25 A.Correct.

1 **Q.When you were transferred to**
2 **Rockview, you were placed where?**
3 A.In the hole.
4 **Q.So you came, and correct me if**
5 **I'm incorrect, you came from a**
6 **restricted housing unit or the hole,**
7 **if we want to call it, in Greene and**
8 **went to the hole in Rockview?**
9 A.No.
10 **Q.What was your custody when you**
11 **were at Greene?**
12 A.I was 05.  Long-term
13 administrative custody.
14 **Q.So you were in AC custody.**
15 **And when you went to Rockview you**
16 **were placed in what type of custody?**
17 A.Administrative custody.
18 **Q.So then we went from**
19 **administrative custody at Greene to**
20 **administrative custody at Rockview?**
21 A.No.  I went to Albion at
22 first.
23 **Q.So then this paragraph it says**
24 **Plaintiff was transferred from Greene**
25 **State Prison to Rockview State**

1 **Prison, that's not correct?  There**
2 **was a move in between there?**
3 A.I went to Albion first, then
4 went to Rockview.
5 **Q.And how long were you at**
6 **Albion?**
7 A.Six days.
8 **Q.And when you were at Albion**
9 **where were you housed?**
10 A.In the hole.
11 **Q.And while you were at Albion**
12 **were you placed in the hole awaiting**
13 **transfer to Rockview?**
14 A.Yes.
15 **Q.Paragraph 51 of your complaint**
16 **you state that the day after**
17 **Plaintiff was released from the hole**
18 **he was escorted to Defendant Meyers**
19 **office, stop there.  When you were at**
20 **Rockview how long were you in the**
21 **hole, or in administrative custody?**
22 A.About three months.
23 **Q.And then what happened ---**
24 **after three months and you were**
25 **released from the hole, where were**

Multi-Page™

Page 18

1 you housed?
2 A.On a block.
3 Q.And do you remember what
4 block?
5 A.No.
6 Q.Paragraph 51 you state that
7 you were escorted to Defendant Meyers
8 office and informed that they did not
9 like troublemakers such as Plaintiff
10 at Rockview State Prison, RSP. And
11 if the Plaintiff would refrain from
12 filing legal actions and grievances,
13 they would try to arrange him to be
14 transferred to another prison close
15 to home and he would not be harassed
16 during in the interim. Do you
17 remember when you had that --- the
18 dates of this conversation?
19 A.It was the day after I was
20 released to population.
21 Q.So if it's three months then
22 you would --- it's a conversation
23 ---?
24 A.It was the next day after I
25 was released to population, it was

Page 19

1 the next morning.
2 Q.So it would be some time in
3 October of 1997?
4 A.Off the top of my head I don't
5 really know, but like I said it's a
6 matter of record.
7 Q.Now in the next paragraph that
8 none the less that was not true as
9 Plaintiff was not transferred soon
10 and was retaliated against for filing
11 legal action and grievances at other
12 prisons. How were you retaliated
13 against?
14 A.Well, they didn't have my
15 property.
16 Q.Go ahead.
17 A.They took my TV. They always
18 searched my cell. They were always
19 saying that inmates would put in
20 request slips against me and some
21 other dudes for doing stuff.
22 Q.I want to stop here so we get
23 the time frame again. This
24 allegation that you make in paragraph
25 number 52 is immediately after you're

Page 2

1 released from administrative custody
2 and back into population?
3 A.Say that again.
4 Q.The time frame for when you
5 say in paragraph 52 or state that
6 none the less you were retaliated
7 against for filing legal actions,
8 this is back at Rockview?
9 A.Yes.
10 Q.And this is when they took
11 your property and your TV?
12 A.Yes, this is during the entire
13 term when I was at Rockview, that's
14 what that references. I'm not
15 through.
16 Q.Excuse me, okay, go ahead.
17 A.Gave me false misconducts.
18 Primarily the one referenced in that
19 complaint. Found me guilty of it
20 even though they knew I wasn't even
21 there.
22 Q.We'll get to that misconduct.
23 Go ahead, anything else?
24 A.No.
25 Q.You make an example that you

Page 2

1 must secure a favorable DOC
2 recommendation for parole, to make
3 parole. And you state that in order
4 to obtain the same you must
5 participate in a prescriptive program
6 plan. Do you remember what your
7 program was at Rockview?
8 A.I didn't have one.
9 Q.Why didn't you have one?
10 A.You have to ask them that.
11 Q.You don't know?
12 A.It was retaliation.
13 Q.So you're saying that you
14 didn't have a prescriptive program
15 because of retaliation?
16 A.What I'm saying is they
17 refused to give me a prescriptive
18 program plan in order not to be able
19 to give me a recommendation for
20 parole.
21 Q.And who refused to give you
22 this program?
23 A.Meyers, Mazzotta, the
24 counselor, the Union Manager, there
25 was a whole lot of them.

Multi-Page™

Page 22

1 Q.In paragraph 55 you state that
2 you were informed by the education
3 department that there was no programs
4 available for him you. Who told you
5 that?
6 A.I don't recall. It's on a
7 request slip.
8 Q.And this request slip would
9 have been in 1997?
10 A.'97 or '98. It was one of the
11 woman at the school building, I can't
12 remember the title.
13 Q.And this is at what
14 correctional institution?
15 A.Rockview.
16 Q.Mr. Iseley, you state in
17 paragraph 59 that Defendant Mazzotta,
18 Bitner, Horn, Meyers, and Whitman
19 regarding the intentional capricious
20 and arbitrary denial of your PPP.
21 And they refused to assist you in
22 retaliation for filing your legal
23 actions and grievances. What lead
24 you to believe that this was in
25 retaliation?

Page 23

1 A.Well, from the beginning like
2 I said and like it says in the
3 complaint, when I first got the
4 population, that's what they told me
5 about the lawsuits and the
6 grievances.
7 Q.Who told you about the ---?
8 A.Meyers.
9 Q.Meyers told you about the
10 lawsuits. What did he say, do you
11 recall?
12 A.He told me if I would just be
13 cool for a while, he would try to get
14 me transferred closer to home. If I
15 didn't start any trouble, I didn't do
16 anything in here, he'd try and make
17 it happen fast. He said he couldn't
18 just get me out like that.
19 Q.And did he ever say anything,
20 Meyers, about your prescriptive
21 program?
22 A.What do you mean?
23 Q.Defendant Meyers, did he say
24 anything to you about your
25 prescriptive program?

Page 24

1 A.Me, personally?
2 Q.Yes.
3 A.No.
4 Q.Did you ever file a grievance
5 about the programs?
6 A.Yes.
7 Q.And you filed the grievance at
8 SCI Rockview?
9 A.Yes.
10 Q.And what happened as a result
11 of the grievances?
12 A.Nothing.
13 Q.Did you appeal the grievances?
14 A.Yes.
15 Q.To what groups or what bodies?
16 A.Meyers and Bitner.
17 Q.You state in your complaint
18 that on August 31st, 1998, you
19 received a misconduct report and the
20 charge was for criminal conspiracy to
21 commit aggravated assault concerning
22 and alleged assault on another
23 prisoner of August 24th, 1998 at
24 12:30 p.m. Can you tell me what
25 happened?

Page 25

1 A.What do you mean what
2 happened?
3 Q.Concerning the misconduct that
4 you received?
5 A.He gave me a misconduct.
6 Q.Why?
7 A.For what you just said.
8 Q.For committing aggravated
9 assault?
10 A.That was the charge. I didn't
11 do it.
12 Q.You didn't do it. The guards
13 came to your cell and handed you a
14 misconduct, is that what happened?
15 A.Yes, that's pretty much what
16 happened.
17 Q.You say that you received a
18 misconduct report at 10:30 and had a
19 hearing regarding the same at 11:20.
20 Less than one hour after receiving
21 the aforesaid misconduct report. The
22 Hearing Examiner was Defendant
23 Mitchell. So you had a hearing with
24 Defendant Mitchell?
25 A.No.

**Page 26**

1 Q.What happened?
2 A.I didn t find that out until a
3 few days later, they had a hearing,
4 they didn't tell us they had a
5 hearing. I can't tell you what
6 happened there because I wasn't
7 there, none of us were there.
8 Q.Did you receive a misconduct
9 report as a result of the sanctions
10 that were opposed against you?
11 A.Days later.
12 Q.And attached to that did you
13 receive any information concerning
14 the hearing that was held that same
15 day?
16 A.I received a paper. There
17 wasn't too much information on there
18 about it.
19 Q.Were you informed that there
20 was a reliability hearing held on
21 August 31st, 1998?
22 A.I told you I didn't find that
23 out until days later.
24 Q.But you agree that there was a
25 reliability hearing held?

**Page 28**

1 Q.But you agree that you did
2 receive a copy?
3 A.Yes, but not that day, like I
4 said days later after the reliability
5 hearing.
6 Q.You say in paragraph 68
7 Defendant Mitchell intentually lied
8 in his hearing report stating the
9 Plaintiff was present at the hearing
10 when Plaintiff was not.
11 A.That's correct.
12 Q.What leads you to believe that
13 Mitchell lied?
14 A.I wasn't at the reliability
15 hearing.
16 Q.But what led you to believe
17 that he said you were?
18 A.Because on the form that they
19 gave us it said that we were there.
20 Q.On the form concerning the
21 reliability hearing?
22 A.Yeah, he said we were there.
23 Q.Where does it say that you
24 were there?
25 A.I don't know but I had it. On

**Page 27**

1 A.No, I don't agree to anything
2 I don t know.
3 Q.Did you receive a copy of the
4 misconduct part two B that detailed
5 the reliability hearing?
6 A.That detailed it?
7 Q.That gave the findings and the
8 facts concerning the reliability
9 hearing?
10 A.They didn't say what was said
11 in the reliability hearing. They
12 just said what they found. They
13 didn't say what the contents of
14 anything --- or the confidential
15 source informant said, I don't know.
16 They didn't give me no identities or
17 anything.
18 Q.But they did say what they
19 found?
20 A.No, they didn't say what they
21 found. When I say they say what he
22 found, he said that he found that
23 they were reliable witnesses in the
24 past. As the content of their
25 testimony I don t have no inkling.

**Page 29**

1 the form said that we were there and
2 he informed me of the --- see where
3 they check it?
4 Q.Uh-huh (yes).
5 A.What does it say?
6 Q.It says the inmate has heard
7 the decision as had been told the
8 reason for it and what will happen.
9 A.And if I wasn't there how
10 could that happen.
11 Q.Well, you received the paper;
12 correct?
13 A.Is that paper dated?
14 Q.It's dated for the hearing
15 date, yeah.
16 A.So how can he tell me that on
17 that date?
18 Q.It doesn't say he told you
19 that on that date.
20 A.He said he gave me the
21 opportunity to appeal.
22 Q.Well, read the bottom of the
23 paper. All he's saying is that you
24 received a copy of it. Did you
25 receive a copy of it?

Multi–Page™

**Page 30**

1 A. That's not what that paper
2 means, when they tell you that they
3 tell you that in person.
4 Q. Did you receive a copy of this
5 report?
6 A. Days later.
7 Q. You also allege on September
8 2nd you had another hearing that
9 Defendant Mitchell was the Hearing
10 Examiner.
11 A. I don't allege anything. I'm
12 telling you what happened.
13 Q. Your complaint, you state that
14 on September 2nd, 1998 you had
15 another hearing and Defendant
16 Mitchell was the Hearing Examiner.
17 You state that he asked you three
18 questions and had the Plaintiff
19 escorted out by the guards. Where
20 were you brought?
21 A. To the hearing room.
22 Q. You went to the hearing room,
23 Mitchell asked you three questions,
24 and then you left?
25 A. He told me wait outside.

**Page 31**

1 Q. You waited outside. And then
2 what happened after that?
3 A. They just came back and told
4 me they're taking me back.
5 Q. Paragraph 71, you state that
6 on September 3rd Plaintiff's hearing
7 was continued. Defendant Mitchell
8 simply gave Plaintiff a copy of the
9 decision and a sentence which was
10 drafted the prior day and prior to
11 any testimony or evidence by
12 Plaintiff or his witnesses. What
13 lead you to believe that that
14 decision was drafted the prior day?
15 A. It was typed up, dated for
16 that day, and signed.
17 Q. And is this a copy of the
18 misconduct and the Hearing Examiner's
19 decision?
20 A. I can't see it from here.
1 Q. If you want to maybe scoot in.
2 A. Yes.
3 Q. You state on September 3rd the
4 hearing was continued and that you
5 requested his witnesses to offer

**Page 32**

1 documentary and physical evidence and
2 to have all your objections entered
3 into the record, but Defendant
4 Mitchell denied all save the
5 witnesses.
6 A. Correct.
7 Q. At the misconduct, your
8 witnesses were allowed to be
9 presented; correct?
10 A. Yes.
11 Q. What information or what
12 evidence was not permitted?
13 A. The fact that they say that
14 guy got beat up. He went to work
15 that day. Also when they locked us
16 all up for the investigation it was
17 because they said a bunch of dudes
18 beat that guy up according to their
19 confidential source informants.
20 There's no gloves like the gloves
21 they said or masks like that in the
22 whole prison. The guy said he wasn't
23 beat up.
24 Q. What documents did you have
25 that were denied?

**Page 33**

1 A. I don't recall all of them but
2 I asked for the testimony of the
3 confidential source informants to let
4 it be said, work reports to prove
5 that he wasn't --- it couldn't have
6 happened when they said it happened.
7 Q. In paragraph 73, you say you
8 were sanctioned to 90 days in the
9 hole, 30 days beyond the maximum
10 sentence allowed because of your
11 race. What evidence do you have that
12 this sentence was because of your
13 race?
14 A. I had one charge and I got 30
15 days more than the guy they said did
16 it, because they told me I was the
17 nigger that did it.
18 Q. Who told you that?
19 A. The guards.
20 Q. What guards?
21 A. It was sergeant in there that
22 day. Mitchell, he also told me after
23 I told him there was no evidence to
24 support a decision of guilt for the
25 misconduct, he told me he can just

Page 34

1 look a nigger and tell they're
2 guilty.
3 Q.And Sergeant Mitchell said
4 this?
5 AI didn't say Sergeant
6 Mitchell. Mitchell was the Hearing
7 Examiner.
8 Q.But who said this sergeant?
9 AI said Mitchell said he can
10 just look at a nigger and tell
11 they're guilty. And I also said
12 prior to that a Sergeant told me that
13 they thought I was the nigger that
14 did it, that's why I was getting more
15 time.
16 Q.You state in paragraph 78 that
17 you believe that Defendant Mitchell
18 was once a guard who was viciously
19 and brutally raped and sodomized by
20 black prisoners with a cleaning
21 utensil possibly because of his
22 superlative racism. What do you base
23 that on?
24 A.Because he asked me if I was
25 at Camp Hill during the riots.

Page 3

1 Whitman, Meyers, Bitner, Tressler,
2 and Horn. You say that they refused
3 to assist you. How did they refuse
4 to assist you?
5 A.They refused to look into the
6 facts of the situation regarding the
7 appeal.
8 Q.And if I'm repetitive I'm
9 sorry. And how did they retaliate
10 against you, again, please?
11 A.By covering up what Mitchell
12 did.
13 Q.How did they cover it up?
14 A.Because they allegedly was
15 suppose to be doing investigation and
16 they didn t do anything.
17 Q.And what was it that Mitchell
18 did?
19 A.Called me a nigger, found me
20 guilty without no evidence.
21 Q.And you appealed to ---?
22 A.The program review committee.
23 Q.And beyond that?
24 A.To the Warden Meyers, then to
25 Bitner, and then to Horn.

Page 35

1 Q.Is that all he asked you?
2 A.That's all he asked me. He
3 said he thought he remembered me from
4 Camp Hill.
5 Q.Anything else that he said?
6 A.No.
7 Q.After you received the
8 misconduct what did you do as far as
9 the misconduct proceedings?
10 AI appealed.
11 Q.And who did you appeal this,
12 the misconduct to?
13 AI don't know, it don't say
14 who. tThe program review committee.
15 Q.You state in paragraph 79 that
16 they refused to assist Plaintiff or
17 denied his appeals in retaliation for
18 filing prison grievances and legal
19 actions because of his race and
20 status as a prisoner. How did they
21 retaliate?
22 A.They refused to even look into
23 the situation.
24 Q.And the individuals that you
25 named here are Wakefield, Gaertner,

Page 3

1 Q.Mr. Iseley, you state on
2 September 9th, 1998 that a
3 publication was confiscated wrongly
4 from your mail and you appealed this.
5 Let's stop there. What publication?
6 AI don't remember. And when I
7 get the complaint I'm taking that out
8 anyway.
9 Q.You're going to amend the
10 complaint?
11 A.Yeah.
12 Q.So do you want to drop this
13 allegation?
14 A.Yes.
15 Q.Put on the record here that
16 you are going to the September 9th,
17 1998 publication was confiscated from
18 Plaintiff and Plaintiff appealed to
19 Defendant Meyers, Horn, and Bitner
20 who denied same in retaliation for
21 Plaintiff filing prison grievances
22 legal materials and ascertains of
23 racism by DOC employees. Mr. Isely,
24 has stated that he is going to drop
25 that claim.

Multi-Page™

1 A.Yes.
2 Q.And following that paragraph
3 is paragraph number 81 where you
4 state Plaintiff's retaliatory
5 transfer from Greene Prison to
6 Rockview State Prison was a result of
7 Defendant Gaertner retaliatory
8 actions against Plaintiff for filing
9 legal actions and prison grievances.
10 Do you want to tell me about that?
11 A.What don't you understand?
12 Q.How is that retaliatory?
13 A.Because transferred me for
14 filing a whole bunch of civil
15 actions.
16 Q.So you're saying that --- what
17 did Defendant Varner do --- was a
18 result of Defendant Varner's
19 retaliatory action?
20 A.Well, that was a --- he's not
21 even a Defendant.  That was just a
22 statement, fact.
23 Q.So you're saying Varner then
24 did not retaliate?
25 A.No, I didn't say that.  That

1 was a statement of fact regarding a
2 complaint.  He's not a Defendant in
3 the complaint.
4 Q.Just for record keeping
5 purposes again we agree that
6 paragraph 80 will be dropped from the
7 complaint.
8 A.Yes.
9 Q.Paragraph 82, you state that
10 in December of 1988 you were
11 transferred to Mahanoy State Prison
12 in retaliation for filing legal
13 actions and grievances.  How is this
14 transfer retaliatory?
15 A.That's what they used to get
16 me transferred out of Rockview, the
17 assault on that guy.  That's why they
18 made it look like I did it so they
19 had a reason to transfer me out.
20 Q.So they used the assault to
21 transfer you out?
22 A.Yes.
23 Q.And who used the assault?
24 A.Meyers.
25 Q.Meyers?

1 A.Whitman, Gaertner.
2 Q.Anybody else?
3 A.Not off the top of my head.
4 Q.On December 11th, 1998, you
5 say you exited your cell to work but
6 was informed by ---?
7 A.I'm amending that too.  I'm
8 eliminating that.
9 Q.Let's slow down here a little
10 bit because we have a number of
11 claims that deal with this.
12 A.I understand but I would have
13 amended the complaint much earlier
14 but I don't have a complaint.
15 Q.Well, if I recall pursuant to
16 your document request that was made a
17 number of months ago a copy of the
18 complaint was made available to you.
19 A.I didn't get it.  Who gave it
20 to me?
21 Q.Did you contact the assistant
22 to the superintendent?
23 A.I remember sending a request.
24 I don't remember what I asked for.
25 Whatever I asked for --- but whatever

1 it was I didn't get anything, and I
2 didn't have a complaint.  Like I told
3 you before I don't have any of my
4 property.
5 Q.At the completion of the
6 deposition we'll straighten out that
7 discovery then.  So we have --- and
8 just for record keeping purposes,
9 again, I'm going through these
10 complaints, these allegations or
11 statements, excuse me, in your
12 complaint.  And you tell me if these
13 are ones that you are going to drop
14 or intend to drop.  December 11th ---
15 go ahead.
16 A.Why don't you give me your pen
17 and I'll mark on it what paragraphs
18 I'll be eliminating.
19 OFF RECORD DISCUSSION
20 ATTORNEY LEWIS:
21 Let the record reflect
22 Mr. Iseley went through the
23 complaint and checked
24 paragraphs in the complaint
25 that he wishes to drop.

Page 42

1 A. That will be dropped when I
2 amend the complaint.
3 BY ATTORNEY LEWIS:
4 Q. That will be dropped when you
5 amend the complaint. So at this
6 point these paragraphs still stand in
7 your complaint; correct? Pending
8 permission to amend your complaint
9 via the Court?
10 A. Yes.
11 ATTORNEY LEWIS:
12 I'm going to attach as
13 a --- I'm going to back up a
14 minute, I want to attach
15 misconduct number 122000 as
16 Exhibit A. And Exhibit B will
17 be a copy of Mr. Iseley's
18 complaint captioned Iseley vs.
19 Busher with paragraphs that
20 were checked by Mr. Iseley as
21 those being the ones that he
22 will drop pending the filing
23 of his amended complaint.
24 (Deposition Exhibits A
25 and B marked for

1 number 83 which you intend to drop,
2 you state that you were --- you
3 exited yourself to work but was
4 informed by Defendant Mackreth to
5 fuckin' lock up right now. Plaintiff
6 complied immediately. Is that what
7 happened, you still maintained that
8 that happened; is that correct?
9 A. Yes.
10 Q. You state in paragraph 84 that
11 you were informed that you were a
12 trouble maker and a stupid fuckin'
13 asshole who does not have a job
14 tomorrow by Mr. Mackreth, is that
15 true?
16 A. Yes.
17 Q. Did you have a job?
18 A. Yes.
19 Q. Who told you, you had a job?
20 A. The worker.
21 Q. What worker?
22 A. The worker that tells
23 everybody their jobs.
24 Q. Does this worker have a name?
25 A. I don't know.

Page 43

1 identification.)
2 BY ATTORNEY LEWIS:
3 Q. And I will have you initial
4 these paragraphs, can you do that for
5 me?
6 A. Yes.
7 Q. And we'll do that at the
8 conclusion of the deposition, hold
9 that, strike that.
10 Let's do that now. Might as
11 well initial them now.
12 OFF RECORD DISCUSSION
13 ATTORNEY LEWIS:
14 Let the record reflect
15 that Mr. Iseley also initialed
16 those paragraphs with which he
17 is considering dropping from
18 his complaint pending the
19 filing of his amended
20 complaint.
21 BY ATTORNEY LEWIS:
22 Q. Is that fair characterization?
23 A. No, they will be dropped.
24 Q. Mr. Iseley, for the purposes
25 of this deposition in paragraph

1 Q. Is he a staff person?
2 A. No, he's an inmate.
3 Q. And he was on the block at
4 that time?
5 A. Yes.
6 Q. Do you remember what he said
7 to you?
8 A. Verbatim?
9 Q. As much as you can recall.
10 A. No, just that I was suppose to
11 start working and what my job was.
12 Q. When you receive a job on the
13 block do you usually get clearance or
14 notification from a staff person?
15 A. I don't know.
16 Q. Has that been your experience
17 in the past when you had a job?
18 A. I never had a job.
19 Q. You never had a job when you
20 were in prison?
21 A. Yes.
22 Q. You state that you were fired
23 from your job the next day?
24 A. Yes.
25 Q. You still maintain that?

**Multi-Page™**

---

1 A. Yes.

2 Q. Paragraph 86, you state that

3 you apprised a Defendant Chesney of

4 the wrongful employment termination,

5 but Chesney stated that you never had

6 a job. You still maintaining that's

7 true?

8 A. Yes.

9 Q. You state this denial of a job

10 and pay was in retaliation for legal

11 actions and prison grievances. How

12 was it in retaliation?

13 A. They fired me for it.

14 Q. Did they give you any reason

15 why they fired you?

16 A. Yeah, Chesney called Mackreth.

17 That's why they told me, they said

18 ---.

19 Q. They said what?

20 A. They said that's why I wasn't

21 having a job because I was filing

22 lawsuits and grievances.

23 Q. Did they ever tell you that

24 according to their records you never

25 had a job?

---

1 A. That's what they said.

2 Q. And did you file grievances

3 concerning ---?

4 A. Yes.

5 Q. And in paragraph number 89,

6 you state that the denial of your job

7 and pay was denied in retaliation for

8 Plaintiff filing legal actions and

9 prison grievances. Why do you think

10 it was retaliation?

11 A. Because that's what they said.

12 Q. And who said this?

13 A. Mackreth and Chesney.

14 Q. And what did Dotter do to you?

15 A. She didn't do anything.

16 Q. And how's that retaliation?

17 A. Because she covered it up.

18 Q. Paragraph 90 which is, again,

19 a paragraph that you are considering

20 to drop, you say that Dotter

21 intentially lied in order to cover up

22 wrongful retaliatory actions against

23 Plaintiff. Do you still maintain

24 that's true?

25 A. Yes.

---

1 Q. And how did she retaliate?

2 A. She lied to cover up the

3 incident.

4 Q. Paragraph 91, another one that

5 you are considering to drop, you

6 state that Plaintiff appealed to

7 Defendant Dragovich, Bitner, and Horn

8 all who denied the same in

9 retaliation for your filing legal

10 actions and prison grievances. How

11 did they retaliate?

12 A. They covered it up.

13 Q. They covered up what?

14 A. In essence they didn't do

15 anything.

16 Q. Concerning the grievance?

17 A. Correct.

18 Q. Paragraph 92, another

19 paragraph that you indicated that you

20 indicated that you would drop, you

21 state on December 12th, 1998, you

22 requested to be permitted to go to

23 the prison commisary on make-up day

24 and was denied that by Defendant

25 Chesney. Do you maintain that as

---

1 being true?

2 A. Yes.

3 Q. You state in paragraph number

4 93, another one that you indicate

5 that you would drop, that other

6 prisoners --- that Defendant Chesney

7 had allowed other prisoners to go and

8 that it was unfair to bar Plaintiff.

9 Chesney replied so you like filing

10 grievances, you like filing lawsuits,

11 I guarantee you won't be on my block

12 much longer, you're a troublemaker,

13 you should never have been released

14 from the RHU. You still maintain

15 that's true?

16 A. Yes.

17 Q. What other prisoners were

18 allowed to go to the commissary on

19 make-up day?

20 A. I put that in my grievance or

21 a request slip and told them they

22 could check and see who went to

23 commissary that day, verify it, but

24 they didn't check on it.

25 Q. Do you in fact know that other

---

Multi-Page™

Page 50

1 prisoners went on that day?
2 A.Yes, I do know that they went.
3 Q.But you --- do you know their
4 names?
5 A.No.
6 Q.Paragraph 94 is another one
7 that you indicate that you are
8 dropping when you file your amended
9 complaint. That you did not respond
10 and simply exited the office while
11 Chesney continued to rant and rave
12 and threaten Plaintiff. What did
13 Chesney say if you recall?
14 A.I don't know I wasn't really
15 listening to him.
16 Q.So you don't know what he
17 said?
18 A.Well, he just called me a
19 bunch of names.
20 Q.Do you remember what names he
21 called you?
22 A.Nothing I really want to
23 repeat.
24 Q.Can you repeat them?
25 A.He called me an asshole,

Page 5

1 obscene and abusive language and
2 refused an order to leave the office.
3 A.He gave me that false
4 retaliatory misconduct report. It
5 was in retaliation for my filing
6 lawsuits and grievances. In essence,
7 for my status as so-called jailhouse
8 lawyer.
9 Q.You state that on December
10 16th, 1998, you had a disciplinary
11 hearing before Defendant Breon
12 concerning the aforementioned
13 relevant false and retaliatory
14 misconduct. Did you receive a copy
15 of the misconduct hearing report?
16 A.Yes.
17 Q.And in there, in paragraph
18 number 98, you state that Breon
19 refused to consider your defenses and
20 refused to allow you to offer any
21 documentary or exculpatory evidence
22 and refused to take in consideration
23 your written and oral versions and
24 refused Plaintiff's witnesses for
25 false and retaliatory purposes and

Page 51

1 fuckin' this and fuckin' that.
2 Q.You state in paragraph number
3 95 that you subsequently received an
4 intentionally false and fabricated
5 misconduct by Defendant Chesney
6 stating Plaintiff used obscene and
7 abusive language and refused to leave
8 the office. And you also state that
9 that report in paragraph number 96
10 was in retaliation for filing prison
11 grievances and legal actions. How
12 did he retaliate against you? What
13 did he do?
14 A.Well, who are you talking
15 about?
16 Q.You refer to Chesney.
17 A.Are you talking Chesney or are
18 you talking about the Hearing
19 Examiner?
20 Q.It's your paragraph, you tell
21 me. It says, paragraph 95 says,
22 Plaintiff subsequently received an
23 intentionally false and fabricated
24 misconduct report by Defendant
25 Chesney stating that Plaintiff used

Page 5

1 reasons. What documentary or
2 exculpatory evidence did Breon
3 refuse?
4 A.The witnesses.
5 Q.Do you remember receiving a
6 copy of the misconduct report?
7 A.Yes.
8 Q.And Hearing Examiner's ---
9 Part 2A, and this is difficult to
10 read, but there is a notation by the
11 Hearing Examiner that says the
12 witnesses were denied. That the
13 inmate indicated none of the staff
14 were present at the time and place of
15 incident.
16 A.But I didn t say that.
17 Q.That's not true, you didn't
18 say that?
19 A.No, I did not say that none of
20 the staff were present at the time.
21 That's why I put them on the witness
22 sheet.
23 Q.What did you say?
24 A.I said that they would testify
25 that they didn t see me yelling at

Page 54

1 anybody and that I was only in the
2 office for a short time, seconds, and
3 then I left.
4 Q.You also state that in
5 paragraph 99 that Defendant Breon was
6 intentionally biased against
7 Plaintiff and made an illogical
8 ruling supported by no evidence.
9 What was the illogical ruling?
10 A.He found me guilty for
11 refusing an order and doesn't say in
12 the misconduct report what the order
13 was.
14 Q.You also state that there was
15 insufficient evidence to support the
16 charge because the false report and
17 biased Hearing Examiner specifically
18 stated that Plaintiff apparently
19 complied with the alleged order
20 although none was given. What do you
21 base that on?
22 A.I wasn t given any order.
23 Q.But you say that the Hearing
24 Examiner specifically stated the
25 Plaintiff apparently complied with

Page 55

1 the alleged order.
2 A.Exactly, he said I was given
3 an order.
4 Q.Where did he say that?
5 A.He doesn t, it --- obviously
6 he said I complied with the order if
7 I left.
8 Q.He says that in his Finding of
9 Fact?
10 A.I don't recall.
11 Q.Do you want to read the
12 Finding of Fact?
13 WITNESS REVIEWS DOCUMENT
14 A.It doesn't say what the orders
15 were. If the orders were like he
16 said.
17 ATTORNEY LEWIS:
18 We're going to attach
19 this as Exhibit C to the
20 deposition. Do you want to
21 mark it so we don't get
22 confused here?
23 (Deposition Exhibit C
24 marked for
25 identification.)

Page 56

1 BY ATTORNEY LEWIS:
2 Q.You also stated that Breon was
3 so biased that he utterly refused to
4 ascertain any true facts concerning
5 the incident. How was he so biased?
6 What do you base the biased claim on?
7 A.Like I said there were prison
8 guards outside the office that would
9 verify they didn't see me yell at
10 anybody, they didn't hear me yell at
11 anybody, and I was only in the office
12 for a few seconds and I just walked
13 out. Now, according to this guy I
14 was yelling and screaming and all
15 this. That couldn't have happened.
16 Q.Did you appeal this
17 misconduct?
18 A.Yes.
19 Q.And who did you appeal it to?
20 A.The PRC.
21 Q.And did you go beyond the PRC?
22 A.Yes.
23 Q.To?
24 A.Dragovich.
25 Q.And after Dragovich?

Page 57

1 A.Bitner and Horn.
2 Q.You state in paragraph 103
3 that you were set up. What do you
4 base that on?
5 A.It was false misconduct
6 regarding an incident that never
7 happened.
8 Q.And who set you up?
9 A.Chesney.
10 Q.And why would Chesney set you
11 up?
12 A.Because of my reputation as a
13 jailhouse lawyer and so-called always
14 be in trouble for things.
15 Q.But things you're in trouble
16 for?
17 A.They always say I'm involved
18 in something.
19 Q.Involved in something meaning?
20 A.Like they say that guy got
21 beat down over some drugs or football
22 tickets or something and I didn't
23 have anything to do with it.
24 Q.Entering into another group of
25 paragraphs that you are considering

## Multi-Page™

1 or will drop pending the filing of
2 your amended complaint. In paragraph
3 105, you allege that while you were
4 in the hole you were denied shaves,
5 showers, recreation and harassed by
6 the Defendants Fryzel and Eichenberg
7 who threatened Plaintiff with
8 physical harm and death in
9 retaliation for filing grievances and
10 legal actions. Do you still maintain
11 that that's true?
12 A.Yes.
13 Q.When were you denied shaves?
14 A.Always.
15 Q.You were not allowed to shave
16 at all?
17 A.That's correct.
18 Q.What about showers?
19 A.That was like a week, two
20 weeks.
21 Q.You were denied a shower for
22 two weeks. Can you put a time frame
23 on when this happened, when you were
24 in the hole?
25 A.I forget when the days were.

1 A.They'd be threatening me and
2 stuff from over there, kicking my
3 door and everything.
4 Q.They kicked your door. Did
5 they do anything else?
6 A.That's about it.
7 Q.You also state that they
8 threatened you with physical harm and
9 death in retaliation for filing
10 grievances and legal actions?
11 A.Yes.
12 Q.What did they say?
13 A.They were going to kill me.
14 Q.And why?
15 A.Because of filing grievances,
16 filing lawsuits, filing things
17 against guards.
18 Q.Did you ever file a lawsuit or
19 grievance --- let's do lawsuits
20 first, lawsuits against Fryzel and
21 Eichenberg?
22 A.No, not until this one.
23 Q.Did you ever file any
24 grievances against them?
25 A.Not until this one.

1 Q.If this would refresh you, is
2 this the result of misconduct number
3 A110205 which occurred in December of
4 1998?
5 A.Regarding?
6 Q.The refusing to obey an order,
7 is that time period you're talking
8 about in the hole?
9 A.That was like a month.
10 Q.So this would have been in
11 January 1991?
12 A.Not '91.
13 Q.Of '99?
14 A.Yes.
15 Q.So in December, January,
16 whenever you were in the hole of '98,
17 '99, you received no shaves?
18 A.Correct.
19 Q.You didn't receive any
20 showers?
21 A.Not that I recall.
22 Q.No recreation?
23 A.Nope.
24 Q.And how were you harassed by
25 Defendants Fryzel and Eichenberg?

1 Q.Do you know why they were
2 threatening you?
3 A.I don't know what would be in
4 their brains.
5 Q.So you don't know why?
6 A.I know why.
7 Q.Why?
8 A.You mean ---.
9 Q.Why would they threaten you?
10 A.They're retaliations for my
11 filing lawsuits and grievances.
12 Q.Did you ever, before coming to
13 Mahanoy, did you ever know Fryzel or
14 Eichenberg before that?
15 A.No. Eichenberg used to work
16 in Graterford. I didn't know him but
17 he was a guard down there.
18 Q.Did you ever have any contact
19 with him at Graterford?
20 A.Yes.
21 Q.What?
22 A.He was just a guard.
23 Q.He was on your block?
24 A.Sometimes.
25 Q.Paragraph 106 is another

Page 62

1 paragraph that you are considering
2 dropping pending the filing of your
3 amended complaint. You state that
4 Eichenberg once again threatened to
5 kill you in retaliation for filing
6 your lawsuit. Do you still maintain
7 that that's true?
8 A.Yes.
9 Q.Paragraph 107, you state that
10 your cell light was used as a
11 psychological weapon by being kept on
12 from approximately 6 p.m. to 11 p.m.
13 and 24 hours a day at times in order
14 to mentally, emotionally, and
15 psychologically danger Plaintiff via
16 disruptive sleep pattern and sleep
17 deprivation which adversely affected
18 Plaintiff with same decreasing his
19 mental, psychological, and emotional
20 awareness and activity. Do you still
21 maintain that that's true?
22 A.Yes.
23 Q.Did you file a grievance
24 concerning this?
25 A.Yes.

Page 64

1 which is another paragraph that you
2 indicate that you will drop, you
3 notified Defendants Dotter,
4 Dragovich, Bitner, and Horn. That
5 they condoned and sanctioned the
6 actions against Plaintiff in
7 retaliation for filing this legal
8 actions and grievances. How did they
9 retaliate against you?
10 A.By ignoring the grievances
11 without even taking into
12 consideration.
13 Q.Taking into consideration
14 what?
15 A.Basically they weren't taking
16 any of the grievances into
17 consideration. They were just
18 denying them on a general principle
19 because they were from me.
20 Q.And why do you believe that
21 Dotter would retaliate against you?
22 A.For filing lawsuits and
23 grievances. See when I went to those
24 prisons they already knew who I was
25 before I even got there. They'd come

Page 63

1 Q.Did you receive a response
2 concerning that grievance?
3 A.Yes.
4 Q.And in a response were you
5 explained that the low intensity
6 night lights were necessary for
7 security in the units?
8 A.That's what they said. But
9 they never did that anywhere else I
10 was at.
11 Q.Anywhere else that you were
12 at?
13 A.Any other prison I was at.
14 Q.They didn't have that at
15 Graterford?
16 A.No, they don't keep them on 24
17 hours a day.
18 Q.And what about at Albion, when
19 you were there?
20 A.No.
21 Q.So you maintain that Mahanoy
22 is the only institution that kept
23 those lights on?
24 A.Yes.
25 Q.You say in paragraph 107,

Page 65

1 to me and tell me about me.
2 Q.Dotter came to you?
3 A.I didn't meet the woman for
4 many months 'til later on when I was
5 there. What I'm talking about is in
6 general.
7 Q.In general?
8 A.In general they all knew who I
9 was before I even got there.
10 Q.Who all was they?
11 A.I'm talking in general.
12 Mahanoy personnel when I got there I
13 was lead to population everybody knew
14 who I was.
15 Q.Everybody at Mahanoy?
16 A.Guards were stopping me,
17 calling me by name and I just got
18 there.
19 Q.So all the guards ---?
20 A.And I had wrote Horn about
21 that because all the time when I get
22 transferred how does everybody know
23 who I am?
24 Q.And did you get a response
25 from someone?

Page 66

1 A. No.
2 Q. Paragraph 109, you state
3 because of your Islamic belief you do
4 not eat pork; is that correct?
5 A. Correct.
6 Q. In paragraph 110, you state
7 that while at Mahanoy you were not
8 permitted to receive the alternate
9 menu course?
10 A. Correct.
11 Q. Did you sign up to receive an
12 alternative menu course?
13 A. That's not the issue. The
14 issue is at Mahanoy the way that they
15 run it, is you have to be on either
16 or. So when they serve pork we don't
17 get anything.
18 Q. Back me up a minute. What do
19 you mean by you have to be on either
20 or, either or what?
21 A. You could have had the
22 alternative meals or the regular
23 meals. So when they serve pork they
24 don't give you anything, if your on a
25 regular meal.

Page [ ]

1 this is the confusion. At the other
2 prisons when they serve pork they
3 give you an alternative.
4 Q. They give everybody an
5 alternative?
6 A. No. Anybody who wants it.
7 But then I don't eat pork for
8 religious reasons. So if they have
9 pork, everywhere else they give us
10 the alternative. At Mahanoy, they
11 give us nothing. They tell me I have
12 to be on the alternative meal list
13 all the time.
14 Q. Were you on the alternative
15 meal list?
16 A. No, but in population you
17 don't have to be. They would give us
18 the alternative if I was in
19 population.
20 Q. At other institutions?
21 A. Yes.
22 Q. At Mahanoy, in order to
23 receive an alternate menu must you be
24 on the alternative menu list?
25 A. Not in population.

Page 67

1 Q. So you have to be on the
2 alternative meal to receive it?
3 A. Correct. And you always get
4 the alternative meal, you don't get
5 anything else.
6 Q. Let's stop there for a minute.
7 So your complaint is, correct me if
8 I'm wrong here, that if you're on the
9 alternative meal plan that --- and
10 it's a day that they're not serving
11 pork but they're serving something
12 else on the regular meal, is that the
13 problem that you want to be on both
14 lists?
15 A. No. This is the problem,
16 everywhere else when they serve pork
17 they give us the alternative meal as
18 a replacement. At Mahanoy, they
19 don't give us anything, do you follow
20 me?
21 Q. No, I think I'm confused. If
22 you're on the alternative meal ---
23 let's do this, were you on the
24 alternative meal?
25 A. I understand what you're ---

Page [ ]

1 Q. In the RHU?
2 A. Yes.
3 Q. So you're saying at Mahanoy if
4 you were in general population, you
5 do not have to be on a alternative
6 menu list to receive an alternative
7 menu selection?
8 A. At Mahanoy, you had to be on
9 the list.
10 Q. Either in general population
11 or in a restricted population? If
12 you're in general population at SCI
13 Mahanoy and you want to receive the
14 alternate menu, must you be on the
15 alternate menu list?
16 A. No, I don t know if that's the
17 rule or if they were just doing it.
18 Q. At Mahanoy.
19 A. Right.
20 Q. And did you file a grievance
21 concerning the ---?
22 A. Yes.
23 Q. Not being permitted to receive
24 the alternate menu?
25 A. When they serve pork.

**Multi-Page™**

1 Q.And did you receive a
2 response?
3 A.Yes.
4 Q.I'll show you the response.
5 Do you want to read it?  You can.
6 A.It didn't have anything to do
7 with the grievance.
8 Q.I'm going to read the --- in
9 the grievance it says Mr. Iscley ---
10 it's dated 12/26/98 and it's
11 grievance number NAH0479-98.  Mr.
12 Iscley, you will be allowed to
13 receive the protein alternative if
14 you sign up for the program, you are
15 medically approved, you had received
16 protein alternative for both dinner
17 and supper meals.  The question is
18 did you ever sign up for the
19 alternate protein?
20 A.If you sign up for the
21 alternate protein, that's all you can
22 get.  You can have either regular
23 meals or you can have protein
24 alternative.
25 Q.And correct me if I'm wrong

1 here, so what you want is to be able
2 to be on ---?
3 A.Like every other prison does
4 it, when they serve pork, why is it
5 that we don't get anything.
6 Q.Because you're not on the
7 alternative list; is that correct?
8 A.This is the whole point.
9 Q.So you want to be able to be
10 on the alternative list only,
11 alternative protein only, on the days
12 when they have pork?
13 A.Exactly.
14 Q.And be on the regular menu all
15 the other times?
16 A.Exactly.
17 ATTORNEY LEWIS:
18 I think we want to
19 attach this as, what are we up
20 to, Exhibit D.  And that is
21 the grievance number MAH0479-
22 98.  I'm sorry.  I'm talking
23 and I'm not giving you enough
24 time to mark.
25 (Deposition Exhibit D

1 marked for
2 identification.)
3 BY ATTORNEY LEWIS:
4 Q.In paragraph 111, Mr. Iscley,
5 you state that you informed
6 Defendants Yarnell, Dotter,
7 Dragovich, Bitner, and Horn via
8 grievances and appeals thereof that
9 they refused to assist Plaintiff in a
10 retaliation for filing your legal
11 actions and grievances.  What did
12 they do that was in retaliation?
13 A.They didn't even consider what
14 the issues and the grievances were.
15 Q.Did they return the grievance
16 to you?
17 A.What do you mean?
18 Q.Did they return the grievances
19 back to you, did they --- did they
20 review them?
21 A.That's what I'm saying, they
22 didn't review them at all.  They just
23 patently denied them.
24 Q.Paragraph 115, you state that
25 in January of '99 you were placed on

1 grievance restriction by Defendant
2 Dragovich in retaliation for filing
3 grievances.  And you say that it was
4 condoned by Defendants Horn and
5 Bitner in retaliation for filing your
6 legal actions.
7 A.Correct.
8 Q.Why do you believe it was in
9 retaliation?
10 A.He said I'm on grievance
11 restriction for filing grievances,
12 what does that mean?
13 Q.Did he give you another
14 explanation, and he referring to Mr.
15 Dragovich?
16 A.Yes.
17 Q.Did he give you an
18 explanation?
19 A.That was the explanation.
20 Q.Did he say anything about the
21 number of grievances you filed in the
22 first few weeks that you were there?
23 A.What does that have to do with
24 anything?
25 Q.Did he tell you anything about

1 using good faith in the grievance
2 system?
3 A.Did you look at the grievances
4 I filed?
5 Q.Mr. Iseley, that's not the
6 question.
7 A.Well, the point is he says
8 that I didn't make a good faith use
9 of the grievance system and I filed
10 five I believe within a few weeks.
11 And he said that that was too large
12 of number. Now, according to state
13 regulations I'm permitted to file a
14 grievance under Title 37. Now, all
15 those grievances were valid
16 grievances.
17 Q.But you agree that you did
18 receive a memo from Superintendent
19 Dragovich dated January 8th, 1999
20 informing you of reasons why you were
21 placed on grievance restriction.
22 A.For filing grievances.
23 Q.But you did receive this memo?
24 A.Let me see.
25 Q.I'll point you to the last

1 paragraph.
2 A.Yes, I did receive this.
3 Q.And I will refer to that as
4 being attached to Exhibit D. It is
5 the last page. Once again, it's
6 dated January 8th, 1999. Mr. Iseley,
7 in paragraph 116 in your complaint
8 you state that in, and it appears to
9 be the copies court hearing, December
10 of 1998, Defendant Dennison came to
11 your prison cell and stated that you
12 had to sign a paper, a psychological
13 --- psychiatric consent form to be
14 evaluated. Can you tell me what
15 happened, or how this came about?
16 A.That's what happened, he came
17 to my cell door and told me I had to
18 sign some sort of consent form or
19 psychological evaluation for parole.
20 Q.And was this in conjunction
21 with any type of meetings that you
22 had with him or any type of parole
23 meeting or review or ---?
24 A.No, I'd never seen the man in
25 my life before.

1 Q.You state in your complaint
2 paragraph 117 that Mr. Dennison said
3 that it was a new policy?
4 A.That's correct.
5 Q.And had to be signed pursuant
6 to the Austin litigation?
7 A.Correct.
8 Q.Have you ever seen this form
9 before?
10 A.No.
11 Q.You did then sign the
12 document; is that correct?
13 A.He told me I had to sign it or
14 I wouldn't be reviewed for parole.
15 Q.You also say in paragraph 118
16 that there was false information?
17 A.That's correct.
18 Q.What information was false, do
19 you recall?
20 A.I didn't have to sign. He
21 gave me the impression that he worked
22 for the parole board and he didn't.
23 Q.Stated in paragraph 119 that
24 you later ascertained that Dennison
25 was not employed by the PBPP and that

1 he did not have to sign the consent
2 form. Do you recall revoking your
3 authorization then to sign?
4 A.Yes.
5 Q.And you also state in
6 paragraph 120 that you informed
7 Defendants Grow and Youron and later
8 immediately informed the parole board
9 that you refuse to sign the form to
10 punish Plaintiff for exercising his
11 right. Can you explain that to me?
12 A.They told me that I
13 refused to sign, but they didn't tell
14 them why.
15 Q.You state that you filed a
16 grievance concerning this incident of
17 the signing of a form. Do you
18 remember getting a response from the
19 Superintendent concerning that?
20 A.Yes.
21 Q.And do you remember that the
22 response, dated January 26th, 1999,
23 where Mr. Dragovich informed you that
24 the psychologist was following the
25 established and routine procedures,

Page 78

1 and that there was a ---?
2 A.Yep, that's what he said, but
3 the guy came up there and lied to me,
4 told me I had to sign it to be
5 reviewed for parole, I wouldn't be
6 reviewed for parole. And he gave me
7 the impression he worked for the
8 parole board. That's not what
9 happened.
10 Q.What happened?
11 A.That's what he told me.
12 That's not what happened, what he
13 says, what Dragovich says, in his
14 response. That didn't have anything
15 to do with what I said in the
16 grievance.
17 Q.And what was your complaint
18 then in the grievance?
19 A.The man lied to me. He didn't
20 give me any type of psychological
21 evaluation. He talked to me for like
22 30 seconds or a minute, two minutes
23 at the most. Two, three minutes at
24 the most. And he was on the other
25 side of my cell door. How's he going

Page 79

1 to give me a psychological evaluation
2 in two or three minutes, and he
3 didn't ask me anything.
4 Q.So you at first signed the
5 form; is that correct?
6 A.He told me I had to.
7 Q.And then you requested that
8 the signature be revoked?
9 A.Yeah, when I found out he
10 lied.
11 Q.And the signature was, in
12 fact, revoked; correct?
13 A.I don't know. That's what
14 they said.
15 Q.What happened after that,
16 after your signature was revoked?
17 What was the problem?
18 A.The problem is they told the
19 parole board I refused to sign it.
20 And they were suppose to give me the
21 forms back and they never did. That
22 form wasn't suppose to be part of my
23 record.
24 Q.Why do you believe ---?
25 A.Because he lied to me. He

Page 80

1 made me sign it under false
2 pretenses.
3 Q.And the false pretenses were?
4 A.He gave me the impression that
5 he was a parole board employee and
6 that if I did not sign the consent
7 form for psychological evaluation, I
8 would not be reviewed for parole.
9 That was a lie.
10 Q.But you did file a grievance
11 concerning this; correct?
12 A.Correct.
13 Q.And you did receive a
14 response; is that correct?
15 A.From who?
16 Q.From Superintendent Dragovich?
17 A.Yes.
18 Q.Did you appeal this to the
19 Chief Hearing Examiner, to Mr.
20 Bitner?
21 A.Yes.
22 Q.And you received a response
23 from him?
24 A.I don't recall if I did or
25 didn't.

Page 81

1 Q.We do have a February 17th
2 response from Mr. Bitner which he
3 denied your appeal; correct?
4 A.Correct.
5 ATTORNEY LEWIS:
6 And we can mark this as
7 Exhibit E.
8 (Deposition Exhibit E
9 marked for
10 identification.)
11 BY ATTORNEY LEWIS:
12 Q.Paragraph 126, you said that
13 in November of 1998, Defendant Craig
14 allegedly performed a psychological
15 evaluation of the Plaintiff, and that
16 the only thing Plaintiff ever spoke
17 to her about concerned his PPP and
18 his transfer pending to another
19 prison; is that correct?
20 A.That's correct.
21 Q.And then you state in
22 paragraph 127 that the relevant
23 psychological evaluations were
24 deliberately and inadequately
25 administered and intentionally

**Multi-Page™**

Page 82

1 included false, misleading
2 information and were purposefully
3 created to be detrimental to
4 Plaintiff in order to deny and quash
5 any opportunity for Plaintiff to make
6 parole in retaliation for filing
7 prison grievances and legal actions.
8 What information did you believe to
9 be false?
10 A.Craig never even evaluated me.
11 Q.And then you're alleging that
12 ---?
13 A.She wrote in her psychological
14 evaluation report a whole bunch of
15 things that she psychologically
16 evaluated me on and came to a whole
17 bunch of conclusions when I never
18 even had an evaluation, period.
19 Q.Did you speak to Defendant
20 Craig?
21 A.I told Craig the day before I
22 was being transferred that I was
23 coming up for parole. She said oh,
24 well, I'm supposed to do a
25 psychological evaluation on you.

Page

1 A.It was a drug program or
2 something, TCV program or something.
3 They told me I had to take those
4 programs, but at the same time, I'm
5 not allowed on those blocks.
6 Q.You spoke with Ms. Craig about
7 your prescriptive program, what else
8 did you speak with her about?
9 A.That was it. Then she came
10 around for, I think they come out
11 every 30 days. Psychologists come
12 every 30 days and say something to
13 you, ask you if you're hallucinating,
14 are you eating, stuff like that.
15 Q.So she asked you questions.
16 And this 30 day review ---?
17 A.Well, she only came once for
18 that.
19 Q.At that time you were in the
20 RHU?
21 A.Yes.
22 Q.So that's two times, you said
23 three or four.
24 A.I spoke to her a lot of times.
25 She's a little goofy. She just be

Page 83

1 Q.That was ---.
2 A.And then later on I find the
3 psychological evaluation report in my
4 records when I never even had a
5 psychological evaluation by Craig.
6 Q.So you only had that one
7 conversation with her?
8 A.No, I spoke to her about three
9 or four times, maybe more. She would
10 always be talking.
11 Q.You spoke to her three or four
12 times?
13 A.Probably more than that, but
14 not about the evaluation report,
15 spoke to her concerned about the
16 prescriptive program plan.
17 Q.What about your prescriptive
18 program?
19 A.Well, they told me I had to go
20 over to --- they told me I had to do
21 some type of program for my
22 prescriptive program plan, but I
23 wasn't allowed on those blocks.
24 Q.Do you remember what it was
25 that you had to do?

Page

1 talking to you sometimes even though
2 you don't say anything to her.
3 Q.What does she do that's goofy?
4 A.Like one time I was sitting
5 there minding my business, she just
6 starts yelling my name across the
7 block.
8 Q.Why would she yell your name?
9 A.To say hi.
10 Q.And what other, let's say
11 conversations, did you have with her?
12 A.I only spoke to her, like I
13 said, about three or four times
14 regarding the prescriptive program
15 plan and the one thing about me
16 coming up for parole and I'm getting
17 ready to transfer.
18 Q.What did you discuss about
19 that coming up for parole?
20 A.Well, we didn't discuss it. I
21 said I was getting ready transfer,
22 and she said she was getting ready to
23 do a parole that's she supposed to do
24 a parole evaluation on me.
25 Q.Did she do a parole evaluation

1 on you?
2 A.I found a parole evaluation
3 report later on in my records when I
4 never had one.
5 Q.Did you file a grievance
6 concerning this?
7 A.I couldn't. I didn't find it
8 out until much later.
9 Q.So you didn't do anything
10 about this, what you characterize as
11 false information?
12 A.It is false information.
13 Q.In paragraph 128, you state
14 that Defendant Bushy intentionally
15 permits his agents in violation of a
16 law to capriciously and arbitrarily
17 deny parole by relying on
18 psychological and DOC reports when he
19 knows --- which he knows, excuse me,
20 deliberately includes inadequate
21 false data, capricious and
22 arbitrarily created to adversely
23 affect the opportunities of Plaintiff
24 for freedom. Defendant Bushy
25 knowingly condones and sanctions such

1 believe Bushy knows, or Bushy
2 intentionally permits this what you
3 call inadequate and false data?
4 A.Well, basically what I'm
5 saying is that it's a well-known
6 practice which they sanction. They
7 know there's no evaluations going on.
8 They know a lot of reports are false.
9 Q.And they, once again you're
10 referring to the board?
11 A.Correct.
12 Q.And how does Bushy knowingly
13 condone and sanction such actions in
14 retaliation against you, how does
15 Bushy retaliate against you?
16 A.Because I told him at the
17 parole interview and I subsequently
18 wrote Bushy a letter about that.
19 Q.Was Mr. Bushy at your parole
20 interview?
21 A.No.
22 Q.But you then wrote him a
23 letter?
24 A.Yes, after I got the green
25 sheet.

1 actions in retaliation against
2 Plaintiff for his filing grievances
3 and legal actions. Do you still
4 maintain all that's true?
5 A.Correct.
6 Q.How does Bushy do this? Can
7 you explain that to me?
8 A.Well, what I'm saying, there
9 is a pattern and practice of them
10 knowing that these reports are being
11 made out.
12 Q.Who's them, them you said
13 knowing?
14 A.The parole board --- the
15 Pennsylvania Board of Probation and
16 Parole employees who do the parole
17 reviews which includes Bushy, because
18 I wrote him about it.
19 Q.Why do you believe it includes
20 Bushy?
21 A.Because I wrote him about it.
22 Q.Did he respond to you?
23 A.No. Also, his name is on the
24 green sheets, or was.
25 Q.Any other reason why you

1 Q.Paragraph 129 states that on
2 February 17th, you were seen for a
3 parole interview by Defendants Grow,
4 Doc, and Moc. And then you allege
5 that you notified them, paragraph
6 130, of prison officials intentional
7 retaliation against him over many
8 years for filing grievances, legal
9 actions, and their deliberate
10 deletion of beneficial data from your
11 file. What information was deleted
12 from your files?
13 A.I took a whole bunch of
14 programs and got certificates and
15 stuff and they never even included it
16 in my files they make out for the
17 board.
18 Q.And who's they?
19 A.The DOC.
20 Q.Who in the DOC?
21 A.That would be at Rockview and
22 Mahanoy.
23 Q.Who at Rockview and Mahanoy?
24 A.Whoever made up the files, I
25 had filed a grievance, like I said,

**Multi-Page™**

1 about the prescriptive program plan.
2 They make out files stating that he
3 didn't participate in his
4 prescriptive program plan when they
5 gave me a prescriptive program plan
6 that I couldn't do.  And I had to
7 file a whole bunch of grievances
8 before they even gave me one.
9 **Q.So you're saying these**
10 **prescriptive program sheets contain**
11 **the false information.  What contains**
12 **the false information?**
13 A.I don't know what contains the
14 false information exactly everything,
15 because I don't have access to the
16 record books.  But I know, for
17 example, that they don't write all
18 the programs that I took.
19 **Q.And they, once again you're**
20 **referring to?**
21 A.For example, the counselors.
22 **Q.Do you know what counselors?**
23 A.Not off the top of my head.
24 Counselors, the deputy warden, the
25 warden, the unit manager.  Even the

1 A.I don't have access to the
2 file.
3 **Q.But you believe there's**
4 **information that's missing from your**
5 **files?**
6 A.I know there's information
7 missing from my files.
8 **Q.Let's try to list what you**
9 **think is missing.**
10 A.The programs that I took and
11 received certificates for are not
12 included in my records.
13 **Q.What were these programs?**
14 A.I took education programs,
15 took college courses.
16 **Q.Where did you take these?**
17 A.I don't even remember, this is
18 over years.
19 **Q.You took these at ---?**
20 A.Different prisons.
21 **Q.What prisons?**
22 A.I don't even remember.
23 **Q.Do you remember what you took**
24 **college courses in?**
25 A.Economics, accounting

1 persons who interview for parole
2 because I tell them about it and they
3 say it's not in the record.
4 **Q.And when did this happen?**
5 A.At that interview date that
6 you're talking about did that.
7 **Q.Perhaps I'm being confusing**
8 **here.  When was the information**
9 **deleted?**
10 A.How am I supposed to know
11 that?
12 **Q.Then what do you base the fact**
13 **on that the information was deleted?**
14 A.Because when I go see the
15 board and I tell them about it, they
16 tell me it's not in the files.  That
17 means it's deleted.
18 **Q.In what files?**
19 A.In the files that they send to
20 the board.
21 **Q.Is this the DC15 file or ---?**
22 A.I don't know, I don't have
23 access to the files.
24 **Q.What about in your parole**
25 **file?**

1 technology, business administration.
2 **Q.From where?**
3 A.I don't remember.
4 **Q.What else is missing from your**
5 **file?**
6 A.Programs that I took, like I
7 said.  I don't even remember the
8 programs.  Impulse control, some
9 other programs, they got weird names
10 for them.
11 **Q.What else is missing from your**
12 **file?**
13 A.The fact that a lot of
14 programs that they said I didn't
15 take, I couldn't take because I
16 wasn't allowed to.  For example, they
17 told me take education programs.  I
18 try to take some education programs,
19 they tell me they don't have anything
20 for me.
21 **Q.And who wouldn't let you take**
22 **those education programs?**
23 A.It wasn't that they wouldn't
24 let me take the programs.  I write
25 whoever's in charge of the education

1 department and they tell me we don't
2 have anything for you.
3 Q. And do you remember who you
4 wrote?
5 A. No.
6 Q. And where was this, what
7 prison?
8 A. That was at Rockview.
9 Q. And you were at Rockview when?
10 A. I believe that's Rockview. I
11 also did it in Mahanoy also.
12 Q. And do you remember who at
13 Mahanoy told you they had nothing for
14 you?
15 A. I believe it was a woman named
16 Ringer. She didn't tell me. She
17 sent it back.
18 Q. And did you submit these to
19 this Ms. Ringer in writing?
20 A. Yes, that's what I received a
21 response in.
22 Q. Anything else that was missing
23 from you files? Do you believe it
24 was deliberately deleted?
25 A. Well, the fact that those

1 evaluation reports never happened for
2 psychological evaluations. Off the
3 top of my head I don't know.
4 Q. You also state that there is
5 intentional addition of adverse data
6 and false data in your files?
7 A. Yes.
8 Q. To ensure adverse parole
9 recommendations to guarantee parole
10 denial for the Plaintiff. Can you
11 tell me what the adverse data and
12 false data that was added to your
13 file is?
14 A. Basically a lot of times I get
15 locked down. And they write down
16 that I'm a security problem, that I'm
17 a troublemaker, and I have an
18 attitude problem, and I'm a security
19 threat.
20 Q. Who writes that down?
21 A. I don't know. I don't have
22 access to the records, but that's
23 what's in the files.
24 Q. And how do you know it's in
25 the file?

1 A. Because that's what they said.
2 Q. Who's they?
3 A. Parole Board people.
4 Q. Do you know who at the Parole
5 Board says this?
6 A. Excuse me?
7 Q. Do you know who at the Parole
8 Board said this?
9 A. For example, like a guy, Grow,
10 parole agent Dare (phonetic), he
11 reviews the stuff and he tells me
12 what they told him. Now, I don't
13 know if it's true or not because all
14 I know is what he tells me. I don t
15 have access to the files. Well, I
16 really can't review files and tell
17 you exactly what's in them or what's
18 missing from them or what's
19 inaccurate. I only have, you know,
20 vague suspicions based on what people
21 tell me. Now they could be lying, I
22 don't know.
23 Q. You state that you were denied
24 parole in retaliation for filing your
25 legal actions and grievances?

1 A. Yeah.
2 Q. How is it retaliation, why do
3 you say it was retaliation?
4 A. Because he told me if I ever
5 expected to make parole, I would have
6 to stop filing legal actions and
7 grievances.
8 Q. And who told you this?
9 A. The guy who interviewed me for
10 parole, him. Grow was there and a
11 woman was there.
12 Q. So it was the three of them?
13 A. Yes.
14 Q. Two of whom you don't know the
15 names?
16 A. Correct. And I even tried to
17 find out the names but they wouldn't
18 tell me.
19 Q. And who is they?
20 A. The two people whose names I
21 didn't know at the interview.
22 Q. But who asked for the name?
23 A. I asked him.
24 Q. You asked Brett --- strike
25 that.

1 At the time that you met with
2 them, you asked them their names and
3 they did not tell you; is that
4 correct?
5 A.Yes. I also wrote Grow and
6 tried to find out their identities.
7 I also wrote the Board and tried to
8 find out their identities.
9 Q.And did you receive any
10 responses?
11 A.As a matter of fact Grow was
12 the one that told me to write the
13 Board for their identities. I also
14 wrote him and told him that I felt it
15 was unfair for them to deny me parole
16 based on the fact that I was filing
17 legal actions and grievances. He
18 told me I had to write the Board
19 about that.
20 Q.So Grow told you?
21 A.No, he didn't tell me that, he
22 wrote that.
23 Q.Just so I'm following you
24 here, Grow wrote that you were being
25 denied parole in retaliation for

1 filing legal actions and grievances?
2 A.I didn't say that. I just
3 said I wrote him to tell him that I
4 felt it was unfair for being denied
5 parole for filing grievances and
6 lawsuits. And I wanted their
7 identities because I wanted to appeal
8 it. He wouldn't give it to me, told
9 me I had to contact the Board.
10 Q.You state in your complaint in
11 paragraph 33 when you noted that he
12 felt it was unfair to retaliate
13 against him and allow retaliation
14 against him for exercising his right,
15 Defendant Moe stated well, that's how
16 things are.
17 A.Right. That's at the time of
18 the interview.
19 Q.And one of the people that
20 would not disclose their identity?
21 A.Yes.
22 Q.You also state in your
23 complaint that in February of 1999,
24 you received two envelopes in the
25 mail which contained two letters and

1 Islamic literature which was
2 confiscated by Defendant Gennarini
3 because of Plaintiff's race and
4 beliefs. What were the two letters
5 and the literature?
6 A.It was Islam literature.
7 Q.Were there any type of names
8 to literature?
9 A.They were like photo copies of
10 articles on Islam.
11 Q.And what were the two letters?
12 A.I don't even recall.
13 Q.Why do you believe they were
14 confiscated because of your race or
15 beliefs?
16 A.Because Gavin told me, the
17 security lieutenant, that they don t
18 allow that Muslim nigger stuff in
19 there.
20 Q.Who told you this?
21 A.Gavin. He said it was gang-
22 related material.
23 Q.Did you get any type of ---
24 did you file a grievance concerning
25 those letters and literature?

1 A.Yes.
2 Q.And did you get a response
3 concerning the literature?
4 A.I imagine so.
5 ATTORNEY LEWIS:
6 And I have here and
7 we'll attach this as Exhibit
8 F, a response dated March 4th,
9 1999, to you.
10 (Deposition Exhibit F
11 marked for
12 identification.)
13 A.Yeah.
14 BY ATTORNEY LEWIS:
15 Q.That's the response that you
16 received?
17 A.Yes. That's in response to
18 the grievance.
19 Q.So you did receive a response
20 to that grievance?
21 A.Well, I just said I didn't
22 remember.
23 Q.You stated that Defendant
24 Gennarini refused to give Plaintiff a
25 reason for the confiscation, in

Page 102

1 paragraph 136, but you did receive a
2 response?
3 A.But they still didn't tell me
4 why they were confiscated.
5 Q.You also state in paragraph
6 138, and this is related to Gavin,
7 that he stated that Plaintiff would
8 be retaliated against via harassment
9 and false misconduct reports for
10 being a, excuse me, these are your
11 words, Muslim nigger, if Plaintiff
12 continued to complain. Plaintiff
13 never received his Islamic
14 literature. You still maintain that
15 that is what Gavin said?
16 A.Yes, that's exactly the way he
17 said it.
18 Q.You state that you would be
19 retaliated against via harassment and
20 false misconduct reports, did that
21 indeed happen?
22 A.Yes.
23 Q.How are you harassed?
24 A.They search my cell all the
25 time.

Page 103

1 Q.What else besides searching
2 your cell?
3 A.They search me all the time
4 every time I want to compound.
5 Q.And this why you're in the
6 RHU?
7 A.When?
8 Q.Well, the time frame here is
9 February 25th, 1999, were you in the
10 RHU at that time?
11 A.No.
12 Q.You were in general
13 population. So they searched you all
14 the time and searched your cell, what
15 else?
16 A.That's about it for that.
17 Q.And you said in false
18 misconduct reports. Did you get a
19 false misconduct report as a result
20 of this?
21 A.Basically what that means is
22 in general for the entire time I was
23 there.
24 Q.And the entire time that you
25 were ---.

Page 104

1 A.The whole issue is that
2 because of my status as so-called
3 jailhouse lawyer when I arrived
4 there, all their actions against were
5 in retaliation for that for filing
6 legal actions and grievances at prior
7 institutions.
8 Q.So all the actions you're
9 complaining about are misconducts?
10 A.Yes.
11 Q.They were all in retaliation?
12 A.Yes.
13 Q.And what else?
14 A.Harassment, the denial on
15 property, the denial of my mail,
16 everything I put in my complaint.
17 Q.You say in paragraph 139 that
18 you contacted Defendants Dragovich
19 and Bitner concerning the wrongful
20 confiscation but they sanctioned,
21 condoned and approved of the
22 intentional discriminatory and
23 unlawful confiscation in retaliation
24 for race, beliefs, and filing of
25 grievances and legal actions. You

Page 105

1 filed a grievance concerning this?
2 A.Yes.
3 Q.And the response was upheld?
4 A.Yes.
5 Q.All the way through to Mr.
6 Bitner?
7 A.I don't recall.
8 Q.So you don't recall if you
9 appealed the response to that
10 grievance beyond ---?
11 A.Well, more likely than not, I
12 did. I appeal everything if I get
13 it. Even if I don't get it, I
14 appeal.
15 Q.Paragraph 140, excuse me ---
16 you state in paragraph 139 that the
17 confiscation was in relation for your
18 race, beliefs, and filing of legal
19 actions. Why do you believe it was
20 race?
21 A.That's what he said.
22 Q.The confiscation?
23 A.That's what he said.
24 Q.And he is?
25 A.Gavin.

Page 106

1 Q.And why do you believe it was
2 based on your beliefs?
3 AI don't recall anywhere where
4 Islamic literature was gang-related
5 material.
6 Q.In paragraph 140, you state
7 that in January of 1999, you were
8 refused from the --- excuse me, it's
9 released from the hole and afterward
10 discovered numerous items were
11 missing from your personal property.
12 Paragraph 141, you say that there
13 were 12 publications that were
14 Exhibits in a federal lawsuit. That
15 you never received any confiscation
16 forms or reasons as to why your
17 property was confiscated. Is that
18 all that was missing were these 12
19 publications?
20 A.At that instance?
21 Q.Yes.
22 A.There were more items but that
23 was the only ones I really wanted.
24 There was some legal work missing and
25 stuff. But those are the items I

Page 10

1 A.It's pending.
2 Q.What were these 12
3 publications, do you remember what
4 they were?
5 A.At Greene Prison, they
6 wouldn't let us purchase any
7 educational books, but they would let
8 us get hardcore pornography. So I
9 bought the hardcore pornography and
10 used them as exhibits because their
11 rule didn't have any basis in
12 reality. How can you let us buy
13 pornographic material but you won't
14 let us buy any educational material.
15 Q.So these were pornographic
16 publications?
17 A.And they were all exhibits in
18 a lawsuit.
19 Q.Do you remember what the
20 caption of the lawsuit is?
21 A.Iseley versus Horn.
22 Q.Did you have a number for it?
23 A.That may be difficult. I'll build a
24 little on that. It's the case that
25 the third circuit brief is due ---

Page 107

1 really wanted.
2 Q.Who confiscated this?
3 A.I don't know. They said they
4 didn't have it.
5 Q.So when you were released from
6 the hole, you go back into general
7 population and you're saying that
8 these publications were not with your
9 property?
10 A.Correct.
11 Q.Did you receive an inventory
12 before you went to the hole?
13 A.I don't recall.
14 Q.How did these publications
15 hamper your third circuit?
16 A.Because they were supposed to
17 be exhibits.
18 Q.And when did you file your
19 third circuit court of appeals brief?
20 A.When?
21 Q.Yes.
22 A.That's to be filed --- it's
23 pending right now.
24 Q.You didn't file a brief on it
25 yet?

Page 10

1 when is the brief due in this case?
2 A.It's pending now.
3 Q.You already filed the brief?
4 A.No, I'm supposed to file it.
5 Q.This month?
6 A.Next month.
7 Q.And that was in January of
8 1999, you realized this?
9 A.Does it say that?
10 Q.Well, it says in January of
11 1999, you were released from the hole
12 ---.
13 A.Well, that's when it happened.
14 Q.It says that you contacted
15 Defendants Dotter, Dragovich, Bitner
16 and Horn but they refused to assist
17 Plaintiff in retaliation for
18 Plaintiff's filing grievances and
19 legal actions. How did they refuse
20 to assist you?
21 A.Because they didn't even
22 investigate the grievance, they just
23 made up said well, you probably
24 didn't have them. You didn't say
25 that when you went down into your

Multi-Page™

Page 110

1 property. I seen them when I went
2 down in my property to get my legal
3 work. They were there. They were in
4 my legal material, that's what I told
5 them.
6 Q. How did Dotter refuse to
7 assist you?
8 A. That's what I just said.
9 Q. All of them the same, Dotter,
10 Dragovich, Bitner, Horn?
11 A. Dotter is the initial
12 grievance coordinator.
13 Q. So all of them, they refused
14 to assist you?
15 A. Yes.
16 Q. And how is that retaliation?
17 A. Because they did that based on
18 my history for filing grievances and
19 lawsuits as a jailhouse
20 lawyer as I already said before.
21 That's what the whole issue about
22 that pertains.
23 Q. You state in paragraph 143
24 that on May 24, 1999, you were
25 wrongfully charged $2.00 for a

Page 111

1 medical visit concerning a chronic
2 condition?
3 A. Correct.
4 Q. What was your chronic
5 condition?
6 A. Hepatitis.
7 Q. And why do you believe you
8 were wrongfully charged?
9 A. Because you're not supposed to
10 be charged for chronic conditions.
11 Q. And what do you base that on?
12 A. That's the policy.
13 Q. Is there a policy number that
14 you recall?
15 A. I don t recall the policy
16 number. But that's the policy, and
17 there is a policy number.
18 Q. You also state in paragraph
19 145 that as a result of the charge,
20 which was improper, you had to pay an
21 additional $5 surcharge?
22 A. Yes.
23 Q. What was the $5 surcharge for?
24 A. I don't even remember now.
25 Q. It says that --- you say in

Page 112

1 paragraph 146 that you contacted
2 Defendants Cerullo, Dotter,
3 Dragovich, and Bitner who all denied
4 the same in retaliation for filing
5 grievances and legal actions. So did
6 you file a grievance concerning this
7 charge?
8 A. Yes.
9 Q. And do you remember what the
10 response was?
11 A. No.
12 Q. Do you remember receiving a
13 response?
14 A. I don't remember. I don't
15 have any of my property.
16 Q. And when you say you don't
17 have any of your property, what do
18 you mean?
19 A. Regarding that civil action.
20 Q. So you don't have any of your
21 grievances or complaints?
22 A. Correct.
23 Q. In paragraph 147, you state
24 that Defendant ABC Corporation
25 specifically follows a pattern of

Page 113

1 practice of discriminatory actions
2 against prisoners. How do they
3 discriminate against prisoners?
4 A. By charging them services that
5 they know they shouldn't be charged
6 for because they know it's so
7 difficult for you to get the money
8 back.
9 Q. So when you received your $2
10 charge or your $5 charge, it was from
11 this ABC Corporation?
12 A. Not the $5 charge. The $2 and
13 that was twice.
14 Q. And the $5 charge was from?
15 A. I don't recall.
16 Q. Do you know of anyone else
17 that was wrongfully charged fees?
18 A. Well, it's my experience that
19 they charge prisoners in general
20 things they're not supposed to
21 charge. And basically most people
22 don't do anything about it because
23 you have to go through a whole lot of
24 nonsense to get your $2 back.
25 Q. Did you try to get your $2

1 back?
2 A.Yes, both instances.
3 Q.And did you?
4 A.No.
5 Q.Were you told why?
6 A.No.
7 Q.And who did you complain to?
8 A.I don't even recall.  I know I
9 wrote Cerullo up and then I filed a
10 grievance.  I don't recall exactly
11 --- like I said, I don't have any of
12 my property for the civil action.
13 Q.Paragraph 152, you state that
14 on February 11th, you ordered a pair
15 of prescription eye glasses.  On the
16 same date you dispatched a written
17 communication requesting that the
18 lenses be made photo-grey.  But
19 Defendant Foe refused to alter or
20 cancel the order to deny this money.
21 Did you order photo-grey lenses?
22 A.Yes.
23 Q.Do you know if photo-grey
24 lenses are permitted?
25 A.Yes.

1 A.Do you want me to read out
2 loud?
3 Q.Yes.
4 A.You did not sign a cash for
5 photo-grey lenses therefore they were
6 not ordered.  You cannot change your
7 order after the fact.
8 Q.So you did receive a response
9 from SCI Mahanoy staff and Ms.
10 Cerullo concerning your photo-grey
11 lenses?
12 A.Yes.
13 Q.And did you appeal this?
14 A.Yes.  I probably did.  I don't
15 recall.  But like I said, more likely
16 than not, I did.  I appeal
17 everything.
18 Q.I can show you this exhibit.
19 You did appeal through a specific G
20 and you received a response on April
21 12, 1999, from Robert Bitner, the
22 Chief Hearing Examiner; is that
23 correct?
24 A.Yes.
25 Q.And he ---.

1 Q.Are they?
2 A.Yes.
3 Q.Do you know who Defendant Foe
4 is?
5 A.No.
6 Q.What did he tell you?
7 A.He didn't tell me anything, I
8 wrote him.
9 Q.And did he allow you to change
10 your order?
11 A.No.
12 Q.Did you receive a reason why
13 you were not allowed to change the
14 order?
15 A.He just told me I couldn't.
16 Q.Did you file a grievance
17 concerning the eye glasses?
18 A.Yes.
19 Q.Do you remember receiving a
20 response from Ms. Cerullo concerning
21 that grievance?
22 A.No.
23 Q.Dated March 4th, let me show
24 you a copy of that.  Do you want to
25 read the first paragraph.

1 A.Sustained it.
2 Q.Yes, he sustained your
3 appeals, thank you.  This will be
4 Exhibit G.
5 (Deposition Exhibit G
6 marked for
7 identification.)
8 A.I never got the glasses or my
9 money.
10 BY ATTORNEY LEWIS:
11 Q.You state in paragraph 154
12 that the AAA Corporation has a
13 pattern in practice of policy of
14 discrimination by not allowing
15 Plaintiff a refund because he is a
16 prisoner but allowing refunds to
17 others.
18 A.Correct.
19 Q.What would you base that on?
20 A.The company has a refund
21 policy which they do not follow for
22 prisoners.  That's discriminatory.
23 Q.Did you seek a refund from the
24 Corporation?
25 A.No.  I did through their

Page 118

1 employees. You mean did I write the
2 CEO or president? No.
3 Q.You sought through the
4 employees. And the employees were
5 here at SCI Mahanoy?
6 A.At Mahanoy.
7 Q.Let's talk a little bit about
8 paragraph 155, which you said you're
9 going to drop, that on April 15th, a
10 guitar bag was confiscated from your
11 mail by prison officials despite the
12 fact that such items were permitted
13 and Plaintiff had received prior
14 approval from prison officials to
15 purchase one. Do you still maintain
16 that's correct?
17 A.That's correct.
18 Q.How do you know that this
19 guitar bag was permitted?
20 A.Because a lot of other people
21 had them.
22 Q.Same kind of guitar bag?
23 A.Yes.
24 Q.Exactly the same bag?
25 A.Not exactly but basically the

Page 119

1 same form, type.
2 Q.And you received prior
3 approval from prison officials to
4 purchase this bag?
5 A.Correct.
6 Q.Did you have a guitar bag like
7 this in any other institution?
8 A.No, I had a case, had a hard
9 shell case.
10 Q.And did you file a grievance
11 concerning this guitar bag?
12 A.Yes.
13 Q.And do you recall receiving a
14 response to the grievance?
15 A.Vaguely.
16 ATTORNEY LEWIS:
17 I'll show you what
18 we'll mark as Exhibit H. It's
19 a response to grievance number
20 NAHO14699.
21 (Deposition Exhibit H
22 marked for
23 identification.)
24 BY ATTORNEY LEWIS:
25 Q.Are you familiar with this

Page 120

1 grievance?
2 A.Yes, but that never happened.
3 Q.Paragraph 7 of the response to
4 the grievance from Lieutenant Mahally
5 says that in regard to your grievance
6 concerning your guitar case, I
7 informed you my reply to request
8 dated 4/21/99, this particular case
9 has excessive soft padding which
10 raises some security concerns. These
11 concerns are specific to the
12 concealment of contraband. For this
13 reason they are not authorized to
14 enter the institution.
15 A.That wasn't true though, other
16 prisoners had that.
17 Q.Well, in the following
18 paragraph he says that the guitar
19 bags that resembles this same style
20 that are already inside the
21 institution will be removed through
22 attrition and as these inmates leave
23 the institution.
24 A.But that's not true.
25 Q.Do you remember receiving this

Page 121

1 response?
2 A.I do but that's a lie.
3 Q.And why do you believe it's a
4 lie?
5 A.Because it is. They didn't
6 confiscate bags when you left.
7 Q.What do you mean they didn't
8 confiscate bags when you left?
9 A.They don't confiscate the
10 guitar bags when you leave.
11 Q.Leave the institution?
12 A.Exactly, that's what they mean
13 when they say by process of
14 attrition.
15 Q.But leaving to go where?
16 A.See another prison.
17 Q.Or to go home?
18 A.To go home they're going to
19 send it home. Regarding transfers to
20 different institutions, that's what
21 he meant. They were going to
22 confiscate them because you're not
23 allowed to have them by attrition.
24 But they didn't do that and they
25 don't do that.

Page 122

1 Q.I'm going to mark this as
2 Exhibit H. And did you appeal this
3 grievance, do you recall?
4 A.Yes. I don't recall it. But
5 99 percent of the time, I appeal
6 everything. Did I mark that down?
7 Q.Yes, I'm just reviewing them.
8 Yes, you did mark those two down.
9 A.I was going to say because I
10 wasn't even going to raise that issue
11 anyway. But the fact is, like I
12 said, that's a lie because I got my
13 bag.
14 Q.You said that you have yet to
15 be reimbursed --- to receive or be
16 reimbursed for his intentionally
17 stolen guitar bag.
18 A.Yeah, they gave it to me.
19 They didn't at the time of the
20 complaint. But they gave it to me
21 subsequent to that.
22 Q.They gave you the guitar bag?
23 A.Yes.
24 Q.So you now have the guitar
25 bag?

Page 12

1 Q.And then what happened when
2 you tried to ---?
3 A.That was a lie he told me.
4 You didn't have to do that. Then
5 when I sent it out they sent a
6 different radio, and I didn't ask for
7 no other radio. I wanted my money
8 back. He told me I had to send it
9 out again. And I kept telling him I
10 didn't order it from that store, I
11 ordered from commissary.
12 Q.So did you take the radio back
13 to commissary?
14 A.How can I take the radio back
15 when they have the radio?
16 Q.The radio's confiscated?
17 A.Yes.
18 Q.And you never received the
19 radio back?
20 A.I never had the radio, the
21 radio came --- you go to the property
22 room to get your radio. I never had
23 a radio, they had a radio. The radio
24 came and I said I didn't order that.
25 Q.So you did look at the radio?

Page 123

1 A.Yes.
2 Q.Stated on January 15th, 1999,
3 that you purchased a radio from the
4 prison store.
5 A.That's correct.
6 Q.You also alleged that the
7 Defendant or state the Defendant
8 Birosak in retaliation for Plaintiff
9 filing prison grievances then ordered
10 Plaintiff to send the radio out at
11 Plaintiff's expense to an outside
12 private store for a refund.
13 A.That's true.
14 Q.Despite the fact that
15 Plaintiff did not purchase it from
16 the store but from prison store?
17 A.Correct.
18 Q.Explain to me what happened
19 about this radio?
20 A.That's what happened. First,
21 the radio, it wasn't the radio I
22 ordered. He told me I had to send it
23 to some store to get the money back.
24 But I didn't buy it from that store.
25 I bought it from that store.

Page 12

1 A.Yes.
2 Q.So you looked at the radio.
3 A.And I told him I didn't want
4 that. He told me you got to send it
5 out to get your money back to the
6 store. I told him I didn't send that
7 out, excuse me --- strike that.
8 I didn't purchase it from the
9 store. I purchased it from
10 commissary. He told me that's their
11 policy.
12 Q.When did you purchase the
13 radio from commissary?
14 A.About --- weeks before that.
15 Q.And then the radio came in,
16 you mean when you went to the
17 commissary, there wasn't a radio
18 there for you?
19 A.You don't get them at the
20 commissary, you purchase them at the
21 commissary. You have to go to the
22 property room to get them.
23 Q.So when you went to the
24 property room it was the wrong radio?
25 A.Right.

1 Q. And then you were told by
2 Birosak that you had to send it back?
3 A. Right. Well, he didn't tell
4 me to send it back. He told me I had
5 to send it to the store. I told him
6 I didn't buy it from that store, I
7 bought it at the commissary.
8 Q. So you didn't get a radio
9 anyways but you were charged for a
10 radio?
11 A. Correct.
12 Q. So than what happened, did you
13 get a radio?
14 A. No.
15 Q. And then what happened to the
16 amount you were charged?
17 A. How am I supposed to know?
18 Q. So you never were refunded for
19 your radio?
20 A. Correct.
21 Q. You state that on August 27th,
22 1999, your cell was searched and
23 legal materials were searched by
24 Defendant Dropinsky?
25 A. Yes.

1 Q. You further state that he
2 ordered you to throw out all of your
3 legal material in the trash can, save
4 for one folder.
5 A. Correct.
6 Q. Because Plaintiff would be
7 going to trial soon for a federal
8 lawsuit against numerous DOC
9 employees.
10 A. Correct.
11 Q. Did you throw out legal
12 material?
13 A. No.
14 Q. What happened?
15 A. He gave me a false misconduct
16 report, said I threatened him.
17 Q. And what else did he do?
18 A. He was walking around when I
19 was locked in my cell, talking about
20 he was going to kill me, call me a
21 fuckin' nigger and all that. That's
22 before they took me to the hole
23 because I was still on the block
24 then.
25 Q. Now, these paragraphs numbered

1 166 through number 171, excuse me,
2 you state that you're going to drop;
3 is that correct?
4 A. Yes.
5 Q. Why would Defendant Dropinsky
6 say those things to you?
7 A. I don't know what's in his
8 head.
9 Q. Did you know Dropinsky from
10 before?
11 A. From before what?
12 Q. Before coming to Mahanoy?
13 A. No.
14 Q. Did you know him while you
15 were at Mahanoy?
16 A. He worked our block at times.
17 Q. Did you ever have any prior
18 contact with him?
19 A. Not that I recall. What do
20 you mean contact?
21 Q. Any conversations, any type of
22 confrontation?
23 A. Not that I remember.
24 Q. Do you know why he would have
25 told you to throw all your legal

1 materials in the trash can?
2 A. Yeah.
3 Q. Why?
4 A. Because somehow he knew I was
5 getting ready to go to Court for a
6 lawsuit and he wanted me to throw
7 away my legal work, that's what he
8 said.
9 Q. You state that you informed
10 Defendant Hoe, via cell intercom ---
11 A. Yeah, that was the Sergeant.
12 Q. --- of the retaliatory and
13 racially-motivated assault on his
14 person but was told by the Defendant
15 so what, in retaliation for filing
16 prison grievances and legal
17 materials.
18 A. That was through the intercom.
19 Q. So he said so what through the
20 intercom?
21 A. Correct.
22 Q. On the block?
23 A. Yes.
24 Q. Everybody heard this?
25 A. How could everybody hear, this

1 was in the cell intercom.
2 Q It was just in your cell?
3 A Yes, all the cells in the
4 level four unit.
5 Q Do you still maintain that
6 that's true?
7 A Yes.
8 Q You allege in paragraph 169
9 that you, again, attempted to speak
10 to a supervisory officer by notifying
11 Defendant Hoe via cell intercom, but
12 was informed by Hoe that he got what
13 he deserved and was locked in his
14 cell pursuant to Defendant Foe's
15 orders.
16 A Correct.
17 Q Do you know who Defendant Foe
18 is?
19 A He was the Sergeant working
20 that night.
21 Q Sergeant working on August
22 27th, 1999?
23 A Correct.
24 Q You also allege that Dropinsky
25 would then periodically come to your

1 planned misconduct report in
2 retaliation for Plaintiff's filing
3 legal actions against prison
4 officials. Why do you believe that
5 the misconduct was false?
6 A Because it didn't happen.
7 Q And who was part of this
8 conspiracy?
9 A The sergeant, Lieutenant
10 Dropinsky, and whoever else put them
11 up to it. The Hearing Examiner, the
12 program review committee, Dragovich,
13 Bitner, and Horn.
14 Q They were all a part of this
15 conspiracy that you allege?
16 A Yes.
17 Q Paragraph 172, you state that
18 on August 30th, you had a hearing
19 before Defendant Kane who refused to
20 even read your written version and
21 stated that Plaintiff should not have
22 been bothered writing one because his
23 officers do not lie; correct?
24 A Correct.
25 Q State that Defendant Kane

1 cell door ---.
2 A That's what I just said and I
3 didn't allege nothing.
4 Q You state that he would come
5 to his cell door and taunt and
6 threaten him with death and refer to
7 him as a, your words, nigger among
8 other things.
9 A That wasn't my words that was
10 his words.
11 Q Words in your complaint,
12 excuse me, --- among other things and
13 told Plaintiff he would not make
14 parole.
15 A Correct.
16 Q Do you know why he would ---?
17 A I don't even know how he knew
18 I was coming up for parole. I don't
19 know what's in his head. I can't.
20 I'm not psychic.
21 Q In paragraph 171, another
22 paragraph that you state you will
23 drop, you state in the complaint that
24 you were thrown in the hole and
25 received a false and conspiratorially

1 refused to comply with state
2 regulations, DOC policy, and state
3 law because of his status as a
4 prisoner?
5 A Correct.
6 Q What policy did Defendant Kane
7 not follow?
8 A Which policy?
9 Q Uh-huh (yes).
10 A Is that 801?
11 Q Is that what you believe he
12 didn't follow?
13 A I'm not sure off the top of my
14 head, but the policy regarding
15 conducting disciplinary hearings.
16 Q How didn't he follow that
17 policy?
18 A Because he was supposed to be
19 an impartial tribunal. He was
20 supposed to allow me to offer
21 evidence. He was supposed to take my
22 defenses into consideration. He
23 didn't do any of those things.
24 Q You also allege that he
25 refused to comply with state

1 regulations, what state regulation?
2 A.That's Title 37.  Pennsylvania
3 Code 92, 93.
4 Q.And how didn't he comply with
5 that?
6 A.Those regulations are what the
7 DOC policy are based on, there's six
8 things they're supposed to do.  A few
9 of them are just what I just said.
10 Q.And how didn't he follow the
11 state law, how do you believe he
12 didn't follow state law?
13 A.Well, that's all based on the
14 same thing.
15 Q.Same thing as what?
16 A.He's supposed to be an
17 impartial tribunal.  He had an
18 obligation legally not to
19 capriciously and arbitrarily punish
20 me.
21 Q.Paragraph 173, you state that
22 Defendant Kane has a long and well-
23 known bias against the above.  I'm
24 not sure what you mean by above, can
25 you tell me what you mean by above?

1 A.I don t know.
2 Q.Do you want to look at
3 paragraph 173.
4 A.Black prisoners, Muslims.
5 Q.That's who he has a bias
6 against?
7 A.Yes.
8 Q.Explain that to me, how do you
9 know that he has a long and well
10 known ---?
11 A.Well, he was a Hearing
12 Examiner down at Graterford when I
13 was down there.
14 Q.And what did he do that leads
15 you to believe that he has this long
16 and well-known bias?
17 A.That's just general
18 information when you're down there.
19 That's what everybody knows.
20 Q.Who's everybody?
21 A.Us, the prisoners.
22 Q.Everybody at Graterford knows?
23 A.That was there at the time,
24 that they knew.
25 Q.How do they know?

1 A.What do you mean how do they
2 know?
3 Q.What do they base that
4 knowledge on?
5 A.Well, for example, you make
6 black prisoners pay more to get out
7 of misconducts than white prisoners.
8 Q.Kane did?
9 A.Yes.
10 Q.Do you know who and what
11 misconducts?
12 A.This is in general.  We were
13 able to buy our way out of
14 misconducts while we were down at
15 Graterford.
16 Q.How did you do that?
17 A.You had to pay the inmate and
18 the inmate would give the money to
19 Kane.
20 Q.Who was the inmate that you
21 paid?
22 A.His real name I forget.
23 That's like six years ago.
24 Q.You also state in paragraph
25 132 that it is believed that the

1 inmate bias stems from the killing of
2 his father by a black prisoner who
3 was a Muslim?
4 A.Correct.
5 Q.Do you know that for a fact?
6 A.Yes.
7 Q.So you're saying that
8 Defendant Kane's father was killed by
9 a --- is that what your saying?
10 A.Yes, that's what they say.
11 Q.Who says?
12 A.That was according to my
13 information.
14 Q.Do you know if that's true?
15 A.I don't know.  I said it was
16 from my information.  I couldn t
17 verify it because I couldn't get any
18 discovery.  I didn't have the
19 complaint.
20 Q.In paragraph 174, you state
21 that you appealed the decisions to
22 Dragovich, Corbacio, Wildenstein,
23 Hornung, and Bitner, but they refused
24 to address Plaintiff's issue in
25 retaliation for filing grievances and

**Multi-Page™**

Page 138

1 legal actions because of his status
2 as a prisoner.  How did they
3 retaliate?
4 A.Once again, they didn t even
5 investigate the appeal or address it
6 in any significant matter.
7 Q.What made you believe that
8 this was retaliation?
9 A.What led me to believe that
10 this was retaliation?  The misconduct
11 I just got was from the dude who told
12 me to throw away all my legal
13 property because I'm getting ready to
14 go for a lawsuit and called me all
15 type of nigger.  That's what he told
16 me.  Now, what do you think?
17 Q.So that's what you base ---?
18 A.No, I base it on the entire
19 time I was at Mahanoy as I already
20 told you.
21 Q.You state that on August 31st,
22 1991, you found out that a large
23 percentage of you personal property
24 was missing including almost all of
25 your legal materials; correct?

Page 139

1 A.Correct.
2 Q.This is another incident?
3 A.Yes, that's a different
4 incident.
5 Q.And what's that incident?
6 What are the facts surrounding that
7 incident about legal materials?
8 A.It was --- I forget exactly
9 how much but it was a large
10 percentage of my legal property
11 missing.
12 Q.And how did you find out that
13 it was missing?
14 A.Because it wasn't on my
15 property sheet.  And then they later
16 on let me inventory it, I believe.
17 Q.At this time in August of
18 1999, were you in the RHU?
19 A.Yes.
20 Q.And where was this property?
21 A.I don't know.
22 Q.Do you know what the property
23 was?
24 A.Yeah, my legal work.
25 Q.What type of legal work?

Page 140

1 A.That had to do mostly with the
2 lawsuits in the Western District.
3 Q.And what type of ---?
4 A.It was the Western District or
5 Middle District cases, the one for
6 '92 and the Western District was for,
7 I believe, '96 or '97.
8 Q.And what type of materials
9 were they?
10 A.They were mostly research
11 stuff.
12 Q.What type of research stuff?
13 A.The research I was doing for
14 the legal action, discovery
15 materials, my records, motions from
16 me, the Defendants, orders from the
17 Court.  Pretty much the
18 documentations is what --- the
19 filings for those actions and my
20 research and stuff.
21 Q.And did you file a grievance
22 concerning this?
23 A.Yes.
24 Q.And what happened as a result
25 of this grievance?

Page 141

1 A.I don't remember.
2 Q.You also state that you
3 believe that the legal material was
4 intentionally taken by Defendant
5 Dropinsky in retaliation?
6 A.Yes.
7 Q.What do you base that on?
8 A.That's what he told me.
9 That's the same stuff he was telling
10 me to throw away.  And then it comes
11 up missing.
12 Q.Well, this then reverts back
13 to ---?
14 A.The entire time I was at
15 Mahanoy like I said before.  It was
16 all based on my status as a jailhouse
17 attorney.
18 Q.So you believe ---?
19 A.No, I don't believe nothing.
20 Q.You state here that you
21 believe, Plaintiff believes.
22 A.Yeah, I got to say that.
23 Q.But you don't know that?
24 A.Oh, I know because he told me.
25 Q.And when did he tell you?

Multi-Page™

Page 142

1 A.This was later on before I
2 went to Court. I put a grievance in
3 for that. I never got it back
4 because I went to Court. And I put
5 witnesses down for that.
6 Q.You also state that your other
7 missing property includes a chess
8 set, numerous magazines, books,
9 magazines, approximately eight which
10 were Exhibits and legal actions,
11 among other things.
12 A.Right.
13 Q.What were the ---?
14 A.The other eight?
15 Q.Yes.
16 A.Books, or magazines rather,
17 were the remainder of the Exhibits
18 for the Third Circuit. As for the
19 other books and stuff and magazines,
20 those were my personal books. They
21 were stuff on like technical analysis
22 and stuff and the chess set that was
23 my chess set.
24 Q.Did you file a grievance
25 concerning this?

Page 143

1 A.Yes.
2 Q.And what happened as a result
3 of the grievance?
4 A.Nothing.
5 Q.You state in paragraph 179
6 that you have been unable to
7 adequately check your property to
8 ascertain what is missing as of this
9 date.
10 A.Correct.
11 Q.Did you ask to inventory your
12 property?
13 A.Yes.
14 Q.And were you permitted to?
15 A.Not at that time.
16 Q.This is at SCI Mahanoy;
17 correct?
18 A.Yes.
19 Q.Did you file a grievance
20 concerning that?
21 A.I don't recall. I included it
22 in the grievance I remember that.
23 Q.And do you remember when you
24 would have filed this grievance?
25 A.I don't remember.

Page 144

1 Q.What do you base your
2 statement in paragraph 181 on? You
3 said in all regarding
4 discipline the relevant Defendant had
5 a duty to ensure that Plaintiff was
6 not punished capriciously or
7 arbitrarily or because of his race or
8 beliefs or his status as a prisoner.
9 My question is, what do you base on
10 the fact that you were punished
11 because of your race?
12 A.Because I was set up because
13 I'm black.
14 Q.And why do you believe that?
15 A.Well, when they call me all
16 type of niggers I'm wondering, would
17 they do that if I was white.
18 Q.And what about your beliefs,
19 what beliefs are you talking about?
20 A.That is regarding them taking
21 my mail because it's Islamic
22 literature. And also ---.
23 Q.All right. Go ahead.
24 A.The food.
25 Q.It was based on your religious

Page 145

1 belief?
2 A.Yes.
3 Q.You state in paragraph 183
4 that you exhausted all of the
5 available administrative remedies as
6 far as you were permitted or allowed.
7 A.Correct.
8 Q.And all the misconducts that
9 you state you received in this
10 complaint, you exhausted all of them?
11 A.I don't really know right now
12 to tell you. Like I said 99 percent
13 of the time I appeal everything. Even
14 if I don't get an answer back, I
15 appeal to the next level.
16 Q.What I'm going to do now is
17 I'm going go through all the
18 individual Defendants and ask you
19 just a few questions about them. You
20 named Conway Bushey as a Defendant,
21 can you tell me how Mr. Bushey
22 violated your constitutional rights?
23 A.He filed --- followed his
24 agency practice of denying me parole
25 based on information he knows is

Multi-Page™

Page 146

1 false or it was defeated and
2 retaliated against me for filing
3 legal actions and grievances.
4 Q.And did Mr. Bushey retaliate
5 against you?
6 A.Because he didn't do anything
7 when I wrote him.
8 Q.Is there anything else that he
9 did or didn't do?
10 A.No, that's the extent for him.
11 Q.Also named Robert Meyers as a
12 Defendant in this case. Can you tell
13 me how Mr. Meyers violated your
14 constitutional rights?
15 A.He retaliated against me for
16 my status as a jailhouse lawyer, set
17 me up, refused to address my
18 grievances, all because, like I said,
19 my status as jailhouse lawyer and
20 because I'm black.
21 Q.Did he do anything else --- is
22 there anything else that Mr. Meyers
23 did?
24 A.Aside from what I already
25 stated?

Page 147

1 Q.Uh-huh (yes).
2 A.Not that I can recall right
3 now.
4 Q.How about Terry Whitman?
5 A.That's similar to what I just
6 said, he's the Deputy Warden.
7 Q.And what did he do?
8 A.The same thing I just said
9 regarding Meyers.
10 Q.Same thing as Meyers. What
11 about Gregory Gaertner?
12 A.That's similar, like I said,
13 they all set me up to get me out of
14 the jail, found me guilty of
15 misconducts. They knew the guy was a
16 racist. They knew there wasn't no
17 evidence to find him guilty of that.
18 Q.And how did he retaliate
19 against you?
20 A.That was the retaliation.
21 Q.The set up?
22 A.Yes.
23 Q.The alleged --- the statement
24 stating that you ---?
25 A.I didn't allege nothing.

Page

1 Q.The statement that you made
2 that he found you guilty, he being
3 the ---?
4 A.Hearing Examiner Mitchell.
5 Q.What about Defendant Mazzotta?
6 A.He's the grievance
7 coordinator.
8 Q.And what did he do?
9 A.He deliberately refused to
10 address any of the grievances in
11 retaliation for me being black and
12 because my history as a jailhouse
13 lawyer.
14 Q.And what did he do in
15 retaliation?
16 A.He denied my grievances and
17 covered up the incidents.
18 Q.You also named Sara Craig,
19 what did she do?
20 A.She filed a false
21 psychological evaluation report for
22 the DOC and Parole Board.
23 Q.And how did that violate your
24 constitutional right?
25 A.I have a constitutional right

Page

1 to have accurate information in my
2 prison parole files, and not be
3 denied parole based on false and
4 inaccurate information.
5 Q.And how did Ms. Craig
6 retaliate against you?
7 A.I just said what she did and
8 that was in retaliation for my being
9 a jailhouse lawyer.
10 Q.You named Charles Mitchell as
11 a Defendant, what did he do to
12 violate your constitutional rights?
13 A.Found me guilty of misconduct
14 report when he knew I was innocent
15 because I'm black.
16 Q.And how did he retaliate?
17 A.That's what I just said.
18 Q.Is that all he did in
19 retaliation?
20 A.Called me all type of niggers
21 and stuff.
22 Q.You also name a Tressler,
23 T-R-E-S-S-L-E-R?
24 A.Yes.
25 Q.How did he violate your

1 constitutional right?
2 A He helped cover up the
3 incident.
4 Q. What incident?
5 A. The incident about Mitchell
6 calling me a nigger.
7 Q. And did he retaliate against
8 you?
9 A. That was the retaliation.
10 Q. Anything else?
11 A. No, not for that.
12 Q. You also name an individual by
13 the name of Wakefield,
14 W-A-K-E-F-I-E-L-D, as a Defendant.
15 A. Yes.
16 Q. Can you tell me how they
17 violated your constitutional rights?
18 A. Those were, I believe, on the
19 grievances or appeals.
20 Q. And what did they do?
21 A. I already said, denying
22 appeals, not investigating them based
23 on the fact that I'm black and
24 because of my history as a jailhouse
25 lawyer.

1 Bitner violated your constitutional
2 rights?
3 A. He did not investigate
4 appeals, the misconducts, and
5 grievances based on the fact of my
6 race and history as a jailhouse
7 lawyer. He did it in retaliation for
8 my history of that. He knew that
9 stuff didn't go on and he just went
10 along and did it.
11 Q. What about Defendant
12 Dragovich, how did he violate your
13 constitutional rights?
14 A. Same thing. Just what I just
15 said.
16 Q. Exactly the same thing, he
17 didn't investigate?
18 A. Exactly.
19 Q. Anything else, anything in
20 addition?
21 A. Not that I can think of right
22 now.
23 Q. You also name Carol Dotter as
24 Defendant. How did she violate your
25 constitutional rights?

1 Q. And what do you base your
2 retaliation on?
3 A. His actions and inactions.
4 Q. Anything else?
5 A. No.
6 Q. You also name Defendant Horn.
7 A. Correct.
8 Q. Can you tell me how he
9 violated your constitutional rights?
10 A. Because he didn't do anything
11 about it. He knew what was going on
12 and he deliberately condoned and
13 sanctioned the actions against me.
14 Q. And what did he know what was
15 going on?
16 A. Everything in the complaint.
17 Q. He knew about everything in
18 the complaint? And how did he
19 retaliate?
20 A. By his inactions.
21 Q. Anything else that Defendant
22 Horn did?
23 A. I can't recall right now.
24 Q. You name Robert Bitner as a
25 Defendant, can you tell me how Robert

1 A. What I just said for them
2 about the initial grievances.
3 Q. Anything else?
4 A. She covered up stuff. The
5 same thing I was saying about
6 everybody.
7 Q. What do you base your
8 allegation of retaliation on
9 concerning Ms. Dotter?
10 A. She refused all the grievances
11 just based on the fact of my history
12 as a jailhouse attorney and because
13 my race, for filing legal action and
14 grievances prior to that.
15 Q. Anything else?
16 A. Not that I can think of right
17 now.
18 Q. You also named K. Breon, B-R-
19 E-O-N, how did he violate your
20 constitutional rights?
21 A. By finding me guilty of a
22 misconduct report based on my status
23 as a jailhouse lawyer and because of
24 my race.
25 Q. And how did he retaliate?

Multi-Page™

Page 154

1 A.That's what I just said.
2 Q.You're saying that he
3 retaliated by finding you guilty and
4 his retaliation was based on the fact
5 that you're a jailhouse lawyer?
6 A.And ---.
7 Q.You tell me.
8 A.Because of my race.
9 Q.Anything else about Mr. Breon?
10 A.Not off the top of my head.
11 Q.You also name J. Kevin Kane as
12 a Defendant, can you tell how ---?
13 A.It s the same thing for Breon.
14 Q.Anything else?
15 A.No, not right now.
16 Q.You also name Novotney,
17 N-O-V-O-T-N-E-Y, can you tell me how
18 he violated your constitutional
19 rights?
20 A.He didn't do anything about
21 the appeals.  It was sent to him
22 based on my history as a jailhouse
23 lawyer and because of my race all in
24 retaliation for same.
25 Q.Anything else about Mr.

Page [155]

1 Q.Do you want to put on record
2 how he did violate your
3 constitutional rights?
4 A.I'm not playing, I'm dropping
5 it anyway.
6 Q.You name Marva Cerullo as a
7 Defendant, can you tell me how she
8 violated your constitutional rights?
9 A.She refused to address my
10 grievances and give me back my money
11 all because my history as a jailhouse
12 lawyer.
13 Q.Anything else about her?
14 A.No.
15 Q.You also name a Richard
16 Spaide, S-P-A-I-D-E.
17 A.The appeals.
18 Q.As a Defendant, how did he
19 violate your constitutional rights?
20 A.He didn't address my
21 misconduct appeal because of my
22 history as a jailhouse lawyer and my
23 race.
24 Q.Anything else about Mr.
25 Spaide?

Page 155

1 Novotney?
2 A.Not right now.
3 Q.You also name Mr. Dennison,
4 D-E-N-N-I-S-O-N, as a Defendant, can
5 you tell me how he violated your
6 constitutional rights?
7 A.Because he intentionally lied
8 to me regarding the psychological
9 evaluation report.  He made up a
10 false psychological evaluation report
11 which resulted in adverse parole
12 ability.
13 Q.And how did he retaliate and
14 what was his retaliation based on?
15 A.My history as a jailhouse
16 lawyer and because of my race.
17 Q.Anything else?
18 A.No.
19 Q.Concerning Mr. Dennison?
20 A.Dennison, no.
21 Q.You also name Mr. Chesney as a
22 Defendant, can you tell me how he
23 violated your constitutional rights?
24 A.Well, I'm dropping that
25 anyway.

Page 1[]

1 A.Regarding?
2 Q.The complaint that you filed,
3 regarding his actions or inactions?
4 A.They're all based on
5 retaliation.
6 Q.Anything else that Mr. Spaide
7 did?
8 A.No.
9 Q.You also name Robert Yarnell
10 as a Defendant.
11 A.Yes.
12 Q.Can you tell me how he
13 violated your constitutional rights?
14 A.He didn't address my grievance
15 because my history as a jailhouse
16 lawyer and because of my race.
17 Q.Anything else that ---?
18 A.He violated my first amendment
19 rights.
20 Q.How did he violate your first
21 amendment right?
22 A.Because he wouldn't address
23 the grievance.
24 Q.Anything else that Mr. Yarnell
25 did?

Multi-Page™

Page 158

1 A.Regarding?
2 Q.Your complaint.
3 A.It's in the complaint.
4 Q.Other than what's in the
5 complaint, there's nothing else?
6 A.No.
7 Q.Sally Gennarini, how did she
8 violate your constitutional rights?
9 A.By confiscating my mail
10 because of my race and my release.
11 Q.Anything else?
12 A.No.
13 Q.You also name James Unell,
14 U-N-E-L-L, how did he violate your
15 constitutional rights?
16 A.Because he sanctioned and
17 approved of false evaluation reports
18 by his agent, Dennison.
19 Q.And how did he retaliate?
20 A.That was in retaliation.
21 Q.Based on?
22 A.His sanctioning and covering
23 up reporting, Dennison's false
24 evaluation report and lies.
25 Q.Anything else Mr. Unell did?

Page 159

1 A.No.
2 Q.You also named James Corbacio,
3 C-O-R-B-A-C-I-O, what did he do to
4 violate your constitutional rights?
5 A.I believe he was on the appeal
6 --- I'm not sure, like I said I
7 didn't have the information. I
8 believe he's on the appeals, and
9 that's all based on they refused to
10 investigate the issues we've been
11 addressing to take them in a
12 significant consideration based on my
13 history.
14 Q.Anything else that he did?
15 A.No.
16 Q.You also named Thomas Hornung.
17 A.Same thing.
18 Q.Same thing as Mr. Corbacio?
19 A.Yes.
20 Q.Anything else that you want to
21 add, you also name Brenda
22 Wildenstein?
23 A.Same thing.
24 Q.Anything you need to add as to
25 Ms. Wildenstein?

Page 160

1 A.No.
2 Q.You also name a Youron,
3 Y-O-U-R-O-N, how did he violate your
4 constitutional rights?
5 A.Is Youron at Mahanoy or
6 Rockview?
7 Q.In your complaint you have an
8 M.S.P.
9 A.That was the same thing that
10 he did for, --- no, he sanctioned and
11 approved the false psychological
12 evaluation report Dennison put in, he
13 was his supervisor.
14 Q.And how was that retaliation?
15 A.He did that because of my
16 history.
17 Q.Your history?
18 A.As a jailhouse lawyer.
19 Q.Is there anything else Mr.
20 Youron did?
21 A.No.
22 Q.And you name an Eichenberg,
23 E-I-C-H-E-N-B---?
24 A.I'm dropping him.
25 Q.You're dropping him?

Page 161

1 A.Yes.
2 Q.You also name a Fryzel,
3 F-R-Y-Z-E-L?
4 A.I'm dropping him, too.
5 Q.Also name Gavin, G-A-V-I-N, as
6 a Defendant in your case, can you
7 tell me how he violated your
8 constitutional rights?
9 A.He confiscated my mail because
10 of my race, my beliefs, and in
11 retaliation for my being a jailhouse
12 lawyer.
13 Q.Anything else that Mr. Gavin
14 did?
15 A.No.
16 Q.You also name a Mr. Mahally,
17 M-A-H-A-L-L-Y, how did he violate
18 your constitutional rights?
19 A.That was regarding the
20 grievances for the property. He
21 didn't address them. He just denied
22 me my property because of my history
23 as a jailhouse lawyer and because of
24 my race.
25 Q.Anything else?

Multi-Page™

**Page 162**

1 A No.
2 Q. You name a Mr. Birosak,
3 B-I-R-O-S-A-K, how did he violate
4 your constitutional rights?
5 A Same thing.
6 Q. Anything else that you want to
7 add that Mr. Birosak did?
8 A He also did it in retaliation
9 for my filing a grievance against.
10 Q. And when was that grievance
11 filed?
12 A I don t recall, like I said, I
13 don't have access to any of my legal
14 work.
15 Q. Was it when you first arrived
16 at Mahanoy or ---?
17 A Yeah, when I first arrived
18 that's when the exhibits were missing
19 and I filed a grievance against.
20 Q. You also name a Defendant by
21 the name of Peek, P-E-E-K.
22 A That's the same thing.
23 Q. Can you tell me how he
24 violated your constitutional rights?
25 A In refusing me my property or

**Page [163]**

1 you state a number of legal claims
2 and I want to go through things
3 quickly. Well, not quickly but we're
4 going to review them. You say that
5 the actions of the Defendants
6 violated your first amendment rights
7 guaranteed by the United States
8 Constitution. And you state first
9 amendment rights, you were retaliated
10 against for filing actions,
11 retaliated against for filing
12 grievances, for not giving permission
13 for his psychological records to be
14 disseminated, denied legal material
15 for trial, denied pork free
16 alternative meal, and his Islamic
17 literature, is there anything else
18 that you include in your first
19 amendment claim?
20 A Would that include the
21 Religious Resperation Freedom Act?
22 Q. That's for you to decide.
23 A Well, that includes that, too.
24 Q. Anything else?
25 A Not right now.

**Page 163**

1 he stole my property based on the
2 fact of my history as a jailhouse
3 lawyer.
4 Q. Anything else Mr. Peek did?
5 A No.
6 Q. You also name a Defendant by
7 the name of MacKreth. ✓
8 A I'm dropping him.
9 Q. You also name a Defendant by
10 the name of Dropinsky.
11 A I'm dropping him, too.
12 Q. You also name a Defendant by
13 the name of Jason Grow, can you tell
14 me how he violated your
15 constitutional rights?
16 A He denied me parole in
17 retaliation for my filing grievances
18 and lawsuits.
19 Q. Anything else that Mr. Grow
20 did?
21 A Well, he also was aware of all
22 the false information in my files and
23 never even investigated or even noted
24 it in the record.
25 Q. At the end of your complaint,

**Page [164]**

1 Q. You also state that the
2 Defendants violated your fourth
3 amendment rights when you were denied
4 employment and pay.
5 A I'm dropping that.
6 Q. Denying opportunity to obtain
7 a favorable parole recommendation,
8 denied the opportunity to obtain
9 parole, denied adequate psychological
10 reports and denied property and
11 money. Anything else that you wish
12 to include?
13 A Not right now.
14 Q. You state in paragraph 187
15 that the Defendants violated your
16 secure eighth amendment rights
17 guaranteed under the United States
18 Constitution when you were denied
19 accurate psychological records, files
20 and when your cell lights were kept
21 on all night, and when you were
22 denied showers and recreation.
23 A The last two will be dropped.
24 Q. Showers and recreation?
25 A Yes.

Multi-Page™

Page 166

1 Q. And what about cell lights?
2 A. That remains.
3 Q. Cell lights are going to
4 remain?
5 A. Did I mark that down?
6 Q. You have that checked.
7 A. Then they'll be dropped.
8 Q. Anything else you want to add
9 to your eighth amendment?
10 A. No.
11 Q. You also allege that your 14th
12 amendment rights were violated when
13 you were denied an opportunity to be
14 heard, had a partial Hearing
15 Examiner, denied opportunity to offer
16 evidence, denied property, denied
17 money, denied employment pay,
18 retaliated against for filing legal
19 actions or prison grievances, and
20 denied his Islamic literature and
21 capriciously and arbitrarily denied
22 and found guilty, and I can't make
23 out what the end of that is. But
24 aside from what you have in paragraph
25 188, do you want to review it, is

Page 167

1 there anything else?
2 A. The employment pay thing will
3 be dropped, and I don't have anything
4 to add right now.
5 Q. Those were your --- paragraph
6 188 deals with due process
7 guarantees. Paragraph 189, you state
8 that Defendants violated and secured
9 your 14th amendments too subsequent
10 to due process guaranteed under the
11 U.S. Constitution. You were punished
12 because of your race, punished
13 because of your belief. You were
14 denied adequate disciplinary
15 proceedings, found guilty with no
16 evidence, denied personal property
17 and money, retaliated against for
18 filing legal actions or prison
19 grievances and denied his Islamic
20 literature and denied an opportunity
21 to make parole and not have
22 inaccurate psychological information
23 in his files.
24 A. Correct.
25 Q. Anything else you want to add

Page 168

1 to that?
2 A. Not right now.
3 Q. You have in paragraph 190 that
4 the actions of the Defendants
5 violated Plaintiff's secured 14th
6 amendment rights to keep a protection
7 guaranteed under the United States
8 Constitution and he was denied the
9 pork free alternative meals, denied
10 his Islamic literature, and punished
11 for his status as a prisoner; is
12 there anything else you want to add
13 to that?
14 A. Not right now.
15 Q. Is there anything else that
16 you want to add concerning this
17 complaint?
18 A. Well, anything that I add, it
19 will be in the amended complaint.
20 ATTORNEY LEWIS:
21 That's it, thank you.
22
23 * * * * * * * *
24 DEPOSITION CONCLUDED AT 1:15 P.M.
25

**-$-**

**$2** [4] 113:9,12,24,25
**$2.00** [1] 110:25
**$20** [1] 9:1
**$30** [1] 9:1
**$5** [5] 111:21,23 113:10
113:12,14

**-'-**

**'91** [1] 59:12
**'92** [1] 140:6
**'96** [1] 140:7
**'97** [2] 22:10 140:7
**'98** [2] 22:10 59:16
**'99** [3] 59:13,17 72:25
**'til** [1] 65:4

**-0-**

**00-00577** [1] 7:18
**05** [1] 16:12

**-1-**

**101** [1] 5:14
**103** [1] 57:2
**105** [1] 58:3
**106** [1] 61:25
**107** [2] 62:9 63:25
**109** [1] 66:2
**10:15** [1] 2:13
**10:30** [1] 25:18
**11** [1] 62:12
**110** [1] 66:6
**110205** [1] 5:10
**111** [1] 72:4
**115** [1] 72:24
**116** [1] 75:7
**117** [2] 5:15 76:2
**118** [1] 76:15
**119** [2] 5:16 76:23
**11:20** [1] 25:19
**11th** [3] 40:4 41:14
114:14
**12** [4] 106:13,18 108:2
116:21
**12/26/98** [1] 70:10
**120** [1] 77:6
**122000** [2] 5:6 42:15
**126** [1] 81:12
**127** [1] 81:22
**128** [1] 86:13
**129** [1] 89:1
**12:30** [1] 24:24
**12th** [1] 48:21
**130** [1] 89:6
**132** [1] 136:25
**136** [1] 102:1
**138** [1] 102:6
**139** [2] 104:17 105:16

**140** [2] 105:15 106:6
**141** [1] 106:12
**143** [1] 110:23
**145** [1] 111:19
**146** [1] 112:1
**147** [1] 112:23
**14th** [1] 166:11 167:9
168:5
**152** [1] 114:13
**154** [1] 117:11
**155** [1] 118:8
**15th** [2] 118:9 123:2
**166** [1] 128:1
**168** [1] 4:5
**169** [2] 4:6 130:8
**16th** [1] 52:10
**171** [2] 128:1 131:21
**17120** [1] 3:10
**172** [1] 132:17
**173** [1] 134:21 135:3
**174** [1] 137:20
**179** [1] 143:5
**17th** [2] 81:1 89:2
**181** [1] 144:2
**183** [1] 145:3
**187** [1] 165:14
**188** [2] 166:25 167:6
**189** [1] 167:7
**190** [1] 168:3
**1988** [1] 39:10
**1991** [2] 59:11 138:22
**1997** [3] 13:2 19:3 22:9
**1998** [12] 24:18,23 26:21
30:14 37:2,17 40:4 48:21
52:10 59:4 75:10 81:13
**1999** [24] 7:19 75:6
77:22 99:23 101:9 103:9
106:7 109:8,11 110:24
116:21 123:2 126:22
130:22 139:18
**1:00-CV-00577** [1] 1:7
**1:15** [1] 168:24

**-2-**

**2/17/99** [1] 5:12
**2001** [2] 1:15 2:13
**23** [2] 1:15 2:12
**24** [3] 62:13 63:16 110:24
**24th** [1] 24:23
**25th** [1] 103:9
**26th** [1] 77:22
**27th** [2] 126:21 130:22
**2A** [1] 53:9
**2nd** [2] 30:8,14

**-3-**

**30** [7] 8:21 33:9,14 78:22
84:11,12,16
**30th** [1] 132:18
**31st** [2] 24:18 26:21
138:21

**33** [1] 99:11
**37** [2] 74:14 134:2
**3rd** [2] 31:6,23

**-4-**

**4/12/99** [1] 5:15
**4/21/99** [1] 120:8
**42** [2] 5:6,8
**4th** [2] 101:8 115:23

**-5-**

**5/18/99** [1] 5:16
**50** [1] 12:24
**51** [2] 17:15 18:6
**52** [2] 19:25 20:5
**55** [2] 5:10 22:1
**59** [1] 22:17

**-6-**

**6** [1] 62:12
**68** [1] 28:6

**-7-**

**7** [2] 4:5 120:3
**71** [2] 5:11 31:5
**73** [1] 33:7
**78** [1] 34:16
**79** [1] 35:15

**-8-**

**80** [1] 39:6
**801** [1] 133:10
**81** [2] 5:12 38:3
**82** [1] 39:9
**83** [1] 44:1
**84** [1] 44:10
**86** [1] 46:2
**89** [1] 47:5
**8th** [2] 74:19 75:6

**-9-**

**90** [2] 33:8 47:18
**91** [1] 48:4
**92** [2] 48:18 134:3
**93** [2] 49:4 134:3
**94** [1] 50:6
**95** [2] 51:3,21
**96** [1] 51:9
**98** [2] 52:18 71:22
**99** [3] 54:5 122:5 145:12
**9th** [2] 37:2,16

**-A-**

**a.m** [1] 2:13
**A110205** [1] 59:3
**AAA** [1] 117:12
**ABC** [2] 112:24 113:11
**ability** [1] 155:12

**able** [4] 21:18 71:1,9
136:13
**above** [3] 134:23,24,25
**abusive** [2] 51:7 52:1
**AC** [1] 16:14
**access** [9] 90:15 91:23
92:1 95:22 96:15 162:13
**according** [2] 32:18
46:24 56:13 74:12 137:12
**accounting** [1] 92:25
**accuracy** [1] 8:18
**accurate** [2] 149:1
165:19
**accurately** [2] 9:7 11:22
**Act** [1] 164:21
**action** [9] 19:11 38:19
112:19 114:12 140:14
153:13
**actions** [52] 12:8 13:3
14:20 18:12 20:7 22:23
35:19 38:8,9,15 39:13
46:11 47:8,22 48:10 51:11
58:10 60:10 64:6,8 72:11
73:6 82:7 87:1,3 88:13
89:9 96:25 97:6 98:17
99:1 104:4,6,8,25 105:19
109:19 112:5 113:1 132:3
138:1 140:19 142:10
146:3 151:3,13 157:3
164:5,10 166:19 167:18
168:4
**activity** [1] 62:20
**add** [2] 159:21,24 162:7
166:8 167:4,25 168:12,16
168:18
**added** [1] 95:12
**addition** [2] 95:5 152:20
**additional** [1] 111:21
**address** [9] 137:24 138:5
146:17 148:10 156:9,20
157:14,22 161:21
**addressing** [1] 159:11
**adequate** [2] 165:9
167:14
**adequately** [1] 143:7
**administered** [1] 81:25
**administration** [1] 93:1
**administrative** [7]
16:13,17,19,20 17:21 20:1
145:5
**adverse** [4] 95:5,8,11
155:11
**adversely** [2] 62:17
86:22
**affect** [1] 86:23
**affected** [1] 62:17
**aforementioned** [1]
52:12
**aforesaid** [1] 25:21
**afterward** [1] 106:9
**again** [15] 7:9 12:22 19:23
20:3 36:10 39:5 41:9
47:18 62:4 75:5 88:9
90:19 124:9 130:9 138:4
**against** [46] 7:12 12:8
19:10,13,20 20:7 26:10

36:10 38:8 47:22 51:12
54:6 60:17,20,24 64:6,9
64:21 87:1 88:14,15 89:7
99:13,14 102:8,19 104:4
113:2,3 127:8 132:3
134:23 135:6 146:2,5,15
147:19 149:6 150:7
151:13 162:9,19 164:10
164:11 166:18 167:17
**agency** [1] 145:24
**agent** [2] 96:10 158:18
**agents** [1] 86:15
**aggravated** [2] 24:21
25:8
**ago** [2] 40:17 136:23
**agree** [5] 26:24 27:1 28:1
39:5 74:17
**ahead** [5] 19:16 20:16,23
41:15 144:23
**al** [2] 1:9 7:17
**Albion** [6] 16:21 17:3,6
17:8,11 63:18
**alcohol** [1] 11:23
**allegation** [3] 19:24
37:13 153:8
**allegations** [2] 8:9 41:10
**allege** [11] 30:7,11 58:3
89:4 130:8,24 131:3
132:15 133:24 147:25
166:11
**alleged** [5] 24:22 54:19
55:1-123:6 147:23
**allegedly** [2] 36:14 81:14
**alleging** [1] 82:11
**allow** [5] 52:20 99:13
100:18 115:9 133:20
**allowed** [15] 13:15 14:3
14:5 32:8 33:10 49:7,18
58:15 70:12 83:23 84:5
93:16 115:13 121:23
145:6
**allowing** [1] 117:14,16
**almost** [1] 138:24.
**along** [1] 152:10
**alter** [1] 114:19
**alternate** [7] 66:8 68:23
69:14,15,24 70:19,21
**alternative** [25] 66:12
66:22 67:2,4,9,17,22,24
68:3,5,10,12,14,18,24
69:5,6 70:13,16,24 71:7
71:10,11 164:16 168:9
**always** [7] 19:17,18
57:13,17 58:14 67:3 83:10
**amend** [5] 11:6 37:9 42:2
42:5,8
**amended** [7] 40:13 42:23
43:19 50:8 58:2 62:3
168:19
**amending** [1] 40:7
**amendment** [10] 157:18
157:21 164:6,9,19 165:3
165:16 166:9,12 168:6
**amendments** [1] 167:9
**among** [3] 131:7,12
142:11

**amount** [1] 126:16
**analysis** [1] 142:21
**answer** [6] 9:23 10:18
  11:6,9 15:7 145:14
**anyway** [4] 37:8 122:11
  155:25 156:5
**anyways** [2] 9:23 126:9
**appeal** [24] 24:13 29:21
  35:11 36:7 56:16,19 80:18
  81:3 99:7 105:12,14
  116:13,16,19 122:2,5
  138:5 145:13,15 156:21
  159:5
**appealed** [5] 35:10 36:21
  37:4,18 48:6 105:9 137:21
**appeals** [10] 35:17 72:8
  107:19 117:3 150:19,22
  152:4 154:21 156:17
  159:8
**apprised** [1] 46:3
**appropriate** [1] 9:17
**approval** [2] 118:14
  119:3
**approved** [4] 70:15
  104:21 158:17 160:11
**April** [3] 116:20 118:9
**arbitrarily** [5] 86:16,22
  134:19 144:7 166:21
**arbitrary** [1] 22:20
**arrange** [1] 18:13
**arrived** [3] 104:3 162:15
  162:17
**articles** [1] 100:10
**ascertain** [2] 56:4 143:8
**ascertained** [1] 76:24
**ascertains** [1] 37:22
**aside** [2] 146:24 166:24
**assault** [7] 24:21,22 25:9
  39:17,20,23 129:13
**asshole** [2] 44:13 50:25
**assist** [5] 22:21 35:16
  36:3,4 72:9 109:16,20
  110:7,14
**assistant** [1] 40:21
**assume** [1] 9:4
**attach** [5] 42:12,14 55:18
  71:19 101:7
**attached** [2] 26:12 75:4
**attempted** [1] 130:9
**attitude** [1] 95:18
**attorney** [7] 3:7 4:5 6:3
  7:7,10 41:20 42:3,11 43:2
  43:13,21 55:17 56:1 71:17
  72:3 81:5,11 101:5,14
  117:10 119:16,24 141:17
  153:12 168:20
**attrition** [3] 120:22
  121:14,23
**August** [8] 24:18,23
  26:21 126:21 130:21
  132:18 138:21 139:17
**Austin** [1] 76:6
**authorization** [1] 77:3
**authorized** [1] 120:13
**available** [3] 22:4 40:18

145:5
**awaiting** [1] 17:12
**aware** [1] 163:21
**awareness** [1] 62:20
**away** [4] 129:7 138:12
  141:10

-B-

**B** [4] 5:7 27:4 42:16,25
**B-I-R-O-S-A-K** [1]
  162:3
**B-R** [1] 153:18
**background** [2] 7:14
  12:1
**bag** [11] 118:10,19,22,24
  119:4,6,11 122:13,17,22
  122:25
**bags** [4] 120:19 121:6,8
  121:10
**bar** [1] 49:8
**base** [15] 34:22 54:21 56:6
  57:4 91:12 111:11 117:19
  136:3 138:17,18 141:7
  144:1,9 151:1 153:7
**based** [22] 96:20 98:16
  102:2 110:17 134:7,13
  141:16 144:25 145:25
  149:3 150:22 152:5
  153:11,22 154:4,22
  155:14 157:4 158:21
  159:9,12 163:1
**basis** [1] 108:11
**beat** [4] 32:14,18,23 57:21
**beginning** [1] 23:1
**behalf** [1] 2:3
**belief** [5] 66:3 145:1
  167:13
**beliefs** [9] 100:4,15
  104:24 105:18 106:2
  144:8,18,19 161:10
**believes** [1] 141:21
**beneficial** [1] 89:10
**between** [2] 9:1 17:2
**beyond** [4] 33:9 36:23
  56:21 105:10
**bias** [4] 134:23 135:5,16
  137:1
**biased** [5] 54:6,17 56:3,5
  56:6
**Birosak** [4] 123:8 126:2
  162:2,7
**bit** [2] 40:10 118:7
**Bitner** [22] 22:18 24:16
  36:1,25 37:19 48:7 57:1
  64:4 72:7 73:5 80:20 81:2
  104:19 105:6 109:15
  110:10 112:3 116:21
  132:13 137:23 151:24
  152:1
**black** [9] 34:20 135:4
  136:6 137:2 144:13
  146:20 148:11 149:15
  150:23
**block** [10] 18:2,4 45:3,13
  49:11 61:23 85:7 127:23
  128:16 129:22

**blocks** [2] 83:23 84:5
**board** [20] 76:22 77:8,12
  78:8 79:19 80:5 87:14,15
  88:10 89:17 91:15,20 96:3
  96:5,8 98:7,13,18 99:9
  148:22
**bodies** [1] 24:15
**books** [6] 90:16 108:7
  142:8,16,19,20
**bothered** [1] 132:22
**bottom** [1] 29:22
**bought** [3] 108:9 123:25
  126:7
**brains** [1] 61:4
**break** [1] 15:11
**Brenda** [1] 159:21
**Breon** [8] 52:11,18 53:2
  54:5 56:2 153:18 154:9
  154:13
**Brett** [1] 97:24
**brief** [5] 107:19,24 108:25
  109:1,3
**brought** [1] 30:20
**brutally** [1] 34:19
**build** [1] 108:23
**building** [1] 22:11
**bunch** [7] 32:17 38:14
  50:19 82:14,17 89:13 90:7
**Busher** [1] 42:19
**Bushey** [5] 1:8 7:17
  145:20,21 146:4
**Bushy** [6] 86:14,24 87:6
  87:17,20 88:1,1,12,15,18
  88:19
**business** [2] 85:5 93:1
**buy** [3] 108:12,14 123:24
  126:6 136:13

-C-

**C** [5] 3:1 5:9 7:1 55:19,23
**C-O-R-B-A-C-I-O** [1]
  159:3
**Camp** [3] 12:11 34:25
  35:4
**cancel** [1] 114:20
**cannot** [1] 116:6
**capricious** [2] 22:19
  86:21
**capriciously** [4] 86:16
  134:19 144:6 166:21
**caption** [2] 15:14 108:20
**captioned** [2] 42:18
**Carol** [1] 152:23
**case** [14] 1:6 7:16 12:17
  15:10,14,16 108:24 109:1
  119:8,9 120:6,8 146:12
  161:6
**cases** [1] 140:5
**cash** [1] 116:4
**cell** [22] 19:18 25:13 40:5
  62:10 75:11,17 78:25
  102:24 103:2,14 126:22
  127:19 129:10 130:1,2,11
  130:14 131:1,5 165:20

166:1,3
**cells** [1] 130:3
**CEO** [1] 118:2
**CERTIFICATE** [1] 4:6
**certificates** [2] 89:14
  92:11
**Cerullo** [5] 112:2 114:9
  115:20 116:10 156:6
**change** [2] 115:9,13
  116:6
**characterization** [1]
  43:22
**characterize** [1] 86:10
**charge** [13] 24:20 25:10
  33:14 54:16 93:25 111:19
  112:7 113:10,10,12,14,19
**charged** [7] 110:25 111:8
  111:10 113:5,17 126:9,16
**charging** [1] 113:4
**Charles** [7] 1:5,14 2:3 3:3
  4:3 7:3 149:10
**check** [5] 12:23 29:3
  49:22,24 143:7
**checked** [3] 41:23 42:20
  166:6
**Chesney** [16] 46:3,5,16
  47:13 48:25 49:6,9 50:11
  50:13 51:5,16,17,25 57:9
  57:10 155:21
**chess** [3] 142:7,22,23
**Chief** [2] 80:19 116:22
**choices** [1] 8:13
**chronic** [3] 111:1,4,10
**circuit** [4] 107:15,19
  108:25 142:18
**civil** [6] 2:5 5:7 8:4 38:14
  112:19 114:12
**claim** [3] 37:25 56:6
  164:19
**claims** [3] 40:11 164:1
**cleaning** [1] 34:20
**clear** [1] 10:16
**clearance** [1] 45:13
**close** [1] 18:14
**closer** [1] 23:14
**Coal** [1] 2:11
**Code** [1] 134:3
**college** [2] 92:15,24
**coming** [6] 61:12 82:23
  85:16,19 128:12 131:18
**commisary** [1] 48:23
**commissary** [10] 49:18
  49:23 124:11,13 125:10
  125:13,17,20,21 126:7
**Commissioner** [1] 2:8
**commit** [1] 24:21
**committee** [3] 35:14
  36:22 132:12
**committing** [1] 25:8
**Commonwealth** [2] 2:9
  9:6
**communication** [1]
  114:17

**company** [1] 117:20
**complain** [1] 102:12
  114:7
**complaining** [1] 104:9
**complaint** [58] 5:8 7:22
  8:10 12:3,4,6,23,25 17:15
  20:19 23:3 24:17 30:13
  37:7,10 39:2,3,7 40:13,14
  40:18 41:2,12,23,24 42:2
  42:5,7,8,18,23 43:18,20
  50:9 58:2 62:3 67:7 75:7
  76:1 78:17 99:10,23
  104:16 122:20 131:11,23
  137:19 145:10 151:16,18
  157:2 158:2,3,5 160:7
  163:25 168:17,19
**complaints** [2] 41:10
  112:21
**completion** [1] 41:5
**complied** [4] 44:6 54:19
  54:25 55:6
**comply** [3] 133:1,25
  134:4
**compound** [1] 103:4
**concealment** [1] 120:12
**concerned** [2] 81:17
  83:15
**concerning** [38] 9:8,15
  10:4 11:4 15:20 24:21
  25:3 26:13 27:8 28:20
  47:3 48:16 52:12 56:4
  62:24 63:2 69:21 77:16
  77:19 80:11 86:6 100:24
  101:3 104:19 105:1 111:1
  112:6 115:17,20 116:10
  119:11 120:6 140:22
  142:25 143:20 153:9
  155:19 168:16
**concerns** [2] 120:10,11
**CONCLUDED** [1]
  168:24
**conclusion** [1] 43:8
**conclusions** [1] 82:17
**condition** [2] 111:2,5
**conditions** [1] 111:10
**condone** [1] 88:13
**condoned** [4] 64:5 73:4
  104:21 151:12
**condones** [1] 86:25
**conducting** [1] 133:15
**confidential** [3] 27:14
  32:19 33:3
**confiscate** [1] 121:6,8,9
  121:22
**confiscated** [10] 37:3
  37:17 100:2,14 102:4
  106:17 107:2 118:10
  124:16 161:9
**confiscating** [1] 158:9
**confiscation** [6] 101:25
  104:20,23 105:17,22
  106:15
**confrontation** [1]
  128:22
**confused** [2] 55:22 67:21
**confusing** [1] 91:7
**confusion** [1] 68:1

**conjunction** [1] 75:20
**consent** [4] 75:13,18 77:1 80:6
**consider** [2] 52:19 72:13
**consideration** [4] 52:22 64:12,13,17 133:22 159:12
**considering** [5] 43:17 47:19 48:5 57:25 62:1
**conspiracy** [3] 24:20 132:8,15
**conspiratorially** [1] 131:25
**Constitution** [4] 164:8 165:18 167:11 168:8
**constitutional** [28] 145:22 146:14 148:24,25 149:12 150:1,17 151:9 152:1,13,25 153:20 154:18 155:6,23 156:3,8 156:19 157:13 158:8,15 159:4 160:4 161:8,18 162:4,24 163:15
**contact** [5] 40:21 61:18 99:9 128:18,20
**contacted** [3] 104:18 109:14 112:1
**contain** [1] 90:10
**contained** [1] 99:25
**contains** [2] 90:11,13
**content** [1] 27:24
**contents** [1] 27:13
**continued** [4] 31:7,24 50:11 102:12
**contraband** [1] 120:12
**control** [1] 93:8
**conversation** [3] 18:18 18:22 83:7
**conversations** [2] 85:11 128:21
**Conway** [1] 1:8 145:20
**cool** [1] 23:13
**coordinator** [2] 110:12 148:7
**copies** [1] 75:9 100:9
**copy** [15] 8:20 9:10 12:3 27:3 28:2 29:24,25 30:4 31:8,17 40:17 42:17 52:14 53:6 115:24
**Corbacio** [3] 137:22 159:2,18
**Corporation** [4] 112:24 113:11 117:12,24
**corpus** [1] 15:8
**correct** [70] 12:12 14:21 15:24,25 16:4 17:1 28:11 29:12 32:6,9 42:7 44:8 48:17 58:17 59:18 66:4,5 66:10 67:3,7 70:25 71:7 73:7 76:4,7,12,17 79:5,12 80:11,12,14 81:3,4,19,20 87:5 88:11 97:16 98:4 107:10 111:3 112:22 116:23 117:18 118:16,17 119:5 123:5,17 126:11,20 127:5,10 128:3 129:21 130:16,23 131:15 132:23

132:24 133:5 137:4 138:25 139:1 143:10,17 145:7 151:7 167:24
**correctional** [2] 12:18 22:14
**corrections** [1] 8:22
**correctness** [1] 8:18
**couldn** [1] 137:16
**COUNSEL** [1] 3:11
**counselor** [1] 21:24
**counselors** [3] 90:21,22 90:24
**county** [2] 15:10,18
**couple** [1] 8:11
**course** [2] 66:9,12
**courses** [2] 92:15,24
**court** [12] 1:1 2:7 9:4 15:17,18 42:9 75:9 107:19 129:5 140:17 142:2,4
**cover** [4] 36:13 47:21 48:2 150:2
**covered** [5] 47:17 48:12 48:13 148:17 153:4
**covering** [2] 36:11 158:22
**Craig** [8] 81:13 82:10,20 82:21 83:5 84:6 148:18 149:5
**created** [2] 82:3 86:22
**criminal** [1] 24:20
**custody** [9] 16:10,13,14 16:16,17,19,20 117:21 20:1

---
**-D-**
---

**D** [6] 4:1 5:11 7:1 71:20 71:25 75:4
**D-E-N-N-I-S-O-N** [1] 155:4
**Dallas** [1] 12:11
**danger** [1] 62:15
**Dare** [1] 96:10
**data** [7] 86:21 88:3 89:10 95:5,6,11,12
**date** [7] 15:6 29:15,17,19 91:5 114:16 143:9
**dated** [10] 29:13,14 31:15 70:10 74:19 75:6 77:22 101:8 115:23 120:8
**dates** [1] 18:18
**days** [14] 8:21 17:7 26:3 26:11,23 28:4 30:6 33:8,9 33:15 58:25 71:11 84:11 84:12
**DC15** [1] 91:21
**deal** [1] 40:11
**deals** [1] 167:6
**death** [3] 58:8 60:9 131:6
**December** [5] 39:10 40:4 41:14 48:21 52:9 59:3,15 75:9
**decide** [1] 164:22
**decision** [5] 29:7 31:9 31:14,19 33:24
**decisions** [1] 137:21

**decreasing** [1] 62:18
**Deeds** [1] 2:8
**defeated** [1] 146:1
**Defendant** [78] 2:4 3:11 17:18 18:7 22:17 23:23 25:22,24 28:7 30:9,15 31:7 32:3 34:17 37:19 38:7,17,18,21 39:2 44:4 46:3 48:7,24 49:6 51:5,24 52:11 54:5 73:1 75:10 81:13 82:19 86:14,24 99:15 100:2 101:23 112:24 114:19 115:3 123:7,7 126:24 128:5 129:10,14 130:11,14,17 132:19,25 133:6 134:22 137:8 141:4 144:4 145:20 146:12 148:5 149:11 150:14 151:6,21,25 152:11,24 154:12 155:4 155:22 156:7,18 157:10 161:6 162:20 163:6,9,20
**Defendants** [1] 1:10 7:11 58:6 59:25 64:3 72:6 73:4 77:7 89:3 104:18 109:15 112:2 140:16 145:18 164:5 165:2,15 167:8 168:4
**defenses** [2] 52:19 133:22
**deleted** [5] 89:11 91:9,13 91:17 94:24
**deletion** [1] 89:10
**deliberate** [1] 89:9
**deliberately** [5] 81:24 86:20 94:24 148:9 151:12
**denial** [6] 22:20 46:9 47:6 95:10 104:14,15
**denied** [42] 32:4,25 35:17 37:20 47:7 48:8,24 53:12 58:4,13,21 72:23 81:3 96:23 98:25 99:4 112:3 148:16 149:3 161:21 163:16 164:14,15 165:3,8 165:9,10,18,22 166:13,15 166:16,16,17,20,21 167:14,16,19,20 168:8,9
**Dennison** [8] 75:10 76:2 76:24 155:3,19,20 158:18 160:12
**Dennison's** [1] 158:23
**deny** [4] 82:4 86:17 98:15 114:20
**denying** [4] 64:18 145:24 150:21 165:6
**department** [2] 22:3 94:1
**Depending** [1] 8:24
**deposed** [1] 7:23
**deposition** [19] 1:13 2:1 7:14,21 8:15 9:22 11:2 41:6 42:24 43:8,25 55:20 55:23 71:25 81:8 101:10 117:5 119:21 168:24
**depositions** [1] 8:2
**deprivation** [1] 62:17
**deputy** [3] 3:7 90:24 147:6

**DESCRIPTION** [1] 5:4
**deserved** [1] 130:13
**despite** [2] 118:11 123:14
**detailed** [2] 27:4,6
**detrimental** [2] 82:3
**device** [1] 8:3
**didn** [6] 26:2 36:16 49:24 53:16,25 138:4
**different** [4] 92:20 121:20 124:6 139:3
**difficult** [3] 53:9 108:23 113:7
**dinner** [1] 70:16
**DIRECT** [1] 7:6
**disciplinary** [3] 52:10 133:15 167:14
**discipline** [1] 144:4
**disclose** [1] 99:20
**discovered** [1] 106:10
**discovery** [3] 41:7 137:18 140:14
**discriminate** [1] 113:3
**discrimination** [1] 117:14
**discriminatory** [3] 104:22 113:1 117:22
**discuss** [2] 85:18,20
**DISCUSSION** [2] 4:19 43:12
**dispatched** [1] 114:16
**disruptive** [1] 62:16
**disseminated** [1] 164:14
**District** [7] 1:1,2 7:19 140:2,4,5,6
**DOC** [10] 12:8 21:1 37:23 86:18 89:19,20 127:8 133:2 134:7 148:22
**docketed** [1] 7:18
**document** [3] 40:16 55:13 76:12
**documentary** [3] 32:1 52:21 53:1
**documentations** [1] 140:18
**documents** [1] 32:24
**Doe** [1] 89:4
**doesn** [1] 55:5
**doesn't** [3] 29:18 54:11 55:14
**don** [8] 27:2,25 69:16 96:14 100:17 111:15 135:1 162:12
**door** [6] 60:3,4 75:17 78:25 131:1,5
**Dotter** [13] 47:14,20 64:3 64:21 65:2 72:6 109:15 110:6,9,11 112:2 152:23 153:9
**down** [21] 8:7 9:6 10:18 10:20 15:11 40:9 57:21 61:17 95:15,15,20 109:25 110:2 122:6,8 135:12,13 135:18 136:14 142:5

**drafted** [2] 31:10,14
**Dragovich** [18] 48:7 56:24,25 64:4 72:7 73:2 73:15 74:19 77:23 78:13 80:16 104:18 109:15 110:10 112:3 132:12 137:22 152:12
**Drive** [1] 2:11
**drop** [16] 37:12,24 41:13 41:14,25 42:22 44:1 47:2 48:5,20 49:5 58:1 64:2 118:9 128:2 131:23
**Dropinsky** [7] 126:24 128:5,9 130:24 132:10 141:5 163:10
**dropped** [7] 39:6 42:1,4 43:23 165:23 166:7 167:1
**dropping** [11] 43:17 50:2 62:2 155:24 156:4 160:24 160:25 161:4 163:8,11 165:5
**drug** [1] 11:23 84:1
**drugs** [1] 57:21
**dude** [1] 138:11
**dudes** [2] 19:21 32:17
**due** [4] 108:25 109:1 167:6,10
**DULY** [1] 7:4
**during** [3] 18:16 20:12 34:25
**duty** [1] 144:5

---
**-E-**
---

**E** [8] 3:1,1 4:1 5:12 7:1,1 81:7,8
**E-I-C-H-E-N-B** [1] 160:23
**E-O-N** [1] 153:19
**eat** [2] 66:4 68:7
**eating** [1] 84:14
**Economics** [1] 92:25
**education** [6] 22:2 92:1 93:17,18,22,25
**educational** [2] 108:7 108:14
**Eichenberg** [7] 58:6 59:25 60:21 61:14,15 62: 160:22
**eight** [2] 142:9,14
**eighth** [2] 165:16 166:9
**either** [5] 66:15,19,20 69:10 70:22
**eliminating** [2] 40:8 41:18
**emotional** [1] 62:19
**emotionally** [1] 62:14
**employed** [1] 76:25
**employee** [1] 80:5
**employees** [7] 12:9 37:23 87:16 118:1,4,4 127:9
**employment** [4] 46:4 165:4 166:17 167:2
**end** [2] 163:25 166:23

ensure [2] 95:8 144:5

enter [1] 120:14

entered [1] 32:2

Entering [1] 57:24

entire [5] 20:12 103:22 103:24 138:18 141:14

envelopes [1] 99:24

escorted [3] 17:18 18:7 30:19

ESQUIRE [1] 3:6

essence [2] 48:14 52:6

established [1] 77:25

et [2] 1:9 7:17

evaluated [2] 75:14 82:10,16

evaluation [21] 75:19 78:21 79:1 80:7 81:15 82:14,18,25 83:3,5,14 85:24,25 86:2 95:1 148:21 155:9,10 158:17,24 160:12

evaluations [3] 81:23 88:7 95:2

everybody [11] 44:23 65:13,15,22 68:4 129:24 129:25 135:19,20,22 153:6

everywhere [2] 67:16 68:9

evidence [14] 31:11 32:1 32:12 33:11,23 36:20 52:21 53:2 54:8,15 133:21 147:17 166:16 167:16

exactly [13] 25:2 71:13 71:16 90:14 96:17 102:16 114:10 118:24,25 121:12 139:8 152:16,18

EXAMINATION [2] 4:4 7:6

examiner [14] 25:22 30:10,16 34:7 51:19 53:11 54:17,24 80:19 116:22 132:11 135:12 148:4 166:15

Examiner's [2] 31:18 53:8

example [6] 20:25 90:17 90:21 93:16 96:19 136:5

excessive [1] 120:9

exculpatory [2] 52:21 53:2

excuse [10] 20:16 41:11 86:19 96:6 102:10 105:15 106:8 125:7 128:1 131:12

exercise [1] 8:19

exercising [2] 77:10 99:14

exhausted [2] 145:4,10

exhibit [18] 5:1 42:16,16 65:19,23 71:20,25 75:4 81:7,8 101:7,10 116:18 117:4,5 119:18,21 122:2

exhibits [8] 42:24 106:14 107:17 108:10,17 142:10 147:17 162:18

exited [4] 40:5 44:3 50:10

expected [1] 97:5

expense [1] 123:11

experience [2] 45:16 113:18

explain [4] 77:11 87:7 123:18 135:8

explained [1] 63:5

explanation [3] 73:14 73:18,19

extent [1] 146:10

eye [2] 114:15 115:17

— F —

F [3] 5:13 101:8,10

F-R-Y-Z-E-L [1] 161:3

fabricated [2] 51:4,23

fact [23] 32:13 38:22 39:1 49:25 55:9,12 79:12 91:12 93:13 94:25 98:11,16 116:7 118:12 122:11 123:14 137:5 144:10 150:23 152:5 153:11 154:4 163:2

facts [6] 8:9 12:2 27:8 36:6 56:4 139:6

failed [1] 12:19

fair [2] 11:10 43:22

faith [2] 74:1,8

false [39] 20:17 51:4,23 52:3,13,25 54:16 57:5 76:16,18 80:1,3 82:1,9 86:11,12,21 88:3,8 90:11 90:12,14 95:6,12 102:9 102:20 103:17,19 127:15 131:25 132:5 146:1 148:20 149:3 155:10 158:17,23 160:11 163:22

familiar [1] 119:25

far [2] 35:8 145:6

fast [1] 23:17

father [2] 137:2,8

favorable [2] 21:1 165:7

February [5] 81:1 89:2 99:23 103:9 114:14

federal [3] 9:16 106:14 127:7

fees [1] 113:17

felt [2] 98:14 99:4,12

few [6] 26:3 56:12 73:22 74:10 134:8 145:19

file [29] 24:4 47:2 50:8 60:18,23 62:23 69:20 74:13 80:10 86:5 89:11 90:7 91:21,25 92:2 93:5 93:12 95:13,25 100:24 107:18,24 109:4 112:6 115:16 119:10 140:21 142:24 143:19

filed [19] 7:12,18 12:7 24:7 73:21 74:4,9 77:15 89:25 105:1 107:22 109:3 114:9 143:24 145:23 148:20 157:2 162:11,19

files [19] 89:12,16,24 90:2 91:16,18,19,23 92:5,7 94:23 95:6,23 96:15,16

149:2 163:22 165:19 167:23

filing [63] 13:3 14:19,25 18:12 19:10 20:7 22:22 35:18 37:21 38:8,14 39:12 42:22 43:19 46:21 47:8 48:9 49:9,10 51:10 52:5 58:1,9 60:9,15,16,16 61:11 62:2,5 64:7,22 72:10 73:2,5,11 74:22 82:6 87:2 89:8 96:24 97:6 98:16 99:1,5 104:5,24 105:18 109:18 110:18 112:4 123:9 129:15 132:2 137:25 146:2 153:13 162:9 163:17 164:10,11 166:18 167:18

filings [1] 140:19

finding [4] 55:8,12 153:21 154:3

findings [1] 27:7

fine [1] 10:12

fired [3] 45:22 46:13,15

first [17] 7:3 8:15 16:22 17:3 23:3 60:20 73:22 79:4 115:25 123:20 157:18,20 162:15,17 164:6,8,18

five [1] 74:10

Foe [3] 114:19 115:3 130:17

Foe's [1] 130:14

folder [1] 127:4

follow [7] 67:19 117:21 133:7,12,16 134:10,12

followed [1] 145:23

following [4] 38:2 77:24 98:23 120:17

follows [5] 7:4 112:25

food [1] 144:24

football [1] 57:21

forget [3] 58:25 136:22 139:8

form [3] 28:18,20 29:1 75:13,18 76:8 77:2,9,17 79:5,22 80:7 119:1

forms [2] 79:21 106:16

found [16] 20:19 27:12 27:19,21,22,22 36:19 54:10 79:9 86:2 138:22 147:14 148:2 149:13 166:22 167:15

four [2] 83:9,11 84:23 85:13 130:4

fourth [1] 165:2

frame [1] 19:23 20:4 58:22 103:8

free [2] 164:15 168:9

freedom [2] 86:24 164:21

Fryzel [2] 58:6 59:25 60:20 61:13 161:2

fuckin' [5] 44:5,12 51:1 51:1 127:21

— G —

G [5] 5:15 7:1 116:19

117:4,5

G-A-V-I-N [1] 161:5

Gaertner [4] 35:25 38:7 40:1 147:11

gang [1] 100:21

gang-related [1] 106:4

gathering [1] 8:3

Gavin [7] 100:16,21 102:6,15 105:25 161:5,13

general [16] 3:7 7:11 64:18 65:6,7,8,11 69:4,10 69:12 103:12,22 107:6 113:19 135:17 136:12

Gennarini [3] 100:2 101:24 158:7

given [5] 54:20,22 55:2

giving [2] 71:23 164:12

glasses [3] 114:15 115:17 117:8

gloves [2] 32:20,20

good [5] 7:8 74:1,8

goofy [2] 84:25 85:3

Graterford [7] 12:11 61:16,19 63:15 135:12,22 136:15

green [2] 87:24 88:24

Greene [17] 12:10 13:1,7 13:8,14 14:9,12,17,23 15:12,22 16:7,11,19,24 38:5 108:5

Gregory [1] 147:11

grievance [58] 5:11 24:4 24:7 48:16 49:20 60:19 62:23 63:2 69:20 70:7,9 70:11 71:21 72:15 73:1 73:10 74:1,9,14,21 77:16 78:16,18 80:10 86:5 89:25 100:24 101:18,20 105:1 105:10 109:22 110:12 112:6 114:10 115:16,21 119:10,14,19 120:1,4,5 122:3 140:21,25 142:2,24 143:3,19,22,24 148:6 157:14,23 162:9,10,19

grievances [71] 18:12 19:11 22:23 23:6 24:11 24:13 35:18 37:21 38:9 39:13 46:11,22 47:2,9 48:10 49:10 51:11 52:6 58:9 60:10,15,24 61:11 64:8,10,16,23 72:8,11,14 72:18 73:3,11,21 74:3,15 74:16,22 82:7 87:2 89:8 90:7 96:25 97:9 98:17 99:1,5 104:6,25 109:18 110:18 112:5,13 123:9 129:16 137:25 146:3,18 148:10,16 150:19 152:5 153:2,10,14 156:10 161:20 163:17 164:12 166:19 167:19

grounds [1] 9:21

group [1] 57:24

groups [1] 24:15

Grow [10] 77:7 89:3 96:9 97:10 98:5,11,20,24 163:13,19

guarantee [2] 49:11 95:9

guaranteed [4] 164:7 165:17 167:10 168:7

guarantees [1] 167:7

guard [3] 34:18 61:17,22

guards [8] 25:12 30:19 33:19,20 56:8 60:17 65:16 65:19

guilt [1] 33:24

guilty [13] 20:19 34:2,11 36:20 54:10 147:14,17 148:2 149:13 153:21 154:3 166:22 167:15

guitar [11] 118:10,19,22 119:6,11 120:6,18 121:10 122:17,22,24

guy [11] 32:14,18,22 33:15 39:17 56:13 57:20 78:3 96:9 97:9 147:15

— H —

H [4] 5:16 119:18,21 122:2

habeous [2] 15:8,19

half [1] 13:25

hallucinating [1] 84:13

hamper [1] 107:15

handed [1] 25:13

harassed [4] 18:15 58:5 59:24 102:23

harassment [2] 102:8 102:19 104:14

hard [1] 119:8

hardcore [2] 108:8,9

harm [2] 58:8 60:8

Harrisburg [1] 3:10

he'd [1] 23:16

head [9] 12:21 19:4 40:3 90:23 95:3 128:8 131:19 133:14 154:10

hear [2] 56:10 129:25

heard [4] 11:11 29:6 129:24 166:14

hearing [43] 7:20 25:19 25:22,23 26:3,5,14,20,25 27:5,9,11 28:5,8,9,15,21 29:14 30:8,9,15,16,21,22 31:6,18,24 34:6 51:18 52:11,15 53:8,11 54:17 54:23 75:9 80:19 116:22 132:11,18 135:11 148:4 166:14

hearings [1] 133:15

held [3] 26:14,20,25

helped [1] 150:2

Hepatitis [1] 111:6

herein [1] 2:4

hi [1] 85:9

Hill [3] 12:11 34:25 35:4

history [16] 110:18 148:12 150:24 152:6,8 153:11 154:22 155:15 156:11,22 157:15 159:13 160:16,17 161:22 163:2

Hoe [3] 129:10 130:11,12

hold [3] 10:6 43:8

hole [20] 13:24 16:3,6,8

17:10,12,17,21,25 33:9
58:4,24 59:8,16 106:9
107:6,12 109:11 127:22
131:24

home [5] 18:15 23:14
121:17,18,19

Horn [16] 22:18 36:2,25
37:19 48:7 57:1 64:4
65:20 72:7 73:4 108:21
109:16 110:10 132:13
151:6,22

Hornung [2] 137:23
159:16

hour [1] 25:20

hours [2] 62:13 63:17

housed [2] 17:9 18:1

housing [1] 16:6

-I-

identification [7] 43:1
55:25 72:2 81:10 101:12
117:7 119:23

IDENTIFIED [1] 5:4

identities [5] 27:16 98:6
98:8,13 99:7

identity [1] 99:20

ignoring [1] 64:10

illogical [2] 54:7,9

imagine [1] 101:4

immediately [3] 19:25
44:6 77:8

impartial [2] 133:19
134:17

impression [3] 76:21
78:7 80:4

improper [1] 111:20

Impulse [1] 93:8

inaccurate [3] 96:19
149:4 167:22

inactions [3] 151:3,20
157:3

inadequate [2] 86:20
88:3

inadequately [1] 81:24

incident [12] 48:3 53:15
56:5 57:6 77:16 139:2,4,5
139:7 150:3,4,5

incidents [1] 148:17

include [3] 164:18,20
165:12

included [4] 82:1 89:15
92:12 143:21

includes [5] 86:20 87:17
87:19 142:7 164:23

including [2] 12:10
138:24

incorrect [1] 16:5

indeed [1] 102:21

indicate [3] 49:4 50:7
64:2

indicated [3] 48:19,20
53:13

individual [2] 145:18
150:12

individuals [1] 35:24

influence [1] 11:23

informant [1] 27:15

informants [2] 32:19
33:3

information [29] 7:15
8:4 12:1 26:13,17 32:11
76:16,18 82:2,8 86:11,12
89:11 90:11,12,14 91:8
91:13 92:4,6 135:18
137:13,16 145:25 149:1,4
159:7 163:22 167:22

informed [14] 18:8 22:2
26:19 29:2 40:6 44:4,11
72:5 77:6,8,23 120:7
129:9 130:12

informing [1] 74:20

initial [4] 43:3,11 110:11
153:2

initialed [1] 43:15

inkling [1] 27:25

inmate [9] 5:11,13 29:6
45:2 53:13 136:17,18,20
137:1

inmates [2] 19:19 120:22

innocent [1] 149:14

inside [1] 120:20

instance [1] 106:20

instances [2] 114:2
144:3

institution [7] 22:14
63:22 119:7 120:14,21,23
121:11

institutions [5] 12:15
12:18 68:20 104:7 121:20

insufficient [1] 54:15

intend [2] 41:14 44:1

intensity [1] 63:5

intentially [1] 47:21

intentional [4] 22:19
89:6 95:5 104:22

intentionally [9] 51:4
51:23 54:6 81:25 86:14
88:2 122:16 141:4 155:7

intentually [1] 28:7

intercom [5] 129:10,18
129:20 130:1,11

interim [1] 18:16

interview [8] 18:17,20
89:3 91:1,5 97:21 99:18

interviewed [1] 97:9

inventory [3] 107:11
139:16 143:11

investigate [5] 109:22
138:5 152:3,17 159:10

investigated [1] 163:23

investigating [1] 150:22

investigation [2] 32:16
36:15

involved [2] 57:17,19

Iseley [25] 1:5,14 2:3 3:3
4:3 7:3,8,17,23 11:14 12:6
12:24 22:16 37:1 41:22
42:18,20 43:15,24 70:9
70:12 72:4 74:5 75:6
108:21

Iseley's [1] 42:17

Isely [1] 37:23

Islam [2] 100:6,10

Islamic [6] 66:3 100:1
102:13 106:4 144:21
164:16 166:20 167:19
168:10

issue [6] 66:13,14 104:1
110:21 122:10 137:24

issues [2] 72:14 159:10

item [1] 9:13

items [4] 106:10,22,25
118:12

-J-

J [1] 154:11

jail [1] 147:14

jailhouse [23] 52:7 57:13
104:3 110:19 141:16
146:16,19 148:12 149:9
150:24 152:6 153:12,23
154:5,22 155:15 156:11
156:22 157:15 160:18
161:11,23 163:2

James [1] 158:13 159:2

January [12] 1:15 2:12
59:11,15 72:25 74:19 75:6
77:22 106:7 109:7,10
132:3

Jason [1] 163:13

job [14] 44:13,17,19 45:11
45:12,17,18,19,23 46:6,9
46:21,25 47:6

jobs [1] 44:23

Jones [1] 2:7

July [1] 13:2

-K-

K [1] 153:18

Kane [7] 132:19,25 133:6
134:22 136:8,19 154:11

Kane's [1] 137:8

keep [2] 63:16 168:6

keeping [2] 39:4 41:8

Kelley [1] 2:11

kept [4] 62:11 63:22
124:9 165:20

Kevin [1] 154:11

kicked [1] 60:4

kicking [1] 60:2

kill [3] 60:13 62:5 127:20

killed [1] 137:8

killing [1] 137:1

kind [1] 118:22

knew [13] 20:20 64:24
65:8,13 129:4 131:17
135:24 147:15,16 149:14
151:11,17 152:8

knowing [2] 87:10,13

knowingly [2] 86:25
88:12

knowledge [1] 136:4

known [2] 134:23 135:10

knows [6] 86:19,19 88:1
135:19,22 145:25

-L-

language [2] 51:7 52:1

large [3] 74:11 138:22
139:9

last [3] 74:25 75:5 165:23

law [4] 86:16 133:3
134:11,12

lawsuit [7] 7:12 60:18
62:6 106:14 108:18,20
127:8 129:16 138:14

lawsuits [15] 15:2 23:5
23:10 46:22 49:10 52:6
60:16,19,20 61:11 64:22
99:6 110:19 140:2 163:18

lawyer [21] 52:8 57:13
104:3 110:20 146:16,19
148:13 149:9 152:5
152:7 153:23 154:5,23
155:16 156:12,22 157:16
160:18 161:12,23 163:3

lead [2] 22:23 31:13 65:13

leads [2] 28:12 135:14

leave [5] 51:7 52:2 120:22
121:10,11

leaving [1] 121:15

led [2] 28:16 138:9

left [5] 30:24 54:3 55:7
121:6,8

legal [32] 12:7 13:3 14:20
18:12 19:11 20:7 22:22
35:18 37:22 38:9 39:17
46:10 47:8 48:9 51:11
58:10 60:10 64:7 72:10
73:6 82:7 87:3 89:8 96:25
97:6 98:17 99:1 104:6,25
105:18 106:24 109:19
110:2,4 112:5 126:23
127:3,11 128:25 129:7,16
139:10,24,25 140:14
141:3 142:10 146:3
153:13 162:13 164:1,14
166:18 167:18

legally [1] 134:18

length [1] 8:24

lenses [5] 114:18,21,24
116:5,11

less [3] 19:8 20:6 25:20

letter [2] 88:18,23

letters [4] 99:25 100:4,11
100:25

level [2] 130:4 145:15

Lewis [21] 3:6 4:5 7:7,9
41:20 42:3,11 43:2,13,21
55:17 56:1 71:17 72:3
81:5,11 101:5,14 117:10
119:16,24 168:20

lie [6] 80:9 121:2,4 122:12
124:3 132:23

lied [6] 28:7,13 47:21 48:2
78:3,19 79:10,25 155:7

lies [1] 158:24

lieutenant [3] 100:17
120:4 132:9

life [1] 75:25

light [1] 62:10

lights [3] 63:6,23 165:20
166:1,3

likely [2] 105:11 116:15

list [10] 12:16 68:12,15
68:24 69:6,9,15 71:7,10
92:8

listening [1] 50:15

lists [1] 67:14

literature [13] 100:1,5,6
100:8,25 101:3 102:14
104:4 144:22 164:17
166:20 167:20 168:10

litigation [2] 3:8 76:6

lock [1] 44:5

locked [4] 32:15 95:15
127:19 130:13

Long-term [1] 16:12

longer [1] 49:12

look [9] 14:16 34:1,10
35:22 36:5 39:18 74:3
124:25 135:2

looked [1] 125:2

loud [2] 10:16 116:2

low [1] 63:5

lying [1] 96:21

-M-

M [1] 3:6

M-A-H-A-L-L-Y [1]
161:17

M.S.P [1] 160:8

Mackreth [5] 44:4,14
46:16 47:13 163:7

magazines [4] 142:8,9
142:16,19

MAH0479 [1] 71:21

Mahally [2] 120:4
161:16

Mahanoy [28] 39:11
61:13 63:21 65:12,15 66:7
66:14 67:18 68:10,22 69:3
69:8,13,18 89:22,23 94:11
94:13 116:9 118:5,6
128:12,15 138:19 141:15
143:16 160:5 162:16

mail [8] 8:23 37:4 99:25
104:15 118:11 144:21
158:9 161:9

maintain [12] 45:25
47:23 48:25 49:14 58:10
62:6,21 63:21 87:4 102:14
118:15 130:5

maintained [1] 44:7

maintaining [2] 46:6

make-up [2] 48:23 49:19

maker [1] 44:12

man [2] 75:24 78:19

manager [2] 21:24 90:25

March [2] 101:8 115:23

Mariska [1] 2:2

mark [5] 41:17 55:21
71:24 81:6 119:18 122:1

**marked - personally**      **Multi-Page™**

122:6,8 166:5

**marked** [7] 42:25 55:24
72:1 81:9 101:11 117:6
119:22

**Marva** [1] 156:6

**Maryanne** [2] 3:6 7:9

**masks** [1] 32:21

**material** [4] 100:22
106:5 108:13,14 110:4
127:3,12 141:3 164:14

**materials** [4] 37:22
126:23 129:1,17 138:25
139:7 140:8,15

**matter** [4] 12:20 19:6
98:11 138:6

**matters** [1] 8:11

**maximum** [1] 14:4 33:9

**may** [3] 9:15 108:23
110:24

**Mazzotta** [2] 21:23
22:17 148:5

**meal** [4] 66:25 67:2,4,9
67:12,17,22,24 68:12,15
164:16

**meals** [4] 66:22,23 70:17
70:23 168:9

**mean** [15] 23:22 25:1 61:8
66:19 72:17 73:12 112:18
118:1 121:7,12 125:16
128:20 134:24,25 136:1

**meaning** [1] 57:19

**means** [3] 30:2 91:17
103:21

**meant** [1] 121:21

**medical** [1] 111:1

**medically** [1] 70:15

**meet** [1] 65:3

**meeting** [1] 75:23

**meetings** [1] 75:21

**memo** [5] 5:12,15,16
74:18,23

**mental** [1] 62:19

**mentally** [1] 62:14

**mention** [1] 12:19

**menu** [1] 66:9,12 68:23
68:24 69:6,7,14,15,24
71:14

**net** [1] 98:1

**Meyers** [19] 17:18 18:7
21:23 22:18 23:8,9,20,23
24:16 36:1,24 37:19 39:24
39:25 146:11,13,22 147:9
147:10

**Middle** [3] 1:2 7:19
140:5

**Might** [1] 43:10

**mind** [1] 11:3

**mindful** [1] 10:14

**minding** [1] 85:5

**minute** [4] 42:14 66:18
67:6 78:22

**minutes** [1] 78:22,23
79:2

**misconduct** [39] 5:5,9
20:22 24:19 25:3,5,14,18

25:21 26:8 27:4 31:18
32:7 33:25 35:8,9,12
42:15 51:5,24 52:4,14,15
53:6 54:12 56:17 57:5
59:2 102:9,20 103:18,19
127:15 132:1,5 138:10
149:13 153:22 156:21

**misconducts** [8] 20:17
104:9 136:7,11,14 145:8
147:15 152:4

**misleading** [1] 82:1

**missing** [17] 92:4,7,9
93:4,11 94:22 96:18
106:11,18,24 138:24
139:11,13 141:11 142:7
143:8 162:18

**Mitchell** [25] 25:23,24
28:7,13 30:9,16,23 31:7
32:4 33:22 34:3,6,6,9,17
36:11,17 148:4 149:10
150:5

**Moe** [1] 89:4 99:15

**money** [11] 113:7 114:20
117:9 123:23 124:7 125:5
136:18 156:10 165:11
166:17 167:17

**month** [1] 59:9 109:5,6

**months** [5] 17:22,24
18:21 40:17 65:4

**morning** [1] 7:8 19:1

**most** [3] 78:23,24 113:21

**mostly** [2] 140:1,10

**motions** [2] 15:1 140:15

**move** [2] 12:2 17:2

**Ms** [7] 84:6 94:19 115:20
116:9 149:5 153:9 159:25

**Muslim** [3] 100:18
102:11 137:3

**Muslims** [1] 135:4

**must** [4] 21:1,4 68:23
69:14

**-N-**

**N** [3] 3:1 4:1 7:1

**N-O-V-O-T-N-E-Y**
[1] 154:17

**NAH0479-98** [7] 70:11

**NAH014699** [1]
119:20

**name** [36] 44:24 65:17
85:6,8 87:23 97:22 136:22
149:22 150:12,13 151:6
151:24 152:23 154:11,16
155:3,21 156:6,15 157:9
158:13 159:21 160:2,22
161:2,5,16 162:2,20,21
163:6,7,9,10,12,13

**named** [9] 35:25 94:15
145:20 146:11 148:18
149:10 153:18 159:2,16

**names** [1] 50:4,19,20 93:9
97:15,17,20 98:2 100:7

**necessary** [1] 63:6

**need** [7] 7:15 8:10 159:24

**never** [7] 13:6,25 45:18
45:19 46:5,24 49:13 57:6
63:9 75:24 79:21 82:10

82:17 83:4 86:4 89:15
95:1 102:13 106:15 117:8
120:2 124:18,20,22
126:18 142:3 163:23

**new** [1] 76:3

**next** [7] 15:5 18:24 19:1
19:7 45:23 109:6 145:15

**nigger** [11] 33:17 34:1,10
34:13 36:19 100:18
102:11 127:21 131:7
138:15 150:6

**niggers** [2] 144:16 149:20

**night** [3] 63:6 130:20
165:21

**none** [7] 6:4 19:8 20:6
26:7 53:13,19 54:20

**nonsense** [1] 113:24

**Nope** [1] 59:23

**notary** [1] 9:5

**notation** [1] 53:10

**noted** [2] 99:11 163:23

**nothing** [4] 24:12 50:22
68:11 94:13 131:3 141:19
143:4 147:25 158:5

**notification** [1] 45:14

**notified** [2] 64:3 89:5

**notifying** [1] 130:10

**November** [1] 81:13

**Novotney** [2] 154:16
155:1

**now** [32] 8:13 10:6,10
14:13 19:7 43:10,11 44:5
56:13 74:12,14 96:12,21
107:23 109:2 111:24
122:24 127:25 138:16
145:11,16 147:3 151:23
152:22 153:17 154:15
155:2 164:25 165:13
167:4 168:2,14

**number** [27] 5:4,6,10
7:18 19:25 38:3 40:10,17
42:15 44:1 47:5 49:3 51:2
51:9 52:18 59:2 70:11
71:21 73:21 74:12 108:22
111:13,16,17 119:19
128:1 164:1

**numbered** [1] 127:25

**numerous** [2] 12:8 15:1
106:10 127:8 142:8

**-O-**

**O** [1] 7:1

**oath** [2] 8:6 11:15

**obey** [1] 59:6

**object** [2] 9:18,21

**objection** [3] 6:1 10:9
10:10

**objections** [5] 9:14 10:2
10:5,11 32:2

**obligated** [1] 11:17

**obligation** [1] 134:18

**obscene** [2] 51:6 52:1

**obtain** [1] 21:4 165:6,8

**obviously** [1] 55:5

**occurred** [1] 59:3

**October** [1] 19:3

**off** [9] 12:21 19:4 40:3
41:19 43:12 90:23 95:2
133:13 154:10

**offer** [4] 31:25 52:20
133:20 166:15

**office** [9] 7:10 17:19 18:8
50:10 51:8 52:2 54:2 56:8
56:11

**officer** [1] 130:10

**officers** [1] 132:23

**offices** [1] 131:2

**officials** [5] 89:6 118:11
118:14 119:13 124:4

**once** [8] 7:9 34:18 62:4
75:5 84:17 88:9 90:19
138:4

**one** [23] 2:10 20:18 21:8
21:9 22:10 25:20 33:14
48:4 49:4 50:6 60:22,25
83:6 85:4,15 86:4 90:8
98:12 99:19 118:15 127:4
132:22 140:5

**ones** [3] 41:13 42:21
106:23

**opportunities** [1] 86:23

**opportunity** [7] 29:21
82:5 165:6,8 166:13,15
167:20

**opposed** [1] 26:10

**option** [3] 8:16,19 9:2

**options** [1] 8:14

**oral** [2] 8:5 52:23

**order** [22] 21:3,18 47:21
52:2 54:11,12,19,22 55:1
55:3,6 59:6 62:13 68:22
82:4 114:20,21 115:10,14
116:7 124:10,24

**ordered** [6] 114:14 116:6
123:9,22 124:11 127:2

**orders** [4] 55:14,15
130:15 140:16

**outside** [4] 30:25 31:1
56:8 123:11

**-P-**

**P** [3] 3:1,1 7:1

**P-E-E-K** [1] 162:21

**p.m** [4] 24:24 62:12,12
168:24

**padding** [1] 120:9

**page** [5] 5:1,3 6:1,3 75:5

**paid** [1] 136:21

**pair** [1] 114:14

**paper** [6] 26:16 29:11,13
29:23 30:1 75:12

**paragraph** [92] 12:24
14:15 16:23 17:15 18:6
19:7,24 20:5 22:1,17 28:6
31:5 33:7 34:16 35:15
38:2,3 39:6,9 43:25 44:10
46:2 47:5,18,19 48:4,18
48:19 49:3 50:6 51:2,9,20
51:21 52:17 54:5 57:2
58:2 61:25 62:1,9 63:25
64:1 66:2,6 72:4,24 75:1

75:7 76:2,15,23 77:6
81:12,22 86:13 89:1,5
99:11 102:1,5 104:17
105:15,16 106:6,12
110:23 111:18 112:1,23
114:13 115:25 117:11
118:8 120:3,18 130:8
131:21,22 132:17 134:21
135:3 136:24 137:20
143:5 144:2 145:3 165:14
166:24 167:5,7 168:3

**paragraphs** [8] 41:17,24
42:6,19 43:4,16 57:25
127:25

**parole** [54] 21:2,3,20
75:19,22 76:14,22 77:8
78:5,6,8 79:19 80:5,8 82:6
82:23 85:16,19,23,24,25
86:2,17 87:14,16,16 88:17
88:19 89:3 91:1,24 95:8,9
96:3,4,7,10,24 97:5,10
98:15,25 99:5 131:14,18
145:24 148:22 149:2,3
155:11 163:16 165:7,9
167:21

**part** [5] 27:4 53:9 79:22
132:7,14

**partial** [1] 166:14

**participate** [2] 21:5 90:3

**particular** [1] 120:8

**past** [2] 27:24 45:17

**patently** [1] 72:23

**pattern** [4] 62:16 87:9
112:25 117:13

**pay** [9] 8:25 46:10 47:7
111:20 136:6,17 165:4
166:17 167:2

**PBPP** [1] 76:25

**Peek** [2] 162:21 163:4

**pen** [1] 41:16

**pending** [10] 15:16 42:7
42:22 43:18 58:1 62:2
81:18 107:23 108:1 109:2

**Pennsylvania** [7] 1:3
2:9,12 7:10,19 87:15
134:2

**people** [6] 96:3,20 97:20
99:19 113:21 118:20

**percent** [2] 122:5 145:12

**percentage** [2] 138:23
139:10

**performed** [1] 81:14

**perhaps** [2] 12:19 91:7

**period** [2] 59:7 82:18

**periodically** [1] 130:25

**permission** [2] 42:8
164:12

**permits** [2] 86:15 88:2

**permitted** [10] 32:12
48:22 66:8 69:23 74:13
114:24 118:12,19 143:14
145:6

**person** [4] 30:3 45:1,14
129:14

**personal** [4] 106:11
138:23 142:20 167:16

**personally** [1] 24:1

personnel [1] 65:12
persons [1] 91:1
pertains [1] 110:22
petition [1] 15:8
phonetic [1] 96:10
photo [1] 100:9
photo-grey [5] 114:18
114:21,23 116:5,10
physical [3] 32:1 58:8
60:8
place [1] 53:14
placed [5] 16:2,16 17:12
72:25 74:21
Plaintiff [57] 1:6 14:16
16:24 17:17 18:9,11 19:9
28:9,10 30:18 31:8,12
35:16 37:18,18,21 38:8
44:5 47:8,23 48:6 49:8
50:12 51:6,2,25 54:7,18
54:25 58:7 62:15,18 64:6
72:9 77:10 81:15,16 82:4
82:5 86:23 87:2 95:10
101:24 102:7,11,12
109:17 117:15 118:13
123:8,10,15 127:6 131:13
132:21 141:21 144:5
Plaintiff's [9] 31:6 38:4
52:24 100:3 109:18
123:11 132:2 137:24
168:5
plan [9] 21:6,18 67:9
83:16,22 85:15 90:1,4,5
planned [1] 132:1
playing [1] 156:4
point [4] 42:6 71:8 74:7
74:25
Police [1] 15:18
policy [15] 76:3 111:12
111:13,15,16,17 117:13
117:21 125:11 133:2,6,8
133:14,17 134:7
population [25] 13:7,9
13:11,15,22 14:1,6 15:1,9
15:21,23 18:20,25 20:2
23:4 65:13 68:16,19,25
69:4,10,11,12 103:13
107:7
pork [13] 66:4,16,23 67:11
67:16 68:2,9,9 69:25 71:4
71:12 164:15 168:9
pornographic [2]
108:13,15
pornography [2] 108:8
108:9
possibly [1] 34:21
postage [1] 8:25
PPP [2] 22:20 81:17
practice [5] 87:9 88:6
113:1 117:13 145:24
PRC [2] 56:20,21
preliminary [1] 8:11
prescription [1] 114:15
prescriptive [14] 21:5
21:14,17 23:20,25 83:16
83:17,22 84:7 85:14 90:1
90:4,5,10
present [3] 28:9 53:14

53:20
presented [1] 32:9
preserve [1] 9:24
president [1] 118:2
pretenses [2] 80:2,3
pretty [2] 25:15 140:17
prevent [1] 11:21
Primarily [1] 20:18
principle [1] 64:18
prison [41] 13:2 14:4,18
16:25 17:1 18:10,14 32:22
35:18 37:21 38:5,6,9
39:11 45:20 46:11 47:9
48:10,23 51:10 56:7 63:13
71:3 75:11 81:19 82:7
89:6 94:7 108:5 118:11
118:14 119:3 121:16
123:4,9,16 129:16 132:3
149:2 166:19 167:18
prisoner [8] 24:23 35:20
117:16 133:4 137:2 138:2
144:8 168:11
prisoners [14] 34:20 49:6
49:7,17 50:1 113:2,3,19
117:22 120:16 135:4,21
136:6,7
prisons [6] 12:9 19:12
64:24 68:2 92:20,21
private [1] 123:12
PRO [1] 3:4
Probation [1] 87:15
problem [6] 67:13,15
79:17,18 95:16,18
Procedure [2] 2:5 8:5
procedures [1] 77:25
proceedings [2] 35:9
167:15
process [3] 121:13 167:6
167:10
program [23] 21:5,7,14
21:18,22 23:21,25 35:14
36:22 70:14 83:16,18,21
83:22 84:1,2,7 85:14 90:1
90:4,5,10 132:12
programs [16] 22:3 24:5
84:4 89:14 90:18 92:10
92:13,14 93:6,8,9,14,17
93:18,22,24
proper [1] 9:18
property [31] 19:15
20:11 41:4 104:15 106:11
106:17 107:9 110:1,2
112:15,17 114:12 124:21
125:22,24 138:13,23
139:10,15,20,22 142:7
143:7,12 161:20,22
162:25 163:1 165:10
166:16 167:16
protection [1] 168:6
protein [6] 70:13,16,19
70:21,23 71:11
prove [1] 33:4
psychiatric [1] 75:13
psychic [1] 131:20
psychological [23]
62:11,19 75:12,19 78:20
79:1 80:7 81:14,23 82:13

82:25 83:3,5 86:18 95:2
148:21 155:8,10 160:11
164:13 165:9,19 167:22
psychologically [2]
62:15 82:15
psychologist [1] 77:24
Psychologists [1] 84:11
publication [2] 37:3,5
37:17
publications [6] 106:13
106:19 107:8,14 108:3,16
punish [2] 77:10 134:19
punished [5] 144:6,10
167:11,12 168:10
purchase [7] 108:6
118:15 119:4 123:15
125:8,12,20
purchased [2] 123:3
125:9
purpose [1] 9:22
purposefully [1] 82:2
purposes [5] 7:21 39:5
41:8 43:24 52:25
pursuant [4] 2:4 40:15
76:5 130:14
put [18] 7:15 8:10 9:13
10:5,9,11,20 19:19 37:15
49:20 53:21 58:22 104:16
132:10 142:2,4 156:1
160:12

-Q-

quash [1] 82:4
questions [6] 8:8 9:15
30:18,23 84:15 145:19
quickly [8] 8:2 164:3,3

-R-

R [2] 3:1 7:1
race [22] 33:11,13 35:19
100:3,14 104:24 105:18
105:20 144:7,11 152:6
153:13,24 154:8,23
155:16 156:23 157:16
158:10 161:10,24 167:12
racially-motivated [1]
129:13
racism [3] 34:22 37:23
racist [1] 147:16
radio [27] 123:3,10,19,21
123:21 124:6,7,12,14,15
124:19,20,21,22,23,23,23
124:25 125:2,13,15,17,24
126:8,10,13,19
radio's [1] 124:16
raise [1] 122:10
raises [1] 120:10
rant [1] 50:11
raped [1] 34:19
rather [1] 142:16
rave [1] 50:11
read [12] 8:17 9:12 14:15
29:22 53:10 55:11 70:5,8
115:25 116:1 126:23
132:20

reading [2] 8:14 9:3
ready [5] 85:17,21,22
129:5 138:13
real [1] 136:22
reality [1] 108:12
realized [1] 109:8
really [8] 14:2 19:5 50:14
50:22 96:16 106:23 107:1
145:11
reason [9] 9:19 13:21
13:23 15:3 29:8 39:19
46:14 87:25 101:25
115:12 120:13
reasons [4] 53:1 68:8
74:20 106:16
receive [30] 26:8,13 27:3
28:2 29:25 30:4 45:12
52:14 59:19 63:1 66:8,11
67:2 68:23 69:6,13,23
70:1,13 74:18,23 75:2
80:13 98:9 101:19 102:1
107:11 115:12 116:8
122:15
received [25] 24:19 25:4
25:17 26:16 29:11,24 35:7
51:3,22 59:17 70:15 80:22
92:11 94:20 99:24 101:16
102:13 106:15 113:9
116:20 118:13 119:2
124:18 131:25 145:9
receiving [6] 25:20 53:5
112:12 115:19 119:13
120:25
recommendation [3]
21:2,19 165:7
recommendations [1]
95:9
record [23] 7:16 8:12 9:13
9:24 10:6,9,12,15 12:20
19:6 32:3 37:15 39:4 41:8
41:19,21 43:12,14 79:23
90:16 91:3 156:1 163:24
records [6] 46:24 83:4
86:3 92:12 95:22 140:15
164:13 165:19
recreation [4] 58:5 59:22
165:22,24
refer [3] 51:16 75:3 131:6
referenced [1] 20:18
references [1] 20:14
referring [3] 73:14 88:10
90:20
reflect [2] 41:21 43:14
refrain [1] 18:11
refresh [2] 8:1 59:1
refund [4] 117:15,20,23
123:12
refunded [1] 126:18
refunds [1] 117:16
refuse [5] 36:3 53:3 77:9
109:19 110:6
refused [31] 21:17,21
22:21 35:16,22 36:2,5
51:7 52:2,19,20,22,24
56:3 72:9 77:13 79:19
101:24 106:8 109:16
110:13 114:19 132:19

133:1,25 137:23 146:17
148:9 153:10 156:9 159:9
refusing [3] 54:11 59:6
162:25
regard [3] 7:22 9:14
120:5
regarding [20] 8:14 15:8
22:19 25:19 36:6 39:1
57:6 59:5 85:14 112:19
121:19 133:14 144:3,20
147:9 155:8 157:1,3 158:1
161:19
regular [5] 66:22,25
67:12 70:22 71:14
regulation [1] 134:1
regulations [4] 74:13
133:2 134:1,6
reimbursed [2] 122:15
122:16
related [4] 100:22 102:6
relation [1] 105:17
release [1] 158:10
released [10] 13:6 17:17
17:25 18:20,25 20:1 49:13
106:9 107:5 109:11
relevancy [1] 9:21
relevant [4] 9:20 52:13
81:22 144:4
reliability [8] 26:20,25
27:5,8,11 28:4,14,21
reliable [1] 27:23
religious [3] 68:8 144:25
164:21
relying [1] 86:17
remain [1] 166:4
remainder [1] 142:17
remains [1] 166:2
remedies [1] 145:5
remember [37] 11:4
12:15 15:13 18:3,17 21:6
22:12 37:6 40:23,24 45:6
50:20 53:5 77:18,21 83:24
92:17,22,23 93:3,7 94:3
94:12 101:22 108:3,19
111:24 112:9,12,14
115:19 120:25 128:23
141:1 143:22,23,25
remembered [1] 35:3
removed [1] 120:21
repeat [5] 10:24 50:23,24
repetitive [1] 36:8
rephrase [1] 10:24
replacement [1] 67:18
replied [1] 49:9
reply [1] 120:7
report [29] 5:5,9 24:19
25:18,21 26:9 28:8 30:5
51:9,24 52:4,15 53:6
54:12,16 82:14 83:3,14
86:3 103:19 127:16 132:1
148:21 149:14 153:22
155:9,10 158:24 160:12
reporter [3] 2:7 9:5 10:1
reporter's [1] 8:6
reporting [1] 158:23

**reports - surcharge**                    Multi-Page™

**reports** [10] 33:4 86:18
87:10 88:8 95:1 102:9,20
103:18 158:17 165:10
**represent** [1] 7:11
**reproduction** [1] 1:25
**reputation** [1] 57:12
**request** [8] 5:13 19:20
22:7,8 40:16,23 49:21
120:7
**requested** [1] 31:25
48:22 79:7
**requesting** [1] 114:17
**research** [4] 140:10,12
140:13,20
**resembles** [1] 120:19
**Resperation** [1] 164:21
**respond** [2] 50:9 87:22
**response** [29] 63:1,4
65:24 70:2,4 77:18,22
78:14 80:14,22 81:2 94:21
101:2,8,15,17,19 102:2
105:3,9 112:10,13 115:20
116:8,20 119:14,19 120:3
121:1
**responses** [3] 8:7 10:16
98:10
**restricted** [2] 16:6 69:11
**restriction** [2] 73:1,11
74:21
**result** [9] 24:10 26:9 38:6
38:18 59:2 103:19 111:19
140:24 143:2
**resulted** [1] 155:11
**retaliate** [20] 35:21 36:9
38:24 48:1,11 51:12 64:9
64:21 88:15 99:12 138:3
146:4 147:18 149:6,16
150:7 151:19 153:25
155:13 158:19
**retaliated** [12] 19:10,12
20:6 102:8,19 146:2,15
154:3 164:9,11 166:18
167:17
**retaliation** [70] 13:3,5
13:17 14:19,24 15:4 21:12
21:15 22:22,25 35:17
37:20 39:12 46:10,12 47:7
47:10,16 48:9 51:10 52:5
58:9 60:9 62:5 64:7 72:10
72:12 73:2,5,9 82:6 87:1
88:14 89:7 96:24 97:2,3
98:25 99:13 104:5,11,23
109:17 110:16 112:4
123:8 129:15 132:2
137:25 138:8,10 141:5
147:20 148:11,15 149:8
149:19 150:9 151:2 152:7
153:8 154:4,24 155:14
157:5 158:20 160:14
161:11 162:8 163:17
**retaliations** [1] 61:10
**retaliatory** [10] 38:4,7
38:12,19 39:14 47:22 52:4
52:13,25 129:12
**return** [2] 72:15,18
**reverts** [1] 141:12
**review** [15] 8:17,22 9:6
9:10 12:5 35:14 36:22

72:20,22 75:23 84:16
96:16 132:12 164:4
166:25
**reviewed** [4] 76:14 78:5
78:6 80:8
**reviewing** [1] 122:7
**reviews** [3] 55:13 87:17
96:11
**revoked** [1] 79:8,12,16
**revoking** [1] 77:2
**RHU** [6] 49:14 69:1 84:20
103:6,10 139:18
**Richard** [1] 156:15
**right** [28] 8:16 9:18 44:5
69:19 77:11 99:14,17
107:23 125:25 126:3
142:12 144:23 145:11
147:2 148:24,25 150:1
151:23 152:21 153:16
154:15 155:2 157:21
164:25 165:13 167:4
168:2,14
**rights** [33] 5:7 145:22
146:14 149:12 150:17
151:9 152:2,13,25 153:20
154:19 155:6,23 156:3,8
156:19 157:13,19 158:8
158:15 159:4 160:4 161:8
161:18 162:24 163:15
164:6,9 165:3,16 166:12
168:6
**Ringer** [2] 94:16,19
**riots** [1] 34:25
**Robert** [5] 116:21 146:11
151:24,25 157:9
**Rockview** [27] 12:12
13:2 14:7,12,14,19,23
16:2,8,15,20,25 17:4,13
17:20 18:10 20:8,13 21:7
22:15 24:8 38:6 39:16
89:21,23 94:8,9,10 160:6
**room** [5] 30:21,22 124:22
125:22,24
**routine** [1] 77:25
**RSP** [2] 14:18 18:10
**rule** [2] 69:17 108:11
**rules** [3] 2:5 8:4 9:16
**ruling** [2] 54:8,9
**run** [1] 66:15

## -S-

**s** [3] 3:1 7:1 154:13
**S-P-A-I-D-E** [1] 156:16
**Sally** [1] 158:7
**sanction** [2] 88:6,13
**sanctioned** [6] 33:8 64:5
104:20 151:13 158:16
160:10
**sanctioning** [1] 158:22
**sanctions** [2] 26:9 86:25
**Sara** [1] 148:18
**save** [2] 32:4 127:3
**says** [18] 16:23 23:2 29:6
51:21,21 53:11 55:8 70:9
74:7 78:13,13 96:5 109:10
109:14 111:25 120:5,18

137:11
**school** [1] 22:11
**SCI** [5] 24:8 69:12 116:9
118:5 143:16
**SCI-Coal** [1] 2:10
**scoot** [1] 31:21
**screaming** [1] 56:14
**SE** [1] 3:4
**search** [2] 102:24 103:3
**searched** [4] 19:18
103:13,14 126:22
**searching** [1] 103:1
**second** [1] 9:13
**seconds** [3] 54:2 56:12
78:22
**Section** [1] 3:8
**secure** [2] 21:1 165:16
**secured** [2] 167:8 168:5
**security** [8] 14:4 63:7
95:16,18 100:17 120:10
168:2,14
**see** [9] 29:2 31:20 49:22
53:25 56:9 64:23 74:24
91:14 121:16
**seek** [1] 117:23
**selection** [1] 69:7
**send** [12] 8:20 9:10 91:19
121:19 123:10,22 124:8
125:4,6 126:2,4,5
**sending** [1] 40:23
**sent** [4] 94:17 124:5,5
154:21
**sentence** [3] 31:9 33:10
33:12
**separations** [2] 13:13
14:1
**September** [4] 30:7,14
31:6,23 37:2,16
**sergeant** [3] 33:21 34:3
34:5,8,12 129:11 130:19
130:21 132:9
**series** [1] 8:8
**serve** [6] 66:16,23 67:16
68:2 69:25 71:4
**services** [1] 113:4
**serving** [2] 67:10,11
**set** [10] 57:3,8,10 142:8
142:22,23 144:12 146:16
147:13,21
**shave** [1] 58:15
**shaves** [2] 58:4,13 59:17
**sheet** [3] 53:22 88:25
139:15
**sheets** [2] 87:24 90:10
**shell** [1] 119:9
**short** [1] 54:2
**shoulders** [1] 10:21
**show** [4] 70:4 115:23
116:18 119:17
**shower** [1] 58:21
**showers** [5] 58:5,18
59:20 165:22,24
**shrugging** [1] 10:21
**side** [1] 78:25

**sign** [21] 8:17,23 9:12
66:11 70:14,18,20 75:12
75:18 76:11,13,20 77:1,3
77:9,13 78:4 79:19 80:1,6
116:4
**signature** [3] 79:8,11,16
**signed** [3] 31:16 76:5
79:4
**significant** [2] 138:6
159:12
**signing** [3] 8:15 9:3
77:17
**similar** [2] 147:5,12
**simply** [3] 10:1 31:8
50:10
**sitting** [1] 85:4
**situation** [3] 35:23 36:6
**six** [3] 17:7 134:7 136:23
**sleep** [2] 62:16,16
**slip** [3] 22:7,8 49:21
**slips** [1] 19:20
**slow** [1] 40:9
**so-called** [4] 52:7 57:13
104:2
**sodomized** [1] 34:19
**soft** [1] 120:9
**someone** [1] 65:25
**sometimes** [2] 61:24
85:1
**soon** [2] 19:9 127:7
**sorry** [2] 36:9 71:22
**sort** [1] 75:18
**sought** [1] 118:3
**source** [3] 27:15 32:19
33:3
**Spaide** [2] 156:16,25
157:6
**speak** [3] 82:19 84:8
130:9
**specific** [2] 116:19
120:11
**specifically** [3] 54:17
54:24 112:25
**spoke** [5] 81:16 83:8,11
83:15 84:6,24 85:12
**Square** [1] 3:9
**staff** [6] 5:14 45:1,14
53:13,20 116:9
**stand** [1] 24:1
**start** [2] 23:15 45:11
**starts** [1] 85:6
**state** [101] 12:7,9,25 13:1
14:2,17 16:25,25 17:16
18:6,10 20:5 22:1,21,16
24:17 30:13,17 31:5,23
34:16 35:15 37:1 38:4,6
39:9,11 44:2,10 45:22
46:2,9 47:6 48:6,21 49:3
51:2,8 52:9,18 54:4,14
57:2 60:7 62:3,9 66:2,6
72:5,24 74:12 75:8 76:1
77:5,15 81:21 86:13 95:4
96:23 99:10,22 102:5,18
105:16 106:6 110:23
111:18 112:23 114:13
117:11 123:7 126:20

127:1 128:2 129:9 131:4
131:22,23 132:17,25
133:1,2,25 134:1,11,12
134:21 136:24 137:20
138:21 141:2,20 142:6
143:5 145:3,9 164:1,8
165:1,14 167:7
**statement** [5] 38:22 39:1
144:2 147:23 148:1
**statements** [1] 41:11
**states** [5] 1:1 89:1 164:7
165:17 168:7
**stating** [5] 28:8 51:6,25
90:2 147:24
**status** [12] 35:20 52:7
104:2 110:19 133:3 138:1
141:16 144:8 146:16,19
153:22 168:11
**stems** [1] 137:1
**steno** [1] 8:19
**still** [15] 42:6 44:7 45:25
46:6 47:23 49:14 58:10
62:6,20 87:3 102:3,14
118:15 127:23 130:5
**stole** [1] 163:1
**stolen** [1] 12:17
**stop** [6] 11:5 17:19 19:22
37:5 67:6 97:6
**stopping** [1] 65:16
**store** [12] 123:4,12,16,16
123:23,24,25 124:10
125:6,9 126:5,6
**straighten** [1] 41:6
**Strawberry** [1] 3:9
**strike** [3] 43:9 97:24
125:7
**stuff** [17] 19:21 60:2
84:14 89:15 96:11 100:18
106:25 140:11,12,20
141:9 142:19,21,22
149:21 152:9 153:4
**stupid** [1] 44:12
**style** [1] 120:19
**submit** [1] 94:18
**subsequent** [2] 122:21
167:9
**subsequently** [3] 51:3
51:22 88:17
**such** [5] 11:22 18:9 86:25
88:13 118:12
**superintendent** [4]
40:22 74:18 77:19 80:16
**superlative** [1] 34:22
**supervisor** [1] 160:13
**supervisory** [1] 130:10
**supper** [1] 70:17
**support** [2] 33:24 54:15
**supported** [1] 54:8
**suppose** [7] 13:8 14:3
15:7 36:15 45:10 79:20
79:22
**supposed** [13] 82:24
85:23 91:10 107:16 109:4
111:9 113:20 126:17
133:18,20,21 134:8,16
**surcharge** [2] 111:21,23

**surrounding** [1] 139:6
**suspicions** [1] 96:20
**sustained** [2] 117:1,2
**SWORN** [1] 7:4
**system** [2] 74:2,9

**-T-**

**t** [17] 26:2 27:2,25 36:16
49:24 53:16,25 54:22 55:5
69:16 96:14 100:17
111:15 135:1 137:16
138:4 162:12
**T-R-E-S-S-L-E-R** [1]
149:23
**taking** [8] 7:21 8:6 31:4
37:7 64:11,13,15 144:20
**taunt** [1] 131:5
**TCV** [1] 84:2
**technical** [1] 142:21
**technology** [1] 93:1
**telling** [3] 30:12 124:9
141:9
**tells** [3] 44:22 96:11,14
**term** [1] 20:13
**termination** [1] 46:4
**Terry** [1] 147:4
**TESTIFIED** [1] 7:4
**testify** [1] 53:24
**testifying** [1] 11:21
**testimony** [5] 8:5 9:7
27:25 31:11 33:2
**thank** [2] 117:3 168:21
**therefore** [2] 14:5 116:5
**thereof** [1] 72:8
**third** [4] 107:15,19 108:25
142:18
**Thomas** [1] 159:16
**thought** [2] 34:13 35:3
**threat** [1] 95:19
**threaten** [3] 50:12 61:9
131:6
**threatened** [4] 58:7 60:8
62:4 127:16
**threatening** [2] 60:1
61:2
**three** [12] 17:22,24 18:21
30:17,23 78:23 79:2 83:8
83:11 84:23 85:13 97:12
**through** [14] 20:15 41:9
41:22 105:5 113:23
116:19 117:25 118:3
120:21 128:1 129:18,19
145:17 164:2
**throw** [6] 127:2,11 128:25
129:6 138:12 141:10
**thrown** [1] 131:24
**tickets** [1] 57:22
**times** [9] 62:13 71:15
83:9,12 84:22,24 85:13
95:14 128:16
**timing** [1] 15:5
**title** [3] 22:12 74:14 134:2
**today** [2] 7:20 11:15

**tomorrow** [1] 44:14
**too** [7] 26:17 40:7 74:11
161:4 163:11 164:23
167:9
**took** [11] 19:17 20:10
89:13 90:18 92:10,14,15
92:19,23 93:6 127:22
**top** [7] 12:21 19:4 40:3
90:23 95:3 133:13 154:10
**Township** [2] 2:10,11
**transcript** [3] 1:25 8:21
9:9
**transfer** [12] 13:4,18
14:23 15:7 17:13 38:5
39:14,19,21 81:18 85:17
85:21
**transferred** [13] 13:1
14:12,17 16:1,24 18:14
19:9 23:14 38:13 39:11
39:16 65:22 82:22
**transfers** [1] 121:19
**trash** [2] 127:3 129:1
**Tressler** [2] 36:1 149:22
**trial** [6] 9:25 10:3,3,7
127:7 164:15
**tribunal** [2] 133:19
134:17
**tried** [2] 97:16 98:6,7
124:2
**trouble** [4] 23:15 44:12
57:14,15
**troublemaker** [2] 49:12
95:17
**troublemakers** [1] 18:9
**true** [19] 19:8 44:15 46:7
47:24 49:1,15 53:17 56:4
56:11 62:7,21 87:4 96:13
120:15,24 123:13 130:6
137:14
**trust** [1] 9:4
**truth** [1] 11:18
**try** [6] 18:13 23:13,16 92:8
93:18 113:25
**tThe** [1] 35:14
**Tuesday** [1] 2:12
**TV** [2] 19:17 20:11
**twice** [1] 113:13
**two** [16] 8:13 27:4 58:19
58:22 78:22,23 79:2 84:22
97:14,20 99:24,25 100:4
100:11 122:8 165:23
**type** [16] 16:16 75:21,22
78:20 83:21 100:7,23
119:1 128:21 138:15
139:25 140:3,8,12 144:16
149:20
**typed** [1] 31:15

**-U-**

**U-N-E-L-L** [1] 158:14
**U.S** [1] 167:11
**unable** [1] 143:6
**unclear** [1] 10:23
**under** [10] 8:4,6 9:16
11:15,22 74:14 80:1

165:17 167:10 168:7
**undersigned** [1] 2:6
**understand** [8] 10:22,25
11:7,11,14 38:11 40:12
67:25
**understood** [1] 11:12
**Unell** [2] 158:13,25
**unfair** [4] 49:8 98:15 99:4
99:12
**Union** [1] 21:24
**unit** [3] 16:6 90:25 130:4
**United** [4] 1:1 164:7
165:17 168:7
**units** [1] 63:7
**unlawful** [1] 104:23
**up** [42] 12:22 31:15 32:14
32:16,18,23 36:11,13
42:13 44:5 47:17,21 48:2
48:12,13 57:3,8,11 66:11
66:18 70:14,18,20 71:19
78:3 82:23 85:16,19 89:24
109:23 114:9 131:18
132:11 141:11 144:12
146:17 147:13,21 148:17
150:2 153:4 155:9 158:23
**upheld** [1] 105:3
**used** [8] 39:15,20,23 51:6
51:25 61:15 62:10 108:10
**using** [1] 74:1
**usually** [1] 45:13
**utensil** [1] 34:21
**utterly** [1] 56:3

**-V-**

**vague** [1] 96:20
**Vaguely** [1] 119:15
**valid** [1] 74:15
**various** [1] 12:9
**Varner** [2] 38:17,23
**Varner's** [1] 38:18
**Verbatim** [1] 45:8
**verify** [1] 49:23 56:9
137:17
**version** [1] 132:20
**versions** [1] 52:23
**versus** [2] 7:17 108:21
**via** [7] 42:9 62:15 72:7
102:8,19 129:10 130:11
**viciously** [1] 34:18
**violate** [15] 148:23
149:12,25 152:12,24
153:19 156:2,19 157:20
158:8,14 159:4 160:3
161:17 162:3
**violated** [20] 145:22
146:13 150:17 151:9
152:1 154:18 155:5,23
156:8 157:13,18 161:7
162:24 163:14 164:6
165:2,15 166:12 167:8
168:5
**violation** [1] 86:15
**visit** [1] 111:1
**vs** [2] 1:7 42:18

**-W-**

**W** [1] 1:8
**W-A-K-E-F-I-E-L-D**
[1] 150:14
**wait** [1] 30:25
**waited** [1] 31:1
**waive** [2] 9:3 10:1
**Wakefield** [2] 35:25
150:13
**walked** [1] 56:12
**walking** [1] 127:18
**wants** [1] 68:6
**warden** [4] 36:24 90:24
90:25 147:6
**wasn** [1] 54:22
**weapon** [1] 62:11
**week** [2] 15:6 58:19
**weeks** [5] 58:20,22 73:22
74:10 125:14
**weird** [1] 93:9
**well-known** [2] 88:5
135:16
**Western** [3] 140:2,4,6
**white** [2] 136:7 144:17
**Whitman** [4] 22:18 36:1
40:1 147:4
**whoever's** [1] 93:25
**whole** [11] 21:25 32:22
38:14 71:8 82:14,16 89:13
90:7 104:1 110:21 113:23
**Wildenstein** [3] 137:22
159:22,25
**wish** [1] 165:11
**wishes** [1] 41:25
**within** [1] 74:10
**without** [2] 36:20 64:11
**witness** [3] 4:3 53:21
55:13
**witnesses** [9] 27:23
31:12,25 32:5,8 52:24
53:4,12 142:5
**woman** [4] 22:11 65:3
94:15 97:11
**wondering** [1] 144:16
**words** [5] 102:11 131:7,9
131:10,11
**worked** [3] 76:21 78:7
128:16
**worker** [6] 44:20,21,22
44:24
**write** [4] 90:17 93:24
95:15 98:12,18 118:1
**writes** [1] 95:20
**writing** [2] 94:19 132:22
**written** [4] 10:15 52:23
114:16 132:20
**wrong** [3] 67:8 70:25
125:24
**wrongful** [3] 46:4 47:22
104:19
**wrongfully** [3] 110:25
111:8 113:17

**wrongly** [1] 37:3
**wrote** [16] 65:20 82:13
87:18,21 88:18,22 94:4
98:5,7,14,22,24 99:3
114:9 115:8 146:7

**-X-**

**X** [1] 4:1

**-Y-**

**Y-O-U-R-O-N** [1]
160:3
**Yarnell** [3] 72:6 157:9
157:24
**year** [2] 13:24,25
**years** [3] 89:8 92:18
136:23
**yell** [3] 56:9,10 85:8
**yelling** [3] 53:25 56:14
85:6
**Yep** [1] 78:2
**yet** [2] 107:25 122:14
**Youron** [4] 77:7 160:2,5
160:20
**yourself** [1] 44:3

2001 WL 539470
--- F.3d ---
**(Cite as: 2001 WL 539470 (3rd Cir.(Pa.)))**
**H**

Only the Westlaw citation is currently available.

United States Court of Appeals, Third Circuit.

Michael A. WESTON; Deborah Weston, H/W,
Appellants,
v.
COMMONWEALTH of Pennsylvania d/b/a
Department of Corrections; State
Correctional Institution at Graterford; Dolores
Merithew.

No. 99-1608.

Argued Sept. 13, 2000.
May 22, 2001.

Male culinary service officer brought action against
Pennsylvania Department of Corrections (PDOC)
and female coworker alleging hostile work
environment sexual harassment and retaliation in
violation of Title VII and the Pennsylvania Human
Relations Act (PHRA). The United States District
Court, 1998 WL 695352, James M. Kelly, J.,
dismissed officer's hostile work environment claims
for failure to state a claim and subsequently granted
summary judgment to PDOC on officer's retaliation
claim, and officer appealed. The Court of Appeals,
Nygaard, Circuit Judge, held that: (1) PDOC was
not liable to officer for failing to prevent sexual
harassment by coworker or for its alleged failure to
reprimand her; (2) District Court erred in failing to
provide officer an opportunity to amend his
complaint so as to make allegations as to prison
officials' instigation or knowledge of the
harassment; (3) allegations in officer's complaint
stated a claim for hostile work environment; (4)
written reprimands were not adverse employment
actions; and (5) one-year period between suspension
of officer and his complaints of sexual harassment
did not support inference of causation between his
complaints and his suspensions.

Affirmed in part, and reversed and remanded in
part.

[1] Federal Courts ⬥763.1

170Bk763.1

Court of Appeals exercises plenary review when
examining a motion to dismiss for failure to state a
claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28
U.S.C.A.

[2] Federal Courts ⬥794
170Bk794

Court of Appeals examining a motion to dismiss for
failure to state a claim accepts the allegations of the
complaint as true and draws all reasonable factual
inferences in favor of the plaintiff. Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[3] Federal Courts ⬥763.1
170Bk763.1

Court of Appeals affirms a dismissal of a complaint
for failure to state a claim only if it appears certain
that a plaintiff will be unable to support his claim.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[4] Civil Rights ⬥145
78k145

In order to be actionable as hostile work
environment harassment under Title VII, harassment
must be so severe or pervasive that it alters the
conditions of the victim's employment and creates
an abusive environment. 42 U.S.C.A. §
2000e-2(a)(1); 29 C.F.R. § 1604.11(a)(3).

[5] Civil Rights ⬥145
78k145

In order to fall within the purview of Title VII's
prohibition against hostile work environment
harassment, conduct in question must be severe and
pervasive enough to create an objectively hostile or
abusive work environment, such that a reasonable
person would find hostile and that the victim-
employee subjectively perceives as abusive or
hostile. 42 U.S.C.A. § 2000e-2(a)(1).

[6] Civil Rights ⬥145
78k145

In determining whether a work environment is
hostile or abusive, for purposes of Title VII hostile
work environment claim, Court of Appeals looks at

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

numerous factors, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. 42 U.S.C.A. § 2000e-2(a)(1).

[7] Civil Rights ☞167
78k167

Under Title VII, employers have an affirmative duty to prevent sexual harassment by supervisors. 42 U.S.C.A. § 2000e-2(a)(1).

[8] Civil Rights ☞167
78k167

To bring a successful claim for a sexually hostile work environment under Title VII, employee must establish that: (1) he or she suffered intentional discrimination because of their sex; (2) discrimination was pervasive and regular; (3) discrimination detrimentally affected the employee; (4) discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) existence of respondeat superior liability. 42 U.S.C.A. § 2000e-2(a)(1).

[9] Civil Rights ☞145
78k145

When an employer's response to employee's complaints of harassment by coworker stops the harassment, there can be no employer liability for hostile work environment harassment under Title VII. 42 U.S.C.A. § 2000e et seq.

[10] Civil Rights ☞167
78k167

Pennsylvania Department of Corrections (PDOC) was not liable to male culinary service officer under Title VII or Pennsylvania Human Relations Act (PHRA) for failing to prevent sexual harassment by female coworker or for its alleged failure to reprimand her where PDOC had grievance procedure in place, officer knew of grievance procedure and used it, and coworker received written reprimand for violating PDOC's policies against sexual harassment. 42 U.S.C.A. § 2000e et seq.; 43 P.S. § 951 et seq.

[11] Federal Civil Procedure ☞1838
170Ak1838

In Title VII action where male culinary service officer alleged that he was subjected to comments, jokes, and jibes by inmates, and complaint against state department of corrections was dismissed for failure to state a claim, district court erred in failing to provide officer an opportunity to amend his complaint so as to make allegations, if possible, as to prison officials' instigation or knowledge of the events. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

[12] Civil Rights ☞145
78k145

Mere utterance of an epithet, joke, or inappropriate taunt in the workplace that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability. 42 U.S.C.A. § 2000e et seq.

[13] Federal Civil Procedure ☞673
170Ak673

Generally, in federal civil cases, a claimant does not have to set out in detail the facts upon which a claim is based, but must merely provide a statement sufficient to put the opposing party on notice of the claim. Fed.Rules Civ.Proc.Rule 8, 28 U.S.C.A.

[14] Civil Rights ☞145
78k145

Allegations in male culinary service officer's complaint, that coworkers, managers, and inmates made offensive comments, jokes, and jibes after officer filed grievance against female coworker who had massaged his back and touched his buttocks in front of inmates stated a claim against Pennsylvania Department of Corrections (PDOC) for hostile work environment under Title VII and the Pennsylvania Human Relations Act (PHRA). 42 U.S.C.A. § 2000e-2(a)(1); 43 P.S. § 951 et seq.; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[15] Federal Civil Procedure ☞673
170Ak673

Complaints need not plead law or match facts to every element of a legal theory.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

[16] Master and Servant ⇐30(6.10)
255k30(6.10)

To establish a prima facie case of retaliation under Title VII, employee must show that: (1) he or she engaged in a protected employee activity; (2) employer took an adverse employment action after or contemporaneous with the protected activity; and (3) causal link exists between the protected activity and the adverse action. 42 U.S.C.A. § 2000e et seq.

[17] Prisons ⇐7
310k7

Two written reprimands which were placed in male corrections officer's personnel file after he had complained about sexual harassment by female coworker and filed discrimination charges were not adverse employment actions, as required for his prima facie case of retaliation under Title VII; officer was not demoted in title, did not have his work schedule changed, was not reassigned to a different position or location in the prison, did not have his hours or work changed or altered in any way, and was not denied any pay raise or promotion as a result of the reprimands. 42 U.S.C.A. § 2000e et seq.

[18] Prisons ⇐7
310k7

One-year period between suspension of corrections officer without pay for alleged attendance problems and his complaints of sexual harassment by female coworker did not support inference of causation between his complaints and his suspensions, as required for officer's prima facie case of retaliation under Title VII; at least four other employees were dismissed for attendance problems during same time period, and decision to suspend officer was not made by his immediate supervisor to whom he had directed his sexual harassment complaints. 42 U.S.C.A. § 2000e et seq.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA, (D.C. No. 98-cv-03899), District Judge: The Honorable James M. Kelly, U.S. Magistrate Judge: The Honorable Thomas J. Rueter.

Thomas M. Holland, Jeffrey Campolongo, (Argued), Philadelphia, PA, Counsel for Appellants.

Randall J. Henzes, (Argued), Office of Attorney General of Pennsylvania, Philadelphia, PA, Counsel for Appellee.

Before BECKER, Chief Judge, NYGAARD, and AMBRO, Circuit Judges.

OPINION OF THE COURT

NYGAARD, Circuit Judge.

*1 Appellant Michael Weston filed a sexual harassment civil action against his employer, the Pennsylvania Department of Corrections ("PDOC"), and Dolores Merithew, a co-worker. Weston alleged violations of Title VII, the Pennsylvania Human Relations Act ("PHRA"), and Pennsylvania common law. Weston's Title VII claim was premised on a hostile work environment theory. Specifically, Weston asserted that he was subjected to a hostile work environment as a result of the PDOC's failure to discipline Merithew after she had physically touched Weston on two occasions, and as a consequence of the comments, jokes and jibes made by employees and inmates who had learned of the incidents. In addition, Weston alleged that, after he complained to the PDOC about this harassment, the PDOC retaliated against him by reprimanding him and transferring him to a less desirable position.

The District Court dismissed Weston's Title VII claim for "hostile work environment" sexual harassment as well as his state common law claims against the PDOC for failure to state a claim. The District Court granted summary judgment to the PDOC on Weston's retaliation claim. After a bench trial, the District Court entered judgment in favor of Weston and against Merithew on the remaining state law claims. Weston timely appealed. We have jurisdiction pursuant to 28 U.S.C. S 1291.

In this appeal, Weston challenges the District Court's disposition of both his hostile work environment claim and his retaliation claim. With respect to the hostile work environment claim, Weston asserts that it was error for the court to dismiss for failure to state a claim, as his complaint's allegations sufficed to make out a hostile work environment claim, particularly in light of the liberal notice pleading requirements contained in FED. R. CIV. P. 8. We decide that Weston's

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

allegations concerning the PDOC's response to the two incidents of physical touching were not adequate to state a Title VII hostile work environment claim, and we affirm the District Court's dismissal of that portion of Weston's complaint. However, we also conclude that Weston's allegations as to a hostile environment created as a result of the comments, jokes, and jibes made by co-workers and managers did meet the federal rules' liberal pleading requirements, and we therefore reverse the District Court's dismissal of that component of Weston's hostile work environment claim, and remand for further discovery and proceedings. Finally, in regard to Weston's averments as to a hostile environment created as a result of verbal harassment on the part of inmates, while we agree with the District Court that those allegations, as they currently stand, do not suffice to state a Title VII claim, we reverse the court's dismissal, and remand with instructions to grant Weston a specified period of time in which to amend (and amplify) that portion of his complaint.

With respect to the retaliation claim, Weston avers that it was error for the court to grant summary judgment, because he succeeded in creating a genuine issue as to the material fact that the PDOC took adverse action against him, in the form of two written reprimands and two suspensions without pay, as a result of his harassment complaints. We conclude that, under the circumstances present in Weston's case, the written reprimands do not constitute adverse employment actions. We further decide that Weston failed to present sufficient evidence to establish the requisite causal connection between the two suspensions and his complaints. Accordingly, we affirm the District Court's summary judgment grant on the retaliation claim.

I.

A. Factual Background

*2 Weston is a corrections officer at the State Correctional Institution at Graterford, Pennsylvania. At the time of this action, he worked in the Food Services Department as a trainer. His duties included supervising inmates who worked in the prison's kitchen. Merithew is also a corrections officer and held a similar position in the prison kitchen. Although testimony indicates that Weston and Merithew did not have an amicable working

relationship, on February 11, 1997, Merithew massaged Weston's back in the presence of inmates. Weston found this physical contact offensive and told Merithew to stop. Merithew laughed in response, but apparently discontinued the activity.

Three days later, Weston tore a visible hole in the seat of his pants. While his back was turned, Merithew placed her finger in the hole, touching his buttocks. As with the previous incident, this act occurred in the presence of inmates. Weston expressed his anger to Merithew and told her to leave him alone.

Weston complained to his supervisor about Merithew's actions, and she was given a written reprimand. Weston claimed that, as a result of Merithew's actions, he was subjected to offensive comments, jibes, and jokes made by co-workers, managers and inmates. According to Weston, the PDOC did not act in response to his complaints. In fact, Weston was reprimanded by the PDOC and transferred to a less desirable position.

B. Procedural Background

Weston sued both the PDOC and Merithew in the District Court. Weston alleged that the PDOC violated Title VII and the PHRA by failing to properly discipline Merithew after Weston's complaints and that Weston was subjected to repeated jokes, jibes, and offensive comments by co-workers, managers and inmates. He also claimed that the PDOC retaliated against him for complaining about Merithew's conduct by reprimanding him and transferring him to a less desirable position.

The PDOC first moved to dismiss Weston's complaint for failure to state a claim upon which relief may be granted. [FN1] See FED. R. CIV. P. 12(b)(6). On September 29, 1998, the District Court granted the motion to dismiss, in part. Specifically, the court determined that Weston's complaint failed to allege facts that showed the PDOC was negligent in disciplining Merithew, and it held that Weston failed to establish the PDOC's liability under respondeat superior. Further, the District Court found that the jokes and offensive comments Weston experienced after the incidents did not constitute a hostile working environment. However, the District Court denied the PDOC's motion to dismiss

Weston's retaliation claim.

After limited discovery, the PDOC moved for summary judgment on the remaining retaliation claim. Although Weston may have suffered adverse employment actions, the District Court held that he had not shown a causal connection between these actions and his complaints about Merithew's conduct. Even if he had established such a connection, the District Court suggested that the outcome would have been the same because the PDOC offered a nondiscriminatory reason for its actions. [FN2]

II. Motion to Dismiss--The Hostile Work Environment Claims

*3 [1][2][3] We exercise plenary review when examining a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Lorenz v. CSX Corp., 1 F.3d 1406, 1411 (3d Cir.1993). We accept the allegations of the complaint as true and draw all reasonable factual inferences in favor of the plaintiff. Id. We will affirm a dismissal only if it appears certain that a plaintiff will be unable to support his claim. Wisniewski v. Johns-Manville Corp., 759 F.2d 271, 273 (3d Cir.1985). Our review of Weston's complaint reveals two separate bases for hostile work environment sexual harassment--one concerning the conduct and actions of the PDOC and Dolores Merithew and one concerning unidentified "coworkers, managers and inmates." Complaint, P 18.

A. Hostile Work Environment Claims

[4] Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act make it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C.S 2000e-2(a)(1). [FN3] Hostile work environment harassment occurs when unwelcome sexual conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment. Meritor Savs. Bank FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (quoting 29 C.F.R. S 1604.11(a)(3)). In order to be actionable, the harassment must be so severe or pervasive that it alters the conditions of the

victim's employment and creates an abusive environment. Id. at 67, 106 S.Ct. at 2405; see also Spain v. Gallegos, 26 F.3d 439, 446-47 (3d Cir.1994).

[5][6] In Harris v. Forklift Sys., Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court clarified the elements of a discrimination claim resulting from a hostile work environment. In order to fall within the purview of Title VII, the conduct in question must be severe and pervasive enough to create an "objectively hostile or abusive work environment--an environment that a reasonable person would find hostile--and an environment the victim-employee subjectively perceives as abusive or hostile." Id. at 21-22, 114 S .Ct. at 370-71. In determining whether an environment is hostile or abusive, we must look at numerous factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." Id. at 23, 114 S.Ct. at 371. The Supreme Court recently reaffirmed Harris' "severe and pervasive" test in Faragher v. City of Boca Raton, 524 U.S. 775, 783, 119 S.Ct. 2275, 2283, 141 L.Ed.2d 662, ---- (1998), and Burlington Indus., Inc. v. Ellerth, 524 U.S. 724, 732, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633, ---- (1998).

[7][8] After the Supreme Court's Faragher/Ellerth decisions, employers must do more that merely take corrective action to remedy a hostile work environment situation. Employers also have an affirmative duty to prevent sexual harassment by supervisors. See Faragher, 524 U.S. at 793, 118 S.Ct. at 2293; Williams v. General Motors Corp., 187 F.3d 553, 561 (6th Cir.1999). Although the Supreme Court has not addressed hostile work environment claims arising from the actions of a co-worker, we have developed a framework for evaluating such a claim:

*4 Five constituents must converge to bring a successful claim for a sexually hostile work environment under Title VII:(1) the employee suffered intentional discrimination because of their sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of

2001 WL 539470
(Cite as: 2001 WL 539470, *4 (3rd Cir.(Pa.)))

respondeat superior liability.

Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990) (footnote and citations omitted); accord Kunin v. Sears Roebuck & Co. ., 175 F.3d 289, 293 (3d Cir.1999).

B. Hostile Work Environment Harassment and Merithew's Actions

In dismissing his complaint, the District Court determined that Weston could not establish a prima facie hostile work environment claim based on the PDOC's failure to adequately reprimand Merithew. It concluded that the alleged discrimination was not pervasive, regular, or objectively detrimental, and that respondeat superior liability did not apply.

Weston alleged in his complaint that the PDOC was liable for Merithew's harassment because it failed to prevent her from assaulting him and did not adequately discipline her. This argument has no merit. Our rule "envisions prompt remedial action when the hostile environment is discovered." Bouton v. BMW of N. America, Inc., 29 F.3d 103, 110 (3d Cir.1994). In other words, when the source of the alleged harassment is a co-worker, a plaintiff must demonstrate that the employer failed to provide a reasonable avenue for complaint, or, if the employer was aware of the alleged harassment, that it failed to take appropriate remedial action. Kunin, 175 F.3d at 293 (citing Andrews, 895 F.2d at 1486 (liability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action)); see also 29 C.F.R. S 1604.11(d)(1999) (employer is liable for co- worker harassment if it knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action .); Kracunas v. Iona Coll., 119 F.3d 80, 89 (2d Cir.1997).

[9][10] Under our jurisprudence, the PDOC's failure to prevent an act of co-worker harassment, in and of itself, does not end the hostile environment inquiry. After Weston officially complained about Merithew's conduct, she received a written reprimand for violating the PDOC's policies against sexual harassment. Weston does not allege that the offensive conduct continued after the reprimand. We have instructed that "an effective grievance procedure--one that is known to the victim and that timely stops the harassment--shields the employer from Title VII liability for hostile environment."

Bouton, 29 F.3d at 110. Moreover, when an employer's response stops the harassment, there can be no employer liability under Title VII. Kunin, 175 F.3d at 294 ("By definition, there is no negligence if the [sexual harassment grievance] procedure is effective.") (citing Bouton, 29 F.3d at 110). The PDOC's grievance procedure was obviously known to Weston (he filed a complaint) and, by his own admission, it was effective. Liability cannot be imputed to the PDOC for Merithew's conduct or for its alleged failure to adequately reprimand her.

C. Hostile Work Environment and the Comments, Jokes, and Jibes of Co-workers, Managers and Inmates

*5 Weston's complaint averred that the PDOC should be held liable for the comments, jokes, and jibes of inmates. In Slayton v. Ohio Dept. of Youth Serv., 206 F.3d 669 (6th Cir.2000), the Court of Appeals for the Sixth Circuit determined that, without more, objectionable conduct by prison inmates cannot, in and of itself, be a sufficient predicate for a hostile work environment claim. Id. We agree that "prisoners, by definition, have breached prevailing societal norms in fundamentally corrosive ways. By choosing to work in a prison, corrections personnel have acknowledged and accepted the probability that they will face inappropriate and socially deviant behavior." Id. (citations omitted).

However, this is not an absolute rule. Prison liability for inmate conduct may indeed apply when, for example, the institution fails to take appropriate steps to remedy or prevent illegal inmate behavior. See id.; Waymire v. Harris County, Tex., 86 F.3d 424, 428-29 (5th Cir.1996) (holding that because prison took prompt remedial action, jailer did not establish a hostile environment where a fellow jailer circulated sexually offensive inmate drawing). Moreover, we can find no authority which suggests that there is an absolute bar to Title VII liability when prison personnel encourage or instigate illegal inmate behavior.

[11] Weston's complaint indicates that he was subjected to comments, jokes, and jibes by unspecified inmates. Complaint at P 18. Absent further amplification--for instance that prison officials encouraged the inmate's comments, or that prison officials knew of the harassing conduct but

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

2001 WL 539470
**(Cite as: 2001 WL 539470, \*5 (3rd Cir.(Pa.)))**

failed to remedy it--this mere allegation is insufficient to state a Title VII claim. However, Weston should have an opportunity to amend his complaint so as to make allegations, if possible, as to prison officials' instigation and/or knowledge of these events. We believe the District Court erred in not providing Weston an opportunity to amend his complaint in this fashion. See FED. R. CIV. P. 15(a); Shane v. Fauver, 213 F.3d 113 (3d Cir.2000) ; Borelli v. City of Reading, 532 F.2d 950 (3d Cir.1976). We reverse the District Court and remand with instructions to grant Weston a specified period of time in which to amend the complaint.

Weston's second basis for employer liability is more complex. In his complaint, Weston alleges that he was subjected to "sexually offensive comments, jokes and jibes by fellow PDOC employees, managers and inmates." Complaint at P 18. On appeal, he has argued that the PDOC is liable for the jokes of its managers and Weston's co-workers because of the PDOC's negligent response to these comments. His central argument is that the jokes, jibes, and comments continued unabated, thereby creating a hostile work environment.

[12] While the Supreme Court has stated that Title VII grants employees "the right to work in an environment free from discriminatory intimidation, ridicule and insult," Meritor Savs. Bank, 477 U.S. at 65, 106 S.Ct. at 2405, it has likewise emphasized that not all workplace conduct that has sexual overtones can be characterized as forbidden harassment. See id. at 67, 106 S.Ct. at 2405-06. The alleged harassment must affect a "term, condition or privilege" of employment in order to fall within Title VII's purview. Id. Moreover, the Supreme Court has instructed that a plaintiff must allege that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted gender discrimination. See Oncale v. Sundowner Offshore Servs. Inc., 523 U.S. 75, 79, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998). The mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability. See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997).

\*6 Weston's complaint includes little detail about the content of the offensive comments, jokes, and jibes. Instead, it merely claims that they were the

result of Merithew's actions, and were made in retaliation for his filing of a grievance against her. See Complaint at P 18. By his own admission, the comments, jokes, and jibes were not directed at his gender. In fact, Weston's complaint fails to allege that he was targeted because of his gender. See Oncale, 523 U.S. at 79, 118 S.Ct. at 1002. Furthermore, the complaint makes no allegation that the conduct altered the conditions of Weston's employment or created an abusive environment in which he had to work. See Meritor Savs. Bank, 477 U.S. at 67, 106 S.Ct. at 2505-06 (quoting Henson v. City of Dundee, 682 F.2d 897, 9040 (11th Cir.1982)).

[13] However, at oral argument, Weston's counsel argued that his allegations were sufficient to survive a motion to dismiss based on our liberal notice pleading requirements. See FED. R. CIV. P. 8. Generally, in federal civil cases, a claimant does not have to set out in detail the facts upon which a claim is based, but must merely provide a statement sufficient to put the opposing party on notice of the claim. FED. R. CIV. P. 8; Remick v. Manfredy, 238 F.3d 248, 264 (3d Cir.2001); Foulk v. Donjon Marine Co., 144 F.3d 252 (3d Cir.1998). In Conley v. Gibson, 355 U.S. 41, 47-48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), the Supreme Court set out the proper role of pleadings:

The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. Such simplified "notice pleading" is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.

The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.

Id. (citations omitted); see also Universe Tankships, Inc. v. United States, 528 F.2d 73, 75 (3d Cir.1975) (notice pleading requires a party only to "disclose adequate information as the basis of his claim for relief."); Quinones v. United States, 492 F.2d 1269, 1273 (3d Cir.1974) ("[A] complaint

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

[14][15] Dismissal under FED. R. CIV. P. 12(b)(6) is inappropriate because Weston's complaint states a claim for hostile work environment and therefore provides adequate notice to the defense. Although Weston's allegations are not strong, they are nonetheless sufficient to meet our lenient standards of notice pleading. See, e.g., Brokaw v. Mercer County, 235 F.3d 1000, 1014 (7th Cir.2000). Complaints "need not plead law or match facts to every element of a legal theory." Krieger v. Fadely, 211 F.3d 134, 136 (D.C.Cir.2000) (quoting Bennett v. Schmidt, 153 F.3d 516, 518 (7th Cir.1998)); see also Powell v. Ridge, 189 F.3d 387, 394 (3d Cir.1999); Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C., 148 F.3d 1080, 1086 (D.C.Cir.1998) ("[A] plaintiff need not allege all the facts necessary to prove its claim."); Atchinson v. District of Columbia, 73 F.3d 418, 421-22 (D.C.Cir.1996) ("A complaint ... need not allege all that a plaintiff must eventually prove ..."); Gooding v. Warner-Lambert Co., 744 F.2d 354, 357-59 (3d Cir.1984) (eschewing "highly technical pleading rules, which only serve to trap the unwary practitioner," in favor of notice pleading;) accord Sinclair v. Kleindienst, 711 F.2d 291, 293 (D.C.Cir.1983) ("The Federal Rules of Civil Procedure do not require a claimant to set out the precise facts on which the claim is based.... 'Notice pleading' is sufficient."); Williams v. Washington Metro. Area Transit Auth., 721 F.2d 1412, 1418 n. 12 (D.C.Cir.1983); Fouche v. Jekyll Island-State Park Auth., 713 F.2d 1518, 1525 (11th Cir.1983).

*7 Discrimination and other civil rights claims are clearly subject to notice pleading. Conley involved a class action by African-American railroad clerks who alleged that their union had breached its duty of fair representation and discriminated against them in violation of the Railway Labor Act, 45 U.S.C. S 151. In reversing the Rule 12(b)(6) dismissal of the complaint, the Supreme Court rejected defendant's argument that dismissal was proper because "the complaint failed to set forth specific facts to support its general allegations of discrimination." Conley, 355 U.S. at 47, 78 S.Ct. at 99. Thirty-five years later, in Leatherman v. Tarrant County, the Court reaffirmed Conley and rejected the suggestion that a

" 'heightened pleading standard'--more stringent than the usual pleading requirements of Rule 8(a)--" should apply in civil rights cases. 507 U.S. at 164, 167-68, 113 S.Ct. at 1160-62.

Therefore, although we question the merits of Weston's claim for hostile work environment due to the comments, jokes, and jibes of his co-workers and managers, he has satisfied the extremely lenient requirement of notice pleading. We will reverse the District Court and remand that portion of the case with instructions to permit further discovery.

We note that, at this stage of the litigation, Weston does not present the most compelling of Title VII hostile work environment claims. Were this an appeal from a grant of summary judgment, we would be hard-pressed to reverse a disposition in PDOC's favor. However, this is an appeal from a 12(b)(6) dismissal and, although we consider the question to be an extremely close one, we conclude that Weston's allegations of a hostile work environment created by the remarks of co-workers and managers suffices to state a Title VII claim.

III. Summary Judgment--The Retaliation Claim

[16] To establish a prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 297 (3d Cir.2000); see also, e.g., Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir.1997); Krouse v. American Sterilized Co., 126 F.3d 494, 500 (3d Cir.1997) (describing the third requirement as a "causal connection"); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir.1989).

It is undisputed that Weston's sexual harassment complaint to his supervisor on February 15, 1997, and his similar inquiries on February 26, March 26, and April 25 were protected activities. See DiIenno v. Goodwill Indus. of Mid- Eastern Pennsylvania, 162 F.3d 235, 236 (3d Cir.1998). Moreover, his filing of a complaint with the Equal Opportunity Employment Commission on July 16, 1997, was also protected. See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir.1997).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**\*8** The District Court identified four adverse employment actions, the second element of a prima facie case. First, Weston suffered two suspensions without pay in June and August of 1998. It is not disputed that these suspensions were adverse employment actions. However, the parties disagree on whether the written reprimands on March 3, 1997, and May 15, 1997, can be similarly characterized. We have specifically found oral reprimands not sufficiently adverse to qualify under the statute. See Robinson, 120 F.3d at 1301 (holding that unsubstantiated oral reprimands and unnecessary derogatory comments were not adverse employment actions in a retaliatory conduct case). The District Court, however, found Weston's written reprimands distinguishable from oral reprimands and therefore held that they were adverse employment actions. In the circumstances of this case, we disagree.

A. The Written Reprimands

Title VII specifically prohibits action which would "deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee." 42 U.S.C. S 2000e-2(a). The Supreme Court has defined a tangible, adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 749, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998) . In the context of this case, Weston must show, among other things, that these written reprimands affected the terms or conditions of his employment.

The District Court believed that Weston satisfied this burden because the reprimands in question were written instead of oral. Additionally, the District Court stressed that the reprimands were placed in Weston's personnel file for a period of six months. [FN4] The District Court found that these reprimands rose to a level serious enough to trigger employer liability because of their "presumed" effect on compensation, terms, conditions or privileges of Weston's employment.

[17] We conclude, however, that Weston failed to establish how these two reprimands effect a material change in the terms or conditions of his employment. We cannot, therefore, characterize them as adverse employment actions. Weston's own deposition testimony indicates that he was not demoted in title, did not have his work schedule changed, was not reassigned to a different position or location in the prison, did not have his hours or work changed or altered in any way, and that he was not denied any pay raise or promotion as a result of these reprimands. Additionally, the reprimands were of a temporary nature. Because they were not permanently affixed to Weston's employment file, we cannot see how they changed or altered his employment status in any way. Moreover, Weston suffered no reduction in pay, reassignment, firing, or any similar employment action. Hence, we focus on whether there was a causal connection between Weston's protected activity and the two suspensions without pay that he received on June 12, 1998 and July 31, 1998. We note that the burden of establishing such a connection falls upon Weston. See Farrell, 206 F.3d at 279.

B. Causation

**\*9** On appeal, Weston presents several arguments that there was sufficient evidence to establish a causal connection between the filing of his complaints and his two suspensions. Initially, he argues that the timing of these events suggests a connection between his complaints and the adverse employment actions taken against him. With one exception, we have never held that timing alone can be sufficient to establish causation. [FN5] We conclude that the timing in this case is not unusual enough to become a causal link. [FN6]

[18] The one-day and three-day suspensions, which Weston received in the summer of 1998, were more than a year distant from his protected activities. Absent other evidence, we cannot infer causation. See Krouse, 126 F.3d at 504 (a nineteen month interlude between the protected activity and the alleged retaliation, without any other evidence of discriminatory animus in the interim, was insufficient as a matter of law to support an inference of causation).

Next, Weston argues that the District Court erred by not considering a "pattern of antagonism," which he believes was evident throughout the entire course of events. Weston relies on our opinion in Kachmar, where we held it was improper for the District Court not to consider evidence establishing such a pattern. 109 F.3d at 177. Kachmar is not

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

relevant to Weston's claims. In Kachmar, retaliatory termination occurred one year after the protected action. See id. at 177. Throughout the intervening year however, there were numerous circumstances that suggested termination might occur, including statements that the plaintiff was off the management track and that she should start looking for another job. See id. at 178. We concluded that the cumulative effect revealed a pattern of antagonism, which overcame any doubts raised by the temporal separation of events. Thus, we held that causation had been established. Unlike Kachmar, the alleged pattern of antagonism in this case did not portend any future retaliation. Instead, the adverse employment actions were discrete responses to particular occurrences. Whereas a pattern of antagonism was clear on the facts in Kachmar, there is no evidence in this case that the PDOC's actions were related.

Weston also argues that a causal connection can be established by the inconsistent explanations the PDOC provided for its reprimands. Inconsistent explanations can be an alternative method for establishing a causal link between a protected activity and adverse employment actions. See Waddell v. Small Tube Prods., Inc., 799 F.2d 73, 77 (3d Cir.1986). Weston contends that the PDOC gave inconsistent accounts of whether other kitchen employees had attendance records similar to Weston's. His argument is unclear. Assuming arguendo that an inconsistency exists, it still does not establish a causal connection because Weston's two adverse employment actions were unrelated to his attendance record.

Weston argues that the District Court erred by not considering whether the PDOC's proffered explanations for the adverse employment actions were a pretext for retaliation. Typically, pretext evidence is considered after a prima face case is established and the defendant has produced non-discriminatory or non- retaliatory explanations for that behavior. See Delli Santi v. CNA Ins. Co. 88 F.3d 192, 199 (3d Cir.1996) (noting that the familiar McDonnell-Douglas burden shifting dichotomy applies to retaliation claims).

*10 Weston is correct that pretext evidence can be relevant to causation. See Farrell, 206 F.3d at 287. As such, he argues that his two 1998 suspensions--justified by the PDOC as discipline for attendance

problems--were imposed in retaliation for his sexual harassment complaint. The PDOC's explanations, the argument continues, were pretextual. Such pretext, he maintains, evidences the PDOC's motivation, which is directly relevant to causation. In support of this position, he claims that other similarly situated officers were not disciplined.

Weston's argument that the "attendance" justifications for his suspensions were pretextual fails. First, Weston does not dispute that his poor attendance was a valid reason for the discipline he received. He merely argues that he was treated unfairly--that he was punished while other culinary service officers with the same attendance problems were not. However, as the District Court noted, there were at least four employees dismissed for attendance problems during the same period of time. In addition, the decisions to suspend Weston were not made by his immediate supervisor to whom he directed his sexual harassment complaints. Although Weston's supervisor did play a role in the suspensions, the suspensions were ultimately decided upon by a panel of three hearing officers. [FN7] Thus, retaliatory animus, whether for purposes of establishing retaliatory causation or pretext, cannot be ascribed to the hearing officers who made the suspension determination. See Jones v. School Dist. of Philadelphia, 198 F.3d 403, 415 (3d Cir.1999) (affirming a grant of summary judgment in a retaliation claim on the basis that the responsible persons had no information about the underlying protected discrimination claim).

Weston simply cannot create a genuine issue of material fact that his suspensions were imposed in retaliation for his sexual harassment claims. He cannot establish causation or pretext.

IV. Conclusion

In summation, we will reverse that portion of the District Court's dismissal of Weston's complaint as to the allegations that the comments, jokes, and jibes of his co-workers and managers created a hostile work environment for which the PDOC would be liable, and we remand the cause for further discovery and proceedings. With regard to that portion of Weston's complaint containing allegations that comments, jokes, and jibes of inmates created a hostile work environment, we reverse the District Court and remand with instructions to grant Weston

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

2001 WL 539470
**(Cite as: 2001 WL 539470, \*10 (3rd Cir.(Pa.)))**

a specified period of time in which to amend the complaint. We affirm the District Court's Fed.R.Civ.P. 12(b)(6) dismissal of Weston's complaint against the PDOC in all other respects.

We likewise affirm the District Court's grant of summary judgment in favor of the PDOC on Weston's retaliation claims.

> FN1. In his response to the PDOC's motion to dismiss, Weston conceded that his state law claims for assault, battery, intentional infliction of emotional distress, and negligent infliction of emotion distress were barred by sovereign immunity. Weston also abandoned his charge that his transfer to a less desirable position was a retaliatory action by the PDOC.

> FN2. Weston also sued Merithew individually. The District Court held a bench trial on June 1, 1999, and found that Merithew had committed a battery under state law. On June 3, 1999, the District Court entered judgment in favor of Weston and against Merithew and awarded compensatory damages in the amount of $1250.00.

> FN3. The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably. See, e.g., Smith v. Pathmark Stores, Inc., No. 97-1561, 1998 WL 309916, at \*3 (E.D.Pa. June 11, 1998) (interpreting the two statutes concurrently in a sexual harassment case); Clark v. Commonwealth of Pennsylvania, 885 F.Supp. 694, 714 (E.D.Pa.1995) (same in racial

discrimination cases).

> FN4. At oral argument, counsel for the PDOC confirmed this practice and additionally noted that although a written reprimand may remain in a correction officer's employment file longer than six months, a collective bargaining agreement prohibits the PDOC from using or making reference to any such reprimand older than six months.

> FN5. In Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir.1989), we found that an employee's dismissal two days after the company learned of his EEOC complaint was sufficiently persuasive evidence to satisfy the causation element of a prima facie case. Our holding in Jalil, however, is limited to the unusually suggestive facts of that case, which are not present in this appeal.

> FN6. We need not consider Weston's EEOC complaint. He does not argue that the PDOC was aware of this filing. See Jones v. School Dist. of Philadelphia, 198 F.3d 403, 415 (3d Cir.1999) (requiring that the party responsible for the adverse conduct be aware of the protected activity before causation can be inferred).

> FN7. Neither party addresses whether those hearing officers were aware of Weston's sexual harassment complaints. However, the PDOC does represent that the hearing officers were unaware of Weston's EEOC filing.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES ISELEY,           :

     Plaintiff         :

            :

     v.           :     No. 1:00-CV-00577

            :     (Judge Kane)

W. CONWAY BUSHEY, <u>et al</u>.,   :

            :

     Defendants     :

## CERTIFICATE OF SERVICE

I, Maryanne M. Lewis, Deputy Attorney General, hereby certify that on this date I caused to be served the foregoing Documents in Support of Defendants' Motion for Summary Judgment, by depositing a copy of the same in the United States mail, postage prepaid, in Harrisburg, PA., addressed to the following:

Charles Iseley, #AM-9320
SCI-Huntingdon
1100 Pike St.
Huntingdon, PA 16654

**MARYANNE M. LEWIS**
**DEPUTY ATTORNEY GENERAL**

**DATE: June 15, 2001**